**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **GARY C. and GALE B. WARREN** | : | |
| 809 Port Penn Road | : | |
| Middletown, DE 19709 | : | |
|    and | : | |
| **TOLL BROS., INC.** | : | |
| 250 Gibraltar Road | : | |
| Horsham, PA 19044 | : | |
|       **Plaintiffs,** | : | **Civil Action No.** |
| | : | |
|     **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **NEW CASTLE COUNTY** | : | |
| 87 Reed's Way | : | |
| New Castle, DE 19720 | : | |
|       **Defendant.** | : | |

<u>**VERIFIED COMPLAINT**</u>

Plaintiffs, Gary C and Gale B. Warren (**"Warrens"**) and Toll Bros., Inc. (**"Toll"**), by and through their undersigned attorneys, hereby bring the following cause of action against New Castle County (**"County"**). In support thereof Plaintiffs aver as follows:

**A.   INTRODUCTION**

1.    This action arises out of the County's attempt to restrict development in certain areas of the County through its refusal to extend sanitary sewer service to those areas or to allow private utilities to provide such service as permitted under the Delaware Code. The conduct of the County constitutes illegal monopolization and is a violation of the Plaintiffs' rights to substantive due process and equal protection as guaranteed by the United States Constitution.

**B.   THE PARTIES**

2.    Warrens are adult individuals and citizens of the State of Delaware residing at 809 Port Penn Road, Middletown, Delaware 19709.

3.    Toll is a corporation incorporated under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 250 Gibraltar Road, Horsham, PA 19044.

4.    The County is a political subdivision of the State of Delaware.

**C.    JURISDICTION AND VENUE**

5.    This civil action arises under the Clayton Act, 15 U.S. C. §26, the Civil Rights Act of 1861 and 1871, 42 U.S.C. §1983 , the Fourteenth Amendment to the United States Constitution, and the Federal Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.

6.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, §1343(a) and §1367 (a), 15 U.S.C. §26 and 42 U.S.C. §1983.

7.    Venue in the District of Delaware is proper and appropriate under 28 U.S.C. §1391(b) because the County is located in this District, the Properties (hereafter defined) which are at issue are located in this District and the events giving rise to Plaintiffs' claims occurred in this District.

**D.    FACTUAL BACKGROUND**

    **1.    <ins>The Properties Proposed to be Developed</ins>**

8.    The Warrens are the owners of approximately 134 acres of undeveloped land located in the County on the north side of Port Penn Road in St. Georges Hundred (**"Warren Property"**).

9.    Kenneth E. Lester is the owner of approximately 79 acres of undeveloped land located in the County on the north side of Port Penn Road in St. Georges Hundred (**"Land Owner #1 Property"**).

- 2 -

10.    Frank J. Diksa and Linda Llanso, Joan M. Good, John G. Gillespie, Diane Gillespie and Marcia M. Schrieber (collectively **"Land Owner #2"**) are the owners of approximately 130 acres of undeveloped land located in the County on the north side of Port Penn Road in St. Georges Hundred (**"Land Owner # 2 Property"**).

11.    John Elton Cole, Jr. and Constance Anne Owens and the Trustees of Constance Owens Revocable Trust (collectively **"Land Owner #3"**) are the owners of 142 acres of undeveloped land located in the County on the east side of Dutch Neck Road in St. Georges Hundred (**"Land Owner # 3 Property"**).

12.    Canal Farms, LTD (**"Land Owner #4"**) is the owner of approximately 149 acres of undeveloped land located in the County in St. Georges Hundred (**"Land Owner # 4 Property"**).

13.    Land Owner #1 Property, Land Owner #2 Property, Land Owner #3 Property, and Land Owner #4 Property are sometimes hereinafter collectively referred to as the **"Port Penn Properties"**.

14.    The Port Penn Properties and the Warren Property are currently used as cultivated land with associated residential and farm structures.

15.    Toll is the equitable owner of 118 acres of the Warren Property, and each of the Port Penn Properties (collectively, the **"Properties"**) pursuant to separate agreements entered into by Toll and each of the land owners providing for the purchase of the Properties by Toll.

16.    The Properties are located adjacent to each other and collectively contain approximately 616 acres.

17.    The location of the Properties is depicted on the map attached hereto as **Exhibit "A."**

**2.    Toll's Proposed Development of the Properties**

18.    Toll proposes to develop the Warren Property as a residential subdivision containing 126 single family dwelling lots and to develop the Port Penn Properties as a residential subdivision containing 273 single family dwelling lots and 232 townhouse lots (**"Proposed Developments"**).

19.    The County's Unified Development Code (**"UDC"**) regulates zoning and the development of land in the County.

20.    The Properties are located in the County's Suburban (S) Zoning District (**"Suburban (S) District"**).

21.    The Suburban (S) District permits a wide range of residential uses.

22.    Pursuant to the UDC, the Proposed Developments are permitted uses in the Suburban (S) District.

**3.    The UDC's Subdivision and Land Development Approval Process**

23.    The UDC requires an applicant seeking major subdivision or land development approval in the County to obtain approval from the New Castle County Department of Land Use (**"NCCDLU"**) of three plans, identified in the UDC as: (i) an exploratory plan, (ii) a preliminary plan, and (iii) a record plan.

24.    Section 40.31.112.G of the UDC provides that an applicant has twelve (12) months from the NCCDLU's first review of an exploratory plan to proceed to the next review stage, *i.e.* the submission, review and approval of the preliminary plan.

- 4 -

25.    The UDC requires the NCCDLU to approve the preliminary plan if it complies with all applicable ordinances, rules and regulations.

26.    Under the UDC, only after the preliminary plan is approved may an applicant proceed to the next stage of review, *i.e.* the submission of a record plan.

27.    Section 40.31.114 of the UDC requires the record plan to be in strict conformity with the approved preliminary plan.

28.    Section 40.31.114 of the UDC provides that "[r]ecord plan submissions shall not be accepted if the date of . . . receipt is greater that one (1) year from the date of . . . preliminary plan and TAC report for majors . . . ."

29.    The UDC requires the NCCDLU to approve the record plan if the plan complies with all applicable ordinances, rules and regulations.

30.    The UDC requires the record plan to be forwarded to New Castle County Council (**"County Council"**) for consent after it is approved by the NCCDLU.

31.    Section 40.31.114(c) of the UDC requires the County Council to consent to the record plan unless the NCCDLU does not confirm that the plan satisfies UDC requirements and complies with other applicable ordinances, rules and regulations.

32.    Section 40.31.390 of the UDC entitled "Time limits and expiration" provides in relevant part:

> A. . . . The time limits of a land use application decision contained in Table 40.31.390 shall be measured from the date of the written decision. *An application shall expire if the next required plan submission is not made within the prescribed time limits in Table 40.31.390.* The General Manager of the Department of Land Use may grant a three (3) month extension for circumstances beyond the applicant's control. . . .

- 5 -

\*      \*      \*

Table 40.31.390
TIME LIMITS

TABLE INSET:

| Application Type | Time Limitation (months) |
| --- | --- |
| Special use | 24* |
| Variance | 24 |
| Limited use | 12 |
| Zoning permit | 12 |
| Exploratory plan review letter | 12 |
| *Preliminary plan and TAC report* | *12* |
| Recordation of plan | 60** |

NOTES:

* Unless specified otherwise in the special use approval. The special use approval may also specify periodic review at which time the approval could be terminated.

** See sunsetting provisions of Article 1 for possible extension of this time limit.

*[Emphasis added.]*

**4.    Sanitary Sewer Aspects of the UDC Approval Process**

33.    Under the UDC, the Department of Special Services (**"Department"**) is a member of the County's Technical Advisory Committee (**"TAC"**). As a member of TAC, the Department provides comments to the NCCDLU on, *inter alia,* the sanitary sewer aspects of an applicant's preliminary land development plan submission.

34.    Article 5 of the UDC establishes limitations on the number of lots that can be developed on a property based upon the developer's ability to obtain, *inter alia,* sewage disposal service for the property (**"Sewer Concurrency Requirement"**).

- 6 -

35.     Section 40.05.300 of the UDC requires all developments to obtain adequate "[s]ewer service, either public or private (as may be permitted by this Chapter)."

36.     Section 40.05.000B of the UDC provides that:

> . . . . In all service areas in the County, *sewer capacity shall be provided on a first come, first serve basis* if and/or when sanitary sewer service becomes available, as determined by the Department of Special Services. *[Emphasis added]*

37.     Section 40.05.320 of the UDC requires that, prior to receiving final approval of a record subdivision or land development plan from the NCCDLU, a developer must obtain verification from the Department that sewer capacity is available or will be available at the time of the construction of the proposed development.

38.     Where there is inadequate sewer capacity, Section 40.05.520 of the UDC provides various options to a developer, including the option of constructing improvements to the sewer system.

39.     Section 40.05.520C of the UDC provides:

> The analysis required in Section 40.05.310 may result in a reduction in density. If the limiting value of the site carrying capacity results from the maximum resource capacity determination, the developer shall build within those limits. *If the limiting value of the site carrying capacity is established by the concurrency capacity determination, the following options are available to the developer.*
>
> *        *        *
>
> C. *Make improvements.* The developer can make improvements for traffic as approved by the County and DelDOT. *Improvements may be made to the sewer as determined by the Department of Special Services. In the Suburban zoning districts, sewer improvements may include the use of spray irrigation, provided that such a system has a minimum processing capacity of one hundred thousand (100,000) gallons per day and so long as the capacity of the system can be increased at a later time by an*

*additional fifty thousand (50,000) gallons per day.  Other types of large scale treatment systems may be permitted if approved by DNREC and the County Department of Special Services.  Such facilities shall only be permitted in Suburban zoning districts and shall only be constructed in accordance with the rules and regulations governing such systems as promulgated by DNREC and the County Department of Special Services.  All such systems shall be turned over to the County upon their completion and formal acceptance by the Department of Special Services.*  The developer may reach agreements with the school district or with a water supplier to make or fund improvements that would be available prior to occupancy. *[Emphasis added]*

40.    Pursuant to Section 2.05.301 of the County Code, the Department also maintains and operates sewage treatment and disposal facilities in the County whether "performed directly, by contract or by licenses as County Council by ordinance may from time to time determine."

**5.    The County's Sewer System in the Southern Section of the County**

41.    Chapter 22 of Title 9 of the Delaware Code empowers the County, *inter alia,* to plan, construct, acquire, reconstruct, improve, extend, operate and maintain any sanitary sewerage system and furnish the services and facilities rendered thereby. 9 Del. Code §2202

42.    Chapter 23 of Title 9 of the Delaware Code permits the County to establish sanitary sewer districts whenever contiguous territory containing "1 or more centers of population, whether incorporated or not, shall be so situated that construction of interceptor sewers, outfall sewers and sewage treatment plants will be conducive to the preservation of the public health." 9 Del. Code §2302.

43.    Section 2302(b) of Title 9 of the Delaware Code provides:

Within 30 days after posting of the notices of the establishment of the district in accordance with provisions of subsection (a) *of this section*, County Council *shall* pass a formal resolution establishing the district, which shall (1) contain a description of the boundaries of the district; (2) direct the Department of Public Works and the attorney of the County Council to procure the necessary land and

- 8 -

> rights-of-way by purchase, agreement, or condemnation in accordance with existing statutes; and (3) authorize the Department of Public Works to prepare maps, plans, specifications, and estimates, let contracts for and supervise the construction and maintenance of, or enlarging and remodeling of, any or all structures required to provide for the safe disposal of the sewage in the sanitary district. *[Emphasis added]*

9 Del. Code §2302(b).

44.     Section 2308 of Title 9 of the Delaware Code entitled "Construction of system adequate for future connections" provides:

> The County Council may construct and maintain main sewers and sewage treatment works in order to provide a satisfactory outlet for any subdivision which may at any future time connect submain or lateral sewers to it.

45.     Pursuant to Title 9 of the Delaware Code, the County elected to establish sanitary sewer districts in the County, *i.e.* the Northern New Castle County Sanitary Service Area and Southern New Castle County Sanitary Sewer Service Area ( the **"SSSA"**).

46.     The Properties are located in the SSSA, the area of the County bounded on the north by the Chesapeake & Delaware Canal, on the east by the Delaware River, on the South by Kent County, and on the West by Maryland.

47.     In the mid to late 1990s, the County developed plans to allow development of the SSSA, which, at the time was largely rural.

48.     In 1999, the County adopted the Wastewater Management Facilities Plan (**"Plan"**) for the SSSA.

49.     The Plan, as originally developed in 1999 and subsequently adjusted, provided that the demand for sanitary sewer service in the SSSA would be satisfied by a public sewer system.

50.     The Plan provided for the construction in the SSSA of a sanitary sewer conveyance system and two new facilities to treat and dispose of the sewage generated and to be generated by development in the SSSA, *i.e.* Water Farm 1 and Water Farm 2.

51.     By Resolution dated June 24, 2003, County Council reaffirmed the County's commitment to construct a sewer system in the County to accommodate the growth expected in the area. A true and correct copy of Resolution No. 03-093 is attached hereto as **Exhibit "B."**

### (i)     Water Farm 1

52.     Pursuant to the Plan, the County constructed, and presently operates in the southeastern part of the SSSA, a lagoon treatment and spray irrigation effluent disposal system (**"Water Farm 1"**).

53.     Water Farm 1 is permitted by the Delaware Department of Natural Resource and Environmental Control (**"DNREC"**) to treat and dispose of 1,800,000 gallons of sewage per day but has the design capacity to treat over 2,000,000 gallons per day.

54.     Water Farm 1 presently treats approximately 400,000 gallons of sewage per day.

55.     Water Farm 1 presently has available approximately 1,400,000 gallons per day of sewage treatment and disposal capacity.

### (ii)     Water Farm 2

56.     Having assumed the obligation to provide sanitary sewer service, as permitted by Title 9, the County approved funding for the design and construction of the second lagoon treatment and spray irrigation effluent disposal facility on approximately 900 acres of land owned by the Department in the central part of the SSSA (**"Water Farm 2"**).

- 10 -

57.    Water Farm 2 has been designed and permitted by DNREC.

58.    Water Farm 2 is designed to treat and dispose of 3,000,000 gallons per day of sewage generated in the SSSA

59.    Since Water Farm 2 has been permitted by DNREC, there is no impediment to the construction of Water Farm 2.

60.    Upon information and belief, after DNREC issued the permit for Water Farm 2, the Department let and awarded the contract for the construction of Water Farm 2.

### (iii)    The Combined Available Capacity

61.    The unused and available sewage treatment and disposal capacity of Water Farm 1, when combined with the permitted sewage treatment and disposal capacity that will become available when Water Farm 2 is constructed, will provide 4,400,000 gallons per day of unused sewage treatment and disposal capacity for the SSSA (**"Combined Available Capacity"**)

62.    The Combined Available Capacity can serve more than 10,000 new homes.

### 6.    The Public Service Commission

63.    On or about July 6, 2004, the General Assembly of the State of Delaware enacted Senate Bill No. 99 amending Title 26 of the Delaware Code to allow private utilities to provide wastewater treatment and disposal services and for the regulation of wastewater utilities by the Public Service Commission (**"PSC"**).

64.    Section 203D of Title 26 as amended established the procedure by which a private person or entity can obtain from the PSC a certificate of public convenience permitting it to engage in the wastewater utility business and provide wastewater utility services to fifty or more customers.

BPA/2699/110/1121818_7

65.     Section 203D(b) of Title 26 as amended restricts a private utility's ability to extend its service territory into a service area of a "municipality, government agency or wastewater authority or district without the approval of such entity and then obtaining a certificate of public convenience" from the Public Service Commission.

66.     Section 203D(b) of the amended Title 26 required, *inter alia*, all municipalities "engaging in or desiring to engage in the business of a wastewater utility" to "supply to the Commission a description of any existing service territory for wastewater service no later than 90 days after the enactment of this Act and shall promptly give notice and a description of any extension of wastewater territory or new wastewater service territory to the Commission."

67.     Pursuant to Senate Bill 99, by letter dated September 15, 2004 to the County Executive, the Regulatory Policy Administrator of the State of Delaware requested that the County identify its wastewater service territories.

68.     By letter dated September 30, 2004 to the Regulatory Policy Administrator of the State of Delaware, the Department enclosed maps depicting the County's sewer service areas and further advised that the County Code prohibited any entity other than the County or its assignee from owning, leasing, operating, managing, utilizing or otherwise maintaining any sanitary sewer infrastructure in the unincorporated areas of the County. True and correct copies of the September 30, 2004 letter and the accompanying maps are attached hereto as **Exhibit "C."**

69.     The map for the SSSA depicted three service areas: the Water Farm 1 service area, the Water Farm 2 service area and the Port Penn service area.

70.     According to the map, the Properties were designated within the Water Farm 2 service area.

### 7.    Toll's Plan Submissions

71.    In or about October 2004, representatives of Toll and the Department participated in a series of meetings to discuss Toll's proposed development of the Properties and the sanitary service needs of the Proposed Developments.

72.    In the meetings, the Department informed representatives of Toll that while the Department's facilities contained adequate capacity to serve the Warren Property and Port Penn Properties and while an existing large gravity interceptor (**"Interceptor"**) extended from Water Farm 1 part way to the Properties, a regional pump station, force main and gravity line would have to be installed to provide public sewer service to the Properties.

73.    By letter dated December 8, 2004, Toll informed the Department that it was willing to design and construct the necessary improvements to the public sewer system as permitted by Section 40.05.520 of the UDC so that sewer capacity would be available for the Proposed Developments. A true and correct copy of the December 8, 2004 letter is attached hereto and made part hereof as **Exhibit "D"**.

74.    On January 1, 2005, a new County Executive and his administration (**"New Administration"**) took office.

75.    In early 2005, representatives of Toll had meetings and discussions with representatives of the New Administration, the NCCDLU and the Department (collectively **"County Government Representatives"**) regarding the provision of sanitary sewer service to the Proposed Developments. During the meetings, County Government Representatives informed Toll representatives that the County's plan was to ultimately provide public sewer treatment and disposal for the Proposed Developments through Water Farm 2, but that unused capacity existed and would continue to exist in Water Farm 1 for some time and could be

- 13 -

"borrowed" by the Proposed Developments until additional capacity in Water Farm 2 is constructed.

76.    As a result of its meetings and discussions with County Government Representatives, on June 9, 2005, Toll wrote to the County and suggested several ways of providing sanitary sewer service to the Proposed Developments.  A true and correct copy of the June 9, 2005 letter is attached hereto and made part hereof as **Exhibit "E."**

77.    In the June 9, 2005 letter, Toll informed the County that: (a) sewage from the Warren Property (and adjacent properties) can be transported to and treated by Water Farm 1 by utilizing the existing pump station in the Augustine Creek Subdivision located a short distance from the Warren Property; (b) Toll was willing to construct a regional pump station on the Warren Property (**"Regional Pump Station"**) and a force main from the Regional Pump Station to the Augustine Creek pump station so that the Augustine Creek pump station could pump sewage from the Warren Property and the Port Penn Properties to the Interceptor for treatment and disposal at Water Farm 1; (c) instead of (or in addition to) constructing the force main from the Regional Pump Station to the Augustine Creek pump station, Toll was willing to construct a force main from the Regional Pump Station along Port Penn Road to Route 13, where it would turn south and continue to the Interceptor; (d) that the force main to the Interceptor could ultimately be turned west to convey the sewage from the Port Penn area to Water Farm 2; (e) as an alternative to all of the foregoing, Toll was willing to design and construct an on-site sanitary sewer collection, conveyance, treatment and disposal system (**"Community System"**), and; (f) upon completion of the Community System, Toll would convey the Community System to the County or to a private wastewater utility.

78.    During this time period, Richard Pryzwara, the General Manager of the Department repeatedly represented to Toll representatives that the County was committed to construction of sewer facilities that would serve the Proposed Developments.

79.    Relying on the County's representations and assurances that it would provide sanitary sewer service to the Proposed Developments, Toll expended substantial time and money in evaluating the suitability of the Properties for development, in preparing subdivision and land development plans for the Properties and by paying nonrefundable deposits to the landowners.

80.    Relying on the County's representations and assurances that it would provide sanitary sewer service to the Proposed Developments, on August 22, 2005, Toll submitted to the County an Exploratory Plan for the Warren Property.

81.    With regard to sanitary sewer service for the Warren Property, by letter dated August 11, 2005, the Department informed Toll:

> In response to the above-referenced request, capacity in the requested amount of 42,900 gallons per day will be available upon completion of the construction of Water Farm II Treatment Facility and all related New Castle County sewer interceptor lines to which the development can connect. However, please be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38. N.C.C.C. § 38-27.

A true and correct copy of the August 11, 2005 letter is attached hereto and made part hereof as **Exhibit "F."**

82.    Relying on the County's representations and assurances that it would provide sanitary sewer service to the Proposed Developments, on October 7, 2005, Toll submitted an Exploratory Plan for the Port Penn Properties to the County.

- 15 -

83.    With regard to sanitary sewer service for the Port Penn Properties, by letter dated October 13, 2005, the Department informed Toll:

> In response to the above-referenced request or plan, capacity in the requested amount of 138,600 gallons per day will be available upon completion of the construction of all necessary sanitary sewer infrastructure to which the DEVELOPMENT will connect. However, please be advised that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38. N.C.C.C. § 38-27.

A true and correct copy of the October 13, 2005 letter is attached hereto and made part hereof as **Exhibit "G"**.

### 8.    The New Administration

84.    Throughout 2005, County Government Representatives continued to represent to Toll and its representatives that the County would provide public wastewater treatment and disposal facilities to service the sanitary sewer needs of the Proposed Developments.

85.    Sometime during this same time period, the New Administration elected to reevaluate the County's sanitary sewage treatment and disposal plan for the SSSA.

86.    In June 2005, at the direction of the New Administration, County Council commissioned Red Oak Consulting (**"ROC"**) to evaluate the County's wastewater program in the SSSA.

87.    On January 25, 2006, ROC issued a report entitled, "Southern Sewer Service Area Waster Water Program Evaluation – Summary of Findings and Recommendations" (**"ROC Report"**).

88.    The ROC Report determined that the County's existing sewage treatment and disposal plan for the SSSA was inadequate because it only provided wastewater disposal for the

- 16 -

first one-third of developable properties in the SSSA and did not provide a regional utility-based wastewater disposal solution for the remaining two-thirds.

89.    The ROC Report concluded that "the provision of capacity for only the first third of landholders severely disadvantages the remaining two-thirds."

90.    The ROC Report, *inter alia,* recommended that the County: (a) abandon portions of its existing plan; (b) investigate several recommended alternatives simultaneously to determine the best long-term solution for providing sewer capacity and disposal in the County, and; (c) *implement a short-term strategy for allowing development to proceed while the County investigates and implements the best long-term solution*.

91.    The ROC Report recommended that in the short term the County, *inter alia*: (a) build conveyance systems to other areas of the SSSA where warranted by current development demand, by density or current County obligations; (b) modify or construct certain facilities for conveying sewage from the central and eastern portions of the SSSA to Water Farm 1 so as to maximize the amount of sewage that could be temporarily treated and disposed of by Water Farm 1; (c) temporarily maximize the amount of sewage being sent to Middletown for treatment, and; (d) if still inadequate to meet current demand pending determination of a long-term solution, construct storage, treatment and disposal facilities at Water Farm 2.

92.    The ROC Report recommended that developers with property interests outside service areas be presented with two alternatives, *i.e.* wait until the long-term sewerage plan for SSSA is finalized and the conveyance systems for that scenario are built or to allow developers who do not want to wait to build their own pipelines to tie into the County system at locations and to specifications dictated by the County.

93.     Sometime in 2006 after the issuance of the ROC Report, the New Administration secretly decided that it wanted to prevent development of the area of the County where the Properties are located and embarked on the course of conduct to prevent development of this area.

94.     Because (1) current zoning permitted the Proposed Developments, and (2) Toll had plans pending for the Proposed Developments which complied with the technical requirements of the UDC, the New Administration secretly decided that it could prevent such development by refusing to extend sewer service to the area of the SSSA in which the Properties are located.

95.     Until January 2006, County maps for the SSSA depicted proposed sewer lines along Port Penn Road to serve the properties bordering Port Penn Road including the Properties.

96.     In or about March 2006, the New Administration presented to County Council a revised sewer service plan for the SSSA which divided the SSSA into three separate sewer service areas, *i.e.* the Central Core Area, the area East of the Central Core Area and the area West of the Central Core Area.

97.     The New Administration arbitrarily and irrationally determined that only properties proposed to be developed in the southern portion of the area East of the Central Core Area could be permanently served by Water Farm 1 even though the Warren Property is located near the conveyance lines that convey sewage to Water Farm 1 and even though Toll had relied on County Government Representatives' representations that Toll could utilize the capacity in Water Farm 1 until Water Farm 2 was constructed.

98.     The New Administration arbitrarily, capriciously and illegally determined that only properties located in the Central Core Area would be permanently serviced by Water Farm 2 if and when it is constructed.

99.     The New Administration directed the Department to revise the SSSA maps to eliminate the proposed sewer line along Port Penn Road depicted on the January 2006 SSSA maps.

100.    Because the New Administration refused to consider or support any other plan for the SSSA, County Council enacted Resolution No. 06-0609 approving the New Administration's plan.  A true and correct copy of Resolution No. 06-0609 is attached hereto as **Exhibit "H."**

101.    Resolution No. 06-0609 provided that only those properties planned to be permanently serviced by Water Farm 1 and the properties in the Central Core Area "will receive exclusive priority to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006."

102.    The County's actions disregarded Section 40.05.00D of the UDC which required sewer capacity to be provided on a first-come-first-served basis.

103.    The County divided the sewer service areas in such a manner that no sewer service capacity is provided for the northern portion of the area East of the Central Core Area with no funding provided for any improvements in this area.

104.    Although the Department had earlier recommended that the Proposed Developments temporarily "borrow" capacity from Water Farm 1, the County refused to allow the Proposed Developments to connect even temporarily to Water Farm 1.

- 19 -

105.    Although the Department had earlier approved connection of the Proposed Developments to Water Farm 2, the New Administration placed an indefinite hold on construction of Water Farm 2.

106.    Prior to enactment of Resolution No. 06-069 some members of Council demanded the addition of the following language to the Resolution:

> Within eighteen (18) months of commencing construction of the components of the Central Core transmission system, the County will provide a detailed report and analysis of available sewer capacities in the Southern Sewer Service Area ("SSSA") to County Council. If it is determined at that time that the Council will be unable to provide sewer capacity for any active or recorded plan as of March 9, 2006 outside the Central Core transmission system, alternative sewer disposal options will be considered by the County."

107.    Upon information and belief, thereafter, at the direction of the New Administration, the Department terminated the contract it had entered into for the construction of Water Farm 2.

108.    Upon information and belief, the County paid the contractor over $350,000.00 for its consent to terminate the construction contract for Water Farm 2.

109.    After enactment of Resolution No. 06-069, Toll reiterated its three alternative offers to the County to build the infrastructure that would enable the Proposed Developments to connect to Water Farm 1, to build the transmission lines to the Central Core Area to enable the Proposed Developments to be serviced by Water Farm 2 when constructed or to build a Community System.

110.    The New Administration rejected Toll's proposals.

111.    The County has, in effect, arbitrarily and irrationally placed a moratorium on all development in the areas of the SSSA northeast of the Central Core Area and the area West of the Central Core Area.

112.    In or about late 2006, the New Administration proposed enactment of a proposed 2007 Comprehensive Land Use Plan.

113.    In the 2007 Comprehensive Land Use Plan, the County proposed that the area northeast of the Central Core Area where the Proposed Developments are located be reclassified as a "Possible Future Growth Area" even though development plans had been pending for the Properties and two other properties in the area for more than three years.

114.    Much of the northeast area of the SSSA is environmentally constrained so that a significant portion of the area is not developable. The Properties and two other properties in the area with pending development plans contain the majority of the developable land in this area.

115.    By reclassifying the area as a "Possible Future Growth Area" instead of a "New Community Growth Area" the County sought to justify its actions in postponing the delivery of sewer service to the area and thereby prevent development of the area altogether.

116.    The SSSA map dated June 14, 2007 depicts that no capacity is available in the area to the northeast of the Central Core Area where the Properties are located and that no improvements are funded for this area. A true and correct copy of the June 14, 2007 map is attached hereto as **Exhibit "I."**

### 9.    The County's Application of Its New Policy to Toll's Pending Plans

### (i)    The Warren Property

117.    On March 3, 2006, Toll submitted a Revised Exploratory Plan to the County

- 21 -

addressing review comments received from the NCCDLU's planning and engineering sections.

118.    By letter dated March 23, 2006, the Department reviewed the Revised Exploratory Plan and informed Toll that

> . . . At the time of this request, sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available.

A true and correct copy of the March 23, 2006 letter is attached hereto and made part hereof as **Exhibit "J."**

119.    By letter dated March 31, 2006, NCCDLU's planning and engineering sections approved the Revised Exploratory Plan but denied the sewer design, commenting that the issue needed to be addressed prior to submission of preliminary plans.  A true and correct copy of the March 31, 2006 letter is attached hereto and made part hereof as **Exhibit "K."**

120.    By letter dated December 20, 2006, the Department issued further comments on the sanitary sewer aspects of Toll's Revised Exploratory Plan as follows:

> . . . It was the decision of this Department to approve the exploratory design review. . . However, it is our feeling that a "regional" design for the sanitary sewer collection system be developed for this site and the neighboring parcels.  Your design should include, but not be limited to, extending portions of the proposed sewer system to common property boundaries (with the respective easements) and **limiting** the proposed pumping stations by selecting the optimal location to provide sanitary sewer to the region.
>
> Approval of the exploratory design review by the Department of Special Services shall not be interpreted as a guarantee that sanitary sewer service will be provided to this region.  Approval of the preliminary design review will be contingent upon successfully developing a "regional" sanitary sewer system." *[Emphasis in original]*

A true and correct copy of the December 20, 2006 letter is attached hereto and made part hereof

as **Exhibit "L."**

121.    On December 28, 2006, Toll submitted a Preliminary Major Subdivision Plan for

the Warren Property to the County.

122.    By letter dated January 22, 2007, NCCDLU's planning and engineering sections

accepted the Preliminary Plan with the following instruction regarding sanitary sewer service for

the proposed development:

> 20.    Contact the New Castle County Department of Special
> services in regard to Note No. 20, as there is no sanitary sewer
> service in this area (per letter from Special services – dated March
> 23, 2006).

A true and correct copy of the January 22, 2007 letter is attached hereto and made part hereof as

**Exhibit "M."**

123.    The January 22, 2007 letter provided that "[i]f a complete Record Plan

submission is not made within twelve (12) months of the date of this letter, the Preliminary Plan

will be considered to be expired in accordance with Section 40.31.390 of the NCCC."

124.    By letter dated October 22, 2007, the Department refused to advance Toll's most

recent preliminary plan submission to the record plan stage informing Toll that:

> . . . Because there is no sewer capacity for this proposed
> development and because sewer capacity will not be available for
> this development pursuant to the Department of Special Services
> and Department of Land Use Sewer Capacity Policy, the above
> application may not continue through the record plan process.
> Thus, the County will not grand preliminary plan approval and will
> not execute a Land Development Improvement Agreement
> ("LDIA") or a sewer agreement for sewer connection, as required
> before final plan approval by *New Castle County Code.*
>
> Please note that this land use application shall be subject to all
> applicable expiration provision in the *New Castle County Code. . .
> . [Emphasis in original.]*

A true and correct copy of the October 22, 2007 letter, with attachment, is attached hereto and made part hereof as **Exhibit "N."**

125.    Accompanying the letter was a memorandum setting forth the purported policy of the Department and the NCCDLU listing a purported original publication date of August 2002 and an effective date of October 22, 2007.

126.    By letter to the Department dated November 6, 2007, Toll reiterated its proposals to make sewer service available to the Warren Property either by Toll's offer to build transmission lines to the Augustine Creek pump station which could then direct the wastewater from the development on the Warren Property to Water Farm 1 for treatment and disposal or through a Community System built by Toll.    Toll requested that the Department inform NCCDLU of the availability of sewer service for the Proposed Development.  A true and correct copy of the November 6, 2007 letter is attached hereto as **Exhibit "O."**

127.    The Department has not responded to Toll's November 6, 2007 letter.

128.    Although all technical and engineering comments have been addressed, the Department and the NCCDLU have refused to further process the Preliminary Plan, continuing to maintain that there is no sanitary sewer service available for the development proposed for the Warren Property.

129.    The Department and the NCCDLU, through the October 22, 2007 letter, have rendered a final decision that the County will (a) not allow Toll's Preliminary Plan for the Warren Property to advance to the record stage, (b) will not approve the record plan for the development of the Warren Property, and (c) and will not execute a land development agreement or a sewer agreement for a sewer connection as required before final plan approval, on the

purported basis that sanitary sewer capacity is not available.

### 10.    The Port Penn Properties

130.    On April 20, 2005, Toll submitted a Pre-Exploratory Plan for the development of the Port Penn Properties to the NCCDLU.

131.    On October 7, 2005, after receiving comments to the Pre-Exploratory Plan, Toll submitted an Exploratory Plan to the County.

132.    On May 5, 2006, Toll submitted a Revised Exploratory Plan addressing comments received from the County's planning and engineering section to its Exploratory Plan.

133.    By letter dated June 14, 2006, NCCDLU's planning and engineering section commented on the Revised Exploratory Plan and on the availability of sanitary sewer service provided as follows:

> The plan relies on connection to a public sanitary sewer system, but no such system exists. . . . Without an approved sewerage strategy, the plan will not be approved and construction will not be permitted."

A true and correct copy of the June 14, 2006 letter is attached hereto and made part hereof as **Exhibit "P."**

134.    On September 14, 2006, NCCDLU found the Revised Exploratory Plan acceptable to advance to the Preliminary Plan stage of the process subject to conditions contained in the June 14, 2006 letter. A true and correct copy of the September 14, 2006 letter is attached hereto and made part hereof as **Exhibit "Q."**

135.    On February 7, 2007, Toll submitted a revised Preliminary Major Subdivision Plan addressing the comments contained in the June 14, 2006 letter.

- 25 -

136.    Although all technical and engineering comments of the June 14, 2006 letter have been addressed, the Department and the NCCDLU have refused to further process the Preliminary Plan because of the purported unavailability of sanitary sewer service for the developments proposed for the Port Penn Properties.

137.    The Department and the NCCDLU have rendered a final decision that the County will not grant preliminary plan approval or permit the preliminary plan to proceed to final record plan approval on the purported basis that sanitary sewer service is not available.

**11.    The County's Wrongful Rejection of Toll's Sewer Proposals**

138.    The County enacted the UDC provisions requiring that developments in the Suburban (S) District are to be served by public sanitary sewer service.

139.    Although the County has required that any new development in the Suburban (S) District be served by public sanitary sewer service, the County is not making such service available to all developments being proposed in the Suburban (S) District.

140.    In connection with the Proposed Developments, Toll has repeatedly offered to construct improvements to the Department's sewer system which would enable the Proposed Developments to connect to and be served by the Department's existing sanitary sewer system

141.    Although 1,400,000 gallons per day of sewage treatment and disposal capacity in Water Farm 1 is presently not being utilized and should be made available on a first-come-first-served basis, the County has refused Toll's request to allow the Proposed Developments to connect to Water Farm 1. Instead, the County is reserving available capacity in Water Farm 1 for unidentified potential future users in violation of the UDC.

BPA/2699/110/1121818_7

142.    As an alternative to utilizing the Department's sewer system, pursuant to Section 40.05.520(c) and as permitted by Title 26 of the Delaware Code, Toll has offered to construct, at its cost, a state of the art Community System in accordance with the rules and regulations governing such systems as promulgated by DNREC and the Department, and consisting of: (a) a treatment plant to treat the sewage from the lots within the Proposed Developments; (b) conveyance lines which would convey the sewage from the lots within the Proposed Developments to the treatment plant; and (3) a disposal system having a processing capacity of 100,000 gallons per day.

143.    Section 40.05.520 of the UDC permits Toll: (a) to make the improvements required to the Department's sewer system to provide the necessary capacity to serve the Proposed Developments; or (b) to construct the Community System.

144.    The County has rejected all of Toll's proposals to make the required improvements to the Department's sewer system to provide the necessary capacity to serve the Proposed Developments or to construct the Community System to serve the Proposed Developments.

145.    The County's refusal has stopped the Proposed Developments from moving forward because of the lack of adequate sewer capacity.

146.    The County's refusal to allow Toll to make the improvements to the Department's sewer system to enable the existing public sewer service system to serve the Proposed Developments or to construct the Community System constitutes an abuse of its authority, and is improper and unlawful.

147.    Contrary to the recommendations of the ROC Report, the County has refused to implement any short-term strategy that would allow developments to proceed in the area northeast of the Central Core Area while the County develops a long term solution to providing sewer capacity for this area.

148.    Although Resolution No. 06-0609 committed the County to provide a detailed report and analysis of available sewer capacities in the SSSA within eighteen (18) months of March 2006, *i.e.* by September 2007, the County has not provided the required report.

149.    Although Resolution No. 06-0609 expressly provided that the County would consider alternate sewer disposal options if County Council was unable to provide sewer capacity for any active or recorded plan as of March 9, 2006 outside the Central Core Area transmission system, the County has wrongfully refused to consider alternative sewer disposal options.

150.    By refusing to permit public sewer service to the area northeast of the Central Core Area and by refusing to allow private utilities to provide sewer service to the area northeast of the Central Core Area, the County is preventing development of that area of the County.

151.    The County wants to acquire the area northeast of the Central Core Area.

152.    By refusing to permit either public or private sewer service to the area northeast of the Central Core Area, the County is rendering the properties in the area unmarketable to anyone other than the County, thereby reducing their fair market value and enabling the County to acquire these properties at a reduced cost.

153.    Prior to the Department issuing its October 22, 2007 letter, the County's Attorney, acting on behalf of County officials, contacted counsel for Warren requesting that Warren and

- 28 -

his counsel meet with County officials to discuss a resolution of the sewer issue. The County Attorney stated that the County was considering the transfer of development rights (**"TDRs"**) option so that the Warren Property could be sold by Warren yet remain undeveloped.

154. Warren and his counsel met with County officials and the County Attorney on October 31, 2007. At the October 31, 2007 meeting, the County officials reiterated the County's position that the County would not provide sewer capacity in the County's sanitary sewer system or permit any alternatives for sewerage disposal for the Warren Property. Although Warren and his counsel had been invited to the meeting under the auspices that the County had a proposal for the TDRs that would allow the Warren Property to be sold, yet remain undeveloped, at the October 31, 2007 meeting, the County officials had made no effort to determine if the purchase of the Warren Property for open space was even a viable option.

155. County officials used the October 31, 2007 meeting to try to interfere with Toll's agreement with Warren for the purchase of the Warren Property.

156. At the October 31, 2007 meeting, when Warren advised County officials that he was under a legal obligation to Toll and was not in a position to sell the Warren Property to the County, County officials suggested that there may arise a "window of opportunity" where Warren "would not be bound to Toll" and if such window presented itself, to let the County know.

157. The County's refusal to allow Toll to connect to the County's sewer system or to construct the Community System is in bad faith, arbitrary and capricious.

### 12.    Toll Will Suffer Irreparable Harm

158. Pursuant to Section 40.31.112G of the UDC, Toll has only twelve (12) months to

complete the next review stage after the County delivers its written review of Toll's preliminary plan, *i.e.* the submission, review and approval of Toll's preliminary plans for the Proposed Developments.

159.    Pursuant to Section 40.31.390 and Section 40.31.113C of the UDC, Toll has only twelve (12) months to complete the next review stage after the County delivers its written review of Toll's preliminary plans, *i.e.* the submission of record plans for the Proposed Developments.

160.    Toll cannot proceed to the record plan stage for the Proposed Developments until the sewer issue is resolved.

161.    Expiration of the deadline for submission of the record plan will result in Toll having to begin the approval process for the Proposed Developments from step one under §40.31.110 of the UDC.

162.    Starting the approval process for the Proposed Developments *ab initio* will cause irreparable harm to Toll. Starting with the resubmission of the Exploratory Sketch Plan will not only cost Toll time but will also force Toll to incur substantial additional engineering, legal and other costs to duplicate work previously performed and to re-apply for secondary agency approvals.

163.    Starting the approval process for the Proposed Developments *ab initio* will be futile because Toll will continue to be unable to provide sewer service to the Proposed Development so long as the County continues to refuse to construct Water Farm 2 and continues to refuse to permit Toll to construct the Regional Pump Station and force main required to connect the sewage generated by the Proposed Developments to Water Farm 1 pending construction of Water Farm 2 or to construct the Community System.

- 30 -

164. If the County is not enjoined from continuing its illegal and improper conduct, Toll's rights under agreements to purchase the Properties will expire and Toll will lose its rights to acquire the Properties.

165. The County is unlawfully preventing development in select areas of the County by refusing to construct Water Farm 2, refusing to allow pending applicants to utilize the unused and available sewage treatment and disposal capacity in Water Farm 1 on the purported basis that the capacity has been reserved for some future potential users, refusing to allow pending applicants to temporarily connect to Water Farm 1 until Water Farm 2 is constructed even where the applicant has proposed to install, at its cost, the improvements necessary for the connection and refusing to allow applicants to construct community systems at the applicant's cost, which will either be privately maintained or turned over to the County upon completion.

166. Toll has no adequate remedy at law.

### COUNT I
### ACTION FOR INJUNCTIVE RELIEF
### THE CLAYTON ACT, 15 U.S.C. §26

167. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

168. Plaintiffs are customers in the market for sanitary sewer service in the County and would be direct purchasers of sanitary sewer services if they purchased the services.

169. The County has intentionally acquired monopoly power in the collection, conveyance, treatment and disposal of sanitary sewage generated in the County.

170. The County willfully acquired and has maintained its monopoly power through restrictive or exclusionary conduct.

- 31 -

171.    The County's conduct substantially affects interstate commerce.

172.    The County's conduct constitutes monopolization in violation of the antitrust laws, 15 U.S.C. §§2, 12 and 26.

173.    The County's conduct is not in furtherance or implementation of any clearly articulated and affirmatively expressed state policy authorizing anticompetitive conduct on the part of the County in the provision of sanitary sewage collection, conveyance, treatment and disposal services in the County.

174.    The Delaware legislature did not intend, and the County can not lawfully claim a monopoly in the provision of essential sanitary sewer services in the County and refuse to provide the service in a reasonable manner.

175.    The County's conduct is contrary to the purposes behind Title 9 and Title 26 of the Delaware Code.

176.    Plaintiffs are threatened by loss and damage to their business and/or property due to the County's violation of the antitrust laws.

177.    The threatened loss to be incurred by Plaintiffs will be caused by the County's actions.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired pending trial on the merits;

B.    Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1;

- 32 -

C.    Following a trial on the merits, issue a permanent injunction Order enjoining the County from prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system;

D.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

E.    Award such other relief as the Court deems proper and just.

**COUNT II**
**42 U.S.C. §1983 - VIOLATION OF CIVIL RIGHTS**
**SUBSTANTIVE DUE PROCESS**

178.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

179.    Plaintiffs have a protected property interest under the United States Constitution to own, use, enjoy and develop their Properties.

180.    Commencing in or about January 2006, the County deliberately engaged in a course of conduct with the specific intent of preventing Plaintiffs from being able to proceed to record plan submission and approval of their development plans.

181.    Assuming control of the provision of sanitary sewer services in the County, the County arbitrarily and capriciously denied Plaintiffs the right to connect their Properties and the Proposed Developments to existing public sanitary sewage collection, conveyance, treatment and disposal systems and refused to allow Plaintiffs to provide a privately owned and operated sanitary sewage collection, conveyance, treatment and disposal system for the Proposed Developments.

182.    The County intentionally determined to carve out the area of the County in which

- 33 -

the Properties are located and to not make sanitary sewer service available to the area so as to prevent the Proposed Developments from being able to move forward through the County land development process to record plan approval because the Proposed Developments purportedly could not demonstrate access to sanitary sewer services.

183.    The County, through the foregoing course of conduct, capriciously and arbitrarily interfered with and prevented Plaintiffs from being able to use, enjoy and develop their Properties.

184.    The County's enactment of Resolution No. 06-0609 and the revised SSSA Map was intentionally directed at the Proposed Developments to cause the expiration of Plaintiffs' land development plans by indefinitely postponing the provision of sanitary sewer service to the area northeast of the Central Core Area which would have the effect of precluding the advancement of Plaintiffs' preliminary plans to the record plan stage for purported lack of sanitary sewer service.

185.    The County enacted Resolution No. 06-0609 knowing that it violated Plaintiffs' legal rights.

186.    The County's enactment of Resolution No. 06-0609 and its conduct preceding and leading up to its enactment was arbitrary, capricious, and not rationally related to a legitimate government interest.

187.    The County's course of conduct preceding and leading up to the enactment of Resolution No. 06-0609, the enactment of Resolution No. 06-0609 and the County's conduct thereafter, was and continues to be an unlawful attempt by the County to interfere with Plaintiffs' legal right to develop the Properties.

BPA/2699/110/1121818_7

188.    The County can not lawfully preclude development by requiring that developers use non-existent municipal services.

189.    The County has acted under color of state law.

190.    As a result of the County's wrongful and illegal conduct, Plaintiffs have suffered damages and continue to suffer damages.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.    Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1.

C.    Issue a Preliminary Injunction Order enjoining the County from prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system

D.    Award Plaintiffs their compensatory and consequential damages;

E.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

F.    Award such other relief as the Court deems proper and just.

## COUNT III
## VIOLATION OF CIVIL RIGHTS
## 42 U.S.C. §§1983 - EQUAL PROTECTION

191.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs

as though set forth at length herein.

192.    The County has intentionally treated Plaintiffs and the Proposed Developments differently from other similarly situated developers and properties in the SSSA.

193.    There is no rational, legitimate reason for the County's refusal to provide sanitary sewer service to properties located in the area northeast of the Central Core Area while making such sewer service available to the area to the southeast of the Central Core Area and to the Central Core Area.

194.    Plaintiffs' major subdivision applications are two of four applications pending for the northeastern part of the SSSA.

195.    The County has also treated Plaintiffs' land development plans differently from the two other developers' plans pending in the northeastern part of the SSSA.

196.    In or about June 12, 2006, the Department permitted the applicant of the Penfield Plan, one of the four applications pending in the northeaster part of the SSSA, to have "available sewer capacity for this proposed development [to] be determined at the record plan stage . . . ."

197.    The Department has intentionally treated Toll differently from the Penfield application and other similarly situated developers in refusing to allow Toll's land development applications to proceed to the record plan stage on the purported basis of lack of available sanitary sewer capacity and not deferring the issue of the available sewer capacity to the record plan stage of the approval process.

198.    The County's action in treating the Plaintiffs differently than other similarly situated landowners and developers in the SSSA was irrational, capricious and arbitrary.

199.    The County's action in treating the Plaintiffs differently than other similarly

- 36 -

situated landowners in the SSSA area was motivated by an intent to inhibit Plaintiffs from exercising their constitutional rights to develop their Properties.

200.    The County has violated Plaintiffs' rights to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

201.    As a result of the County's equal protection violation with respect to Plaintiffs' Properties, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.    Issue a Preliminary Injunction Order enjoining the County from refusing to allow the Proposed Developments to connect to the existing public sanitary sewage collection, conveyance, treatment and disposal system or prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system

C.    Award Plaintiffs their compensatory and consequential damages;

D.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

E.    Award such other relief as the Court deems proper and just.

## COUNT IV
## DECLARATORY JUDGMENT

202.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs

as though set forth at length herein.

203.    The Court has authority to declare the rights and responsibilities of parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202

204.    There is a dispute between the parties whose interests are real and adverse, which is justiciable and ripe for adjudication respecting Plaintiffs' right under  Section 40.05.520 of the UDC to construct improvements if public sanitary sewer service facilities are inadequate including (a) a community sanitary collection, conveyance treatment and disposal system to serve the Proposed Developments, and/or (b) pump stations, force mains and/or other transmission lines to allow connections to the exiting public sanitary sewer systems.

205.    There is a dispute between the parties whose interests are real and adverse, which is justiciable and ripe for adjudication respecting the County's rights under Title 9 and Title 29 of the Delaware Code to refuse to timely provide essential sanitary sewer service to property owners in areas of the County while claiming a monopoly in the provision of such essential sanitary sewer services in those areas.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.    Following trial on the merits, enter an Order declaring that Section 40.05.520 of the UDC and Title 29 of the Delaware Code permits Toll to provide sanitary sewer to the Proposed Developments by constructing a community sanitary collection, conveyance, treatment and disposal system to serve the Proposed Developments which upon completion may be turned

- 38 -

over to the County or privately operated;

C.     Following a trial on the merits, issue a mandatory injunction Order directing the County to permit sewer service to the Proposed Developments either through the Augustine Creek pump station by allowing Toll to construct necessary improvements to connect to the pump station or through a community based privately constructed sewage collection, conveyance, treatment and disposal system which may be turned over to the County upon completion or privately operated;

D.     Award Toll all attorney's fees and costs incurred in connection with this action, as permitted by law and;

E.     Award such other relief as the Court deems proper and just.

## COUNT V
## ESTOPPEL

206.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

207.     In 2004 and throughout 2005, County Government Representatives repeatedly informed Plaintiffs that the Proposed Developments would be serviced by public sanitary sewer systems.

208.     Plaintiffs reasonably relied on the existing zoning of the Properties and the representations of County Government Representatives that the Proposed Developments could be serviced immediately by Water Farm 1 and ultimately by Water Farm 2.

209.     Plaintiffs acted in good faith in relying on the representations of County Government Representatives and incurred substantial investment of time, expense and

- 39 -

obligations as a result.

210.    Plaintiffs have been prejudiced in relying on the representations and actions of the County Government Representatives.

211.    It would be highly inequitable and unjust to deny the Proposed Developments, at this late stage of the approval process, access to the Department's sanitary sewer systems that were promised to Plaintiffs and which the County has an obligation to provide.

212.    The County acted improperly, willfully and in violation of Delaware law and the UDC.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.    Following trial on the merits, issue a mandatory injunction Order directing the County to permit sewer service to the Proposed Developments either through the Augustine Creek pump station by allowing Toll to construct necessary improvements to connect to the pump station or through a community based privately constructed sewage collection, conveyance, treatment and disposal system which may be turned over to the County upon completion or privately operated;

C.    Award Toll all attorney's fees and costs incurred in connection with this action, as permitted by law and;

D.    Award such other relief as the Court deems proper and just.

By:    _____
Jeffrey M. Weiner, Esquire (DE # 403)
1332 King Street
Wilmington, Delaware 19801
(302) 652-0505
Attorneys for Plaintiffs

Of Counsel:

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

Marc B. Kaplin, Esquire
Barbara Anisko, Esquire
910 Harvest Drive
P. O. Box 3037
Blue Bell, PA 19422-0765
(610) 260-6000

DATED:

BPA/2699/110/1121818_7

**EXHIBIT "A"**



**EXHIBIT "B"**

Introduced by: Robert Weiner
William Tansey
Christopher Coons
J. Robert Woods

**RESOLUTION NO. 03- 093**

## SUPPORTING THE IMPLEMENTATION OF THE
## SOUTHERN NEW CASTLE COUNTY SEWER SYSTEM

**WHEREAS,** with the adoption of the Unified Development Code in 1997, New Castle County made a commitment to construct sewers in southern New Castle County to accommodate the growth expected within this area which was designated as a growth area by the County and the State of Delaware as part of the *Shaping Delaware's Future Plan*; and

**WHEREAS,** the implementation of a sewer system in southern New Castle County is a necessary component of good land use planning and is consistent with the tenets of the State's Livable Delaware program; and

**WHEREAS,** the installation of sewers in southern New Castle County will provide better protection for the environment by substantially reducing the pollution of groundwater resulting from leaking septic systems; and

**WHEREAS,** the State Department of Transportation has made a commitment to provide the necessary road improvements in southern New Castle County to adequately handle growth, thereby eliminating the concern that development would be on hold in southern New Castle County even with sewers in place; and

**WHEREAS,** the installation of a sewer system in southern New Castle County is essential for the expansion of the schools in the Appoquinimink School District to meet the increasing needs of the population and for the construction of the New Castle County Vo-Tech High School; and

**WHEREAS,** the State made improvements in the battle to control unsystematic annexation by requiring that annexation proposals conform to a municipality's comprehensive plan and evidence a sustainable growth pattern; and

**WHEREAS,** New Castle County has already proposed funding in its FY'04 Capital Budget for the Southern New Castle County Sewer District project.

**NOW, THEREFORE, BE IT RESOLVED** by New Castle County Council that it reaffirms the County's commitment to sound land use planning and the protection of the environment by supporting the Southern New Castle County Sewer Project as contained in the Capital budget.

Adopted by County Council
of New Castle County on _6/24/03_

President of County Council
of New Castle County

SYNOPSIS: Same as title.
FISCAL NOTE: The approval of this Resolution has no fiscal impact; it supports the approval of the Southern New Castle County sewer system.

Ronald a. Morris
BY/JHM

**EXHIBIT "C"**



THOMAS P. GORDON
COUNTY EXECUTIVE

JOSEPH J. FREEBERY
GENERAL MANAGER

RECEIVED
OCT -1 AM 11: 49
DELAWARE P.S.C.

DEPARTMENT OF SPECIAL SERVICES

September 30, 2004

**Via Regular Mail**
Mr. Kevin Neilson
Regulatory Policy Administrator
State of Delaware
Public Service Commission
861 Silver Lake Boulevard
Cannon Building, Suite 100
Dover, Delaware 19904

Re:    Senate Bill 99

Dear Mr. Neilson:

Pursuant to Senate Bill 99 and your September 15, 2004 letter to County Executive Thomas P. Gordon, enclosed please find maps depicting New Castle County's ("County's") sewer service area. Please note that although the City of Newark owns and maintains sanitary sewer infrastructure within its city limits, a sewer agreement between Newark and the County mandates that wastewater from Newark is transported through the County sewer system to the Wilmington Wastewater Treatment Plant. Further, a sewer agreement between the County and the City of Middletown provides for the County to transport and treat up to 500,000 gallons per day of wastewater from Middletown.

Please be advised that Section 38.02.007.D of the County Code restricts the construction and operation of sanitary sewer infrastructure in the unincorporated areas of the County as follows:

No entity, other than New Castle County or its assigns, may own, lease, operate, manage, utilize or otherwise maintain in any way any sewer system including, but not limited to, sewer lines, pumps stations and waste water disposal systems of any kind, in the unincorporated areas of New Castle County. This paragraph shall not apply to any approved Department of Special Services related sewer projects or to septic systems approved pursuant to Chapter 40, Article 22 of this Code.

38 N.C.C.C. §38.02.007.D

87 READS WAY, NEW CASTLE, DE  19720

PHONE: 302-395-5700    FAX: 302-395-5797

September 30, 2004
Mr. Kevin Neilson
Page 2


Please do not hesitate to contact me at (302) 395-5777 if you have any questions.

Very truly yours,

Tracy Z. Sunes
Senior Manager


TZS/lll
Enclosures

cc:  The Honorable Thomas P. Gordon, County Executive
     Messrs. Joseph J. Freebery, General Manager, NCC Special Services
           J. Wayne Merritt, NCC Special Services
           Jonathan W. Husband, NCC Special Services

# Northern New Castle County Sanitary Sewer Service Areas



**Legend**

New Castle County Service Area

118,486 Customers (2003 yr)

0   1   2       4       6       8
Miles

# Southern New Castle County Sanitary Sewer Service Areas



WF #1 EXISTING - 1213 (2003 yr)
WF #1 ULTIMATE - 11,000 DU
WF #2 PHASE I - 10,700 DU
WF #2 ULTIMATE - 30,700 DU

**Legend**

NCC Water Farm #1 Service Area

NCC Water Farm #2 Service Area

NCC Port Penn Service Area

EXHIBIT "D"

# Kaplin|Stewart
*Attorneys at Law*

**Marc B. Kaplin**
Direct Dial: (610) 941-2666
Direct Fax: (610) 260-1240
Email: mkaplin@kaplaw.com

December 8, 2004

**Via Facsimile and
First Class Mail**

Tracy Surles, Esquire
Department of Special Services, New Castle County
87 Reads Way
New Castle, DE  19720

RE:    **Toll Brothers, Inc. - Warren Property - Port Penn Road, New Castle County, Delawre**

Dear Tracy:

As you know, I represent Toll Brothers, Inc. ("Toll").  Toll is the equitable owner of approximately 120 acres of undeveloped property located adjacent to Port Penn Road, east of Route 1, presently owned by Gary Warren ("Property").  The Property is located in the County's S Zoning District which contemplates public sewer.  However, it is my understanding that while the Department of Special Services' facilities contain adequate treatment capacity to serve the area of the County in which the Property is located, and although there is a gravity collection line which extends part of the way from the treatment plan to the property, a regional pump station, force main and gravity line would have to be installed in order for public sewer service to be provided to the Property.

As you know, Article V of New Castle County's Unified Development Code ("UDC") contains the concurrency requirements for development, and, as a general rule, limits the number of units that can be developed on a property to the units for which there is available sewer capacity.  However, where there is inadequate sewer capacity, Section 5.520 provides various development options:

    a)    Develop at a lower density;

    b)    Build with future development reservation;

    c)    Make **improvements**, or

    d)    Acquire development rights.

With regard to making the necessary improvements, Section 5.520(c) provides that:

Tracy Surles, Esquire
December 8, 2004
Page 2

The developer can make improvements for traffic as approved by the County and DelDOT. Improvements may be made to the sewer as determined by the Department of Special Services.

Accordingly, the UDC expressly permits a landowner to make the improvements to the public sewer system to provide the necessary capacity for its proposed development.

Toll would like to employ the provisions of Section 5.520(c) and design and construct the improvements required to provide public sewer system to the Property. As you may recall, this is exactly the same thing that Toll did in connection with the development of its Red Lion Chase community – decommissioned an existing pump station, installed a new gravity collection line from the location of the decommissioned pump station to the location of a new pump station, constructed a new pump station and force main. Toll's engineers prepared all of the plans for the Red Lion Chase improvements and the plans were reviewed and approved by the Department.

There is, however, one significant difference between what was done at Red Lion Chase and what appears to be necessary with regard to the Property. That is, at Red Lion Chase the cost of the facilities to be installed could be economically carried by the Red Lion Chase development. At this point it appears that the cost to install the regional system required to service the Property will cost substantially more than can be borne by the development of the Property alone. However, the facilities that would be installed to service the Property will also create substantial additional capacity that could be used in the future by the County to service other developments. Therefore, I believe that there is a mechanism available in the UDC that would make it possible for Toll to design and install the entire system, and (a) recoup a portion of the cost thereof by connecting the houses to be constructed on the Property to the system, and (b) recoup a portion of the "excess cost" as a credit against the impact fees that would otherwise be required. If the "excess costs" cannot all be recouped from (a) and (b) above, we suggest that we discuss the possibility of an agreement in which Toll is reimbursed the remaining "excess cost" if and when additional development is connected to the facilities that Toll constructs.

I believe that the Department has the authority to agree with Toll that Toll construct facilities that provide greater capacity than is needed by Toll's development and grant Toll a credit against the impact fees that would otherwise be levied.

Article XIV of the UDC regulates the payment of impact fees. Section 14110 states as follows:

Section 14110 Determination of Service Standard.

A.     Impact fees are one-time payments used to fund system improvements needed to accommodate development. Impact fees for the County are proportionate and reasonably

Tracy Surles, Esquire
December 8, 2004
Page 3

related to the capital facility service demands of new development. The impact fee methodologies establish that impact fees will adequately benefit new development. **The County's impact fee methodology also identifies the extent to which newly developed properties are entitled to various types of credits to avoid potential double payment of capital costs. . . .**

Another general requirement that is common to impact fee methodologies is the evaluation of credits. There are several types of credits that have been considered. First, a future revenue credit has been evaluated to avoid potential double payment for capital facilities through both one-time impact fees and ongoing revenues that may fund system improvements.

The second type of credit is a site-specific credit for system improvements that have been included in impact fee calculations. Project improvements normally required as part of the development approval process are not eligible for credits against impact fees. Specific policies and procedures related to site-specific credits for system improvements will be addressed in the ordinance that establishes the County's fees. However, the general concept is that developers may be eligible for site specific credits only if they provide system improvements that have been included in the impact fee calculations.

The general impact fee regulations of the UDC are broad in scope. In addition, there are specific sections of the UDC which address the reduction of impact fees and credits to a developer where the developer constructs facilities that will provide more capacity than is required for his development. Section 14.241 provides as follows:

A.    An impact fee reduction shall be determined by the Department of Special Services on a case-by-case basis for those applicants who construct a spray irrigation system (or other approved large-scale treatment system) as provided in Article 05 of this Chapter. The impact fee reduction shall be based upon the extent to which the facility or its connection lines will be utilized by the County as part of the County sewer system.

These concepts were discussed at a meeting that took place about a month ago in your office. The meeting was attended by John Husband, Eleanor Blackwell, Mitch Kotler and other Toll representatives. I followed that up with a conversation with Eleanor, who suggested that I put my thoughts in writing to you.

Tracy Surles, Esquire
December 8, 2004
Page 4

Mitch Kotler and I would like to meet with you, John, Eleanor and anyone else that you think would be appropriate to discuss the concepts set forth in this letter. I think an appropriate agenda would be as follows:

A.    Design

      1.    Can Toll have its engineers design the project for review by the department or the department's designated consulting engineer.

B.    Construction

      1.    Construction by Toll

      2.    Inspection/supervision by county

      3.    Determination of costs

C.    Credits

      1.    Determination of the portion of cost of improvements that are to be borne by development of the Property.

      2.    Determination of the balance of the cost to be recouped by Toll (total cost less than proportionate share to be borne by development of the Property)

      3.    Method of reimbursement

            a)    Credit against impact fee

            b)    Reimbursement agreement

            c)    Timing

            d)    Approval Process

Tracy Surles, Esquire
December 8, 2004
Page 5

I would appreciate it if you would consider the foregoing and that we could schedule a meeting to discuss ways to move forward.

Sincerely,

Marc B. Kaplin

MBK:ljk

cc:     B. Mitchell Kotler
        John Husband
        Eleanor Blackwell

EXHIBIT "E"

**Marc B. Kaplin**
Direct Dial: (610) 941-2666
Direct Fax: (610) 260-1240
Email: mkaplin@kaplaw.com

June 9, 2005

David W. Singleton, CEO
New Castle County Government Center
87 Reads Way
Corporate Commons
Newcastle, DE 19720

Richard T. Przywara
Chief of Staff
New Castle County Government Center
87 Reads Way
New Castle, DE 19720

RE:    **Toll Brothers, Inc. - Warren Property - Port Penn Road, New Castle County, Delaware - Regional Sewer Improvements**

Gentlemen:

I am writing to follow up our recent discussions.

Toll Bros, Inc is the equitable owner of the 125 acre Gary Warren Farm and three other farms which are adjacent to it. The Warren Farm is located adjacent to Port Penn Road. Toll is in the exploratory stages of the development process with regard to the Gary Warren Farm and estimates that the total build out of all five Port Penn Road properties is approximately 600-700 dwelling units. In addition, we understand that another developer is in the process of exploring the development of the adjacent Lester property for approximately 100 additional homes. Therefore, there is a critical mass of approximately 800 proposed homes located adjacent to Port Penn Road. We understand that the County's plan is that the Port Penn area is intended to be provided public sewer by sewage treatment and effluent disposal facilities to be constructed on Water Farm 2.

The first of our recent discussions took place at a meeting in Dave's office which was attended by Dave, Gregg Wilson, Carol J. Dulin, Mitch Kotler of Toll Brothers, Gary Warren and me to explain that Toll Brothers is the equitable owner of Gary Warren's property and four adjacent properties and its experience with the construction of sewer treatment and conveyance systems in a "public/private partnership" and how that experience might be used to assist the County in expanding the proposed sewer system for the southern part of the County so that Toll Brothers and other developers may proceed with the development of their respective projects in the S-Suburban Zoning District as provided for by the Uniform Development Code; i.e., with public sewer. When we left the meeting in Dave's office we indicated that we would put together our thoughts on a proposed public/private partnership and return to meet with Dave, Gregg and Carol.

Kaplin Stewart Meloff Reiter & Stein, PC
350 Sentry Parkway Building 640
Blue Bell, PA 19422-0765
(610) 260-6000 tel

*Offices in:*
Pennsylvania
New Jersey
MBK/2699/110/675407 1 06/10/2005 02:57 PM

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 2

Thereafter, when we attempted to prepare that proposal we quickly realized that we did not have enough information about the amount of sewer treatment capacity that exists at Water Farm 1, the amount of sewer treatment capacity at Water Farm 1 that is actually being used, nor the amount of sewer treatment capacity at Water Farm 1 that has been reserved for future developments. Similarly, we had even less information about the plans for the construction of Water Farm 2 and the plans for the conveyance systems necessary to transport sewage from the southern part of the County to either Water Farm 1 or Water Farm 2. Therefore, rather than spend more of Dave's valuable time in exploratory discussions, we asked Gregg to reschedule the meeting so that we could get more specific information from the Department of Special Services. Gregg was kind enough to schedule a meeting with Rich and John Husband and Mitch and I brought Toll's most experienced land development coordinator, Bob McCarron, to the meeting along with Craig Kachmar of MGK Industries, Inc., a company that designs and installs sewer systems.

From the meeting with Gregg, Gary and John we learned the following information that forms the basis of the suggestion that I will make at the end of this letter.

**Water Farm 1**

Water Farm 1 is a property owned by the County on which there is constructed a lagoon sewage treatment system, the treated effluent from which is disposed of by spray irrigation on the property adjacent to the lagoons that treat the raw sewage and store the treated effluent. The rated capacity of Water Farm 1 is 1.5 million gallons per day (gpm). Of the 1.5 million gallons of capacity approximately 500,000 gallons is presently used. Although all, or substantially all of the remaining 1 million gallons of capacity has been "reserved" to developers or to the City of Middletown, none of that capacity is presently used.

The fees charged to treat the 500,000 gpd of sewage that are conveyed to Water Farm 1 are not enough to cover the costs of operating Water Farm 1.

If 250 gallons of capacity is allocated to each dwelling unit that ultimately will be connected to the Water Farm 1 system (an "**EDU**") the "reserved" 1 million gallons of capacity could service as many as 4,000 additional homes. Because it will be at least four or five years before that capacity is used, the reserved, but unused capacity could be "borrowed" by other developments and the County would have that 4-5 year period before it must complete the construction of additional capacity.

**Water Farm 2**

Water Farm 2 is a 900+ acre parcel of ground located a significant distance from Water Farm 1. Water Farm 1 and Water Farm 2 are intended to serve different areas of the southern portion of the County. The prior administration's plans for the development of Water Farm 2 contemplated that a lagoon treatment and spray irrigation disposal system would also be

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 3

constructed by the County on Water Farm 2 and that system be capable of treating approximately 3.5 million gpd of sewage. The Warren Property (and adjacent properties) are located in an area planned to be served by Water Farm 2.

## Possible Connection to Augustine Creek Pump Station.

Because there is a pump station located in the Augustine Creek Subdivision, which is located relatively close to the Warren Property, sewage from the Warren property (and adjacent properties) can be treated by Water Farm 1. This is because the Augustine Creek pump station pumps sewage along Pole Bridge Road to an existing 24 inch gravity sewer main that runs adjacent to Dupont Parkway and terminates at Water Farm 1. Therefore, it would be possible, at least on a temporary basis, for the homes to be constructed adjacent to Port Penn Road to "borrow" the unused capacity at Water Farm 1. All that would be needed to facilitate the conveyance of such sewage to Water Farm 1 would be the construction of a force main from the area of Port Penn Road adjacent to the Warren Farm to the pump station at Augustine Creek. As an alternative, a force main could be permanently constructed adjacent to Port Penn Road from a regional pump station to be located near the Warren Farm to Biddle's Corner, where it could turn directly south along Dupont Parkway. As depicted on the drawing that is attached, that force main could ultimately be turned west to convey the sewage from the Port Penn area to Water Farm 2. However, on a temporary basis the line could be continued south along Dupont Parkway to its intersection with Pole Bridge Road for connection to the 24 inch gravity main that conveys sewage to Water Farm 1.

## Sewer Impact Fees.

In performing our analysis we have assumed that the County will continue to charge an impact fee of $8,500 per EDU for the use of both its sewage conveyance system and its sewage treatment facilities. As such, the 700 dwelling units to be developed by Toll adjacent to Port Penn Road would generate $5,950,000 in impact fees and the additional 100 units to be developed on the Lester property would generate another $850,000 for a total of $6,800,000. Toll's estimates are that the construction of the regional pump station near the Warren Farm together with the construction/installation of the Port Penn Road/Biddle's Corner/Dupont Parkway force main depicted on the attached drawing will cost approximately $4,000,000.

## Sewer Consultant.

We understand that the County has retained or will shortly retain a consultant to reassess how the County should proceed in the future with regard to the provision of public sewer service for the southern part of the County in general, and how to proceed with regard to Water Farm 2 in particular.

## Toll's Participation in Other Public/Private Partnerships.

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 4

Toll has participated with many municipalities in Pennsylvania and in other states with regard to the development of sewer treatment and/or regional conveyance systems. Bob McCarron has primarily responsibility for constructing the sewer treatment and conveyance systems that Toll has recently constructed. They include the regional sewer treatment plant in Upper Uwchlan (Downingtown), Chester County, PA, the reconstruction of the sewer system in Chadds Ford Township in Chester County, the construction of the large regional pumping station at Cheyney Road and Baltimore Pike in Concord Township, and the construction of a sewer treatment system in Ocean City, MD.

In most instances Toll (and other developers) purchase the land, caused the design of the systems, had the systems approved by the municipality's consultants, constructed the systems, operated the systems until the systems broke even, and then conveyed the systems to the municipality. Where Toll (and other developers) advance significantly more than the current sewer impact fee and the expenditure of those funds result in the creation of additional capacity that can be sold in the future to other developers, Toll usually recoups its excess contribution from impact fees paid in the future by other developers as they connect to the improvements that Toll has constructed. By using this type of public/private partnership, the following are accomplished:

    1. The available dollars (sewer impact fees) are used to create more extensive improvements. That is, because of Toll's buying power and the fact that it is not encumbered by the requirement that prevailing wages be paid, the money expended by Toll usually purchases more improvements than the money expended by governmental agencies.

    2. The municipality does not have to make large capital investments, financed by long term bonds, and then wait for development to start to pay back the cost of the improvements.

    3. Toll is usually able to move the process through the permitting process faster than the County can do so when it uses public funds as Toll is not saddled with additional regulatory hurdles that often affect governmental projects.

**Suggested Course of Action.**

With all of the foregoing in mind, Toll suggests the following course of action to the County:

    1. Toll will design and construct the Port Penn regional pump station and the Port Penn Road force main at least to Biddle's Corner, and probably to a location where it can be used by the new school being constructed in that area.

    2. Either the Port Penn Road/Biddle's Corner/Dupont Parkway force main is extended to the 24 inch gravity main at Pole Bridge Road so that the Port Penn properties can be served, or Toll will construct the temporary force main from Port Penn Road to the Augustine Creek pump station.

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 5

3. The County will acquire any land or rights of way that are required to construct the pump station and the force main(s).

4. Toll and the developer of the Lester property would receive credit against its $6,800,000 of sewer impact fees for the actual cost of the design, permitting, construction and approval of the pump station and force main. As indicated above, the cost is presently estimated to be about $4,000,000.

5. Toll and the Department of Special Services would cooperate in the design, permitting, construction and approval of the pump station and force main in the same manner that they cooperated in the design, permitting, construction and approval of the Red Lion pump station and force main.

6. The foregoing program would leave approximately $2,800,000 -$3,000,000 from the sewer impact fees that Toll and the developer of the Lester property would be required to pay, and they would either pay that amount directly to the Department of Special Services as they would in the ordinary course of any development, or apply those funds to the construction of some portion of the Water Farm 2 facility (or other facility) that the County elected Toll to construct.

7. At the present time it seems to us that the proper course is to set the $2,800,000 - $3,000,000 aside for the future construction of the Water Farm 2 facility as that facility will ultimately be needed because the Port Penn Road properties would only be "borrowing" the Water Farm 1 capacity that has already been reserved to other governmental agencies and developers. That is, eventually the County is going to have to construct additional facilities and we assume that those facilities will be constructed at Water Farm 2. However, until the County and its consultant make a final decision with regard to the type of improvements to be constructed at Water Farm 2, it would probably be most prudent to accumulate the funds from Toll and other developers who "borrow" the Water Farm 1 previously allocated, but unused capacity.

8. To illustrate the potential positive impact of the employment of this concept further, please assume that I am correct that the 1 million gallons of allocated but unused Water Farm 1 capacity is sufficient to serve 4,000 dwelling units in the future. In that case the County could permit Toll and other developers to "borrow" at least one-half of that capacity, thereby creating the ability for the County to serve approximately 2,000 additional dwelling units. If the $8,500 per EDU fee remains at that level, the sewer impact fees generated by those 2,000 units would be approximately $17,000,000. After subtracting the $4,000,000 cost of the Port Penn Road pump station and force main from that $17,000,000 there would be $13,000,000 available for the construction of Water Farm 2 and the conveyance facilities required to service those 2,000 dwelling units. Obviously, that is a much more prudent way to finance the eventual construction of Water Farm 2 than to have the County construct the

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 6

improvements using County funds. Furthermore, the addition of sewer user fees from an additional 2000 homes would make the operation of Water Farm 1 more palatable.

One final point that I would like to emphasize -- based on what we know, we think that the County could implement the foregoing immediately and that it would be compatible with whatever solution the County and its consultant agree upon.

We would like to follow up this letter with another meeting where we could discuss its feasibility and possibly, its implementation.

Many thanks for taking the time to listen to our ideas.

Sincerely,

/ s /

Marc B. Kaplin

MBK:ljk

Enclosure

cc:     Gregg E. Wilson
        Jonathan W. Husband
        B. Mitchell Kotler
        Robert McCarron
        Gary Warren

**EXHIBIT "F"**

CHRISTOPHER A. COONS
COUNTY EXECUTIVE

RICHARD T. PRZYWARA
GENERAL MANAGER

**DEPARTMENT OF SPECIAL SERVICES**

August 11, 2005

AUG 16 2005

Mr. Marc Kaplin
Kaplin Stewart
350 Sentry Parkway, Bldg. 640
Blue Bell, PA 19422

**RE:    Sewer Capacity Request-Warren Property
TP# 13-009.00-024**

Dear Mr. Kaplin:

In response to the above-referenced request, capacity in the requested amount of 42,900 gallons per day will be available upon completion of the construction of Water Farm II Treatment Facility and all related New Castle County sewer interceptor lines to which the development can connect. However, please be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38 N.C.C.C. § 38-27.

Thank you for your attention to this matter. If you have any questions, please do not hesitate to contact Elinor Blackwell at 395-5711 or David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:    Richard T. Przywara
       Tracy Surles
       Charles Baker
       File                                              JH/57-5557

*The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or in writing. Please understand that the Department's position, as stated in this letter, can only be modified by written instrument signed by the General Manager of the Department and expressly referencing this letter and the modification.*

**EXHIBIT "G"**

CHRISTOPHER A. COONS
COUNTY EXECUTIVE

RECEIVED OCT 1 9 2005

RICHARD T. PRZYWARA
GENERAL MANAGER



### DEPARTMENT OF SPECIAL SERVICES

October 13, 2005

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

**RE:** **Sewer Capacity Request-Port Penn Assemblage Plan**
 **TP#13-004.00-008,010,013,016,017**
 **Application #2005-0459 -S**

Dear Sir or Madam:

In response to the above-referenced request or plan, capacity in the requested amount of 138,600 gallons per day will be available upon completion of the construction of all necessary sanitary sewer infrastructure to which the DEVELOPMENT will connect. However, please be advised that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38 N.C.C.C. § 38-27.

Thank you for your attention to this matter. If you have any questions, please do not hesitate to contact Elinor Blackwell at 395-5711 or David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:    Richard T. Przywara
        Tracy Surles
        Charles Baker
        File                                                                   JH/58-5599

*The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or in writing. Please understand that the Department's position, as stated in this letter, can only be modified by written instrument signed by the General Manager of the Department and expressly referencing this letter and the modification.*

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720          PHONE: 302-395-5700          FAX: 302-395-5802

**EXHIBIT "H"**

Introduced by: Mr. Tansey
Date of Introduction: March 28, 2006

### RESOLUTION NO. 06-069
### AS AMENDED BY ORAL AMENDMENT NO. 1

### ENDORSING A PLAN TO PROVIDE SANITARY SEWER SERVICE TO THE SOUTHERN SEWER SERVICE AREA

**WHEREAS**, New Castle County's (the "County's") Comprehensive Development Plan and the *New Castle County Code* provide for sewering the Southern Sewer Service Area (SSSA), an area roughly bounded to the north by the Chesapeake and Delaware Canal, to the south by Middletown, to the west by Maryland and to the east by the Delaware River; and

**WHEREAS**, in light of the magnitude and complexity of sewering the SSSA, the County retained a nationally-renowned engineering firm to evaluate alternatives and assess their impact on County residents; and

**WHEREAS**, the County Administration and New Castle County Council ("Council") have cooperatively listened to concerns expressed by residents, schools, businesses, civic groups, land owners and developers; and

**WHEREAS**, based on the results of the consultant's evaluation, coordination of efforts with State and local governments, and consideration of stakeholder's concerns, the County Administration has proposed a responsible path forward; and

**WHEREAS**, the path forward entails providing wastewater treatment and disposal to a portion of the SSSA for the short-term, while evaluating regulatory, technical and financial issues for the long-term; and

**WHEREAS**, the path forward furthers environmental stewardship; supports the establishment of more livable communities through effective planning and partnership; distributes risks, costs and benefits in a fair and equitable manner; and ensures that the SSSA will be financially self-sustaining.

**NOW, THEREFORE, BE IT RESOLVED** by the County Council in and for New Castle County that Council hereby endorses the following actions to be taken to further the path forward for the SSSA.

1.  The County will as soon as possible commence construction of the components of the Central Core transmission system depicted on the attached Exhibit "A," but not the treatment and disposal facilities.

2. The County will negotiate an agreement with Middletown to provide some sewer capacity for the SSSA, subject to New Castle County Council approval. Such agreement will include purchase of some permanent capacity and lease of some temporary capacity.

3. The County will also utilize temporarily surplus capacity at Water Farm #1 to provide sewer capacity for some areas of the SSSA for five to seven years. All or portions of such flows may be diverted elsewhere once the County constructs a long-term treatment and disposal facility.

4. The County will utilize capacity at Middletown and Water Farm #1 to service development over the next five to seven years while it coordinates infrastructure improvements with the Delaware Department of Transportation ("DelDOT") and other State agencies, evaluates growth through the Comprehensive Development Plan process and evaluates the feasibility of at least the following disposal options:

    a) Rapid Infiltration Basins (RIBs) at Water Farm #1 and Water Farm #2;
    b) RIBs at locations other than Water Farm #1 and Water Farm #2;
    c) spray irrigation at locations other than Water Farm #1 and Water Farm #2; and
    d) discharge from the Wilmington Wastewater Treatment Plant.

5. Developments that are located in the Central Core (see area shaded green on Exhibit "A") and developments that are planned to be permanently sewered by Water Farm #1 (see areas shaded pink on Exhibit "A") will receive exclusive priority with respect to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006. The County shall develop an allocation plan to fairly distribute the limited capacity over the next five to seven years. Schools and facilities owned by the State or County shall receive the full capacity determined to be necessary; private developments may receive a prorated portion of their ultimate requirement. The costs to provide the interim sewer service for the next five to seven years will be paid for by those using the capacity, and construction of the short-term plan shall only be commenced upon confirmation that a sufficient number of eligible users have committed to participate.

6. If the County has not found a better long-term disposal alternative in time to divert flows from Middletown and Water Farm #1 on a timely basis, it will construct Water Farm #2 while continuing to finalize a long-term solution.

7. The County will prepare amendments to the *New Castle County Code* to ensure that development plans can only continue through the Land Use process if sewer capacity is or will be available for the development.

8. The County will prepare *New Castle County Code* amendments to convert from a sewer impact fee to a capital recovery fee for the SSSA. The County will retain a qualified firm to establish the capital recovery fees and annual user fees for the SSSA. The County will remain one unified sewer district for the purpose of establishing the

annual user fees.  The capital recovery fees and annual user fees shall be set at levels reasonably expected to recover the entire costs of creating and operating the sanitary sewer system serving the SSSA.

9.  The County will revise its capital plan to reflect the new SSSA plan.

10. Within eighteen (18) months of commencing construction of the components of the Central Core transmission system, the County will provide a detailed report and analysis of available sewer capacities in the Southern Sewer Service Area ("SSSA") to County Council. If it is determined at that time that the County will be unable to provide sewer capacity for any active or recorded plan as of March 9, 2006 outside the Central Core transmission system, alternative sewer disposal options will be considered by the County.

Adopted by County Council of<br>
New Castle County on: 3/28/06<br><br>
President of County Council<br>
of New Castle County

SYNOPSIS:        This Resolution provides a path forward for providing sanitary sewer service to the Southern Sewer Service Area.

FISCAL NOTE:  The County will pay Middletown up to $3,200,000.00 for the purchase of 100,000 gallons per day (gpd) of sewer capacity.  The County will also pay Middletown's annual residential user rate for the lease of 150,000 gpd for as long as the County utilizes the leased capacity.  The first annual payment of $133,042.50 shall be due within thirty (30) days of execution of the agreement.  It is estimated that construction of the Central Core transmission system and the short-term infrastructure will cost $34,000,000 to $39,000,000.  The County will also likely spend $5,000,000 to $10,000,000 evaluating long-term disposal methods over the next five to seven years.  The County expects to recoup these costs over time through capital recovery fees and a short-term connection fee.

**EXHIBIT "I"**



# New Castle County
# Southern Sewer
# Service Area

Date: June 14th, 2007
Scale: 1" = 8000'





0   0.5   1         2         3         4
Miles

**Capacity Status**

Capacity Available

Capacity Not Available but
Improvements are Funded.

Capacity Not Available and
No Improvements are Funded.



C:\gisdata\Projects\SSSA Update\SSSA 2007_06_14.mxd

EXHIBIT "J"

CHRISTOPHER A. COONS                                                    RICHARD T. PRZYWARA

COUNTY EXECUTIVE                                                         GENERAL MANAGER



## DEPARTMENT OF SPECIAL SERVICES

March 23, 2006

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

RE:    **Sewer Capacity Request-Warren Tract**
       **TP#: 13-009.00-015,024,028**
       **Application #:2005-0353-S**

Dear Sir or Madam:

In response to the above-referenced plan, capacity has been requested in the amount of 37,800 gallons per day with the lots shown on this plan having been designed to be served by sanitary sewer service. At the time of this request, sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available. No building permit shall be issued for any lot shown on this plan, or any lot created by any revision or resubdivision of this plan, until or unless the Department of Land Use receives written verification from the Department of Special Services that sanitary sewer service is or will be available for the Development and that the Department of Special Services has approved all necessary sanitary sewer construction plans.

Please be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38 N.C.C.C. § 38.02.002(c).

Thank you for your attention to this matter. If you have any questions, please do not hesitate to contact David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:    Richard T. Przywara
       Tracy Surles
       Charles Baker
       File                                                           JH/59-5701

*The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or in writing. Please understand that the Department's position, as stated in this letter, can only be modified by written instrument signed by the General Manager of the Department and expressly referencing this letter and the modification.*

EXHIBIT "K"

Christopher A. Coons
County Executive



Charles L. Baker
General Manager

**Department of Land Use**

Department of Land Use Revised Exploratory Report

Application Number – 2005-0353
Name of Project – Warren Tract
Type of Plan - Exploratory Major Subdivision Plan (Revised)
Date of Review- March 31, 2006

Engineer- Choong Yim, Eastern States

Project Review Team – Brad Shockley (Planning) – 395-5446
Stephanie DeAscanis, P.E. (Engineering) – 395-5475
Christine Quinn (Historic) – 395-5521
Owen Robatino (Transportation) – 395-5427

Status of Review – Status of Review - General Compliance for the Public Hearing on May 2, 2006 - The Department will issue an additional review report after the Public Hearing that will find the plan acceptable to proceed to preliminary after you address all comments and/or studies or unacceptable, submit a revised exploratory plan to address all comments and/or studies.

Planning:

✓ 1. The plan references an agricultural subdivision (by deed - per state regulations) that will create 'Lot B', so as to subtract this area from the gross site acreage for site capacity purposes. Note that the plan may proceed as proposed; however, the agricultural subdivision must occur prior to the record plan submission. The applicant should recognize that the ultimate approval of this plan is based on the exclusion of the 15.79 acre parcel;

2. Provide a narrative (cover letter is acceptable) that summarizes the discrepancies between the overall acreage of protected resources within Note No. 12 and the site capacity calculations. Also, correct the *total resource land* within Step 1 of Table 40.05.421;

3. Specify if the acreage of usable open space and/or stormwater management is accounted for in the overall acreage of open space (as shown within Note No. 11);

4. Specify if there are drainageways that drain greater than 10 acres and provide a RBA as may be required. Also, there are several areas in which the drainageways should be extended (example - refer to the area to the north of Lot 81 and the area to the north of Lots 63 and 64);

5. There are large sections of drainageways within the LOD, but relatively small acreages are referenced within the disturbed area calculations. Correct the disturbance calculations as

may be required. Note that the overall disturbance must comply with Table 40.10.010 of the New Castle County Code (unless otherwise permitted by Table 40.10.210);

6. Verify the overall acreage and area of disturbance within the vicinity of Lots 69 and 70;

7. Verify the resource that is used in establishing the RBA that originates on Sheet 7 (south of Lots 93-98). Also, verify this RBA as it is shown on all other sheets;

8. Verify the acreage of young forest, young forest CNA, mature forest, and drainageways within Note No. 12 based on the labels per sheet;

9. Your cover letter notes that all areas of open space access are a minimum of 45' in width. Verify the area between Lots 42 and 43;

10. Address Section 40.26.330 of the UDC to justify the proposed cul-de-sac lengths;

11. Provide certification of approval from DNREC (as referenced within Note No. 16) in regard to the critical natural area (CNA). Also, the department is in receipt of a 'Memorandum of Agreement' between DNREC and Toll Bros. Note that New Castle County does not enforce private agreements; therefore, DNREC should document (prior to recordation) that the plan complies with the agreement;

12. Revise the lot lines for Lots 21 and 22, so that the easement to the DNREC property is within open space;

13. Provide documentation from the Army Corps of Engineers in regard to the areas labeled as 'Waters of the U.S.';

14. The density and site area information may be removed from the record plan (Note No. 10), as the acreage is addressed by the site capacity calculations. Also, remove the 'provided' calculations for the lot area, width, and setbacks, as this information should be shown on the individual lots. The 'typical' lot detail should reference the minimum lot width;

15. Designate natural resource area/community area open space on the plan in accordance with Section 40.20.225 of the New Castle County Code;

16. Correct the acreage/square footage conversions within Note No. 11 and verify the total road (ROW) coverage;

17. Contact the New Castle County Department of Special Services in regard to Note No. 18, as there is no sanitary sewer service in this area (per letter from Special Services - dated March 23, 2006).

Engineering:

The Engineering Section within the Department of Land Use has reviewed the above mentioned Exploratory Plan and finds the application unsatisfactory due to comment number 2 and 3 listed below. Again, the remaining comments should be addressed with the preliminary submission. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Please note the following comments provided:

1. Date complete submission received by Department of Land Use:        3/06/06
   Date review complete by Engineering Section:                        3/27/06
   Number of Days in the Engineering Section:                                    15 days

2. In conjunction with comment No. 4 from Planning, the Engineering Section requires that all areas designated "drainageways" be evaluated and assigned their proper level of protection in accordance with those parameters outlined in the UDC definition of riparian buffer area. In addition, Section 40.10.331 of the UDC states that all RBA areas shall be classified and planted in accordance with this section where native vegetation is not present. This designation plays a viable role to the assessment of the current site conditions in respect to stormwater management. Care should be taken to preserve these areas within the property with significant natural drainage patterns. In accordance with Section 40.10.360, the positive

surface drainage flow of a drainageway shall not be interrupted. Under this provision, any portion of the drainageway up-slope of the disturbance, should also be considered disturbed and must be included in the calculations.

3.  The design intent of the proposed plan shall adhere to Section 40.22.210 of the New Castle County Unified Development Code (UDC). Stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points all components of an overall conservation design approach. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and protected resources. There are several areas on the plan where the forests are disturbed in order to incorporate stormwater management and relocation is suggested to avoid this conflict. It should be noted that forested areas have definite stormwater benefit and it would be counterproductive to remove these areas, especially when it appears there are other possible stormwater locations that may better serve the intent of conservation design.

The applicant has not addressed this previous comment to the extent the department requires. Both the Planning and Engineering Section would suggest a meeting to discuss this matter and convey the intent "to preserve the drainageways and resources" to the maximum extent possible. It would be beneficial to the applicant, in order to facilitate this meeting, to prepare and bring Drainage Area Maps similar to those prepared for Port Penn Assemblage (App. 2005-0459). If you need a copy of these to use as an example, please contact Stephanie DeAscanis at 395-5475.

4.  Note that in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event. Please provide the necessary computations to verify site compliance.

5.  In accordance with Engineering Checklist Item I, note that due to the proposed Green Technology Best Management Practices' proposed, the applicant will be required to submit field testing to demonstrate feasibility where soil characteristics may limit infiltration.

6.  As noted in the Conservation Design, Green Technology, and Critical Natural Area Report, the applicant will need to further assess the downstream affect on the four residential properties and State of Delaware property which may be impacted by the post-development stormwater discharge.

Transportation:

On August 17, the County and DelDOT scoped a Traffic Impact Study (TIS) for this Plan with the Applicant. The TIS may recommend improving Port Penn Road's nearby angled intersection with Pole Bridge Road (deemed substandard by the 2003 Southern New Castle County Local Road Plan). The plan should dedicate right-of-way along Port Penn Road (which is classified a Rural Minor Collector), and improve it to Collector Road Standard per the Road Plan.

The Applicant should combine the proposed Port Penn Road access with the proposed eastern access to Port Penn Assemblage (2005-0459-S), near the location of the existing shared driveway on the common property line (as previously discussed). That may eliminate the need for one of the two proposed street connections between the sites. Both plans will likely need a walkway along Port Penn Road (possibly within the Open Space Scenic Buffer) to reach other

neighborhoods, like existing Pine Valley Farms to the west and proposed Augustine Preserve (2004-0917-S) to the east.

<u>Historic:</u>

N/A

<u>Standard Comments:</u>

1. The 'keymap' should reference the actual sheet numbers;
2. The legend references a historical buffer, but a buffer is not shown on the plan;
3. Clarify Note No. 6 that references mapping that "may not meet accuracy standards";
4. Provide the appropriate tax parcel number for each 'certification of ownership';
5. Extend the scenic corridor to the east of Lot B;
6. Correct the reference to 'existing proposed to be removed' on Sheet 3;
7. Specify what the 'dotted' symbols represent;
8. Delete any duplicate notes on Sheets 1 and 2 and include all notes on one sheet;
9. Provide certification of approval from the water supplier;
10. Submit a landscape/open space management/natural resource area plan for review and approval. Show the final width/opacity for all bufferyards on the record plan. Note that proposed lot lines along the existing perimeter may need to be revised based on the required bufferyards;
11. Submit a copy of the required maintenance declaration and a copy of the plan to the Division of Law and this department for review and approval;
12. Contact the New Castle County Department of Special Services in order to address Section 40.27.310.B of the New Castle County Code;
13. Address Section 40.21.150 of the New Castle County Code in regard to accessway standards;
14. Provide a note on the plan addressing the requirements of Section 40.20.230, F., 4. of the New Castle County Code regarding street connectors;
15. Provide street names and/or postal addresses in accordance with U. S. Postal Service policy. Submit a copy of the plan to the Department of Police (Communications) for review of street names. Submit a copy of the plan to the Department of Land Use, Mapping Section for review of postal addresses. Written approval from those agencies, referencing the latest plan revision date, must be received prior to record plan approval;
16. Provide monuments in accordance with Section 40.20.520 of the New Castle County Code;
17. Submit a copy of this plan to the Office of the State Fire Marshal for review and approval;
18. Submit a copy of this plan to the State Division of Highways for review and approval;
19. Performance surety must be provided in accordance with Chapter 40, Division 31.800 of the New Castle County Code. Initiate the Land Development Improvement Agreement by submitting the Land Development Improvement Agreement Information Sheet, based on either the Formula Method or the Cost Estimate Method, to this office;
20. The Owner/Developer must provide certification to the Department of Land Use from the Secretary of the Department of Education that the school district(s) serving the site has adequate capacity for the proposed development. Add the following note to the plan as may be required:
    "Prior to the issuance of any certificate of occupancy for any lot or unit shown on this plan, the owner/developer shall provide a certification from the Secretary of the Department of Education that the Voluntary School Assessment for that lot or unit has been paid."

04/04/2006 09:54 FAX 3023955443          NCC LAND USE                                            ☒006

21. If a complete Preliminary Plan submission is not made within twelve (12) months of the date of the initial exploratory letter, the Exploratory Sketch Plan will be considered to be expired in accordance with Chapter 40, Section 31.390 of the County Code.

cc:     David Culver, Planning Manager
        Gary & Gale Warren

EXHIBIT "L"

CHRISTOPHER A. COONS

COUNTY EXECUTIVE

RICHARD T. PRZYWARA

GENERAL MANAGER



**DEPARTMENT OF SPECIAL SERVICES**

December 20, 2006

John Lehane, P.E.
Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

RE:     Major Subdivision Plan Comment
        Warren Tract – Application Number 2005-0353

Dear Mr. Lehane:

The Department of Special Services, Engineering & Environmental Services Division has reviewed the aforementioned Major Subdivision Plan and provides the following comment:

According to the Department of Special Services Sewer Capacity Policy (policy #7), "...*approximately one hundred fifty (150) residences are needed to reasonably cover the maintenance of one pump station.*" The application only proposes one hundred twenty-six (126) single family dwellings. According to Neil Sander, 25 lots within the emerging development of Port Penn Assemblage are to direct their sewage into the gravity sanitary sewer system proposed within the subdivision of Warren Tract, thus meeting the required minimum number of lots to justify the proposed pumping station.  It was the decision of this Department to approve the exploratory design review for the aforementioned application, regardless of whether the 25 lots are brought into the proposed pump station.  However, it is our feeling that a "regional" design for the sanitary sewer collection system be developed for this site and the neighboring parcels. Your design should include, but not be limited to, extending portions of the proposed sewer system to common property boundaries (with the respective easements) and **limiting** the proposed pumping stations by selecting the optimal location to provide sanitary sewer to the region.

Approval of the exploratory design review by the Department of Special Services shall not be interpreted as a guarantee that sanitary sewer service will be provided to this region. Approval of the preliminary design review will be contingent upon successfully developing a "regional" sanitary sewer system.

Please contact me at (302) 395-5722 if you have any questions regarding the content of this letter.

Very truly yours,

Robert Magnotti, E.I.T.
Civil Engineer I

CC:     Gary Warren
        Richard Przywara, General Manager of the Department of Special Services
        Jonathan Husband, Engineering & Environmental Services Division Manager
        Jason Zern, P.E.
        Bradford Shockley
        Stephanie DeAscanis, P.E.
        File

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720        PHONE: 302-395-5700        FAX: 302-395-5802

**EXHIBIT "M"**



Christopher A. Coons
County Executive



Charles L. Baker
General Manager

*Department of Land Use*

Department of Land Use Preliminary TAC Report

Application Number – 2005-0353
Name of Project – Warren Tract
Type of Plan – Preliminary Major Subdivision Plan
Date of Review – January 22, 2007

Engineer – Neil Sanders

Project Review Team – Brad Shockley (Planning) – 395-5446
Stephanie DeAscanis, P.E. (Engineering) – 395-5475
Christine Quinn (Historic) – 395-5521
Owen Robatino (Transportation) – 395-5427

Status of Review – General Compliance for the Public Hearing  - The Department will issue
an additional review report after the Public Hearing.

Planning:

Date complete submission received by Department of Land Use: 12/28/06
Date review complete by Planning Section:                          1/4/07
Number of Days in the Planning Section:                            4 days

1.  *The plan may proceed as proposed; however, the agricultural subdivision must occur prior to
    the record plan submission;*
2.  Identify (within the plan view on Sheet 5) the acreage for each protected resource that is
    referenced within the 'natural resource protection' table on Sheet 4 (Note No. 14) and Sheet
    5.  Further, in order to clarify the total acreage of resources to be disturbed, identify the area
    and acreage of each resource (as shown on Sheet 5) to be disturbed for stormwater
    management;
3.  Correct the *total resource land* within Step 1 of Table 40.05.421;
4.  There are still sections of drainageways within the LOD, but relatively small acreages are
    identified as being disturbed. Correct the disturbance calculations as may be required. Note
    that the overall disturbance must comply with Table 40.10.010 of the New Castle County
    Code (unless otherwise permitted by Table 40.10.210). Further, note that all "protected"
    resources must be within open space; therefore, at a minimum, all drainageways on
    individual lots must be considered disturbed;
5.  Identify the forest disturbance behind Lots 69 and 70 on Sheet 5;
6.  Revise the LOD to the southwest of Lot 46, as the RBA is shown to be disturbed;
7.  Designate natural resource area/community area open space on the plan in accordance with
    Section 40.20.225 of the New Castle County Code;
8.  Provide documentation from the Army Corps of Engineers in regard to the areas labeled as
    'Waters of the U.S.';

87 Read's Way, New Castle, DE 19720          www.nccdelu.org          Phone: 302-395-5400          Fax: 302-395-5587

9. Submit a landscape/open space management/natural resource area plan for review and approval. Show the final width/opacity for all bufferyards on the record plan. Note that proposed lot lines along the existing perimeter may need to be revised based on the required bufferyards. For example, there are areas along the northern property line in which a 0.2 opacity buffer is shown without providing the minimum width of 15'. Include the standard landscape plan note on the record plan;

10. Your cover letter notes that the Memorandum of Agreement between DNREC and Toll Bros. represents approval of the plan in regard to CNA issues; however, the Department is in receipt of correspondence from DNREC (letter dated August 1, 2006 and the attached TAC comments) that outlines additional concerns in regard to the CNA. Specify if the DNREC issues have been resolved;

11. Revise the lot lines for Lots 21 and 22, so that the easement to the DNREC property is within open space. The record plan should clearly specify any areas of public access through the subject subdivision to the DNREC property;

12. Verify that the acreage of lots, roads, and stormwater management equal 118 acres (within Note No. 13). Also, Note No. 39 may be removed, as the required information is shown within Note No. 13;

13. Correct the reference to Parcel 14 within Note No. 2;

14. Verify the deed book reference within Note No. 4 and explain the purpose of the easement that is to be eliminated;

15. Remove the second sentence from Note No. 6;

16. Note No. 10 continues to refer to an exploratory plan;

17. Note No. 31 continues to reference a pending TIS;

18. Verify that all lots comply with the minimum side loading garage setback. For example, refer to Lots 27 and 43;

19. Correct the acreage/square footage conversions within Note No. 13 and verify the total road (ROW) coverage;

20. Contact the New Castle County Department of Special Services in regard to Note No. 20, as there is no sanitary sewer service in this area (per letter from Special Services - dated March 23, 2006).

Engineering:

The Engineering Section within the Department of Land Use has reviewed the above mentioned Preliminary Plan and finds the application unacceptable due to comments 2 through 6, the remaining comments are provided for ease of record plan preparation. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Note the following comments:

1. Date complete submission received by Department of Land Use: 12/28/06
   Date review complete by Engineering Section:                1/10/07
   Number of Days in the Engineering Section:                  8 days

2. The department previously commented on implementation of conservation design in accordance with Article 22 of the UDC, which states stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points all components of an overall conservation design approach. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and

protected resources. There are some areas on the plan where the department feels the nature of this intent is not honored to the maximum extent possible.

    a. The applicant shall take advantage of the results from the GTA report dated October 3, 2006 which indicate several test pit locations where acceptable infiltration rates were encountered allowing incorporation of volume reduction into the calculations. The incorporation of practices, to recognize a volume and peak rate reduction, into the design and computations may have a beneficial effect on the peak rates at each of the analysis points. The volume reduction may essentially eliminate the need for the proposed wet pond for peak rate compliance. Essentially the report shall provide further information as to how the applicant proposes to achieve volume reduction as mentioned on sheet 7 of the report. (Checklist Item G-8)

    b. Previous comments were rendered regarding forest disturbance with respect to GTBMP implementation. It should be noted that forested areas have definite stormwater benefit and it would be counterproductive to remove these areas, especially when it appears there are other possible stormwater management alternatives. Though the code permits this disturbance, if it can be avoided with implementation of an alternative GTBMP (e.g. – bioretention) that would be the preference of the department, particularly Bio-swale C-1, C-2 which appear to disturb forest in order to meet the length requirement in DURMM. It also appears that Bio-swale B-2 may be shifted to the west in order to avoid forest disturbance.

    c. Additionally, there seems to be redundant conveyance systems in areas where the proposed layout is not maintaining the natural drainage divides.

3. In conjunction to the planning comment any forest elimination associated with a stormwater feature shall be considered disturbed.

4. The Engineering Section further supports the Planning comment regarding interpretation of drainageway disturbance. Section 40.10.360 states, "the protected area may be re-graded and reshaped to provide for stormwater management and drainage." Any drainageway not in open space shall be considered disturbed. Artificially reconstructing the drainageway with an alignment that suits development is not conservation of that resource as set forth in the referenced section of code.

5. In addition to the above comment, note Section 40.10.360.D with respect to design of stormwater management in drainageways. All permanent pool stormwater management ponds shall be designed with aquatic benches planted with approved materials.

6. The following items were absent for the stormwater analysis report:

    a. CN values and Tc path depicted on the drainage plan and associated computations. (Checklist Item G-3,4)

    b. No mention in the report as to a path forward with respect to the GTA results regarding infiltration and volume reduction with GTBMPs. (Checklist Item G-8)

    c. Effects on downstream properties and existing conveyance analysis. (Checklist Item G-9)

Sheet 7 of the report mentions that drainage area, cover numbers and Tc calculations are included, however Exhibit III-2 only provide a hydrograph summary for the peak flows. Sheet 8 of the report mentions bio-retention areas twice; however it appears that 16 bioswales and a wet pond are proposed. The department would prefer a mixed use application of stormwater practices and ask the applicant to reflect this on the plan and in the computations.

Record Plan Compliance

7. As previously requested, in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event. Please provide the necessary computations to verify site compliance.

8. As previously requested, provide an assessment per the New Castle County Drainage Code Section 12.04.001.F for each proposed drainage discharge point. Include a topographic detail plan from the discharge point to the location where conveyance is adequate. Within the preliminary stormwater management report, the determination of using a pond as a method of control shall be pursuant to Section 12.04.001.F4 of the New Castle County Drainage Code (Section 10.3.8 of the Delaware Sediment and Stormwater Regulations).

9. Conveyance (stormwater management) systems shall outfall to a stormwater facility or watercourse capable of accepting the design runoff in accordance with Section 12.04.001.D. Verification of this code section will be required with the stormwater management report.

10. There are several areas on the plan where it is unclear how the runoff leaves the road and enters stormwater systems. Please clarify these areas with labeling or in the legend.

11. Provide a statement regarding filed verification of the topography in the note on the record plan.

12. Clearly label exhibits in the report as present in the table of contents and report body. The current exhibits in the report are not labeled.

13. Comments regarding sewer design shall be furnished by the New Castle County Department of Special Services.

14. In accordance with Section 12.04.001.E of the NCC Drainage Code, the applicant must provide verification that the one hundred (100) year storm event shall reach the designed stormwater management facility, without adversely affecting structures, in the event runoff exceeds the capacity of the conveyance system or the conveyance system fails.

15. Provide and label all required drainage and stormwater management easements on the Preliminary Plan for both open and closed conveyance systems, per Article 4 of the NCC Drainage Code. All easements shall be labeled in favor of a maintenance entity.

16. Functional design of stormwater practices will be further scrutinized with additional calculation and information to be provided at the record plan stage. Areas of concern include bio-swale #B-6, A-4, A-5, and any areas in the vicinity of homes which contain a pipe sump.

17. Provide a NRCS / Open Space Management Plan (please contact Land Use for a copy of a plan with the desired format) in accordance with UDC Section 40.27.210.C. Upon acceptance of the plan, a computation is required for the cost of maintaining all the features show thereon for a two year period to establish the maintenance escrow amount per UDC Section 40.27.300.B.

Transportation:

The Applicant has done a combined Traffic Impact Study (TIS), dated July 2006, with the adjacent Port Penn Assemblage (2005-0459-S). DelDOT has reviewed that TIS in a letter dated 10/25/2006—but will issue a revised letter. We understand the revisions may involve off-site road, intersection, and bicycle/pedestrian improvements. The Plan should cite the TIS and final DelDOT letter, as well as the final off-site improvements with appropriate phasing.

Per UDC Paragraph 40.21.162.C, the improvements should include a paved walkway along the Port Penn Road. That walkway should extend westward from the site access to the eastern Port

Penn Assemblage access, and continue to the western Assemblage access. To ease roadwork and provide a more pleasant walkway, it should be placed off the right-of-way in the parallel Open Space buffer.

Historic:

N/A

Standard Comments:

1. Provide an overall sheet index on Sheet 4;
2. Submit a copy of the required maintenance declaration and a copy of the plan to the Division of Law and this department for review and approval;
3. Contact the New Castle County Department of Special Services in order to address Section 40.27.310.B of the New Castle County Code. Provide a note on the plan that references the required funding;
4. Provide a note on the plan addressing the requirements of Section 40.20.230, F., 4. of the New Castle County Code regarding street connectors;
5. Provide street names and/or postal addresses in accordance with U. S. Postal Service policy. Submit a copy of the plan to the Department of Police (Communications) for review of street names. Submit a copy of the plan to the Department of Land Use, Mapping Section for review of postal addresses. Written approval from those agencies, referencing the latest plan revision date, must be received prior to record plan approval;
6. Provide monuments in accordance with Section 40.20.520 of the New Castle County Code;
7. Submit a copy of this plan to the Office of the State Fire Marshal for review and approval;
8. Submit a copy of this plan to the State Division of Highways for review and approval;
9. Performance surety must be provided in accordance with Chapter 40, Division 31.800 of the New Castle County Code. Initiate the Land Development Improvement Agreement by submitting the Land Development Improvement Agreement Information Sheet, based on either the Formula Method or the Cost Estimate Method, to this office;
10. The Owner/Developer must provide certification to the Department of Land Use from the Secretary of the Department of Education that the school district(s) serving the site has adequate capacity for the proposed development. Add the following note to the plan as may be required:
    "Prior to the issuance of any certificate of occupancy for any lot or unit shown on this plan, the owner/developer shall provide a certification from the Secretary of the Department of Education that the Voluntary School Assessment for that lot or unit has been paid."
11. If a complete Record Plan submission is not made within twelve (12) months of the date of this letter, the Preliminary Plan will be considered to be expired in accordance with Section 40.31.390 of the NCCC.

cc:    David Culver, Planning Manager
       Gary & Gale Warren

EXHIBIT "N"

FROM :BillWARREN FARM          FAX NO. :302834960000       Oct. 24 2007 02:11PM P1

CHRISTOPHER A. COONS
COUNTY EXECUTIVE



TRACY Z. SURLES
ACTING GENERAL MANAGER

### DEPARTMENT OF SPECIAL SERVICES

October 22, 2007

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

Re:   Application No. 2005-0035, Proposed Development known as "Warren Tract"

Dear Sir or Madam:

This letter is sent in response to your most recent preliminary major subdivision plan submission to the New Castle County ("County") Department of Land Use. As noted in previous County responses to your submissions, your proposed development, currently known as "Warren Tract," Application No. 2005-0353, is located within an area in which the County does not currently have sanitary sewer capacity available. Furthermore, the County currently does not have any approved and fully funded projects to provide sanitary sewer capacity to that area.

Section 40.05.320 of the *Unified Development Code* states that the Department of Land Use cannot provide final plan approval for a plan unless verification from the Department of Special Services is received indicating that sewer capacity is or will be available for a proposed development. Because there is no sewer capacity for this proposed development and because sewer capacity will not be available for this development pursuant to the Department of Special Services and Department of Land Use Sewer Capacity Policy, the above application may not continue through the record plan process. Thus, the County will not grant preliminary plan approval and will not execute a Land Development Improvement Agreement ("LDIA") or a sewer agreement for sewer connection, as required before final plan approval by *New Castle County Code*.

Please note that this land use application shall be subject to all applicable expiration provisions in the *New Castle County Code*. Thank you for your attention to this matter.

Sincerely,

Jonathan W. Husband
Acting Senior Manager

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720       PHONE: 302-395-5700       FAX: 302 395 5870

NEW CASTLE COUNTY
DEPARTMENT OF SPECIAL SERVICES
DEPARTMENT OF LAND USE
SEWER CAPACITY POLICY

Special Services Policy No:        02

Land Use Policy No.:              2.9

Subject:                          Available Sanitary Sewer Capacity Determinations and
                                  Processing of Land Development Applications

Original Date of Publication:     August 26, 2002

Effective Date:                   October 22, 2007

Approved: _____

General Manager, Department of Special Services

Approved: _____

General Manager, Department of Land Use

**LEGAL AUTHORITY:** The New Castle County ("County") Department of Special Services ("Special Services"), the County Department of Land Use ("Land Use")(Land Use and Special Services collectively hereinafter known as "Departments") and the General Managers of these Departments enact this policy pursuant to authority granted to them in Title 9, Section 1341 of the Delaware Code, 9 Del. C. § 1341; Title 9, Section 1301 of the Delaware Code, 9 Del. C. § 1301; Chapter 2, Section 2.05.301 of the County Code ("Code"), N.C.C.C. § 2.05.301; Chapter 2, Section 2.05.100 of the County Code, N.C.C.C. § 2.05.100; and Section 40.05.320 of the Unified Development Code ("UDC"), N.C.C.C. § 40.05.320.

**BACKGROUND:** In light of the significant investment the County has made to rehabilitate and upgrade the County-wide sewer system, and in light of increased building pressure, this policy provides the Departments with standards for determining when sewer capacity will be available for proposed development. This policy also avoids inefficient use of the Departments' limited resources in the event sewer capacity is not or will not be available. The policy outlined below supercedes all previous policies regarding sewer capacity availability provisions in Article 5 of the UDC.

**POLICY:** Section 40.05.320 of the UDC provides that for sewered developments located in the County, prior to receiving final plan approval, "the developer must obtain verification from the Department of Special Services that sewer capacity is available or will be

available at the time of the proposed development." N.C.C.C. § 40.5.320. The determination of whether sewer capacity "is available" shall be based upon Special Services' analysis of the sewer capacity model on the date that the request is received. Any statement by Special Services that capacity is available prior to execution of a sewer agreement at the record plan stage is not a guarantee that sanitary sewer capacity will be available later in the plan review process. Sewer capacity shall only be available on a first come, first serve basis and may only be reserved through the execution and recording of a sewer agreement at the record plan stage. See N.C.C.C. § 38.02.002.C; N.C.C.C. 40 § 31.820.

In some areas, sewer capacity is not available at the time of the capacity request; however, a sewer improvement project is scheduled to provide capacity in that area. In these circumstances, the Department may determine that capacity "will be available" for the proposed development if the necessary sewer improvement project has been approved and fully funded by the County Executive and County Council as part of the County's Capital Program & Budget for the fiscal year in which the Department receives the request.[*]

If a determination is made by Special Services that capacity "will be available" at the exploratory or preliminary plan stage of the application process, the developer may continue through the development plan application and review process. The developer's continued processing of such plans is made with the understanding that capacity may not be available at the record plan stage and with the understanding that the Department may place a hold on building permits and/or certificates of occupancy at the record plan stage as necessary to ensure that sewer improvements are completed prior to the proposed development connecting to the County sanitary sewer system. Special Services does not guarantee if and/or when sewer improvements will be completed, and does not guarantee if and/or when sewer capacity will be available. The developer shall proceed at his or her own risk in processing plan applications where capacity "will be available," understanding that numerous factors, such as obtaining required permits from other government agencies, obtaining right-of-ways, unforeseen weather conditions, construction issues, changes in policy or plans, the commitment of available capacity for other developments, and other unforeseen circumstances may impact the ultimate availability of sewer or the timing and completion of proposed sewer improvements.

In instances where Special Services determines that capacity "will be available" and where Special Services is willing to consent to the recording of a record plan with restrictions, Special Services shall notify developers by letter of the restrictions on building permits and/or certificates of occupancy at the record plan stage. The Department shall also note any restrictions in the sewer agreement for the development and require notes to that effect on the recorded record plan.

---

[*] While most of the projects in the County's Capital Program & Budget provide funding for a specific improvement to a section of the system, i.e., parallel line, add a pump to a pump station, increase pipe size, etc., some projects merely provide funding to allow the Department to study sections of its system to identify problems. More defined projects develop as a result of such studies. The studies themselves shall not be considered "sewer improvement projects" under this policy for the purpose of determining that capacity will be available for a development unless the Department reasonably believes that work performed as part of the study (i.e., line cleaning, grouting, etc.) will provide capacity. If/when the study identifies a specific project to provide capacity, the Department may then determine that capacity will be available upon completion of such project, consistent with this policy.

connection to sewer when service is not or will not be available because continued processing of a plan application that cannot ultimately be recorded is an inefficient use of the County's limited financial and personnel resources. The Developer shall be notified via letter from Special Services with a copy provided to Land Use when sewer capacity is not or will not be available.

Distribution: Policy Book Holders

**EXHIBIT "O"**

**aplin|Stewart**
*Attorneys at Law*

Marc B. Kaplin
Direct Dial: (610) 941-2666
Direct Fax: (610) 684-2000
Email: mkaplin@kaplaw.com
www.kaplaw.com

November 6, 2007

Jonathan W. Husband
Acting Senior Manager
Department of Special Services
187-A Old Churchmans Road
New Castle, DE 19720

**RE:   Application No. 2005-0035, Proposed Development known as "Warren Tract"**

Dear Mr. Husband:

This letter is in response to your October 22, 2007 letter to Eastern States Engineering ("ESE") wherein you informed ESE that "because there is no sewer capacity for this proposed development and because sewer capacity will not be available for this development pursuant to the Department of Special Services and Department of Land Use Sewer Capacity Policy, the above application may not continue through the process."

By letter dated June 26, 2005 directed to David W. Singleton and Richard T. Przyara, on which you were copied, I informed New Castle County and the Department of Special Services of the methods by which sanitary sewer service can be made available to the homes proposed to be developed on the Warren Tract. These methods are still available today and therefore your explanation that there is no sewer capacity available for the Warren Tract development is incorrect.

As I explained at the time and as it continues to be the case today, there is sufficient unused capacity in Water Farm 1 to service the sewage needs of the homes to be constructed on the Warren Tract. Because there is a pump station located in the Augustine Creek Subdivision, sewage from the Warren Tract (and adjacent properties) can be pumped to that pump station by the regional pump station that Toll Bros, Inc ("Toll"), the equitable owner of the Warren Tract, has offered to construct on the Warren Property ("Regional Pump Station"). The Augustine Creek pump station pumps sewage along Pole Bridge Road to an existing 24 inch gravity sewer main that runs adjacent to Dupont Parkway and terminates at Water Farm 1. Therefore, homes that are to be constructed on the Warren Tract can utilize the unused capacity at Water Farm 1. All that is needed to facilitate the conveyance of such sewage to Water Farm 1 is the construction of the Regional Pump Station and accompanying force main from the Warren Tract to the pump station at Augustine Creek. Alternatively, a force main can be permanently constructed from the Regional Pump Station, along Port Penn Road to

Kaplin Stewart Meloff Reiter & Stein, PC
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA 19422-0765
(610) 260-6000 tel

*Offices in:*
*Pennsylvania*
*New Jersey*

Jonathan W. Husband
November 6, 2007
Page 2

Biddle's Corner, where it can turn directly south along Dupont Parkway. That force main can ultimately be turned west to convey the sewage from the Port Penn area to Water Farm 2 should New Castle County at some point decide to construct Water Farm 2. However, on a temporary basis the line can be continued south along Dupont Parkway to its intersection with Pole Bridge Road for connection to the 24 inch gravity main that conveys sewage to Water Farm 1.

Alternatively, Toll has offered to design and construct an on-site sanitary sewer collection, conveyance, treatment and disposal system ("Community System"), which upon completion could be conveyed by Toll to New Castle County and operated by the Department of Special Services, or could be conveyed to and operated by a wastewater utility approved and licensed by the Public Service Commission. The Community System is permitted under both the New Castle County Unified Development Code ("UDC") and the Delaware Code.

Specifically, Section 40.05.520(c) of the UDC provides in relevant part:

> The analysis required in Section 40.05.310 may result in a reduction in density. If the limiting value of the site carrying capacity results from the maximum resource capacity determination, the developer shall build within those limits. *If the limiting value of the site carrying capacity is established by the concurrency capacity determination, the following options are available to the developer.*
>
> *       *       *
>
> C. *Make improvements.* The *developer can make* improvements for traffic as approved by the County and DelDOT. *Improvements may be made to the sewer as determined by the Department of Special Services. In the Suburban zoning districts, sewer improvements may include the use of spray irrigation, provided that such a system has a minimum processing capacity of one hundred thousand (100,000) gallons per day and so long as the capacity of the system can be increased at a later time by an additional fifty thousand (50,000) gallons per day. Other types of large scale treatment systems may be permitted if approved by DNREC and the County Department of Special Services. Such facilities shall only be permitted in Suburban zoning districts and shall only be constructed in accordance with the rules and regulations governing such systems as promulgated by DNREC and the County Department of Special Services.* All such systems shall be turned over to the County upon their completion and formal acceptance by the Department of Special Services. The

Jonathan W. Husband
November 6, 2007
Page 3

developer may reach agreements with the school district or with a water supplier to make or fund improvements that would be available prior to occupancy. *[Emphasis added]*

Further, Title 26, Section 203D of Delaware Code sets forth the procedure by which a private wastewater utility provider can become authorized to provide wastewater service for a service area or proposed development.

In 2006, after many meetings and discussions with members of the New Castle County government and the Department of Special Services, I prepared and delivered to Richard Przywara and the Department of Special Services a proposed sewer agreement. The proposed agreement between Toll and the Department of Special Services sets forth a procedure for the delivery of sewer service to properties to be developed by Toll in New Castle County's southern sewer district including the Warren Tract. I am enclosing another copy of the proposed sewer agreement to again demonstrate that sanitary sewer service can be provided to the Warren Tract. Additionally, Toll has negotiated and is prepared to execute a wastewater service agreement with an experienced regulated utility company for the design, construction and operation of the Community System.

In view of the availability of sanitary sewer service by any of the above described methods, Toll requests that the Department of Special Services confirm to the Department of Land Use that sewer capacity is available for the proposed development.

Very truly yours,

Marc B. Kaplin, Esquire

MBK:ba
Enclosure

cc:    Brad Shockley
       Greg Wilson

**EXHIBIT "P"**

JUN-26-2006 14:33 FROM:                               TO:ESE-ENGINEERING        P:2/10

Christopher A. Coons
County Executive



RECEIVED JUN 2 0 2006

Charles L. Baker
General Manager

### Department of Land Use

### Department of Land Use Revised Exploratory Sketch Plan Review Report

| | |
|---|---|
| Date – | June 14, 2006 |
| Application Number – | 2005-0459 (S) |
| Project Title – | **Port Penn Assemblage** |
| Consulting Engineer – | Choong Y. Yim, P.E., Eastern States Engineering |
| Legal Property Owner – | Mitch Kotler, V.P., Toll Brothers, Inc. |
| Description – | Proposal to subdivide 481.21 acres into an Open Space Planned development of 505 dwelling units northeast of Port Penn and Dutch Neck Roads. |

Type and Stage of Plan –   Revised Exploratory Sketch Major Subdivision Plan
Prior Reviews –   November 10, 2005 Exploratory Sketch Plan Review

Project Review Team –   Planner, Steven Faux at 395-5437
Engineer, Stephanie DeAscanis at 395-5475 *sf fax P*
Historic Preservation, Christine Quinn at 395-5521
Transportation, John Janowski at 395-5426
Special Services, David Thurman at 395-5752

Status of Review –   General compliance for public hearing – The Department will issue an additional review report after the August 1, 2006, Planning Board Public Hearing that will either find the plan acceptable to proceed to the Preliminary level after all comments and/or studies explained below are addressed or unacceptable with instructions to submit a revised Exploratory Sketch Plan addressing all comments and/or studies.

Timeframe –   Pursuant to Section 40.31.390 of the New Castle County Code (NCCC), the Preliminary Plan submission must be made within one year from the date of this first review report (by November 10, 2006) or the application will be expired. The Exploratory Sketch Plan must first achieve official approval status and the Traffic Impact Study must also be completed and be approved by DelDot by that date in order for the Preliminary Plan submission to be complete.

**Planning comments:**

1.  This plan relies on connection to a public sanitary sewer system, but no such system exists. The applicant has been advised on numerous occasions, since the

2

initial plan submission, that the County has made no commitment to provide sewer infrastructure availability to this site. The developer is again reminded that advancing a subdivision plan in reliance of the provision of sewer infrastructure secures no guarantee that the County will provide such infrastructure. Without an approved sewerage strategy, the plan will not be approved and construction will not be permitted.

2. As stated in comment 4 of the Department's November 10, 2005 initial review report, the lots directly opposite Road F should be relocated to provide a viewshed into the open space and to avoid the establishment of driveways backing out into the entrance. This affects lots 2061 and 2062.

3. The active recreation facilities proposed at the intersection of Roads A and B are generally acceptable, however, that complex is subject to the dimensional requirements applicable to nonresidential facilities in the Suburban zoning district per Table 40.04.110 B. of the NCCC. The connector drive between the parking areas and several of the parking spaces are not in compliance with the 50 foot street yard paving setback requirement and must be redesigned.

4. Although a suggestion had been made that a reduction of sidewalks may aid in reducing impervious surfaces and promoting green technology stormwater management practices, the partial waiver of the sidewalk requirement has not yet been approved by the Department. For each street along which no sidewalk is proposed, justification must be provided. It must be demonstrated that the sidewalk is generally unnecessary and that it would be either problematic from a stormwater management standpoint or that it would be environmentally beneficial to not have the particular sidewalk.

5. The requested waiver of the curbing requirement for the overflow parking spaces and the authorization to provide dead-end parking is not approved at this time. Consideration will be given upon receipt of an acceptable rationale for each separate parking area. Also, several of the proposed overflow parking lots are very close to the adjoining residential lot lines and have the front of the spaces oriented toward the houses; a swath of evergreen landscaping should be provided between such parking lots and the lots.

6. The plan provides substantial open spaces comprised predominantly of the Thousand Acre Marsh and its associated floodplain, wetlands, and Riparian Buffer Areas. Additional unconstrained open space is also provided in various locations and configurations. However, the plan does not appear to comply with the "usable open space" requirement of Section 40.20.225 B.5. of the NCCC. For this 505 lot subdivision, 5.05 acres of "centrally located, highly visible, unconstrained" usable open space is required in addition to the protected natural resources. The approximately one acre active recreation area with the proposed pool, clubhouse, and tennis courts shall count toward part of the 5.05 acres, but the five other areas labeled "Community Open Space" are all tucked-away behind

3

several groups of lots. None of those areas meet the "highly visible" criteria. Usable, highly visible open spaces typically require some direct street frontage so they are visually obvious to the residents of the development.

7. The Critical Natural Area Report is inadequate. In addition to the very general statements in the Report, each area of CNA proposed to be encroached upon should be discussed and justified. Although each category of CNA has less than a 100% protection level, the particular areas of proposed CNA development shall be evaluated on a case by case basis. The Department of Land Use, the Delaware Division of Fish and Wildlife, and DNREC's Natural Areas Program Division have all previously expressed concern about the proposed CNA impacts associated with Road L and lots 1010 to 1015. Pursuant to Section 40.10.370 of the NCCC, that particularly sensitive portion of the Critical Natural Area is required to be preserved and the affected lots are to be removed or relocated. This issue was previously discussed in comment 12 of the Department's initial review report.

8. Wherever pedestrian access to the open space is provided via a strip of open space between lots, the open space access strip is required to be at least 45 feet wide. Several such strips need to be widened. Among the locations of necessary widening are between lots 1023-1024, 2078-2090, 3009-4020, 3069-3070, and 5029-5030. This requirement is derived from Sections 40.21.162 D. and 40.21.163 C. of the NCCC. The five foot wide "pedestrian way" access through the open space strips need not be paved or improved but must be 20 feet away from the adjoining lot lines.

9. Provide a swath of landscaped open space between Road F and lots 2002 and 2003. Section 40.20.220 A. prohibits "double frontage lots". This will also improve the entrance to the subdivision.

10. The appropriateness of the proposed sewer pump station parcel behind lot 3044 will depend on the type of pump station and the probable land use impacts of it (noise, odor, vibration...). It appears to be too close to the adjoining residential lots and should be relocated to be in a more inconspicuous location. It is presumed that the unlabeled parcel shown to the east of lot 2069 is the second pump station lot. If so, label it accordingly; if not, please clarify what it is.

11. DNREC has indicated their desire to accept a large portion of the open space as public open space to be owned and maintained by them. After coordinating with the DNREC Division of Parks and Recreation, depict the boundaries separating the proposed public and private open spaces and label them accordingly. Also, per the recorded agreement between the developer and DNREC, acknowledge the commitment for the Maintenance Corporation to pay DNREC $5,000.00 per year toward their "Habitat Restoration Project" in a note on the plan.

12. Since the existing DNREC vehicular and pedestrian access easement along the eastern tract boundary will not be extinguished until 30 days after the recordation of the pending "Warren Tract" subdivision to the east of this site per the recorded Memorandum of Agreement, it will still exist (potentially indefinitely) at the time of the approval of this plan if the Warren Tract plan is not recorded first. In that event, the either provisions must be made to extinguish it concurrently with this plan or substantial landscaping must be provided between the access drive and the proposed lots.

13. Revise the plan purpose note to more specifically state that "The purpose of this plan is to subdivide 481.22 acres into 505 lots including 270 single family detached lots, 232 single family attached lots, and 3 existing historical dwelling lots. The plan also establishes 2 sewer pump station lots as well as public and private open space parcels." (The vacant large lot next to the Cleaver House is considered a single family detached lot.)

14. Please renumber all of the lots to sequentially go from 1 to 505.

**Engineering comments:**

The Engineering Section within the Department of Land Use has reviewed the above mentioned Exploratory Plan and finds the application generally acceptable. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Please note the following comments must be satisfactorily addressed with the preliminary submission:

1. Date complete submission received by Department of Land Use: 05/08/05
   Date review complete by Engineering Section:                    6/07/05
   Number of Days in the Engineering Section:                      20 days

2. As previously mentioned, the following significant issues must be addressed with respect to intent:
   a. The applicant shall provide the Department with written response from DNREC regarding the extent of area designated as Critical Natural Area (CNA) and management/ownership issues of land adjacent to the 1000 Acre Marsh. As previously indicated, the Department and DNREC remain concerned with the location of lots 1020 through 1025 and the impact on the CNA.
   b. Upon completion, the applicant shall provide the Department with the structural analysis of the "man-made" pond. In addition, upon determination, please advise the Department as to the ownership of this facility.

3. Re-evaluate the extent of Riparian Buffer Area given the definition set forth in the Unified Development Code for Zone 1 Riparian Buffers on page 33-54. It is apparent that the extent of riparian buffer will expand in some locations on the parcel to suit this definition.

Case 1:07-cv-00725-SLR-LPS     Document 1-2     Filed 11/13/2007     Page 63 of 70
JUN-26-2006 14:34   FROM:                                TO:ESE-ENGINEERING     P:6/10

5

4. The design intent of the proposed plan shall adhere to Section 40.22.210 of the Unified Development Code (UDC) by utilizing Green Technology Stormwater Best Management Practices to address stormwater conveyance and stormwater management objectives. Stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and protected resources. These comments represent several aspects of this plan which the department feels fall short of the intent and practice of conservation design.

5. As previously mentioned, the Preliminary Plan should depict all proposed Stormwater Management Areas and label specific practices to be implemented with the design, as proximity to resources and topography must be accounted for in practice selection. The plan should be revised to reduce riparian impacts, specifically where steep slope areas are present. Pursuant to Item J of the exploratory plan checklist, all stormwater management facilities are required to be shown on the plan in order to approve the general feasibility of the stormwater design in relation to the sites natural resources and layout. The stormwater narrative references the proposal to use bioswales to address stormwater quality which may be suitable for the upland and middle portions of the site. However, as discussed in the pre-exploratory meeting, this site has areas that are constrained by Article 10 resources (i.e., floodplain, riparian buffer) and steep grades where bioswales may not be suitable practices. The focus of that discussion was centered on using the practice of stormwater terracing, but no indication of terracing or any practice is shown on the plan. Be sure to address this issue with any subsequent submission.

   a. The applicant shall consider substantial protection of the mapped drainageways as necessary since they generally provide stable (nonerosive) conveyance of stormwater to protected natural resources. Instead of conforming to the existing topography, there are several areas where considerable fill is required in drainageways to achieve the street and lot configuration. Utilization of the natural drainage patterns would promote stormwater management via surface water dispersion and infiltration. The engineering section views these drainageways as natural areas which should be preserved. Filling and re-routing of these natural features also introduce the potential for erosive conditions and in some areas this occurs in close proximity to other protected resources. There are existing locations that would be more serviceable for the purpose of directing post developed drainage to the receiving Riparian Buffer Areas and resources.

   b. Note that in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event.

JUN-26-2006 14:34   FROM:                                    TO:ESE-ENGINEERING    P:7/10

6

   c. Proposed lot and stormwater management layout in the following areas shall be reconsidered as their impact does not comply with the standards set forth in Article 22 of the UDC:

1. Relocation of lot 3021 and 3022 to reduce the impact adjacent to the RBA line and the existing drainageway.(sheet10)
2. The LOD can not be located on individual lots. At a minimum, remove the LOD from the following lots: 3021, 3022, 3051, 3052, 3057, 2112, 2047. There may be other lots subject to this comment. Provide a separate LOD and LOC on the future plans.
3. The applicant shall consider curb-cuts rather than complete curb removal in several areas, especially those adjacent to RBA and steep slope resources. The engineering section may not support a waiver request for complete curb removal due to safety issues associated with adjacent topography.
4. Refer to the zone 1 definition of the RBA on page 33-54 of the UDC with respect to the steep slopes and there possible effect on the RBA.
5. Consider feasibility of road construction for Road "Y" adjacent to RBA.
6. Location of townhomes adjacent to existing single family lots.(sheet 14)

6. Provide the Department with an overlay of the mapped engineering delineation of the floodplain using elevation 10 (9.22) with that of a scaled FEMA drawing to compare to verify the extents of this resource are properly mapped.

7. It shall be determined no later than the preliminary plan submission whether a stormwater quantity waiver will be sought for this project according to the Delaware Sediment and Stormwater Regulations, Section 3.2.2.

8. Please provide and label all required drainage easements on the Preliminary Plan for both open and closed conveyance systems, per Article 4 of the NCC Drainage Code. All easements shall be labeled in favor of a maintenance entity.

9. Add the following note to the plan, "The owner/developer shall pay, to New Castle County, funds for residential storm water management facility maintenance pursuant to section 40.27.310.C of the County code. The funds shall be issued for the costs associated with inspections, long-term sediment cleanout and structural repair and reconstruction of storm water management facilities. An amount shall be determined by the Department of Special Service and shall be payable upon issuance of seventy-five (75) percent of building permits for the lots in the subdivision, or phase thereof. The Department of Land Use shall withhold the issuance of any additional building permits until the Department of Land Use is furnished with satisfactory written proof that the funds have been paid to New Castle County in accordance with the requirements."

10. Add the following note to the plan, "Pursuant to Chapter 40, Article 27 of the New Castle County Code, the developer shall place funds in an interest bearing escrow account equivalent to the cost of maintaining the private open space and common facilities for a two (2) year period. The amount shall be _____

7

($_____) dollars per lot shown on this plan or subsequent plans ($_____ x
505 Lots = $ _____)."

**Historic comments:**

The following comments in italics are reiterated verbatim from the Department's
November 10, 2005 review report. The comments remain applicable to this revised plan.
However, it is acknowledged that the applicant is currently scheduled to present the
application to the Historic Review Board at their June 20, 2006 hearing. Depending upon
the Board's recommendation as a result of that hearing, the buffer requirements may or
may not be modified. If the 500 foot buffers around the historic houses remain
mandated, substantial design revisions will be necessary.

*"The historic preservation section has reviewed the submitted Exploratory Sketch Major
Subdivision Plan for Port Penn Assemblage (application 2005-0459). Three historic farm
complexes are located within the area proposed for development, and the submitted plan
shows open space buffers of two hundred feet around these resources.*

*The Cleaver House, also known as the Lester property, is located on Tax Parcel 13-
009.00-016. The Cleaver House is listed in the National Register of Historic Places, and
Appendix 4 of the Unified Development Code notes that this farm complex is located
within an open context setting. Therefore, a 500' open space buffer is required between
the contributing structures, sites, and objects in this National Register site and any
proposed new construction, per Article 15.111.B of the Unified Development Code.*

*The Diksa property, located on Tax Parcel 13-009.00-010, does not have any official
historic designation at this time. However, the house is known to be over fifty years old.
The structures that comprise the farm complex are located in an open context setting.
Therefore, the 200' open space buffer shown on the submitted plan is insufficient to
properly protect the historic setting of these resources.*

*The Cole property, located at 740 Dutch Neck Road and on Tax Parcel 13-004.00-008,
does not have any official historic designation at this time. This house is also known to be
over fifty years old and appears to be located in an open context setting. As with the
Diksa property, the 200' open space buffer shown on the submitted plan is insufficient to
properly protect the historic setting of these resources.*

*Because the Diksa and Cole properties are not currently listed in Appendix 4 of the
Unified Development Code, the Department may consider challenges to the
determinations that these resources are located within open context settings. If the
applicant can reasonably argue that they are located in partially open or enclosed
contexts, the 500' open space buffer requirement may be reduced.*

*Finally, the historic preservation section wishes to remind the applicant of the Old Zion
Cemetery located to the south of the proposed development, on Tax Parcel 13-009.00-
014. There may be unmarked graves associated with this cemetery, and there may be
graves outside of the official tax parcel boundaries. Therefore, great care should be*

8

*taken when disturbing the ground in the vicinity of the cemetery. If any human remains are found, work must cease immediately, and the proper authorities must be contacted."*

**Transportation comments:**

The Transportation Section is currently awaiting the submission of the required Traffic Impact Study and DelDot's review comments relative to it. The parameters of the TIS were scoped with the applicant in a meeting on August 7, 2005.

The proposed entrances onto Port Penn Road and Dutch Neck Road, as well as the proposed interconnections with the adjoining property to the east, appear to be logical but are subject to approval by DelDot. Comments on this plan have not been received from DelDot to date. It is suggested that DelDot be consulted before preparing the Preliminary Plan.

A sidewalk should be provided along the entire frontage of Dutch Neck Road. The plan is not clear as to where the internal sidewalks end at or along Dutch Neck Road. The preliminary plan should clearly indicate the locations of all sidewalks as well as their width and construction material (Portland Cement Concrete). The sidewalk provided along Port Penn Road should have more gradual transitions instead of making a series of right angle turns around the adjacent properties.

**Special Services comments:**

The building lots proposed by the aforementioned application are being designed to discharge their untreated sewage to a community sanitary sewer collection system. There is no sanitary sewer service available nor has New Castle County warranted when or if sanitary sewer service will be available for this proposed subdivision. Therefore, no building permit shall be issued for any lot created by this application until sanitary sewer service becomes available and the Department of Special Services has approved all necessary sanitary sewer construction plans pertaining to this application. Add the following note to both the sanitary sewer feasibility and record plans:

*"The lots shown on this plan are designed to be served by sanitary sewer service. At the time of approval of the record plan, sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available. No building permit shall be issued for any lot shown on this plan, or any lot created by any revision or resubdivision of the record plan, until or unless the Department of Land Use receives written verification from the Department of Special Services that sanitary sewer service is or will be available for the Development and that the Department of Special Services has approved all necessary sanitary sewer construction plans."*

Add the following note to the sanitary sewer feasibility plan:

*"Only the feasibility of the community sanitary sewer collection system will be reviewed and approved by the Department of Special Services, prior to recordation. All necessary sanitary sewer construction plans and supporting documentation, pertaining to .this application, must be received by the*

9

*Department of Special Services for review at the time sanitary sewer service becomes available for the Development."*

CC:  Mitch Kotler, Toll Brothers, Inc.
     Choong Y. Yim, P.E., Eastern States Engineering
     David M. Culver, Planning Manager
     Planning Board Members

**EXHIBIT "Q"**

Christopher A. Coons
County Executive



RECEIVED SEP 1 0 2006

Charles L. Baker
General Manager

Department of Land Use

## Department of Land Use Revised Exploratory Sketch Plan Approval

| | |
|---|---|
| Date – | September 14, 2006 |
| Application Number – | 2005-0459 (S) |
| Project Title – | **Port Penn Assemblage** |
| Consulting Engineer – | Choong Y. Yim, P.E., Eastern States Engineering |
| Legal Property Owner – | Mitch Kotler, V.P., Toll Brothers, Inc. |
| Description – | Proposal to subdivide 481.21 acres into an Open Space Planned development of 505 dwelling units northeast of Port Penn and Dutch Neck Roads. |
| Type and Stage of Plan – | Exploratory Sketch Major Subdivision Plan Approval |
| Prior Reviews – | November 10, 2005 Exploratory Sketch Plan Review |
| | June 14, 2006 Revised Exploratory Sketch Plan Review |
| Project Review Team – | Planner, Steven Faux at 395-5437 |
| | Engineer, Stephanie DeAscanis at 395-5475 |
| | Historic Preservation, Christine Quinn at 395-5521 |
| | Transportation, John Janowski at 395-5426 |
| | Special Services, David Thurman at 395-5452 |

Status of Review –     Approved with Conditions – The Department of Land Use finds the above referenced application acceptable to advance to the Preliminary Plan stage subject to all of the conditions explained in the Department's June 14, 2006 Revised Exploratory Sketch Plan Review Report. Several local residents spoke at the August 1, 2006 Planning Board Public Hearing and raised concerns relative to traffic congestion, roadway conditions, potential flooding, and incompatibility with the surrounding areas. These concerns and the issues raised by the Department should be addressed with the Preliminary Plan submission.

Timeframe –     Pursuant to Section 40.31.390 of the New Castle County Code (NCCC), the Preliminary Plan submission must be made within one year from the date of this first review report (by November 10, 2006) or the application will be expired. The Traffic Impact Study must be completed and be approved by DelDot by that date in order for the Preliminary Plan submission to be complete. A three month extension for this deadline may be requested if necessary.

CC:     Mitch Kotler, Toll Brothers, Inc.
        Choong Y. Yim, P.E., Eastern States Engineering
        David M. Culver, Planning Manager
        Planning Board Members

✎JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)   PLAINTIFFS | DEFENDANTS |
|---|---|
| GARY C. WARREN and GALE B. WARREN and TOLL BROS., INC. | NEW CASTLE COUNTY |
| (b) County of Residence of First Listed Plaintiff   New Castle | County of Residence of First Listed Defendant   New Castle |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
| Jeffrey M. Weiner, Esq. 302-652-0505 1332 King St., Wilm., DE 19801 | Gregg E. Wilson, Esq.302-395-5146 87 Reads Way., NC, DE  19720-1648 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government  Plaintiff

☒ 3  Federal Question  (U.S. Government Not a Party)

☐ 2  U.S. Government  Defendant

☐ 4  Diversity  (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability   ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander   ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability     Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine   **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product   ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability   ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle     Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability   ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment     Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/   **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations   ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment   ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities -   ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original  Proceeding

☐ 2  Removed from  State Court

☐ 3  Remanded from  Appellate Court

☐ 4  Reinstated or  Reopened

☐ 5  Transferred from  another district  (specify)

☐ 6  Multidistrict  Litigation

☐ 7  Appeal to District  Judge from  Magistrate  Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 42 USC Sec. 1983 28 USC Sec.1331, 1343(a) and 1367(a), 15 USC Sec. 26 and

Brief description of cause:  Injunctive Relief-Clayton Act and Violation of Civil Rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   11/13/07

SIGNATURE OF ATTORNEY OF RECORD   Jeffrey M. Weiner, Esq. #403

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ____0 7 - 7 2 5____

# ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

2007 NOV 13  PM 3: 23

CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

I HEREBY ACKNOWLEDGE RECEIPT OF ____3____ COPIES OF AO FORM 85.

NOV 1 3 2007

_____        _____
(Date forms issued)        (Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action