## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **GARY C. and GALE B. WARREN**<br>809 Port Penn Road<br>Middletown, DE 19709<br>and<br>**TOLL BROS., INC.**<br>250 Gibraltar Road<br>Horsham, PA 19044 | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| Plaintiffs, | : | **Civil Action No. 07-725-LPS** |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| **NEW CASTLE COUNTY**<br>87 Reed's Way<br>New Castle, DE 19720 | :<br>:<br>: | |
| Defendant. | : | |

## FIRST AMENDED COMPLAINT

### A. THE PARTIES

1.     Plaintiffs, Gary C. and Gale B. Warren (**"Warrens"**) are adult individuals and citizens of the State of Delaware residing at 809 Port Penn Road, Middletown, Delaware 19709.

2.     Plaintiff Toll Bros., Inc. (**"Toll"**) is a corporation incorporated under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 250 Gibraltar Road, Horsham, PA 19044.

3.     Defendant New Castle County (**"County"**) is a political subdivision of the State of Delaware.

### B. JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. §1331, §1343(a) and §1367 (a), 15 U.S.C. §§2, 26 and 42 U.S.C. §1983, because the claims asserted in this cause of action arise under the Clayton Act, 15 U.S. C. §§2 and 26, the Civil Rights Act of 1861 and 1871, 42 U.S.C. §1983, the Fourteenth Amendment to the United States Constitution and the

Federal Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.

5.    Venue exists in the District of Delaware, pursuant to 28 U.S.C. §1391(b), because

the properties which are the subject of this action are located in this District and the County is

located in this District.

## C.    NATURE OF THE ACTION

6.    Plaintiffs seek to enjoin the County from engaging in a pattern of wrongful and

illegal conduct designed to prevent Plaintiffs from developing and using their Properties

(hereinafter defined).  The County has assumed monopoly power over the provision of sanitary

sewer service in the southern area of the County including the area where the Properties are

located.  The County has abused its monopoly power by, *inter alia*: (a.) refusing to allow

Plaintiffs access to the public sewer system, even though the County's sewer system is

underutilized and the County repeatedly promised to make it available to the Properties; (b.)

rejecting Plaintiffs' offers to construct  sewer infrastructure and/or a community sewage

treatment and disposal system, even though permitted under state law and (c.) prohibiting private

utilities from providing sanitary sewer service to the Properties, although permitted under state

law.  By leveraging its monopoly power over sewer, the County has managed to circumvent its

own zoning laws which permit the Properties to be developed with public or privately

constructed community sewer facilities.

7.    Plaintiffs also seek redress for the County's course of irrational and arbitrary

conduct which has deprived Plaintiffs of due process of the law as guaranteed by the United

States Constitution.  While claiming an exclusive right over the provision of sanitary sewer

service in the southern area of the County, the County has carved out the area of the County in

which the Properties are located as the area where it will not provide such sewer service nor

allow any private party to provide such sewer service. The County has then used the purported

- 2 -

lack of sewer service as a means of stalling Plaintiffs' pending development plans for the Properties. By refusing access to sewer, the County capriciously and arbitrarily is interfering with and preventing Plaintiffs from being able to use, enjoy and develop their Properties.

8.    The County has also deprived Plaintiffs of equal protection of the law as guaranteed by the United States Constitution by intentionally treating Plaintiffs and their Properties differently than other similarly situated developers and properties in the same sanitary sewer area. While the County has refused to allow Toll and another out-of-state homebuilder access to the sewer system in the area of the County where the Properties are located, the County has allowed all the developers with local ties to connect their proposed developments to the County's sewer system. There is no rational, legitimate reason for the County's refusal to provide sanitary sewer service to the Properties particularly when the County has allowed comparable properties within the same sewer area to be served by the County's sewer system.

## D.    FACTS COMMON TO ALL COUNTS

### 1.    The Properties Proposed to be Developed

9.    The Warrens are the owners of approximately 134 acres of undeveloped land located on the north side of Port Penn Road in the St. Georges Hundred in the Southern portion of the County (**"Warren Property"**). Toll is the equitable owner of 118 acres of the Warren Property.

10.    Toll is also the equitable owner of approximately 500 acres of land located in the County adjacent to the Warren Property (**"Port Penn Properties"**). The location of Warren and Port Penn Properties (collectively referred to as the **"P roperties"**) i s depicted on the map attached hereto as **Exhibit "A"**. Together the Properties total 634 acres of undeveloped land.

11.     The Properties are currently used as cultivated land with associated residential and farm structures. The Properties are located within the County's Suburban (S) Zoning District. "S" zoning permits residential subdivision and development and access to public sewer.

### 2.     Toll's Proposed Development of the Properties

12.     Toll is in the business of building homes in planned communities which offer the essential services a homeowner expects and requires, including sanitary sewer service.

13.     Toll proposes to develop the Properties as residential subdivisions providing for a total of 631 new residences on approximately 618 acres of land (**"Proposed Developments"**).

14.     The Proposed Developments are permitted uses in the Suburban (S) District pursuant to the County's Uniform Development Code (**"UDC"**). The Comprehensive Plan Maps in effect at the time Toll's development applications were filed depicted the Properties as being located in the County's public sewer districts.

### 3.     The County's Sewer System

15.     The County has established two sanitary sewer districts in the County: (a.) the Northern New Castle County Sanitary Sewer Area and (b.) the Southern New Castle County Sanitary Area (**"SSSA"**). The Properties are located in the SSSA, the area of the County bounded on the North by the Chesapeake and Delaware Canal, on the East by the Delaware River, on the South by Kent County, and on the West by Maryland.

16.     In and around 1992, the Weston Study, which the County had commissioned, recommended that public sewer be installed in the area of the Proposed Developments in order to protect ground water quality and to prevent contamination from septic tanks.

17.     In the mid to late 1990s, the County developed plans to encourage development of the SSSA, which at that time was largely rural. To accommodate the anticipated growth, in 1999, the County adopted the Wastewater Management Facilities Plan (**"Wastewater Plan"**)

- 4 -

which provided that the demand for sanitary sewer service in the SSSA would be satisfied by a public sewer system. The County reiterated its commitment to construct sewers in the SSSA to accommodate the growth expected in this area in Resolution No. 03-093. A true and correct copy of Resolution No. 03-093, dated June 24, 2003, is attached hereto as "**Exhibit B.**" The Resolution provides that the installation of a sanitary sewer system would "provide better protection for the environment by substantially reducing the pollution of groundwater resulting from leaking septic systems." *Id.*

18.    To achieve the County's goal of installing public sewer to meet growing demand, the Wastewater Plan provided for construction in the SSSA of a sewer conveyance system and two new facilities to treat and dispose of the sewage generated and to be generated in the SSSA. The two facilities were designed as a lagoon treatment and spray irrigation effluent system and called Water Farm 1 and Water Farm 2.

### (i)    Water Farm 1's Capacity

19.    Pursuant to the Wastewater Plan, the County constructed and presently operates Water Farm 1 located in the southeastern part of the SSSA. Plaintiffs' Properties are located approximately five to six miles from Water Farm 1. The County's map for the SSSA depicted sewer lines along Port Penn Road to convey sewage from the Properties bordering Port Penn Road. A true and correct copy of the County's map is attached hereto as **Exhibit "C."**

20.    The Delaware Department of Natural Resource and Environmental Control permitted Water Farm 1 to treat and dispose of 1,800,000 gallons of sewage per day. Water Farm I was designed to be able to treat over 2,500,000 gallons per day. Currently, Water Farm I treats approximately 400,000 gallons of sewage per day. In sum, Water Farm I has the permitted capacity to treat and dispose of an additional 1,400,000 gallons of sewage per day that it is not currently utilizing.

21.    Toll's development plans anticipate that the Warren Property will generate 42,900 gallons of sewage per day and that the Port Penn Property will generate 168,000 gallons per day for a combined total of 210,900 gallons per day. Water Farm 1, therefore, has ample permitted capacity (1,800,000 gpd) to treat and dispose of the Properties' overall sewage output (210,900 gpd).

### (ii)    Water Farm 2's Capacity

22.    Pursuant to its Wastewater Plan, the County approved funding for the design and construction of Water Farm 2 on approximately 900 acres of land which the County owns in the central part of the SSSA. Plaintiffs' Properties are located approximately five to six miles from the Water Farm 2 site and approximately three miles from the Hyatts Corner interceptor which is intended to convey sewage to Water Farm 2.

23.    Water Farm 2 is designed to treat and dispose of 3,000,000 gallons of sewage generated in the SSSA per day. The Department of Natural Resource and Environmental Control has approved Water Farm 2 to treat and dispose of 3,000,000 gallons per day. Waterfarm 2 thus has ample permitted capacity (3,000,000 gpd) to treat and dispose of the sewage that will be generated by the Proposed Developments (210,900 gpd).

24.    Since Water Farm 2 has been permitted by Department of Natural Resource and Environmental Control, there is no impediment to the construction of Water Farm 2. Upon information and belief, after the Department of Natural Resource and Environmental Control issued the permit for Water Farm 2, the County let and awarded the contract for the construction of Water Farm 2.

### 4.    Toll's Plan Submissions

25.    In or about October 2004, Toll and Warren met with the County in order to discuss the Proposed Developments and to verify the County's commitment to provide public

sewer to their areas. In those meetings, the County confirmed its commitment to provide public sewer service to the Properties and assured Plaintiffs that Water Farm 1, and ultimately Water Farm 2, contained adequate capacity to serve the Warren and Port Penn Properties.

26.     In the 2004 meetings, the County pointed out that an existing large gravity collection line ("**Large Gravity Line**") already extended part way from Water Farm 1 to the Properties. The County indicated it was considering having Toll extend the gravity line and build a regional pump station and force main in order to connect the Proposed Developments to public sewer.

27.     By letter December 8, 2004, Toll confirmed its willingness to design and construct, at its own cost, the necessary improvements to the public sewer system in order to connect the Proposed Developments to the County's sanitary sewer system. A true and correct copy of the December 8, 2004 letter is attached hereto as **Exhibit "D."**

28.     On January 1, 2005, a new County Executive and his administration took office. In 2005, Toll and Warren met with the County's new administration on numerous occasions to discuss connecting the Proposed Developments to public sewer. Throughout these discussions, the County assured Plaintiffs that it intended to provide public sewer treatment and disposal for the Proposed Developments. The County represented that once Water Farm 2 was completed, it would provide sufficient sewer service to the Proposed Developments. The County also recognized that ample unused capacity already existed and would continue to exist in Water Farm 1 and advised Plaintiffs that the Proposed Developments could "borrow" capacity from Water Farm 1 until such time as Water Farm 2 was constructed.

29.     By letter to the County dated June 9, 2005, Toll described two proposals that would allow the County to provide public sewer service to the Proposed Developments. First,

Toll offered to construct a pump station and force main to connect the Properties to an existing pump station at the nearby Augustine Creek Subdivision which would convey the Properties' sewage via the existing Large Gravity Line to Water Farm 1. Alternatively, Toll offered to construct a regional pump station on the Warren Property and a force main to convey the sewage to the Large Gravity Line that would convey the sewage to Water Farm 1. Toll pointed out to the County that the advantage of this second alternative was that the force main could later be redirected in a Westerly direction to convey the sewage to Water Farm 2. A true and correct copy of the June 9, 2005 letter is attached hereto as **Exhibit "E."**

30.    Moreover, Toll presented a third alternative, offering to design and construct a state of the art Community System (the **"Community System"**). The Community System would consist of: (a.) a treatment plant to treat the sewage from the Proposed Developments; (b.) conveyance lines to transport the sewage from the Proposed Developments to the treatment plant; and (c.) a disposal system having a processing capacity in excess of 100,000 gallons per day. Upon completion of construction, Toll would turn over the Community System either to the County or if it preferred, a private wastewater utility, as permitted under the Delaware Code.

31.    The County refused to accept any of Toll's proposals for providing sewer service to the Proposed Developments. Nonetheless, the County verbally assured Plaintiffs that the County was committed to constructing sewer facilities that would service the sanitary sewer needs of the Proposed Developments.

32.    Relying on the County's assurances, Toll expended substantial time and money in evaluating the suitability of the Properties for development, in preparing subdivision and land development plans for the Properties and by paying nonrefundable deposits to the landowners.

33.    The County sent a letter to Toll, on August 11, 2005, confirming that once

- 8 -

construction of Water Farm 2 was complete, the facility would have sufficient capacity available to treat and dispose of the Warren Property's sewage, *i.e.*, the requested amount of 42,900 gallons per day. A true and correct copy of the August 11, 2005 letter is attached hereto as **Exhibit "F."**

34.    Regarding the Port Penn Properties, the County sent a letter to Toll, on October 13, 2005, confirming that once all necessary sewer infrastructure was constructed, the County would have capacity available to treat and dispose of the Port Penn Properties' sewage, *i.e.*, the requested amount of 138,600 gallons per day. A true and correct copy of the October 13, 2005 letter is attached hereto as **Exhibit "G."**

35.    On August 22, 2005, in reliance upon the County's assurances that the County would provide sanitary sewer service, Toll submitted to the County an Exploratory Plan for the Warren Property. On October 7, 2005, Toll submitted to the County an Exploratory Plan for the Port Penn Properties, again in reliance on the County's assurances that the County would provide sanitary sewer service to the Proposed Developments.

### 5.    The County Decides to Halt Development of the Properties

36.    Some time in 2005, the County, under its new administration, secretly determined to halt development of the Properties. To that end, the County embarked on a course of conduct to prevent the Proposed Developments from advancing any further in the County's land use planning process. To prevent the Properties from being developed, the County was confronted with two obstacles: (a.) current zoning permitted the Proposed Developments and (b.) Toll's pending plans for the Proposed Developments complied with the County's Uniform Development Code. The County decided its most effective means for preventing the Proposed Development was to exert its monopoly power over the provision of sanitary sewer service. By withholding any access to public sewer to the Properties, the County was able to circumvent its

own planning process. The County was keenly aware that Plaintiffs would not be able to obtain final planning approval unless and until the County verified it would allow sanitary sewer access. *See* NCC Code §40.05.320.

37.    Furthermore, the County was critically aware that Toll's plans for the Proposed Developments would expire if they did not resolve the County's objections within the twelve month time frames set forth in the County's Uniform Development Code. *See, e.g.,* NCC Code §40.31.390. Finally, the County knew it was required to provide sewer capacity on a first come, first serve basis. *See* NCC Code §40.05.000B.

38.    In June 2005, the County commissioned Red Oak Consulting (**"ROC"**) to re-evaluate the County's Wastewater Plan for the SSSA. On January 25, 2006, ROC issued a report concluding that the County's existing sewage treatment and disposal plan for the SSSA was inadequate because it only provided wastewater disposal for one-third of developable properties in the SSSA and did not provide a regional utility-based wastewater disposal solution for the remaining two-thirds.

39.    ROC recommended that the County overhaul its Wastewater Management Plan but cautioned the County to implement a short-term strategy for allowing development to proceed while the County investigated and implemented the best long-term solution.

40.    The County seized the opportunity ROC's recommendation gave it of overhauling the Wastewater Management Plan for the SSSA to effectuate its new goal of preventing the development of the Properties. In or about March 2006, the County divided the SSSA into three new sewer service areas: (a.) the Central Core area, (b.) the area East of the Central Core area and (c.) the area West of the Central Core area. With respect to the eastern section, where the Properties are located, the County further carved out a pocket in the Northeast, again where the

Properties are located, that would not receive any access to public sewer for the foreseeable future. A true and correct copy of the County's map showing the new sewer areas for the SSSA is attached hereto as **Exhibit "H."**

41.    The County's decision to exclude the Properties from public sewer was arbitrary and irrational because (a.) the County allowed similarly situated properties directly to the Properties' South and West to obtain sewer service; (b.) the Properties are located approximately one mile from the conveyance lines that convey sewage to Water Farm 1; (c.) the County had assured Plaintiffs they could utilize the capacity in Water Farm 1 until Water Farm 2 was constructed and (d.) the County had assured Plaintiffs that the Proposed Developments would ultimately be serviced by Water Farm 2.

42.    Now the County arbitrarily and irrationally determined that only properties located within the borders it drew for the Central Core area would be permanently serviced by Water Farm 2. The County thus effectively excluded the Proposed Developments not only from Water Farm 1 but now Water Farm 2.

43.    Furthermore, contrary to the recommendations of the ROC Report, the County refused to implement any short-term strategy that would allow the Proposed Developments to proceed while the County developed its long term solution to providing sewer capacity for the SSSA.

44.    In accordance with its new plan, the County caused the SSSA maps to be revised to eliminate the proposed sewer line previously shown on its maps extending to the Proposed Developments. For the first time since January 2006, the SSSA maps no longer depicted public sewer lines along Port Penn Road which would service the Properties.

45.     The County, by its enactment of Resolution No. 06-069 approved the New Administration's line drawing for who would and would not receive sanitary sewer service in the SSSA.  Resolution No. 06-069 provided that only those properties planned to be permanently serviced by Water Farm 1 and the properties in the Central Core area "will receive exclusive priority to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006."  The County refused to allow the Proposed Developments access to public sewer and put off indefinitely the decision of whether or not the Properties would ever be able to gain access.  A true and correct copy of Resolution No. 06-069 is attached hereto as **Exhibit "I."**

46.     The County has wrongfully refused to consider alternative sewer disposal options even though Resolution No. 06-069 expressly provided that the County would consider alternate sewer disposal options if the County was unable to provide sewer capacity for any active or recorded plan as of March 9, 2006 outside the Central Core area transmission system.

47.     Upon information and belief, the County terminated the contract it had entered into for the construction of Water Farm 2 and paid the contractor over $350,000 in penalty as a result of terminating the construction contract.

48.     After the enactment of Resolution No. 06-069, Toll reiterated to the County that it remained ready and willing to move forward with its proposals to build: (a.) the infrastructure to connect the Proposed Developments to Water Farm 1; (b.) the transmission lines to connect the Proposed Developments to Water Farm 2 or (c.) to build a separate stand alone Community System to be turned over to the County or a public utility.  Pursuant to its plan to prevent the development of the Properties, the County rejected all three of Toll's proposals.

49.     The County has, in effect, arbitrarily and irrationally placed a moratorium on all

development in the areas of the SSSA northeast of the Central Core area and the area West of the Central Core area.

50.     In or about late 2006, the New Administration proposed enactment of a proposed 2007 Comprehensive Land Use Plan.

51.     In the 2007 Comprehensive Land Use Plan, the County has carved out the area northeast of the Central Core area where the Proposed Developments are located and reclassified this area as a "Possible Future Growth Area" even though development plans had been pending for the Properties and two other properties in the area for more than three years.

52.     The Properties and two other properties in the area with pending development plans contain the majority of the developable land in this area.

53.     By reclassifying the area as a "Possible Future Growth Area" instead of a "New Community Growth Area" the County sought to justify its actions in postponing the delivery of sewer service to the area and thereby prevent development of the area altogether.

      **6.**      **The County Rejects Toll's Pending Plans Due to Lack of Sewer**

              **(i)**       **The Warren Property**

54.     The UDC requires an applicant seeking major subdivision or land development approval in the County to obtain approval from the New Castle County Department of Land Use ("NCCDLU") of three plans: (a.) an exploratory plan, (b.) a preliminary plan and (c.) a record plan. An applicant has twelve months from the NCCDLU's first review of an exploratory plan to proceed to the next review stage, *i.e.*, the submission, review and approval of the preliminary plan. NCC Code §40.31.112.G. The UDC requires the NCCDLU to approve the preliminary plan if it complies with all applicable ordinances, rules and regulations.

55.     On March 3, 2006, Toll submitted to the County a Revised Exploratory Plan for the Warren Property which addressed the NCCDLU's review comments. On March 23, 2006,

- 13 -

the County, through its Department of Special Services, sent a letter to Toll announcing that "sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available." A true and correct copy of the March 23, 2006 letter is attached hereto as **Exhibit "J."** The NCCDLU will not give final approval of a record development plan unless and until the Department of Special Services verifies that sewer capacity is or will be available. NCC Code §40.05.320.

56.     On March 31, 2006, the NCCDLU sent a letter commenting on Toll's Revised Exploratory Plan for the Warren Property in which it noted "there is no sanitary sewer service in this area." A true and correct copy of the March 31, 2006 letter is attached hereto as **Exhibit "K."**

57.     On December 20, 2006, the County's Department of Special Services sent a letter to Toll advising that "[a]pproval of the exploratory design review by the Department of Special Services shall not be interpreted as a guarantee that sanitary sewer service will be provided to this region." A true and correct copy of the December 20, 2006 letter is attached hereto as **Exhibit "L."**

58.     During all the time that their plan for the Warren Property was pending, the County continued to assure Plaintiffs verbally that the County intended to provide the Proposed Development with access to public sewer and that because their development plans were pending they would be dealt with based on their individual circumstances.

59.     On December 28, 2006, Toll submitted to the NCCDLU a Preliminary Major Subdivision Plan for the Warren Property. On January 22, 2007, the NCCDLU accepted the Preliminary Plan but pointed out "there is no sanitary sewer service in this area." The NCCDLU further advised that if a complete Record Plan submission was not made within twelve months

from January 22, 2007, *i.e.*, by January 22, 2008, the Preliminary Plan would be deemed expired. A true and correct copy of the January 22, 2007 letter is attached hereto as **Exhibit "M."**

60.     On October 22, 2007, the County's Department of Special Services refused to verify that sewer capacity is or would become available for the Proposed Warren Development, thereby preventing it from advancing to record stage approval. The Department also reminded Toll that the plan submission was subject to expiration under the County's Code. Finally, the Department enclosed a memorandum setting forth the County's purported policy regarding Available Sanitary Sewer Capacity. The County provided that the effective date for its policy was October 22, 2007, the same date as its cover letter to Toll, but the memorandum also provided that its original publication date was nearly five years earlier, on August 26, 2002. A true and correct copy of the October 22, 2007 letter, with the enclosed policy, is attached hereto as **Exhibit "N."**

61.     On November 6, 2007, Toll sent a letter to the County reiterating its proposals to make sewer service available to the Warren Property including building infrastructure to connect to the Waterfarms and/or building a Community System to be turned over to the County or a public utility. A true and correct copy of the November 6, 2007 letter is attached hereto as **Exhibit "O."** The County never responded to Toll's November 6, 2007 proposals.

62.     By its October 22, 2007 letter (with its enclosed October 22, 2007 policy memorandum), the County rendered its final decision refusing to allow Toll's Preliminary Plan to advance to record stage. The County knew that the Proposed Development for the Warren Property would not be able to proceed to record stage approval without a verification from its Department of Special Services that sewer capacity would be available. The County had leveraged its monopoly power to deny the Proposed Developments access to public sewer,

thereby guaranteeing that Toll's Proposed Development for the Warren Property would be rejected.

### 7.    The Port Penn Properties

63.    On April 20, 2005, Toll submitted to the County a Pre-Exploratory Plan for the Port Penn Property. On October 7, 2005, after receiving comments to this Plan, Toll submitted a Revised Exploratory Plan to the County. On June 14, 2006, the County commented on the Revised Exploratory Plan, emphasizing that "[t]he plan relies on connection to a public sanitary sewer system, but no such system exists … Without an approved sewerage strategy, the plan will not be approved and construction will not be permitted." A true and correct copy of the June 14, 2006 letter is attached hereto as **Exhibit "P."**

64.    During the time that Toll's plan for the Port Penn Property was pending, the County continued to assure Plaintiffs verbally that the County intended to provide the Proposed Development with access to public sewer and that because their development plan was pending they would be dealt with based on their individual circumstances.

65.    On September 14, 2006, the County found the Revised Exploratory Plan acceptable to advance to the Preliminary Plan stage of the process, except for the lack of sewer connection noted in the June 14, 2006 letter. A true and correct copy of the September 14, 2006 letter is attached hereto as **Exhibit "Q."** On February 7, 2007, Toll submitted to the County a revised Preliminary Major Subdivision Plan addressing each of the technical and engineering comments of the June 14, 2006 letter.

66.    On November 20, 2007, the County's Department of Special Services sent a letter declining to grant the Port Penn Properties access to public sewer. Sent after the original complaint was filed, the Department stated:

> Your proposed development, ..., is designated for connection to the County sanitary sewer system but is located within an area in which the County does not currently have sanitary sewer capacity available. Furthermore, the County currently does not have any approved and fully funded projects to provide sanitary sewer capacity to that area.

A true and correct copy of the County's November 20, 2007 letter is attached hereto as **Exhibit "R."** The County purported to inform Toll that it would consider a revised submission that designated the use of on-site septic systems. The County knew or should have known that on-site septic was not an available option for properties located in the area in which the Properties are located since the 1992 Weston Study commissioned by the County expressly recommended against the use of septic tanks in the Properties' area due to their risk of contaminating ground water. The County also knew that use of on-site septic systems would drastically reduce the number of lots that Toll could develop.

67.    By its November 20, 2007 letter, the County rendered a final decision that it will not grant preliminary plan approval or permit the preliminary plan for the Port Penn Properties to proceed to final record plan approval because it refuses to grant access to public sewer.

## 8.    The County's Interference Between Toll and Warren

68.    Before issuing its Final Decision refusing to allow the Warren Property to proceed to record plan submission on October 22, 2007, the County requested a meeting with Warren purportedly to discuss a resolution of the sewer issue.

69.    At a meeting on October 31, 2007, however, the County reiterated its position that the County would neither provide sewer capacity in the County's sanitary sewer system nor permit any alternatives for sewage disposal for the Warren Property. At the meeting, the County advised Warren that it was considering transferable development rights (**"TDRs"**) for the Warren Property so that Warren could "sell" the TDRs, thereby enabling Warren to be paid for

- 17 -

the Warren Property while allowing the Warren Property to remain undeveloped. The County made the proposal to Warren without making any effort to determine if the creation and sale of the rights to develop the Warren Property was even a viable option.

70.    At the October 31, 2007 meeting, Warren advised the County he was under a legal obligation to Toll and was not in a position to sell the development rights to the Warren Property to the County or to anyone else. The County responded that there may arise a "window of opportunity" in which Warren "would not be bound to Toll" and if such window presented itself, to let the County know. The County, in an attempt to prevent development of the Warren Property, sought to interfere with Toll's agreement with Warren for the purchase of the Warren Property.

71.    The County's refusal to allow Toll to connect to the County's sewer system or to construct the Community System is in bad faith, arbitrary and capricious.

72.    By refusing to permit either public or private sewer service to the area northeast of the Central Core area, the County is rendering the properties in the area unmarketable to anyone other than the County, thereby reducing their fair market value and enabling the County to acquire these properties at a reduced cost.

### 9.    Toll Will Suffer Damages and Irreparable Harm

73.    Toll has until April 22, 2008 to submit its record plan for the Warren Property and March 21, 2008 for the Port Penn Properties. *See* NCC Code. §§40.31.390 and 40.31.113C. The County has advised Plaintiffs that it will not allow Plaintiffs to proceed to the record plan stage for the Proposed Developments unless and until the County agrees to make "sewer service capacity" available for the Proposed Developments.

74.    If Toll does not submit the record plans within the mandated deadlines, Plaintiffs' land development applications will expire and Plaintiffs will be forced to begin the approval

- 18 -

process for the Proposed Developments from the beginning. NCC Code. §40.31.110. Starting the approval process for the Proposed Developments *ab initio* will cause irreparable harm to Toll. If the County is not enjoined from continuing its illegal and improper conduct, Toll's rights under agreements to purchase the Properties will expire and Toll will lose its rights to acquire the Properties.

75.    Further, if Toll is required to start from the beginning in the submission of plans, Toll will be forced to incur substantial additional engineering, legal and other costs to duplicate work previously performed and to re-apply for agency approvals.

76.    Moreover, beginning the approval process for the Proposed Developments *ab initio* will be futile because Toll will continue to be unable to provide or obtain sewer service for the Proposed Developments so long as the County continues to monopolize the provision of sanitary sewer service and continues to refuse to allow Toll to utilize the County's existing sewer capacity, continues to refuse to plan or fund the provision of sanitary service for the area in which the Properties are located and continues to refuse Toll the right to construct a Community System.

77.    The County is unlawfully preventing the Proposed Developments from proceeding by refusing to: (a.) allow Plaintiffs to utilize the unused and available sewage treatment and disposal capacity in Water Farm 1, (b.) allow Plaintiffs to temporarily connect to Water Farm 1 until Water Farm 2 is constructed even when Toll has proposed to install, at its own cost, the improvements necessary for the connection, (c.) plan or fund for public sewer service for the area in which the Properties or located, and (d.) to construct a Community System at Toll's cost, which will either be privately maintained or conveyed to the County upon completion.

78.     Toll has no adequate remedy at law.

## COUNT I
## ACTION FOR INJUNCTIVE RELIEF
## THE CLAYTON ACT, 15 U.S.C. §26

79.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

80.     Plaintiffs are customers in the market for sanitary sewer service in the County and would be direct purchasers of sanitary sewer services if the County permitted them to purchase its sanitary sewer services.  Additionally, Toll is a competitor in the sanitary sewer market because it provides such services as part of the developments it develops and sells.

81.     The County has intentionally acquired monopoly power over the collection, conveyance, treatment and disposal of sewage generated in the County.

82.     The County has willfully acquired and maintained its monopoly power through restrictive or exclusionary conduct.

83.     The County's conduct substantially affects interstate commerce.

84.     The County's conduct, as alleged above, constitutes an abuse of its monopoly power.

85.     The County's conduct constitutes monopolization in violation of the antitrust laws, 15 U.S.C. §§2, 12 and 26.

86.     The County's conduct is not in furtherance or implementation of any clearly articulated and affirmatively expressed state policy authorizing anticompetitive conduct on the part of the County in the provision of services to collect, convey, treat and dispose of sewage in the County.

87.     The Delaware legislature did not intend, and the County can not lawfully claim, a monopoly in the provision of essential sanitary sewer services in the County and refuse to

provide the service in a reasonable manner.

88.    The County's conduct is contrary to the purposes of the Delaware Code's Title 9, which empowers the County to provide sanitary sewer service, and Title 26, which allows private utilities to provide wastewater services under the regulation of the Delaware Public Service Commission.

89.    Plaintiffs are threatened by loss and damage to their business and/or property due to the County's violation of the antitrust laws.

90.    The threatened loss to be incurred by Plaintiffs will be caused by the County's actions.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired or will expire pending trial on the merits;

B.    Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1;

C.    Alternatively, following a trial on the merits, issue a permanent injunction Order enjoining the County from prohibiting the Proposed Developments from being serviced by a privately constructed Community System;

D.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

E.    Award such other relief as the Court deems proper and just.

## COUNT II
## 42 U.S.C. §1983 – VIOLATION OF PROCEDURAL DUE PROCESS

91.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs

- 21 -

as though set forth at length herein.

92.     Although the County included the Properties within its sewer service districts, the County has established a policy not to fund or provide sanitary sewer service to the area of the County where the Properties are located.

93.     With its October 22, 2007 letter, the County's Department of Special Services applied the County's policy to Plaintiffs refusing to verify that sewer capacity is or would become available for the Proposed Warren Development. *See* Exhibit N.  Similarly, with its November 20, 2007 letter, the Department of Special Services applied the County's policy to Plaintiffs with respect to the Port Penn Properties, refusing to verify sewer capacity for that development as well. *See* Exhibit R.

94.     The County's October 22, 2007 and November 20, 2007 final decisions have prevented Plaintiffs from being able to advance their preliminary plans for the Proposed Developments to record stage approval.

95.     The County does not provide any meaningful procedure whereby Plaintiffs can challenge the Department of Special Services' decisions with respect to their Proposed Developments.

96.     Plaintiffs lack an adequate post-deprivation remedy for the violation of their procedural due process rights in that the County has issued a final decision which is not reviewable.

97.     Plaintiffs have suffered damages and continue to suffer damages.

        **WHEREFORE,** Plaintiffs pray that this Court:

A.      Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

- 22 -

B.      Enter an Order vacating the decision of the Department of Special Services;

C.      Issue a Preliminary Injunction Order enjoining the County from refusing to allow the Proposed Developments to connect to the existing public sanitary sewage collection, conveyance, treatment and disposal system or prohibiting the Proposed Developments from being serviced by a privately constructed Community System;

D.      Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1;

E.      Alternatively, issue a permanent injunction Order enjoining the County from prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system;

F.      Award Plaintiffs their compensatory and consequential damages;

G.      Award Plaintiffs their attorneys fees and costs as permitted by law, and;

H.      Award such other relief as the Court deems proper and just.

## COUNT III
## 42 U.S.C. §1983 - VIOLATION OF CIVIL RIGHTS
## SUBSTANTIVE DUE PROCESS

98.      Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

99.      Plaintiffs have a protected property interest under the United States Constitution to own, use, enjoy and develop their Properties.

100.      Commencing in or about January 2006, the County deliberately engaged in a course of conduct with the specific intent of preventing Plaintiffs from being able to proceed to record plan submission and approval of their development plans.

- 23 -

101.    Assuming control of the provision of sanitary sewer services in the County, the County arbitrarily and capriciously denied Plaintiffs the right to connect their Properties and the Proposed Developments to existing public sanitary sewage collection, conveyance, treatment and disposal systems and refused to allow Plaintiffs to provide a privately owned and operated sanitary sewage collection, conveyance, treatment and disposal system for the Proposed Developments.

102.    The County intentionally determined to carve out the area of the County in which the Properties are located to prevent such area from obtaining sanitary sewer service.    The County knew that by prohibiting public or private sewage collection, conveyance, treatment and disposal systems from serving the Proposed Developments, Toll would not be able to proceed through the County land development process to record plan approval.

103.    The County, through the foregoing course of conduct, capriciously and arbitrarily interfered with and prevented Plaintiffs from being able to use, enjoy and develop their Properties.

104.    The County's enactment of Resolution No. 06-069, the revised SSSA Map and the provisions of the 2007 Comprehensive Plan as it relates to the area northeast of the Central Core area was intentionally directed at the Proposed Developments to cause the expiration of Plaintiffs' land development plans by indefinitely postponing the provision of sanitary sewer service to the area northeast of the Central Core area.    By excluding the Proposed Development from public sewer, the Resolution effectively prevented Plaintiffs' preliminary plans from otherwise proceeding to the record plan stage.

105.    The County enacted Resolution No. 06-069 and the SSSA Map knowing that they violated Plaintiffs' legal rights.

- 24 -

106.    The County's enactment of Resolution No. 06-069 and the SSSA Map and its conduct preceding and leading up to its enactment was arbitrary, capricious, and not rationally related to a legitimate government interest.

107.    The County's course of conduct preceding and leading up to the enactment of Resolution No. 06-069, the enactment of Resolution No. 06-069 and the County's conduct thereafter, was and continues to be an unlawful attempt by the County to interfere with Plaintiffs' legal right to develop the Properties.

108.    The County cannot lawfully preclude development by requiring that developers use non-existent municipal services.

109.    The County has acted under color of state law.

110.    As a result of the County's wrongful and illegal conduct, Plaintiffs have suffered damages and continue to suffer damages.

**WHEREFORE**, Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.    Issue a Preliminary Injunction Order enjoining the County from refusing to allow the Proposed Developments to connect to the existing public sanitary sewage collection, conveyance, treatment and disposal system or prohibiting the Proposed Developments from being serviced by a privately constructed Community System;

C.    Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1;

D.    Alternatively, issue a permanent injunction Order enjoining the County from

prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system;

E.    Award Plaintiffs their compensatory and consequential damages;

F.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

G.    Award such other relief as the Court deems proper and just.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS
## 42 U.S.C. §1983 - EQUAL PROTECTION

111.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

112.    The County has intentionally treated Plaintiffs and the Proposed Developments differently from other similarly situated developers and properties in the SSSA.

113.    The County allowed the Augustine Creek Subdivision, located East of the Central Core area and less than one mile from the Proposed Developments, to be connected to public sewer.

114.    On or about January 8, 2008, the County granted final record approval for the Silver Maple Development, which is located East of the Central Core area and approximately two miles due South from the Proposed Developments.  Toll's application for the Warren Property was filed within a year of Silver Maple Development's application.  Nonetheless, the County has allowed the developers of Silver Maple to connect to public sewer by constructing their own line and pump station but denied Toll the same solution.

115.    The County is also treating differently two developments, Baymont Farms and Ponds at Odessa, located approximately three miles from the Proposed Developments.  Toll's application for the Proposed Developments was filed within twelve months of the applications

- 26 -

for these two developments. Nonetheless, the County has allowed both of these developments, Baymont and Ponds at Odessa, access to public sewer while their plans are still pending final approval.

116.     Upon information and belief, the County has permitted all developments located to the West of the Central Core area that were left without sewer service after March 2006 the right to build their own sewer facilities. Initially, the Carter Farm, which is located to the West of the Central Core area, applied to the Public Service Commission for permission to install a private sewer facility, and the County objected, refusing to grant its consent. Recently, however, the County decided to withdraw its objection, allowing the Carter Farm to proceed with a private wastewater utility.

117.     On or about June 12, 2006, the County decided that the Pennfield Development, located in the northeastern part of the SSSA, would have its available sewer capacity determined at the record plan stage. The Plaintiffs alleged in their original complaint that the County was giving the Pennfield Properties preferential treatment by allowing them to defer the issue of available sewer capacity until the record approval stage. Only after asserting that allegation did the County revoke its decision and send a letter to Pennfield rejecting sewer capacity. Because the County holds monopoly power over sanitary sewer services, the County is capable of changing its mind again about the Pennfield application.

118.     The County has permitted development plans for properties located east of the Central Core area to proceed to final approval, with the exception of the Proposed Developments and now Pennfield. Similar to Toll, Pennfield's developer, Gemcraft, is an out-of-state homebuilder active in the mid-Atlantic region. Upon information and belief, the County has allowed sewer access for each of these properties, leaving only Toll and Gemcraft, as the two

- 27 -

out-of-state builders, without access to public sewer or permission to provide private sewer.

119.    There is no rational, legitimate reason for the County's refusal to provide sanitary sewer service to properties located in the area northeast of the Central Core area while making such sewer service available to the area southeast of the Central Core area, to the Central Core area and to certain properties west of the Central Core area. In short, the County has granted access to public or permission to proceed with private sewer to every area in the SSSA, except for the northeast corner where the Properties are located.

120.    The County has intentionally treated Toll differently from the other similarly situated developers by refusing to allow Toll's land development applications to proceed to the record plan stage on the purported basis of lack of available sanitary sewer.

121.    The County's action in treating the Plaintiffs differently than other similarly situated landowners and developers in the SSSA was irrational, capricious and arbitrary.

122.    The County's action in treating the Plaintiffs differently than other similarly situated landowners in the SSSA area was motivated by an intent to inhibit Plaintiffs from exercising their constitutional rights to develop their Properties.

123.    The County has violated Plaintiffs' rights to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

124.    As a result of the County's equal protection violations with respect to Plaintiffs' Properties, Plaintiffs have suffered damages.

**WHEREFORE,** Plaintiffs pray that this Court:

A.    Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

- 28 -

B.    Issue a Preliminary Injunction Order enjoining the County from refusing to allow the Proposed Developments to connect to the existing public sanitary sewage collection, conveyance, treatment and disposal system or prohibiting the Proposed Developments from being serviced by a privately constructed Community System;

C.    Following a trial on the merits, issue a permanent injunction Order directing the County to permit the Proposed Developments to connect to Water Farm 1;

D.    Alternatively, issue a permanent injunction Order enjoining the County from prohibiting the Proposed Developments from being serviced by a community based privately constructed sanitary sewage collection, conveyance, treatment and disposal system;

E.    Award Plaintiffs their compensatory and consequential damages;

F.    Award Plaintiffs their attorneys fees and costs as permitted by law, and;

G.    Award such other relief as the Court deems proper and just.

## COUNT V
## DECLARATORY JUDGMENT

125.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

126.    The Court has authority to declare the rights and responsibilities of parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202

127.    There is a dispute between the parties whose interests are real and adverse, which is justiciable and ripe for adjudication respecting Plaintiffs' right under §40.05.520 of the UDC to construct improvements if public sanitary sewer service facilities are inadequate including (a.) a privately constructed Community System to serve the Proposed Developments, and/or (b.) pump stations, force mains and/or other transmission lines to allow connections to the exiting

public sanitary sewer systems. NCC Code. §40.05.520.

128.    Where there is inadequate sewer capacity, Section 40.05.520 of the UDC provides

the developer the option of constructing improvements to the sewer system:

> C. *Make improvements*.  The developer can make improvements
> for traffic as approved by the County and DelDOT. *Improvements*
> *may be made to the sewer as determined by the Department of*
> *Special Services.   In the Suburban zoning districts, sewer*
> *improvements may include the use of spray irrigation, provided*
> *that such a system has a minimum processing capacity of one*
> *hundred thousand (100,000) gallons per day and so long as the*
> *capacity of the system can be increased at a later time by an*
> *additional fifty thousand (50,000) gallons per day.  Other types of*
> *large scale treatment systems may be permitted if approved by*
> *DNREC and the County Department of Special Services.  Such*
> *facilities shall only be permitted in Suburban zoning districts and*
> *shall only be constructed in accordance with the rules and*
> *regulations governing such systems as promulgated by DNREC*
> *and the County Department of Special Services. All such systems*
> *shall be turned over to the County upon their completion and*
> *formal acceptance by the Department of Special Services.* The
> developer may reach agreements with the school district or with a
> water supplier to make or fund improvements that would be
> available prior to occupancy.

NCC Code §40.05.520C (emphasis added).  Given this express remedy in the County's UDC,

Plaintiffs should be permitted to build the necessary improvements by which to connect to the

public sewer system, pursuant to Section 40.05.520C.

129.    In addition, there is a dispute between the parties whose interests are real and

adverse, which is justiciable and ripe for adjudication respecting the County's rights under Title

9 of the Delaware Code to provide sewer, on the one hand, and Title 26 of the Delaware Code

allowing public utilities to provide sewer, on the other.

130.    Title 9 allows a municipality to designate areas in which it plans to provide public

sanitary sewer service.  9 Del. Code §2302.  The County designated the SSSA as an area in

which it planned to provide sewer service pursuant to Title 9.

- 30 -

131.    Title 26 allows a private entity to obtain from the Public Service Commission a certificate of public convenience permitting it to engage in the wastewater utility business and provide wastewater utility services to fifty or more customers. 26 Del. Code §203D. Title 26 restricts the private utility's ability to provide wastewater service in an area designated by a municipality without the municipality's approval. 26 Del. Code §203D(b). Finally, Title 26 requires all municipalities engaging in the business of the wastewater utility to supply a description of any existing service territory for wastewater service no later than 90 days from enactment, i.e., by October 6, 2004. *Id.*

132.    On September 30, 2004, the County sent a letter to the State of Delaware enclosing maps showing its sewer service area and advising that the County's Code prohibited any entity other than the County or its assignee from owning, leasing, operating, managing, utilizing or otherwise maintaining any sanitary sewer infrastructure in the unincorporated areas of the County. A true and correct copy of the September 30, 2004 letter is attached hereto as **Exhibit "S."**

133.    When the State Legislature authorized municipalities to provide sanitary sewer service, it intended that the municipalities would actually provide the service. By granting private utilities the ability to provide sanitary sewer service, the State Legislature demonstrated (a.) the municipalities' jurisdiction over sewer is not exclusive and (b.) if the municipality is not providing sewer, a private utility may do so. Plaintiffs seek a judicial declaration that because the County has declined to provide sanitary sewer service northeast of the Central Core area, the County must consent to a private utility providing wastewater service to the Proposed Developments.

**WHEREFORE**, Plaintiffs pray that this Court:

A.      Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.      Following a trial on the merits, issue a mandatory injunction Order directing the County to permit sewer service to the Proposed Developments either through use of the County's Sewer System by allowing Toll to construct the improvements required to connect the Proposed Developments to the County's Sewer System;

C.      Following trial on the merits, enter an Order declaring that Section 40.05.520 of the UDC and Title 26 of the Delaware Code permits Toll to provide sanitary sewer to the Proposed Developments by constructing a Community System to serve the Proposed Developments, which upon completion may be turned over to the County or privately operated;

D.      Award Toll all attorney's fees and costs incurred in connection with this action, as permitted by law and;

E.      Award such other relief as the Court deems proper and just.

## COUNT VI
## ESTOPPEL

134.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as though set forth at length herein.

135.    In 2004 and throughout 2005, County representatives repeatedly informed Plaintiffs that the Proposed Developments would be serviced by public sanitary sewer systems.

136.    Plaintiffs reasonably relied on the existing zoning of the Properties, which included access to public sewer service, and the representations of County representatives that

- 32 -

the Proposed Developments could be serviced immediately by Water Farm 1 and ultimately by Water Farm 2.

137.    Plaintiffs acted in good faith in relying on the representations of County representatives and incurred substantial investment of time, expense and obligations as a result.

138.    Plaintiffs have been prejudiced in relying on the representations and actions of the County representatives.

139.    It would be inequitable and unjust to deny the Proposed Developments, at this late stage of the approval process, access to the public sanitary sewer system that was promised to Plaintiffs and which the County has an obligation to provide.

140.    The County acted improperly, willfully and in violation of Delaware law and the Uniform Development Code.

**WHEREFORE**, Plaintiffs pray that this Court:

A.      Issue a Preliminary Injunction Order, pending trial on the merits, enjoining any action or finding on the part of the County that the time limit for Toll's next plan submission for the Proposed Developments has expired;

B.      Following a trial on the merits, issue a mandatory injunction Order directing the County to permit sewer service to the Proposed Developments either through use of the County's Sewer System by allowing Toll to construct the improvements required to connect the Proposed Developments to the County's Sewer System, or through the private construction of a Community System which may be turned over to the County upon completion or privately operated;

C.    Award Toll all attorney's fees and costs incurred in connection with this action, as permitted by law and;

D.    Award such other relief as the Court deems proper and just.

By: _____
Jeffrey M. Weiner, Esquire (DE # 403)
1332 King Street
Wilmington, Delaware 19801
(302) 652-0505
Attorneys for Plaintiffs

Of Counsel:

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

Marc B. Kaplin, Esquire
Barbara Anisko, Esquire
910 Harvest Drive
P. O. Box 3037
Blue Bell, PA 19422-0765
(610) 260-6000

DATED: January 18, 2008

**EXHIBIT "A"**



**Legend**

- Proposed Roads
- Pump Stations
- Gas
- Water
- Proposed Sewer Line
- Sewer Area
- Proposed Development

STATUS
- APPROVED
- PENDING

*Toll Brothers*
*America's Luxury Home Builder®*
Updated 1-24-07

**New Castle County**
Utilities and Transportation Map
1" = 1.33 Miles

**EXHIBIT "B"**

Introduced by: Robert Weiner
William Tansey
Christopher Coons
J. Robert Woods (Rev)

**RESOLUTION NO. 03-093**

## SUPPORTING THE IMPLEMENTATION OF THE
## SOUTHERN NEW CASTLE COUNTY SEWER SYSTEM

**WHEREAS,** with the adoption of the Unified Development Code in 1997, New Castle County made a commitment to construct sewers in southern New Castle County to accommodate the growth expected within this area which was designated as a growth area by the County and the State of Delaware as part of the *Shaping Delaware's Future Plan*; and

**WHEREAS,** the implementation of a sewer system in southern New Castle County is a necessary component of good land use planning and is consistent with the tenets of the State's Livable Delaware program; and

**WHEREAS,** the installation of sewers in southern New Castle County will provide better protection for the environment by substantially reducing the pollution of groundwater resulting from leaking septic systems; and

**WHEREAS,** the State Department of Transportation has made a commitment to provide the necessary road improvements in southern New Castle County to adequately handle growth, thereby eliminating the concern that development would be on hold in southern New Castle County even with sewers in place; and

**WHEREAS,** the installation of a sewer system in southern New Castle County is essential for the expansion of the schools in the Appoquinimink School District to meet the increasing needs of the population and for the construction of the New Castle County Vo-Tech High School; and

**WHEREAS,** the State made improvements in the battle to control unsystematic annexation by requiring that annexation proposals conform to a municipality's comprehensive plan and evidence a sustainable growth pattern; and

**WHEREAS,** New Castle County has already proposed funding in its FY'04 Capital Budget for the Southern New Castle County Sewer District project.

**NOW, THEREFORE, BE IT RESOLVED** by New Castle County Council that it reaffirms the County's commitment to sound land use planning and the protection of the environment by supporting the Southern New Castle County Sewer Project as contained in the Capital budget.

Adopted by County Council
of New Castle County on 6/24/03

_____
President of County Council
of New Castle County

SYNOPSIS: Same as title.
FISCAL NOTE: The approval of this Resolution has no fiscal impact; it supports the approval of the Southern New Castle County sewer system.

Ronald A. Morris
by /EHM

EXHIBIT "C"



**Southern New Castle County
Development Activity**

EXHIBIT "D"



Kaplin|Stewart
Attorneys at Law

Marc B. Kaplin
Direct Dial: (610) 941-2666
Direct Fax: (610) 260-1240
Email: mkaplin@kaplaw.com

December 8, 2004

**Via Facsimile and**
**First Class Mail**

Tracy Surles, Esquire
Department of Special Services, New Castle County
87 Reads Way
New Castle, DE 19720

RE:    **Toll Brothers, Inc. - Warren Property - Port Penn Road, New Castle County,**
       **Delawre**

Dear Tracy:

As you know, I represent Toll Brothers, Inc. ("**Toll**"). Toll is the equitable owner of
approximately 120 acres of undeveloped property located adjacent to Port Penn Road, east of
Route 1, presently owned by Gary Warren ("**Property**"). The Property is located in the
County's S Zoning District which contemplates public sewer. However, it is my
understanding that while the Department of Special Services' facilities contain adequate
treatment capacity to serve the area of the County in which the Property is located, and
although there is a gravity collection line which extends part of the way from the treatment
plan to the property, a regional pump station, force main and gravity line would have to be
installed in order for public sewer service to be provided to the Property.

As you know, Article V of New Castle County's Unified Development Code ("**UDC**")
contains the concurrency requirements for development, and, as a general rule, limits the
number of units that can be developed on a property to the units for which there is available
sewer capacity. However, where there is inadequate sewer capacity, Section 5.520 provides
various development options:

    a)     Develop at a lower density;

    b)     Build with future development reservation;

    c)     Make **improvements,** or

    d)     Acquire development rights.

With regard to making the necessary improvements, Section 5.520(c) provides that:

Tracy Surles, Esquire
December 8, 2004
Page 2

      The developer can make improvements for traffic as approved by the County and DelDOT.  Improvements may be made to the sewer as determined by the Department of Special Services.

Accordingly, the UDC expressly permits a landowner to make the improvements to the public sewer system to provide the necessary capacity for its proposed development.

Toll would like to employ the provisions of Section 5.520(c) and design and construct the improvements required to provide public sewer system to the Property.  As you may recall, this is exactly the same thing that Toll did in connection with the development of its Red Lion Chase community – decommissioned an existing pump station, installed a new gravity collection line from the location of the decommissioned pump station to the location of a new pump station, constructed a new pump station and force main.  Toll's engineers prepared all of the plans for the Red Lion Chase improvements and the plans were reviewed and approved by the Department.

There is, however, one significant difference between what was done at Red Lion Chase and what appears to be necessary with regard to the Property.  That is, at Red Lion Chase the cost of the facilities to be installed could be economically carried by the Red Lion Chase development.  At this point it appears that the cost to install the regional system required to service the Property will cost substantially more than can be borne by the development of the Property alone.  However, the facilities that would be installed to service the Property will also create substantial additional capacity that could be used in the future by the County to service other developments.  Therefore, I believe that there is a mechanism available in the UDC that would make it possible for Toll to design and install the entire system, and (a) recoup a portion of the cost thereof by connecting the houses to be constructed on the Property to the system, and (b) recoup a portion of the "excess cost" as a credit against the impact fees that would otherwise be required.  If the "excess costs" cannot all be recouped from (a) and (b) above, we suggest that we discuss the possibility of an agreement in which Toll is reimbursed the remaining "excess cost" if and when additional development is connected to the facilities that Toll constructs.

I believe that the Department has the authority to agree with Toll that Toll construct facilities that provide greater capacity than is needed by Toll's development and grant Toll a credit against the impact fees that would otherwise be levied.

Article XIV of the UDC regulates the payment of impact fees.  Section 14110 states as follows:

    Section 14110 Determination of Service Standard.

      A.    Impact fees are one-time payments used to fund system improvements needed to accommodate development.  Impact fees for the County are proportionate and reasonably

Tracy Surles, Esquire
December 8, 2004
Page 3

related to the capital facility service demands of new development. The impact fee methodologies establish that impact fees will adequately benefit new development. **The County's impact fee methodology also identifies the extent to which newly developed properties are entitled to various types of credits to avoid potential double payment of capital costs. . . .**

Another general requirement that is common to impact fee methodologies is the evaluation of credits. There are several types of credits that have been considered. First, a future revenue credit has been evaluated to avoid potential double payment for capital facilities through both one-time impact fees and ongoing revenues that may fund system improvements.

The second type of credit is a site-specific credit for system improvements that have been included in impact fee calculations. Project improvements normally required as part of the development approval process are not eligible for credits against impact fees. Specific policies and procedures related to site-specific credits for system improvements will be addressed in the ordinance that establishes the County's fees. However, the general concept is that developers may be eligible for site specific credits only if they provide system improvements that have been included in the impact fee calculations.

The general impact fee regulations of the UDC are broad in scope. In addition, there are specific sections of the UDC which address the reduction of impact fees and credits to a developer where the developer constructs facilities that will provide more capacity than is required for his development. Section 14.241 provides as follows:

A.    An impact fee reduction shall be determined by the Department of Special Services on a case-by-case basis for those applicants who construct a spray irrigation system (or other approved large-scale treatment system) as provided in Article 05 of this Chapter. The impact fee reduction shall be based upon the extent to which the facility or its connection lines will be utilized by the County as part of the County sewer system.

These concepts were discussed at a meeting that took place about a month ago in your office. The meeting was attended by John Husband, Eleanor Blackwell, Mitch Kotler and other Toll representatives. I followed that up with a conversation with Eleanor, who suggested that I put my thoughts in writing to you.

MBK/2699/110/514709_1 12/08/2004 12:25 PM

Tracy Surles, Esquire
December 8, 2004
Page 4

Mitch Kotler and I would like to meet with you, John, Eleanor and anyone else that you think would be appropriate to discuss the concepts set forth in this letter. I think an appropriate agenda would be as follows:

A.    Design

    1.    Can Toll have its engineers design the project for review by the department or the department's designated consulting engineer.

B.    Construction

    1.    Construction by Toll

    2.    Inspection/supervision by county

    3.    Determination of costs

C.    Credits

    1.    Determination of the portion of cost of improvements that are to be borne by development of the Property.

    2.    Determination of the balance of the cost to be recouped by Toll (total cost less than proportionate share to be borne by development of the Property)

    3.    Method of reimbursement

        a)    Credit against impact fee

        b)    Reimbursement agreement

        c)    Timing

        d)    Approval Process

Tracy Surles, Esquire
December 8, 2004
Page 5

I would appreciate it if you would consider the foregoing and that we could schedule a meeting to discuss ways to move forward.

Sincerely,

Marc B. Kaplin

MBK:ljk

cc:     B. Mitchell Kotler
        John Husband
        Eleanor Blackwell

EXHIBIT "E"

Marc B. Kaplin
Direct Dial: (610) 941-2666
Direct Fax: (610) 260-1240
Email: mkaplin@kaplaw.com

June 9, 2005

David W. Singleton, CEO
New Castle County Government Center
87 Reads Way
Corporate Commons
Newcastle, DE  19720

Richard T. Przywara
Chief of Staff
New Castle County Government Center
87 Reads Way
New Castle, DE  19720

RE:   **Toll Brothers, Inc. – Warren Property – Port Penn Road, New Castle County, Delaware – Regional Sewer Improvements**

Gentlemen:

I am writing to follow up our recent discussions.

Toll Bros, Inc is the equitable owner of the 125 acre Gary Warren Farm and three other farms which are adjacent to it.  The Warren Farm is located adjacent to Port Penn Road.  Toll is in the exploratory stages of the development process with regard to the Gary Warren Farm and estimates that the total build out of all five Port Penn Road properties is approximately 600-700 dwelling units.  In addition, we understand that another developer is in the process of exploring the development of the adjacent Lester property for approximately 100 additional homes.  Therefore, there is a critical mass of approximately 800 proposed homes located adjacent to Port Penn Road. We understand that the County's plan is that the Port Penn  area is intended to be provided public sewer by sewage treatment and effluent disposal facilities to be constructed on  Water Farm 2.

The first of our recent discussions took place at a meeting in Dave's office which was attended by Dave, Gregg Wilson, Carol J. Dulin, Mitch Kotler of Toll Brothers, Gary Warren and me to explain that Toll Brothers is the equitable owner of Gary Warren's property and four adjacent properties and its experience with the construction of sewer treatment and conveyance systems in a "public/private partnership" and how that experience might be used to assist the County in expanding the proposed sewer system for the southern part of the County so that Toll Brothers and other developers may proceed with the development of their respective projects in the S-Suburban Zoning District as provided for by the Uniform Development Code; i.e., with public sewer. When we left the meeting in Dave's office we indicated that we would put together our thoughts on a proposed public/private partnership and return to meet with Dave, Gregg and Carol.

Kaplin Stewart Meloff Reiter & Stein, PC
350 Sentry Parkway Building 640
Blue Bell, PA 19422-0765

*Offices in:*
Pennsylvania

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 2

Thereafter, when we attempted to prepare that proposal we quickly realized that we did not have enough information about the amount of sewer treatment capacity that exists at Water Farm 1, the amount of sewer treatment capacity at Water Farm 1 that is actually being used, nor the amount of sewer treatment capacity at Water Farm 1 that has been reserved for future developments. Similarly, we had even less information about the plans for the construction of Water Farm 2 and the plans for the conveyance systems necessary to transport sewage from the southern part of the County to either Water Farm 1 or Water Farm 2. Therefore, rather than spend more of Dave's valuable time in exploratory discussions, we asked Gregg to reschedule the meeting so that we could get more specific information from the Department of Special Services. Gregg was kind enough to schedule a meeting with Rich and John Husband and Mitch and I brought Toll's most experienced land development coordinator, Bob McCarron, to the meeting along with Craig Kachmar of MGK Industries, Inc., a company that designs and installs sewer systems.

From the meeting with Gregg, Gary and John we learned the following information that forms the basis of the suggestion that I will make at the end of this letter.

## Water Farm 1

Water Farm 1 is a property owned by the County on which there is constructed a lagoon sewage treatment system, the treated effluent from which is disposed of by spray irrigation on the property adjacent to the lagoons that treat the raw sewage and store the treated effluent. The rated capacity of Water Farm 1 is 1.5 million gallons per day (gpm). Of the 1.5 million gallons of capacity approximately 500,000 gallons is presently used. Although all, or substantially all of the remaining 1 million gallons of capacity has been "reserved" to developers or to the City of Middletown, none of that capacity is presently used.

The fees charged to treat the 500,000 gpd of sewage that are conveyed to Water Farm 1 are not enough to cover the costs of operating Water Farm 1.

If 250 gallons of capacity is allocated to each dwelling unit that ultimately will be connected to the Water Farm 1 system (an "EDU") the "reserved" 1 million gallons of capacity could service as many as 4,000 additional homes. Because it will be at least four or five years before that capacity is used, the reserved, but unused capacity could be "borrowed" by other developments and the County would have that 4-5 year period before it must complete the construction of additional capacity.

## Water Farm 2

Water Farm 2 is a 900+ acre parcel of ground located a significant distance from Water Farm 1. Water Farm 1 and Water Farm 2 are intended to serve different areas of the southern portion of the County. The prior administration's plans for the development of Water Farm 2 contemplated that a lagoon treatment and spray irrigation disposal system would also be

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 3

constructed by the County on Water Farm 2 and that system be capable of treating approximately 3.5 million gpd of sewage. The Warren Property (and adjacent properties) are located in an area planned to be served by Water Farm 2.

## Possible Connection to Augustine Creek Pump Station.

Because there is a pump station located in the Augustine Creek Subdivision, which is located relatively close to the Warren Property, sewage from the Warren property (and adjacent properties) can be treated by Water Farm 1. This is because the Augustine Creek pump station pumps sewage along Pole Bridge Road to an existing 24 inch gravity sewer main that runs adjacent to Dupont Parkway and terminates at Water Farm 1. Therefore, it would be possible, at least on a temporary basis, for the homes to be constructed adjacent to Port Penn Road to "borrow" the unused capacity at Water Farm 1. All that would be needed to facilitate the conveyance of such sewage to Water Farm 1 would be the construction of a force main from the area of Port Penn Road adjacent to the Warren Farm to the pump station at Augustine Creek. As an alternative, a force main could be permanently constructed adjacent to Port Penn Road from a regional pump station to be located near the Warren Farm to Biddle's Corner, where it could turn directly south along Dupont Parkway. As depicted on the drawing that is attached, that force main could ultimately be turned west to convey the sewage from the Port Penn area to Water Farm 2. However, on a temporary basis the line could be continued south along Dupont Parkway to its intersection with Pole Bridge Road for connection to the 24 inch gravity main that conveys sewage to Water Farm 1.

## Sewer Impact Fees.

In performing our analysis we have assumed that the County will continue to charge an impact fee of $8,500 per EDU for the use of both its sewage conveyance system and its sewage treatment facilities. As such, the 700 dwelling units to be developed by Toll adjacent to Port Penn Road would generate $5,950,000 in impact fees and the additional 100 units to be developed on the Lester property would generate another $850,000 for a total of $6,800,000. Toll's estimates are that the construction of the regional pump station near the Warren Farm together with the construction/installation of the Port Penn Road/Biddle's Corner/Dupont Parkway force main depicted on the attached drawing will cost approximately $4,000,000.

## Sewer Consultant.

We understand that the County has retained or will shortly retain a consultant to reassess how the County should proceed in the future with regard to the provision of public sewer service for the southern part of the County in general, and how to proceed with regard to Water Farm 2 in particular.

## Toll's Participation in Other Public/Private Partnerships.

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 4

Toll has participated with many municipalities in Pennsylvania and in other states with regard to the development of sewer treatment and/or regional conveyance systems. Bob McCarron has primarily responsibility for constructing the sewer treatment and conveyance systems that Toll has recently constructed. They include the regional sewer treatment plant in Upper Uwchlan (Downingtown), Chester County, PA, the reconstruction of the sewer system in Chadds Ford Township in Chester County, the construction of the large regional pumping station at Cheyney Road and Baltimore Pike in Concord Township, and the construction of a sewer treatment system in Ocean City, MD.

In most instances Toll (and other developers) purchase the land, caused the design of the systems, had the systems approved by the municipality's consultants, constructed the systems, operated the systems until the systems broke even, and then conveyed the systems to the municipality. Where Toll (and other developers) advance significantly more than the current sewer impact fee and the expenditure of those funds result in the creation of additional capacity that can be sold in the future to other developers, Toll usually recoups its excess contribution from impact fees paid in the future by other developers as they connect to the improvements that Toll has constructed. By using this type of public/private partnership, the following are accomplished:

1. The available dollars (sewer impact fees) are used to create more extensive improvements. That is, because of Toll's buying power and the fact that it is not encumbered by the requirement that prevailing wages be paid, the money expended by Toll usually purchases more improvements than the money expended by governmental agencies.

2. The municipality does not have to make large capital investments, financed by long term bonds, and then wait for development to start to pay back the cost of the improvements.

3. Toll is usually able to move the process through the permitting process faster than the County can do so when it uses public funds as Toll is not saddled with additional regulatory hurdles that often affect governmental projects.

## Suggested Course of Action.

With all of the foregoing in mind, Toll suggests the following course of action to the County:

1. Toll will design and construct the Port Penn regional pump station and the Port Penn Road force main at least to Biddle's Corner, and probably to a location where it can be used by the new school being constructed in that area.

2. Either the Port Penn Road/Biddle's Corner/Dupont Parkway force main is extended to the 24 inch gravity main at Pole Bridge Road so that the Port Penn properties can be served, or Toll will construct the temporary force main from Port Penn Road to the Augustine Creek pump station.

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 5

    3. The County will acquire any land or rights of way that are required to construct the pump station and the force main(s).

    4. Toll and the developer of the Lester property would receive credit against its $6,800,000 of sewer impact fees for the actual cost of the design, permitting, construction and approval of the pump station and force main. As indicated above, the cost is presently estimated to be about $4,000,000.

    5. Toll and the Department of Special Services would cooperate in the design, permitting, construction and approval of the pump station and force main in the same manner that they cooperated in the design, permitting, construction and approval of the Red Lion pump station and force main.

    6. The foregoing program would leave approximately $2,800,000 -$3,000,000 from the sewer impact fees that Toll and the developer of the Lester property would be required to pay, and they would either pay that amount directly to the Department of Special Services as they would in the ordinary course of any development, or apply those funds to the construction of some portion of the Water Farm 2 facility (or other facility) that the County elected Toll to construct.

    7. At the present time it seems to us that the proper course is to set the $2,800,000 - $3,000,000 aside for the future construction of the Water Farm 2 facility as that facility will ultimately be needed because the Port Penn Road properties would only be "borrowing" the Water Farm 1 capacity that has already been reserved to other governmental agencies and developers. That is, eventually the County is going to have to construct additional facilities and we assume that those facilities will be constructed at Water Farm 2. However, until the County and its consultant make a final decision with regard to the type of improvements to be constructed at Water Farm 2, it would probably be most prudent to accumulate the funds from Toll and other developers who "borrow" the Water Farm 1 previously allocated, but unused capacity.

    8. To illustrate the potential positive impact of the employment of this concept further, please assume that I am correct that the 1 million gallons of allocated but unused Water Farm 1 capacity is sufficient to serve 4,000 dwelling units in the future. In that case the County could permit Toll and other developers to "borrow" at least one-half of that capacity, thereby creating the ability for the County to serve approximately 2,000 additional dwelling units. If the $8,500 per EDU fee remains at that level, the sewer impact fees generated by those 2,000 units would be approximately $17,000,000. After subtracting the $4,000,000 cost of the Port Penn Road pump station and force main from that $17,000,000 there would be $13,000,000 available for the construction of Water Farm 2 and the conveyance facilities required to service those 2,000 dwelling units. Obviously, that is a much more prudent way to finance the eventual construction of Water Farm 2 than to have the County construct the

David W. Singleton, CEO
Richard T. Przywara
June 9, 2005
Page 6

improvements using County funds.  Furthermore, the addition of sewer user fees from an additional 2000 homes would make the operation of Water Farm 1 more palatable.

One final point that I would like to emphasize -- based on what we know, we think that the County could implement the foregoing immediately and that it would be compatible with whatever solution the County and its consultant agree upon.

We would like to follow up this letter with another meeting where we could discuss its feasibility and possibly, its implementation.

Many thanks for taking the time to listen to our ideas.

Sincerely,

/s/

Marc B. Kaplin

MBK:ljk

Enclosure

cc:     Gregg E. Wilson
        Jonathan W. Husband
        B. Mitchell Kotler
        Robert McCarron
        Gary Warren

EXHIBIT "F"

CHRISTOPHER A. COONS
COUNTY EXECUTIVE



RICHARD T. PRZYWARA
GENERAL MANAGER

**DEPARTMENT OF SPECIAL SERVICES**

August 11, 2005

AUG 16 2005

Mr. Marc Kaplin
Kaplin Stewart
350 Sentry Parkway, Bldg. 640
Blue Bell, PA 19422

RE:   Sewer Capacity Request-Warren Property
       TP# 13-009.00-024

Dear Mr. Kaplin:

In response to the above-referenced request, capacity in the requested amount of 42,900 gallons per day will be available upon completion of the construction of Water Farm II Treatment Facility and all related New Castle County sewer interceptor lines to which the development can connect. However, please be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38 N.C.C.C. § 38-27.

Thank you for your attention to this matter. If you have any questions, please do not hesitate to contact Elinor Blackwell at 395-5711 or David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:   Richard T. Przywara
       Tracy Surles
       Charles Baker
       File                                                    JH/57-5557

*The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or in writing. Please understand that the Department's position, as stated in this letter, can only be modified by written instrument signed by the General Manager of the Department and expressly referencing this letter and the modification.*

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720          PHONE: 302-395-5700          FAX: 302-395-5802

**EXHIBIT "G"**

OCT 13 2005  01:10PM  FROMFESE ENG
CHRISTOPHER A. COONS
COUNTY EXECUTIVE                                        +2152935493          T-328   P.002/003   F-086
                                                                      RICHARD T. PRZYWARA
                                      RECEIVED OCT 1 0 2005                GENERAL MANAGER



DEPARTMENT OF SPECIAL SERVICES

October 13, 2005

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

RE:     Sewer Capacity Request-Port Penn Assemblage Plan
        TP#13-004.00-008,010,013,016,017
        Application #2005-0459 -S

Dear Sir or Madam:

In response to the above-referenced request or plan, capacity in the requested amount of
138,600 gallons per day will be available upon completion of the construction of all
necessary sanitary sewer infrastructure to which the DEVELOPMENT will connect.
However, please be advised that capacity can only be reserved by execution of a sewer
agreement at the record plan stage of the development. See 38 N.C.C.C. § 38-27.

Thank you for your attention to this matter. If you have any questions, please do not
hesitate to contact Elinor Blackwell at 395-5711 or David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:     Richard T. Przywara
        Tracy Surles
        Charles Baker
        File
                                                                      JH/58-5599

The information contained in this letter represents the final position of the Department of Special Services
regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or
in writing. Please understand that the Department's position, as stated in this letter, can only be modified
by written instrument signed by the General Manager of the Department and expressly referencing this
letter and the modification.

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720         PHONE: 302-395-5700          FAX: 302-395-5802

EXHIBIT "H"



# New Castle County
# Southern Sewer
# Service Area

Date: June 14th, 2007
Scale: 1" = 8000'

0   0.5   1          2          3          4
Miles



### Capacity Status

Capacity Available

Capacity Not Available but
Improvements are Funded.

Capacity Not Available and
No Improvements are Funded.






C:\gisdata\Projects\SSSA Update\SSSA 2007_06_14.mxd

EXHIBIT "I"

FROM :BILLWARREN FARM            FAX NO. :302834960000       Oct. 25 2007 02:09PM  P1

Introduced by:  Mr. Tansey
Date of Introduction: March 28, 2006

## RESOLUTION NO. 06-069
## AS AMENDED BY ORAL AMENDMENT NO. 1

## ENDORSING A PLAN TO PROVIDE SANITARY SEWER SERVICE TO THE SOUTHERN SEWER SERVICE AREA

**WHEREAS**, New Castle County's (the "County's") Comprehensive Development Plan and the *New Castle County Code* provide for sewering the Southern Sewer Service Area (SSSA), an area roughly bounded to the north by the Chesapeake and Delaware Canal, to the south by Middletown, to the west by Maryland and to the east by the Delaware River; and

**WHEREAS**, in light of the magnitude and complexity of sewering the SSSA, the County retained a nationally-renowned engineering firm to evaluate alternatives and assess their impact on County residents; and

**WHEREAS**, the County Administration and New Castle County Council ("Council") have cooperatively listened to concerns expressed by residents, schools, businesses, civic groups, land owners and developers; and

**WHEREAS**, based on the results of the consultant's evaluation, coordination of efforts with State and local governments, and consideration of stakeholder's concerns, the County Administration has proposed a responsible path forward; and

**WHEREAS**, the path forward entails providing wastewater treatment and disposal to a portion of the SSSA for the short-term, while evaluating regulatory, technical and financial issues for the long-term; and

**WHEREAS**, the path forward furthers environmental stewardship; supports the establishment of more livable communities through effective planning and partnership; distributes risks, costs and benefits in a fair and equitable manner; and ensures that the SSSA will be financially self-sustaining.

**NOW, THEREFORE, BE IT RESOLVED** by the County Council in and for New Castle County that Council hereby endorses the following actions to be taken to further the path forward for the SSSA.

1.  The County will as soon as possible commence construction of the components of the Central Core transmission system depicted on the attached Exhibit "A," but not the treatment and disposal facilities.

2. The County will negotiate an agreement with Middletown to provide some sewer capacity for the SSSA, subject to New Castle County Council approval. Such agreement will include purchase of some permanent capacity and lease of some temporary capacity.

3. The County will also utilize temporarily surplus capacity at Water Farm #1 to provide sewer capacity for some areas of the SSSA for five to seven years. All or portions of such flows may be diverted elsewhere once the County constructs a long-term treatment and disposal facility.

4. The County will utilize capacity at Middletown and Water Farm #1 to service development over the next five to seven years while it coordinates infrastructure improvements with the Delaware Department of Transportation ("DelDOT") and other State agencies, evaluates growth through the Comprehensive Development Plan process and evaluates the feasibility of at least the following disposal options:

    a) Rapid Infiltration Basins (RIBs) at Water Farm #1 and Water Farm #2;
    b) RIBs at locations other than Water Farm #1 and Water Farm #2;
    c) spray irrigation at locations other than Water Farm #1 and Water Farm #2; and
    d) discharge from the Wilmington Wastewater Treatment Plant.

5. Developments that are located in the Central Core (see area shaded green on Exhibit "A") and developments that are planned to be permanently sewered by Water Farm #1 (see areas shaded pink on Exhibit "A") will receive exclusive priority with respect to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006. The County shall develop an allocation plan to fairly distribute the limited capacity over the next five to seven years. Schools and facilities owned by the State or County shall receive the full capacity determined to be necessary; private developments may receive a prorated portion of their ultimate requirement. The costs to provide the interim sewer service for the next five to seven years will be paid for by those using the capacity, and construction of the short-term plan shall only be commenced upon confirmation that a sufficient number of eligible users have committed to participate.

6. If the County has not found a better long-term disposal alternative in time to divert flows from Middletown and Water Farm #1 on a timely basis, it will construct Water Farm #2 while continuing to finalize a long-term solution.

7. The County will prepare amendments to the *New Castle County Code* to ensure that development plans can only continue through the Land Use process if sewer capacity is or will be available for the development.

8. The County will prepare *New Castle County Code* amendments to convert from a sewer impact fee to a capital recovery fee for the SSSA. The County will retain a qualified firm to establish the capital recovery fees and annual user fees for the SSSA. The County will remain one unified sewer district for the purpose of establishing the

annual user fees. The capital recovery fees and annual user fees shall be set at levels reasonably expected to recover the entire costs of creating and operating the sanitary sewer system serving the SSSA.

9. The County will revise its capital plan to reflect the new SSSA plan.

10. Within eighteen (18) months of commencing construction of the components of the Central Core transmission system, the County will provide a detailed report and analysis of available sewer capacities in the Southern Sewer Service Area ("SSSA") to County Council. If it is determined at that time that the County will be unable to provide sewer capacity for any active or recorded plan as of March 9, 2006 outside the Central Core transmission system, alternative sewer disposal options will be considered by the County.

Adopted by County Council of
New Castle County on: 3/28/06

President of County Council
of New Castle County

**SYNOPSIS:**    This Resolution provides a path forward for providing sanitary sewer service to the Southern Sewer Service Area.

**FISCAL NOTE:**  The County will pay Middletown up to $3,200,000.00 for the purchase of 100,000 gallons per day (gpd) of sewer capacity. The County will also pay Middletown's annual residential user rate for the lease of 150,000 gpd for as long as the County utilizes the leased capacity.  The first annual payment of $133,042.50 shall be due within thirty (30) days of execution of the agreement. It is estimated that construction of the Central Core transmission system and the short-term infrastructure will cost $34,000,000 to $39,000,000. The County will also likely spend $5,000,000 to $10,000,000 evaluating long-term disposal methods over the next five to seven years. The County expects to recoup these costs over time through capital recovery fees and a short-term connection fee.

EXHIBIT "J"

CHRISTOPHER A. COONS
COUNTY EXECUTIVE



RICHARD T. PRZYWARA
GENERAL MANAGER

**DEPARTMENT OF SPECIAL SERVICES**

March 23, 2006

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

RE:    Sewer Capacity Request-Warren Tract
       TP#: 13-009.00-015,024,028
       Application #:2005-0353-S

Dear Sir or Madam:

In response to the above-referenced plan, capacity has been requested in the amount of 37,800 gallons per day with the lots shown on this plan having been designed to be served by sanitary sewer service. At the time of this request, sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available. No building permit shall be issued for any lot shown on this plan, or any lot created by any revision or resubdivision of this plan, until or unless the Department of Land Use receives written verification from the Department of Special Services that sanitary sewer service is or will be available for the Development and that the Department of Special Services has approved all necessary sanitary sewer construction plans.

Please be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development. See 38 N.C.C.C. § 38.02.002(c).

Thank you for your attention to this matter. If you have any questions, please do not hesitate to contact David Thurman at 395-5752.

Sincerely,

Jonathan W. Husband
Engineering & Environmental Services Manager

JWH:DT/dc

cc:    Richard T. Przywara
       Tracy Surles
       Charles Baker
       File                                                    JH/59-5701

*The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity and supercedes all prior representations, whether transmitted orally or in writing. Please understand that the Department's position, as stated in this letter, can only be modified by written instrument signed by the General Manager of the Department and expressly referencing this letter and the modification.*

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720    PHONE: 302-395-5700    FAX: 302-395-5802

EXHIBIT "K"

Christopher A. Coons
County Executive



Charles L. Baker
General Manager

**Department of Land Use**

<u>Department of Land Use Revised Exploratory Report</u>

| | |
|---|---|
| Application Number – | 2005-0353 |
| Name of Project – | Warren Tract |
| Type of Plan – | Exploratory Major Subdivision Plan (Revised) |
| Date of Review– | March 31, 2006 |

Engineer-            Choong Yim, Eastern States

Project Review Team – Brad Shockley (Planning) – 395-5446
                          Stephanie DeAscanis, P.E. (Engineering) – 395-5475
                          Christine Quinn (Historic) – 395-5521
                          Owen Robatino (Transportation) – 395-5427

Status of Review –      Status of Review - General Compliance for the Public Hearing on May 2,
2006 - The Department will issue an additional review report after the
Public Hearing that will find the plan acceptable to proceed to
preliminary after you address all comments and/or studies or
unacceptable, submit a revised exploratory plan to address all comments
and/or studies.

<u>Planning:</u>

✓ 1.   The plan references an agricultural subdivision (by deed - per state regulations) that will
create 'Lot B', so as to subtract this area from the gross site acreage for site capacity
purposes. Note that the plan may proceed as proposed; however, the agricultural subdivision
must occur prior to the record plan submission. The applicant should recognize that the
ultimate approval of this plan is based on the exclusion of the 15.79 acre parcel;

2.   Provide a narrative (cover letter is acceptable) that summarizes the discrepancies between
the overall acreage of protected resources within Note No. 12 and the site capacity
calculations. Also, correct the *total resource land* within Step 1 of Table 40.05.421;

3.   Specify if the acreage of usable open space and/or stormwater management is accounted for
in the overall acreage of open space (as shown within Note No. 11);

4.   Specify if there are drainageways that drain greater than 10 acres and provide a RBA as may
be required. Also, there are several areas in which the drainageways should be extended
(example - refer to the area to the north of Lot 81 and the area to the north of Lots 63 and
64);

5.   There are large sections of drainageways within the LOD, but relatively small acreages are
referenced within the disturbed area calculations. Correct the disturbance calculations as

may be required. Note that the overall disturbance must comply with Table 40.10.010 of the New Castle County Code (unless otherwise permitted by Table 40.10.210);

6. Verify the overall acreage and area of disturbance within the vicinity of Lots 69 and 70;

7. Verify the resource that is used in establishing the RBA that originates on Sheet 7 (south of Lots 93-98). Also, verify this RBA as it is shown on all other sheets;

8. Verify the acreage of young forest, young forest CNA, mature forest, and drainageways within Note No. 12 based on the labels per sheet;

9. Your cover letter notes that all areas of open space access are a minimum of 45' in width. Verify the area between Lots 42 and 43;

10. Address Section 40.26.330 of the UDC to justify the proposed cul-de-sac lengths;

11. Provide certification of approval from DNREC (as referenced within Note No. 16) in regard to the critical natural area (CNA). Also, the department is in receipt of a 'Memorandum of Agreement' between DNREC and Toll Bros. Note that New Castle County does not enforce private agreements; therefore, DNREC should document (prior to recordation) that the plan complies with the agreement;

12. Revise the lot lines for Lots 21 and 22, so that the easement to the DNREC property is within open space;

13. Provide documentation from the Army Corps of Engineers in regard to the areas labeled as 'Waters of the U.S.';

14. The density and site area information may be removed from the record plan (Note No. 10), as the acreage is addressed by the site capacity calculations. Also, remove the 'provided' calculations for the lot area, width, and setbacks, as this information should be shown on the individual lots. The 'typical' lot detail should reference the minimum lot width;

15. Designate natural resource area/community area open space on the plan in accordance with Section 40.20.225 of the New Castle County Code;

16. Correct the acreage/square footage conversions within Note No. 11 and verify the total road (ROW) coverage;

17. Contact the New Castle County Department of Special Services in regard to Note No. 18, as there is no sanitary sewer service in this area (per letter from Special Services - dated March 23, 2006).

Engineering:

The Engineering Section within the Department of Land Use has reviewed the above mentioned Exploratory Plan and finds the application unsatisfactory due to comment number 2 and 3 listed below. Again, the remaining comments should be addressed with the preliminary submission. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Please note the following comments provided:

1. Date complete submission received by Department of Land Use:      3/06/06
   Date review complete by Engineering Section:                                    3/27/06
   Number of Days in the Engineering Section:                                        15 days

2. In conjunction with comment No. 4 from Planning, the Engineering Section requires that all areas designated "drainageways" be evaluated and assigned their proper level of protection in accordance with those parameters outlined in the UDC definition of riparian buffer area. In addition, Section 40.10.331 of the UDC states that all RBA areas shall be classified and planted in accordance with this section where native vegetation is not present. This designation plays a viable role to the assessment of the current site conditions in respect to stormwater management. Care should be taken to preserve these areas within the property with significant natural drainage patterns. In accordance with Section 40.10.360, the positive

surface drainage flow of a drainageway shall not be interrupted. Under this provision, any portion of the drainageway up-slope of the disturbance, should also be considered disturbed and must be included in the calculations.

3. The design intent of the proposed plan shall adhere to Section 40.22.210 of the New Castle County Unified Development Code (UDC). Stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points all components of an overall conservation design approach. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and protected resources. There are several areas on the plan where the forests are disturbed in order to incorporate stormwater management and relocation is suggested to avoid this conflict. It should be noted that forested areas have definite stormwater benefit and it would be counterproductive to remove these areas, especially when it appears there are other possible stormwater locations that may better serve the intent of conservation design.

The applicant has not addressed this previous comment to the extent the department requires. Both the Planning and Engineering Section would suggest a meeting to discuss this matter and convey the intent "to preserve the drainageways and resources" to the maximum extent possible. It would be beneficial to the applicant, in order to facilitate this meeting, to prepare and bring Drainage Area Maps similar to those prepared for Port Penn Assemblage (App. 2005-0459). If you need a copy of these to use as an example, please contact Stephanie DeAscanis at 395-5475.

4. Note that in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event. Please provide the necessary computations to verify site compliance.

5. In accordance with Engineering Checklist Item I, note that due to the proposed Green Technology Best Management Practices' proposed, the applicant will be required to submit field testing to demonstrate feasibility where soil characteristics may limit infiltration.

6. As noted in the Conservation Design, Green Technology, and Critical Natural Area Report, the applicant will need to further assess the downstream affect on the four residential properties and State of Delaware property which may be impacted by the post-development stormwater discharge.

<u>Transportation:</u>

On August 17, the County and DelDOT scoped a Traffic Impact Study (TIS) for this Plan with the Applicant. The TIS may recommend improving Port Penn Road's nearby angled intersection with Pole Bridge Road (deemed substandard by the 2003 Southern New Castle County Local Road Plan). The plan should dedicate right-of-way along Port Penn Road (which is classified a Rural Minor Collector), and improve it to Collector Road Standard per the Road Plan.

The Applicant should combine the proposed Port Penn Road access with the proposed eastern access to Port Penn Assemblage (2005-0459-S), near the location of the existing shared driveway on the common property line (as previously discussed). That may eliminate the need for one of the two proposed street connections between the sites. Both plans will likely need a walkway along Port Penn Road (possibly within the Open Space Scenic Buffer) to reach other

neighborhoods, like existing Pine Valley Farms to the west and proposed Augustine Preserve (2004-0917-S) to the east.

Historic:

N/A

Standard Comments:

1. The 'keymap' should reference the actual sheet numbers;
2. The legend references a historical buffer, but a buffer is not shown on the plan;
3. Clarify Note No. 6 that references mapping that "may not meet accuracy standards";
4. Provide the appropriate tax parcel number for each 'certification of ownership';
5. Extend the scenic corridor to the east of Lot B;
6. Correct the reference to 'existing proposed to be removed' on Sheet 3;
7. Specify what the 'dotted' symbols represent;
8. Delete any duplicate notes on Sheets 1 and 2 and include all notes on one sheet;
9. Provide certification of approval from the water supplier;
10. Submit a landscape/open space management/natural resource area plan for review and approval. Show the final width/opacity for all bufferyards on the record plan. Note that proposed lot lines along the existing perimeter may need to be revised based on the required bufferyards;
11. Submit a copy of the required maintenance declaration and a copy of the plan to the Division of Law and this department for review and approval;
12. Contact the New Castle County Department of Special Services in order to address Section 40.27.310.B of the New Castle County Code;
13. Address Section 40.21.150 of the New Castle County Code in regard to accessway standards;
14. Provide a note on the plan addressing the requirements of Section 40.20.230, F., 4. of the New Castle County Code regarding street connectors;
15. Provide street names and/or postal addresses in accordance with U. S. Postal Service policy. Submit a copy of the plan to the Department of Police (Communications) for review of street names. Submit a copy of the plan to the Department of Land Use, Mapping Section for review of postal addresses. Written approval from those agencies, referencing the latest plan revision date, must be received prior to record plan approval;
16. Provide monuments in accordance with Section 40.20.520 of the New Castle County Code;
17. Submit a copy of this plan to the Office of the State Fire Marshal for review and approval;
18. Submit a copy of this plan to the State Division of Highways for review and approval;
19. Performance surety must be provided in accordance with Chapter 40, Division 31.800 of the New Castle County Code. Initiate the Land Development Improvement Agreement by submitting the Land Development Improvement Agreement Information Sheet, based on either the Formula Method or the Cost Estimate Method, to this office;
20. The Owner/Developer must provide certification to the Department of Land Use from the Secretary of the Department of Education that the school district(s) serving the site has adequate capacity for the proposed development. Add the following note to the plan as may be required:
   "Prior to the issuance of any certificate of occupancy for any lot or unit shown on this plan, the owner/developer shall provide a certification from the Secretary of the Department of Education that the Voluntary School Assessment for that lot or unit has been paid."

21. If a complete Preliminary Plan submission is not made within twelve (12) months of the date of the initial exploratory letter, the Exploratory Sketch Plan will be considered to be expired in accordance with Chapter 40, Section 31.390 of the County Code.

cc:     David Culver, Planning Manager
        Gary & Gale Warren

EXHIBIT "L"

CHRISTOPHER A. COONS
COUNTY EXECUTIVE

RICHARD T. PRZYWARA
GENERAL MANAGER



DEPARTMENT OF SPECIAL SERVICES

December 20, 2006

John Lehane, P.E.
Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

RE:     Major Subdivision Plan Comment
        Warren Tract – Application Number 2005-0353

Dear Mr. Lehane:

The Department of Special Services, Engineering & Environmental Services Division has reviewed the aforementioned Major Subdivision Plan and provides the following comment:

According to the Department of Special Services Sewer Capacity Policy (policy #7), *"...approximately one hundred fifty (150) residences are needed to reasonably cover the maintenance of one pump station."* The application only proposes one hundred twenty-six (126) single family dwellings. According to Neil Sander, 25 lots within the emerging development of Port Penn Assemblage are to direct their sewage into the gravity sanitary sewer system proposed within the subdivision of Warren Tract, thus meeting the required minimum number of lots to justify the proposed pumping station. It was the decision of this Department to approve the exploratory design review for the aforementioned application, regardless of whether the 25 lots are brought into the proposed pump station. However, it is our feeling that a "regional" design for the sanitary sewer collection system be developed for this site and the neighboring parcels. Your design should include, but not be limited to, extending portions of the proposed sewer system to common property boundaries (with the respective easements) and limiting the proposed pumping stations by selecting the optimal location to provide sanitary sewer to the region.

Approval of the exploratory design review by the Department of Special Services shall not be interpreted as a guarantee that sanitary sewer service will be provided to this region. Approval of the preliminary design review will be contingent upon successfully developing a "regional" sanitary sewer system.

Please contact me at (302) 395-5722 if you have any questions regarding the content of this letter.

Very truly yours,

Robert Magnotti, E.I.T.
Civil Engineer I

CC:     Gary Warren
        Richard Przywara, General Manager of the Department of Special Services
        Jonathan Husband, Engineering & Environmental Services Division Manager
        Jason Zern, P.E.
        Bradford Shockley
        Stephanie DeAscanis, P.E.
        File

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE  19720          PHONE:  302-395-5700          FAX:  302-395-5802

EXHIBIT "M"

Christopher A. Coons
County Executive

RECEIVE  JAN 2 4 2007



Charles L. Baker
General Manager

*Department of Land Use*

<u>Department of Land Use Preliminary TAC Report</u>

Application Number – 2005-0353
Name of Project – Warren Tract
Type of Plan – Preliminary Major Subdivision Plan
Date of Review – January 22, 2007

Engineer- Neil Sanders

Project Review Team – Brad Shockley (Planning) – 395-5446
Stephanie DeAscanis, P.E. (Engineering) – 395-5475
*Christine Quinn* (Historic) – 395-5521
Owen Robatino (Transportation) – 395-5427

Status of Review – General Compliance for the Public Hearing - The Department will issue an additional review report after the Public Hearing.

<u>Planning:</u>

Date complete submission received by Department of Land Use: 12/28/06
Date review complete by Planning Section:                1/4/07
Number of Days in the Planning Section:                   4 days

1.  *The plan may proceed as proposed; however, the agricultural subdivision must occur prior to* the record plan submission;
2.  Identify (within the plan view on Sheet 5) the acreage for each protected resource that is referenced within the 'natural resource protection' table on Sheet 4 (Note No. 14) and Sheet 5. Further, in order to clarify the total acreage of resources to be disturbed, identify the area and acreage of each resource (as shown on Sheet 5) to be disturbed for stormwater management;
3.  Correct the *total resource land* within Step 1 of Table 40.05.421;
4.  There are still sections of drainageways within the LOD, but relatively small acreages are identified as being disturbed. Correct the disturbance calculations as may be required. Note that the overall disturbance must comply with Table 40.10.010 of the New Castle County Code (unless otherwise permitted by Table 40.10.210). Further, note that all "protected" resources must be within open space; therefore, *at a minimum, all drainageways on individual lots must be considered disturbed;*
5.  Identify the forest disturbance behind Lots 69 and 70 on Sheet 5;
6.  Revise the LOD to the southwest of Lot 46, as the RBA is shown to be disturbed;
7.  Designate natural resource area/community area open space on the plan in accordance with Section 40.20.225 of the New Castle County Code;
8.  *Provide documentation from the Army Corps of Engineers in regard to the areas labeled as* 'Waters of the U.S.';

87 Read's Way, New Castle, DE 19720          www.nccdelu.org       Phone: 302-395-5400      Fax: 302-395-5587

9.  Submit a landscape/open space management/natural resource area plan for review and approval. Show the final width/opacity for all bufferyards on the record plan. Note that proposed lot lines along the existing perimeter may need to be revised based on the required bufferyards. For example, there are areas along the northern property line in which a 0.2 opacity buffer is shown without providing the minimum width of 15'. Include the standard landscape plan note on the record plan;

10. Your cover letter notes that the Memorandum of Agreement between DNREC and Toll Bros. represents approval of the plan in regard to CNA issues; however, the Department is in receipt of correspondence from DNREC (letter dated August 1, 2006 and the attached TAC comments) that outlines additional concerns in regard to the CNA. Specify if the DNREC issues have been resolved;

11. Revise the lot lines for Lots 21 and 22, so that the easement to the DNREC property is within open space. The record plan should clearly specify any areas of public access through the subject subdivision to the DNREC property;

12. Verify that the acreage of lots, roads, and stormwater management equal 118 acres (within Note No. 13). Also, Note No. 39 may be removed, as the required information is shown within Note No. 13;

13. Correct the reference to Parcel 14 within Note No. 2;

14. Verify the deed book reference within Note No. 4 and explain the purpose of the easement that is to be eliminated;

15. Remove the second sentence from Note No. 6;

16. Note No. 10 continues to refer to an exploratory plan;

17. Note No. 31 continues to reference a pending TIS;

18. Verify that all lots comply with the minimum side loading garage setback. For example, refer to Lots 27 and 43;

19. Correct the acreage/square footage conversions within Note No. 13 and verify the total road (ROW) coverage;

20. Contact the New Castle County Department of Special Services in regard to Note No. 20, as there is no sanitary sewer service in this area (per letter from Special Services - dated March 23, 2006).

Engineering:

The Engineering Section within the Department of Land Use has reviewed the above mentioned Preliminary Plan and finds the application unacceptable due to comments 2 through 6, the remaining comments are provided for ease of record plan preparation. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Note the following comments:

1.  Date complete submission received by Department of Land Use: 12/28/06
    Date review complete by Engineering Section:           1/10/07
    Number of Days in the Engineering Section:             8 days

2.  The department previously commented on implementation of conservation design in accordance with Article 22 of the UDC, which states stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points all components of an overall conservation design approach. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and

protected resources. There are some areas on the plan where the department feels the nature of this intent is not honored to the maximum extent possible.

    a.   The applicant shall take advantage of the results from the GTA report dated October 3, 2006 which indicate several test pit locations where acceptable infiltration rates were encountered allowing incorporation of volume reduction into the calculations. The incorporation of practices, to recognize a volume and peak rate reduction, into the design and computations may have a beneficial effect on the peak rates at each of the analysis points. The volume reduction may essentially eliminate the need for the proposed wet pond for peak rate compliance. Essentially the report shall provide further information as to how the applicant proposes to achieve volume reduction as mentioned on sheet 7 of the report. (Checklist Item G-8)

    b.   Previous comments were rendered regarding forest disturbance with respect to GTBMP implementation. It should be noted that forested areas have definite stormwater benefit and it would be counterproductive to remove these areas, especially when it appears there are other possible stormwater management alternatives. Though the code permits this disturbance, if it can be avoided with implementation of an alternative GTBMP (e.g. – bioretention) that would be the preference of the department, particularly Bio-swale C-1, C-2 which appear to disturb forest in order to meet the length requirement in DURMM. It also appears that Bio-swale B-2 may be shifted to the west in order to avoid forest disturbance.

    c.   Additionally, there seems to be redundant conveyance systems in areas where the proposed layout is not maintaining the natural drainage divides.

3.   In conjunction to the planning comment any forest elimination associated with a stormwater feature shall be considered disturbed.

4.   The Engineering Section further supports the Planning comment regarding interpretation of drainageway disturbance. Section 40.10.360 states, "the protected area may be re-graded and reshaped to provide for stormwater management and drainage." Any drainagway not in open space shall be considered disturbed. Artificially reconstructing the drainageway with an alignment that suits development is not conservation of that resource as set forth in the referenced section of code.

5.   In addition to the above comment, note Section 40.10.360.D with respect to design of stormwater management in drainageways. All permanent pool stormwater management ponds shall be designed with aquatic benches planted with approved materials.

6.   The following items were absent for the stormwater analysis report:

    a.   CN values and Tc path depicted on the drainage plan and associated computations. (Checklist Item G-3,4)

    b.   No mention in the report as to a path forward with respect to the GTA results regarding infiltration and volume reduction with GTBMPs. (Checklist Item G-8)

    c.   Effects on downstream properties and existing conveyance analysis. (Checklist Item G-9)

Sheet 7 of the report mentions that drainage area, cover numbers and Tc calculations are included, however Exhibit III-2 only provide a hydrograph summary for the peak flows. Sheet 8 of the report mentions bio-retention areas twice; however it appears that 16 bioswales and a wet pond are proposed. The department would prefer a mixed use application of stormwater practices and ask the applicant to reflect this on the plan and in the computations.

Record Plan Compliance

7. As previously requested, in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event. Please provide the necessary computations to verify site compliance.

8. As previously requested, provide an assessment per the New Castle County Drainage Code Section 12.04.001.F for each proposed drainage discharge point. Include a topographic detail plan from the discharge point to the location where conveyance is adequate. Within the preliminary stormwater management report, the determination of using a pond as a method of control shall be pursuant to Section 12.04.001.F4 of the New Castle County Drainage Code (Section 10.3.8 of the Delaware Sediment and Stormwater Regulations).

9. Conveyance (stormwater management) systems shall outfall to a stormwater facility or watercourse capable of accepting the design runoff in accordance with Section 12.04.001.D. Verification of this code section will be required with the stormwater management report.

10. There are several areas on the plan where it is unclear how the runoff leaves the road and enters stormwater systems. Please clarify these areas with labeling or in the legend.

11. Provide a statement regarding filed verification of the topography in the note on the record plan.

12. Clearly label exhibits in the report as present in the table of contents and report body. The current exhibits in the report are not labeled.

13. Comments regarding sewer design shall be furnished by the New Castle County Department of Special Services.

14. In accordance with Section 12.04.001.E of the NCC Drainage Code, the applicant must provide verification that the one hundred (100) year storm event shall reach the designed stormwater management facility, without adversely affecting structures, in the event runoff exceeds the capacity of the conveyance system or the conveyance system fails.

15. Provide and label all required drainage and stormwater management easements on the Preliminary Plan for both open and closed conveyance systems, per Article 4 of the NCC Drainage Code. All easements shall be labeled in favor of a maintenance entity.

16. Functional design of stormwater practices will be further scrutinized with additional calculation and information to be provided at the record plan stage. Areas of concern include bio-swale #B-6, A-4, A-5, and any areas in the vicinity of homes which contain a pipe sump.

17. Provide a NRCS / Open Space Management Plan (please contact Land Use for a copy of a plan with the desired format) in accordance with UDC Section 40.27.210.C. Upon acceptance of the plan, a computation is required for the cost of maintaining all the features show thereon for a two year period to establish the maintenance escrow amount per UDC Section 40.27.300.B.

Transportation:

The Applicant has done a combined Traffic Impact Study (TIS), dated July 2006, with the adjacent Port Penn Assemblage (2005-0459-S). DelDOT has reviewed that TIS in a letter dated 10/25/2006—but will issue a revised letter. We understand the revisions may involve off-site road, intersection, and bicycle/pedestrian improvements. The Plan should cite the TIS and final DelDOT letter, as well as the final off-site improvements with appropriate phasing.

Per UDC Paragraph 40.21.162.C, the improvements should include a paved walkway along the Port Penn Road. That walkway should extend westward from the site access to the eastern Port

Penn Assemblage access, and continue to the western Assemblage access. To ease roadwork and provide a more pleasant walkway, it should be placed off the right-of-way in the parallel Open Space buffer.

Historic:

N/A

Standard Comments:

1.   Provide an overall sheet index on Sheet 4;
2.   Submit a copy of the required maintenance declaration and a copy of the plan to the Division of Law and this department for review and approval;
3.   Contact the New Castle County Department of Special Services in order to address Section 40.27.310.B of the New Castle County Code. Provide a note on the plan that references the required funding;
4.   Provide a note on the plan addressing the requirements of Section 40.20.230, F., 4. of the New Castle County Code regarding street connectors;
5.   Provide street names and/or postal addresses in accordance with U. S. Postal Service policy. Submit a copy of the plan to the Department of Police (Communications) for review of street names. Submit a copy of the plan to the Department of Land Use, Mapping Section for review of postal addresses. Written approval from those agencies, referencing the latest plan revision date, must be received prior to record plan approval;
6.   Provide monuments in accordance with Section 40.20.520 of the New Castle County Code;
7.   Submit a copy of this plan to the Office of the State Fire Marshal for review and approval;
8.   Submit a copy of this plan to the State Division of Highways for review and approval;
9.   Performance surety must be provided in accordance with Chapter 40, Division 31.800 of the New Castle County Code. Initiate the Land Development Improvement Agreement by submitting the Land Development Improvement Agreement Information Sheet, based on either the Formula Method or the Cost Estimate Method, to this office;
10.  The Owner/Developer must provide certification to the Department of Land Use from the Secretary of the Department of Education that the school district(s) serving the site has adequate capacity for the proposed development. Add the following note to the plan as may be required:
     "Prior to the issuance of any certificate of occupancy for any lot or unit shown on this plan, the owner/developer shall provide a certification from the Secretary of the Department of Education that the Voluntary School Assessment for that lot or unit has been paid."
11.  If a complete Record Plan submission is not made within twelve (12) months of the date of this letter, the Preliminary Plan will be considered to be expired in accordance with Section 40.31.390 of the NCCC.

cc:   David Culver, Planning Manager
      Gary & Gale Warren

**EXHIBIT "N"**

FROM :Bill WARREN FARM                FAX NO. :3028349600000         Oct. 24 2007 02:11PM  P1

CHRISTOPHER A. COONS
COUNTY EXECUTIVE

TRACY Z. SURLES
ACTING GENERAL MANAGER



DEPARTMENT OF SPECIAL SERVICES

October 22, 2007

Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, PA 19044

Re:     Application No. 2005-0035, Proposed Development known as "Warren
         Tract"

Dear Sir or Madam:

This letter is sent in response to your most recent preliminary major subdivision plan submission to the New Castle County ("County") Department of Land Use. As noted in previous County responses to your submissions, your proposed development, currently known as "Warren Tract," Application No. 2005-0353, is located within an area in which the County does not currently have sanitary sewer capacity available. Furthermore, the County currently does not have any approved and fully funded projects to provide sanitary sewer capacity to that area.

Section 40.05.320 of the *Unified Development Code* states that the Department of Land Use cannot provide final plan approval for a plan unless verification from the Department of Special Services is received indicating that sewer capacity is or will be available for a proposed development. Because there is no sewer capacity for this proposed development and because sewer capacity will not be available for this development pursuant to the Department of Special Services and Department of Land Use Sewer Capacity Policy, the above application may not continue through the record plan process. Thus, the County will not grant preliminary plan approval and will not execute a Land Development Improvement Agreement ("LDIA") or a sewer agreement for sewer connection, as required before final plan approval by *New Castle County Code*.

Please note that this land use application shall be subject to all applicable expiration provisions in the *New Castle County Code*. Thank you for your attention to this matter.

Sincerely,

Jonathan W. Husband
Acting Senior Manager

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720          PHONE: 302-395-5700          FAX: 302-395-5870

# NEW CASTLE COUNTY
## DEPARTMENT OF SPECIAL SERVICES
## DEPARTMENT OF LAND USE
## SEWER CAPACITY POLICY

Special Services Policy No:            02

Land Use Policy No.:                   2.9

Subject:                               Available Sanitary Sewer Capacity Determinations and
                                       Processing of Land Development Applications

Original Date of Publication:          August 26, 2002

Effective Date:                        October 22, 2007

Approved:

        General Manager, Department of Special Services

Approved:

        General Manager, Department of Land Use

**LEGAL AUTHORITY:**  The New Castle County ("County") Department of Special Services ("Special Services"), the County Department of Land Use ("Land Use")(Land Use and Special Services collectively hereinafter known as "Departments") and the General Managers of these Departments enact this policy pursuant to authority granted to them in Title 9, Section 1341 of the Delaware Code, 9 Del. C. § 1341; Title 9, Section 1301 of the Delaware Code, 9 Del. C. § 1301; Chapter 2, Section 2.05.301 of the County Code ("Code"), N.C.C.C. § 2.05.301; Chapter 2, Section 2.05.100 of the County Code, N.C.C.C. § 2.05.100; and Section 40.05.320 of the Unified Development Code ("UDC"), N.C.C.C. § 40.05.320.

**BACKGROUND:**  In light of the significant investment the County has made to rehabilitate and upgrade the County-wide sewer system, and in light of increased building pressure, this policy provides the Departments with standards for determining when sewer capacity will be available for proposed development. This policy also avoids inefficient use of the Departments' limited resources in the event sewer capacity is not or will not be available. The policy outlined below supercedes all previous policies regarding sewer capacity availability provisions in Article 5 of the UDC.

**POLICY:**  Section 40.05.320 of the UDC provides that for sewered developments located in the County, prior to receiving final plan approval, "the developer must obtain verification from the Department of Special Services that sewer capacity is available or will be

A19

available at the time of the proposed development." N.C.C.C. § 40.5.320. The determination of whether sewer capacity "is available" shall be based upon Special Services' analysis of the sewer capacity model on the date that the request is received. Any statement by Special Services that capacity is available prior to execution of a sewer agreement at the record plan stage is not a guarantee that sanitary sewer capacity will be available later in the plan review process. Sewer capacity shall only be available on a first come, first serve basis and may only be reserved through the execution and recording of a sewer agreement at the record plan stage. *See* N.C.C.C. § 38.02.002.C; N.C.C.C. 40 § 31.820.

In some areas, sewer capacity is not available at the time of the capacity request; however, a sewer improvement project is scheduled to provide capacity in that area. In these circumstances, the Department may determine that capacity "will be available" for the proposed development if the necessary sewer improvement project has been approved and fully funded by the County Executive and County Council as part of the County's Capital Program & Budget for the fiscal year in which the Department receives the request.*

If a determination is made by Special Services that capacity "will be available" at the exploratory or preliminary plan stage of the application process, the developer may continue through the development plan application and review process. The developer's continued processing of such plans is made with the understanding that capacity may not be available at the record plan stage and with the understanding that the Department may place a hold on building permits and/or certificates of occupancy at the record plan stage as necessary to ensure that sewer improvements are completed prior to the proposed development connecting to the County sanitary sewer system. Special Services does not guarantee if and/or when sewer improvements will be completed, and does not guarantee if and/or when sewer capacity will be available. The developer shall proceed at his or her own risk in processing plan applications where capacity "will be available," understanding that numerous factors, such as obtaining required permits from other government agencies, obtaining right-of-ways, unforeseen weather conditions, construction issues, changes in policy or plans, the commitment of available capacity for other developments, and other unforeseen circumstances may impact the ultimate availability of sewer or the timing and completion of proposed sewer improvements.

In instances where Special Services determines that capacity "will be available" and where Special Services is willing to consent to the recording of a record plan with restrictions, Special Services shall notify developers by letter of the restrictions on building permits and/or certificates of occupancy at the record plan stage. The Department shall also note any restrictions in the sewer agreement for the development and require notes to that effect on the recorded record plan.

---

* While most of the projects in the County's Capital Program & Budget provide funding for a specific improvement to a section of the system, *i.e.*, parallel line, add a pump to a pump station, increase pipe size, etc., some projects merely provide funding to allow the Department to study sections of its system to identify problems. More defined projects develop as a result of such studies. The studies themselves shall not be considered "sewer improvement projects" under this policy for the purpose of determining that capacity will be available for a development unless the Department reasonably believes that work performed as part of the study (*i.e.*, line cleaning, grouting, etc.) will provide capacity. If/when the study identifies a specific project to provide capacity, the Department may then determine that capacity will be available upon completion of such project, consistent with this policy.

*Processing of Land Use Applications When Sewer Capacity Is Not Available*

Section 40.05.320 of the UDC states that Land Use cannot provide final plan approval for a plan unless verification from Special Services is received indicating that sewer capacity is or will be available for a proposed development. Thus, once a developer of proposed sewered development is notified by Special Services that sanitary sewer capacity is not and will not be available for the proposed development, the application shall not be permitted to continue through the land use application process. The County will not process plan applications for connection to sewer when service is not or will not be available because continued processing of a plan application that cannot ultimately be recorded is an inefficient use of the County's limited financial and personnel resources. The Developer shall be notified via letter from Special Services with a copy provided to Land Use when sewer capacity is not or will not be available.

Distribution: Policy Book Holders

3

A21

EXHIBIT "O"

# aplin|Stewart
*Attorneys at Law*

Marc B. Kaplin
Direct Dial: (610) 941-2666
Direct Fax: (610) 684-2000
Email: mkaplin@kaplaw.com
www.kaplaw.com

November 6, 2007

Jonathan W. Husband
Acting Senior Manager
Department of Special Services
187-A Old Churchmans Road
New Castle, DE 19720

RE:    **Application No. 2005-0035, Proposed Development known as "Warren Tract"**

Dear Mr. Husband:

This letter is in response to your October 22, 2007 letter to Eastern States Engineering ("ESE") wherein you informed ESE that "because there is no sewer capacity for this proposed development and because sewer capacity will not be available for this development pursuant to the Department of Special Services and Department of Land Use Sewer Capacity Policy, the above application may not continue through the process."

By letter dated June 26, 2005 directed to David W. Singleton and Richard T. Przyara, on which you were copied, I informed New Castle County and the Department of Special Services of the methods by which sanitary sewer service can be made available to the homes proposed to be developed on the Warren Tract. These methods are still available today and therefore your explanation that there is no sewer capacity available for the Warren Tract development is incorrect.

As I explained at the time and as it continues to be the case today, there is sufficient unused capacity in Water Farm 1 to service the sewage needs of the homes to be constructed on the Warren Tract. Because there is a pump station located in the Augustine Creek Subdivision, sewage from the Warren Tract (and adjacent properties) can be pumped to that pump station by the regional pump station that Toll Bros, Inc ("Toll"), the equitable owner of the Warren Tract, has offered to construct on the Warren Property ("Regional Pump Station"). The Augustine Creek pump station pumps sewage along Pole Bridge Road to an existing 24 inch gravity sewer main that runs adjacent to Dupont Parkway and terminates at Water Farm 1. Therefore, homes that are to be constructed on the Warren Tract can utilize the unused capacity at Water Farm 1. All that is needed to facilitate the conveyance of such sewage to Water Farm 1 is the construction of the Regional Pump Station and accompanying force main from the Warren Tract to the pump station at Augustine Creek. Alternatively, a force main can be permanently constructed from the Regional Pump Station, along Port Penn Road to

Jonathan W. Husband
November 6, 2007
Page 2

Biddle's Corner, where it can turn directly south along Dupont Parkway. That force main can ultimately be turned west to convey the sewage from the Port Penn area to Water Farm 2 should New Castle County at some point decide to construct Water Farm 2. However, on a temporary basis the line can be continued south along Dupont Parkway to its intersection with Pole Bridge Road for connection to the 24 inch gravity main that conveys sewage to Water Farm 1.

Alternatively, Toll has offered to design and construct an on-site sanitary sewer collection, conveyance, treatment and disposal system ("Community System"), which upon completion could be conveyed by Toll to New Castle County and operated by the Department of Special Services, or could be conveyed to and operated by a wastewater utility approved and licensed by the Public Service Commission. The Community System is permitted under both the New Castle County Unified Development Code ("UDC") and the Delaware Code.

Specifically, Section 40.05.520(c) of the UDC provides in relevant part:

> The analysis required in Section 40.05.310 may result in a reduction in density. If the limiting value of the site carrying capacity results from the maximum resource capacity determination, the developer shall build within those limits. *If the limiting value of the site carrying capacity is established by the concurrency capacity determination, the following options are available to the developer.*
>
>          \*      \*      \*
>
> C. *Make improvements.* The *developer can make* improvements for traffic as approved by the County and DelDOT. *Improvements may be made to the sewer as determined by the Department of Special Services. In the Suburban zoning districts, sewer improvements may include the use of spray irrigation, provided that such a system has a minimum processing capacity of one hundred thousand (100,000) gallons per day and so long as the capacity of the system can be increased at a later time by an additional fifty thousand (50,000) gallons per day. Other types of large scale treatment systems may be permitted if approved by DNREC and the County Department of Special Services. Such facilities shall only be permitted in Suburban zoning districts and shall only be constructed in accordance with the rules and regulations governing such systems as promulgated by DNREC and the County Department of Special Services.* All such systems shall be turned over to the County upon their completion and formal acceptance by the Department of Special Services. The

Jonathan W. Husband
November 6, 2007
Page 3

> developer may reach agreements with the school district or with
> a water supplier to make or fund improvements that would be
> available prior to occupancy. *[Emphasis added]*

Further, Title 26, Section 203D of Delaware Code sets forth the procedure by which a private wastewater utility provider can become authorized to provide wastewater service for a service area or proposed development.

In 2006, after many meetings and discussions with members of the New Castle County government and the Department of Special Services, I prepared and delivered to Richard Przywara and the Department of Special Services a proposed sewer agreement. The proposed agreement between Toll and the Department of Special Services sets forth a procedure for the delivery of sewer service to properties to be developed by Toll in New Castle County's southern sewer district including the Warren Tract. I am enclosing another copy of the proposed sewer agreement to again demonstrate that sanitary sewer service can be provided to the Warren Tract. Additionally, Toll has negotiated and is prepared to execute a wastewater service agreement with an experienced regulated utility company for the design, construction and operation of the Community System.

In view of the availability of sanitary sewer service by any of the above described methods, Toll requests that the Department of Special Services confirm to the Department of Land Use that sewer capacity is available for the proposed development.

Very truly yours,

Marc B. Kaplin, Esquire

MBK:ba
Enclosure

cc:    Brad Shockley
       Greg Wilson

**EXHIBIT "P"**

JUN-26-2006 14:33 FROM:                                    TO:ESE-ENGINEERING        P:2/10

Christopher A. Coons
County Executive



RECEIVED JUN 2 2006

Charles L. Baker
General Manager

Department of Land Use

## Department of Land Use Revised Exploratory Sketch Plan Review Report

Date —                          June 14, 2006
Application Number —            2005-0459 (S)
Project Title —                 **Port Penn Assemblage**
Consulting Engineer —           Choong Y. Yim, P.E., Eastern States Engineering
Legal Property Owner —          Mitch Kotler, V.P., Toll Brothers, Inc.
Description —                   Proposal to subdivide 481.23 acres into an Open Space
                                Planned development of 505 dwelling units northeast of
                                Port Penn and Dutch Neck Roads.

Type and Stage of Plan —        Revised Exploratory Sketch Major Subdivision Plan
Prior Reviews —                 November 10, 2005 Exploratory Sketch Plan Review

Project Review Team —           Planner, Steven Faux at 395-5437
                                Engineer, Stephanie DeAscanis at 395-5475 if fee P
                                Historic Preservation, Christine Quinn at 395-5521
                                Transportation, John Janowski at 395-5426
                                Special Services, David Thurman at 395-5752

Status of Review —              General compliance for public hearing — The Department
                                will issue an additional review report after the August 1,
                                2006, Planning Board Public Hearing that will either find
                                the plan acceptable to proceed to the Preliminary level after
                                all comments and/or studies explained below are addressed
                                or unacceptable with instructions to submit a revised
                                Exploratory Sketch Plan addressing all comments and/or
                                studies.

Timeframe —                     Pursuant to Section 40.31.390 of the New Castle County
                                Code (NCCC), the Preliminary Plan submission must be
                                made within one year from the date of this first review
                                report (by November 10, 2006) or the application will be
                                expired. The Exploratory Sketch Plan must first achieve
                                official approval status and the Traffic Impact Study must
                                also be completed and be approved by DelDot by that date
                                in order for the Preliminary Plan submission to be
                                complete.

**Planning comments:**
1. This plan relies on connection to a public sanitary sewer system, but no such
   system exists. The applicant has been advised on numerous occasions, since the

2

initial plan submission, that the County has made no commitment to provide sewer infrastructure availability to this site. The developer is again reminded that advancing a subdivision plan in reliance of the provision of sewer infrastructure secures no guarantee that the County will provide such infrastructure. Without an approved sewerage strategy, the plan will not be approved and construction will not be permitted.

2. As stated in comment 4 of the Department's November 10, 2005 initial review report, the lots directly opposite Road F should be relocated to provide a viewshed into the open space and to avoid the establishment of driveways backing out into the entrance. This affects lots 2061 and 2062.

3. The active recreation facilities proposed at the intersection of Roads A and B are generally acceptable, however, that complex is subject to the dimensional requirements applicable to nonresidential facilities in the Suburban zoning district per Table 40.04.110 B. of the NCCC. The connector drive between the parking areas and several of the parking spaces are not in compliance with the 50 foot street yard paving setback requirement and must be redesigned.

4. Although a suggestion had been made that a reduction of sidewalks may aid in reducing impervious surfaces and promoting green technology stormwater management practices, the partial waiver of the sidewalk requirement has not yet been approved by the Department. For each street along which no sidewalk is proposed, justification must be provided. It must be demonstrated that the sidewalk is generally unnecessary and that it would be either problematic from a stormwater management standpoint or that it would be environmentally beneficial to not have the particular sidewalk.

5. The requested waiver of the curbing requirement for the overflow parking spaces and the authorization to provide dead-end parking is not approved at this time. Consideration will be given upon receipt of an acceptable rationale for each separate parking area. Also, several of the proposed overflow parking lots are very close to the adjoining residential lot lines and have the front of the spaces oriented toward the houses; a swath of evergreen landscaping should be provided between such parking lots and the lots.

6. The plan provides substantial open spaces comprised predominantly of the Thousand Acre Marsh and its associated floodplain, wetlands, and Riparian Buffer Areas. Additional unconstrained open space is also provided in various locations and configurations. However, the plan does not appear to comply with the "usable open space" requirement of Section 40.20.225 B.5. of the NCCC. For this 505 lot subdivision, 5.05 acres of "centrally located, highly visible, unconstrained" usable open space is required in addition to the protected natural resources. The approximately one acre active recreation area with the proposed pool, clubhouse, and tennis courts shall count toward part of the 5.05 acres, but the five other areas labeled "Community Open Space" are all tucked-away behind

3

several groups of lots. None of those areas meet the "highly visible" criteria. Usable, highly visible open spaces typically require some direct street frontage so they are visually obvious to the residents of the development.

7. The Critical Natural Area Report is inadequate. In addition to the very general statements in the Report, each area of CNA proposed to be encroached upon should be discussed and justified. Although each category of CNA has less than a 100% protection level, the particular areas of proposed CNA development shall be evaluated on a case by case basis. The Department of Land Use, the Delaware Division of Fish and Wildlife, and DNREC's Natural Areas Program Division have all previously expressed concern about the proposed CNA impacts associated with Road L and lots 1010 to 1015. Pursuant to Section 40.10.370 of the NCCC, that particularly sensitive portion of the Critical Natural Area is required to be preserved and the affected lots are to be removed or relocated. This issue was previously discussed in comment 12 of the Department's initial review report.

8. Wherever pedestrian access to the open space is provided via a strip of open space between lots, the open space access strip is required to be at least 45 feet wide. Several such strips need to be widened. Among the locations of necessary widening are between lots 1023-1024, 2078-2090, 3009-4020, 3069-3070, and 5029-5030. This requirement is derived from Sections 40.21.162 D. and 40.21.163 C. of the NCCC. The five foot wide "pedestrian way" access through the open space strips need not be paved or improved but must be 20 feet away from the adjoining lot lines.

9. Provide a swath of landscaped open space between Road F and lots 2002 and 2003. Section 40.20.220 A. prohibits "double frontage lots". This will also improve the entrance to the subdivision.

10. The appropriateness of the proposed sewer pump station parcel behind lot 3044 will depend on the type of pump station and the probable land use impacts of it (noise, odor, vibration...). It appears to be too close to the adjoining residential lots and should be relocated to be in a more inconspicuous location. It is presumed that the unlabeled parcel shown to the east of lot 2069 is the second pump station lot. If so, label it accordingly; if not, please clarify what it is.

11. DNREC has indicated their desire to accept a large portion of the open space as public open space to be owned and maintained by them. After coordinating with the DNREC Division of Parks and Recreation, depict the boundaries separating the proposed public and private open spaces and label them accordingly. Also, per the recorded agreement between the developer and DNREC, acknowledge the commitment for the Maintenance Corporation to pay DNREC $5,000.00 per year toward their "Habitat Restoration Project" in a note on the plan.

4

12. Since the existing DNREC vehicular and pedestrian access easement along the eastern tract boundary will not be extinguished until 30 days after the recordation of the pending "Warren Tract" subdivision to the east of this site per the recorded Memorandum of Agreement, it will still exist (potentially indefinitely) at the time of the approval of this plan if the Warren Tract plan is not recorded first. In that event, the either provisions must be made to extinguish it concurrently with this plan or substantial landscaping must be provided between the access drive and the proposed lots.

13. Revise the plan purpose note to more specifically state that "The purpose of this plan is to subdivide 481.22 acres into 505 lots including 270 single family detached lots, 232 single family attached lots, and 3 existing historical dwelling lots. The plan also establishes 2 sewer pump station lots as well as public and private open space parcels." (The vacant large lot next to the Cleaver House is considered a single family detached lot.)

14. Please renumber all of the lots to sequentially go from 1 to 505.

**Engineering comments:**
    The Engineering Section within the Department of Land Use has reviewed the above mentioned Exploratory Plan and finds the application generally acceptable. A cover letter addressing each comment within this review letter must accompany any resubmission of this project. The letter must describe the manner in which each comment was addressed. Please note the following comments must be satisfactorily addressed with the preliminary submission:

1. Date complete submission received by Department of Land Use: 05/08/05
   Date review complete by Engineering Section:                        6/07/05
   Number of Days in the Engineering Section:                         20 days
2. As previously mentioned, the following significant issues must be addressed with respect to intent:
    a. The applicant shall provide the Department with written response from DNREC regarding the extent of area designated as Critical Natural Area (CNA) and management/ownership issues of land adjacent to the 1000 Acre Marsh. As previously indicated, the Department and DNREC remain concerned with the location of lots 1020 through 1025 and the impact on the CNA.
    b. Upon completion, the applicant shall provide the Department with the structural analysis of the "man-made" pond. In addition, upon determination, please advise the Department as to the ownership of this facility.
3. Re-evaluate the extent of Riparian Buffer Area given the definition set forth in the Unified Development Code for Zone 1 Riparian Buffers on page 33-54. It is apparent that the extent of riparian buffer will expand in some locations on the parcel to suit this definition.

5

4.  The design intent of the proposed plan shall adhere to Section 40.22.210 of the Unified Development Code (UDC) by utilizing Green Technology Stormwater Best Management Practices to address stormwater conveyance and stormwater management objectives. Stormwater runoff management should be maintained through surface water dispersion, volume reduction and discharge at multiple points. The amount of cutting and filling shall be minimized by honoring natural drainage divides. Streets shall be placed and lots designed as close to existing grade as possible, and land grading shall minimize disturbance and adverse impacts to existing vegetation and protected resources. These comments represent several aspects of this plan which the department feels fall short of the intent and practice of conservation design.

5.  As previously mentioned, the Preliminary Plan should depict all proposed Stormwater Management Areas and label specific practices to be implemented with the design, as proximity to resources and topography must be accounted for in practice selection. The plan should be revised to reduce riparian impacts, specifically where steep slope areas are present. Pursuant to Item J of the exploratory plan checklist, all stormwater management facilities are required to be shown on the plan in order to approve the general feasibility of the stormwater design in relation to the sites natural resources and layout. The stormwater narrative references the proposal to use bioswales to address stormwater quality which may be suitable for the upland and middle portions of the site. However, as discussed in the pre-exploratory meeting, this site has areas that are constrained by Article 10 resources (i.e., floodplain, riparian buffer) and steep grades where bioswales may not be suitable practices. The focus of that discussion was centered on using the practice of stormwater terracing, but no indication of terracing or any practice is shown on the plan. Be sure to address this issue with any subsequent submission.

   a.  The applicant shall consider substantial protection of the mapped drainageways as necessary since they generally provide stable (nonerosive) conveyance of stormwater to protected natural resources. Instead of conforming to the existing topography, there are several areas where considerable fill is required in drainageways to achieve the street and lot configuration. Utilization of the natural drainage patterns would promote stormwater management via surface water dispersion and infiltration. The engineering section views these drainageways as natural areas which should be preserved. Filling and re-routing of these natural features also introduce the potential for erosive conditions and in some areas this occurs in close proximity to other protected resources. There are existing locations that would be more serviceable for the purpose of directing post developed drainage to the receiving Riparian Buffer Areas and resources.

   b.  Note that in accordance with Section 40.10.300 of the UDC, for all protected resources, stormwater outfalls shall be permitted, provided that the discharge velocity from the terminal end of the pipe or associated energy dissipation practice does not exceed two (2) feet per second for the two (2) year frequency storm event.

6

   c. Proposed lot and stormwater management layout in the following areas shall be reconsidered as their impact does not comply with the standards set forth in Article 22 of the UDC:

     1. Relocation of lot 3021 and 3022 to reduce the impact adjacent to the RBA line and the existing drainageway.(sheet10)

     2. The LOD can not be located on individual lots. At a minimum, remove the LOD from the following lots: 3021, 3022, 3051, 3052, 3057, 2112, 2047. There may be other lots subject to this comment. Provide a separate LOD and LOC on the future plans.

     3. The applicant shall consider curb-cuts rather than complete curb removal in several areas, especially those adjacent to RBA and steep slope resources. The engineering section may not support a waiver request for complete curb removal due to safety issues associated with adjacent topography.

     4. Refer to the zone 1 definition of the RBA on page 33-54 of the UDC with respect to the steep slopes and there possible effect on the RBA.

     5. Consider feasibility of road construction for Road "Y" adjacent to RBA.

     6. Location of townhomes adjacent to existing single family lots.(sheet 14)

6. Provide the Department with an overlay of the mapped engineering delineation of the floodplain using elevation 10 (9.22) with that of a scaled FEMA drawing to compare to verify the extents of this resource are properly mapped.

7. It shall be determined no later than the preliminary plan submission whether a stormwater quantity waiver will be sought for this project according to the Delaware Sediment and Stormwater Regulations, Section 3.2.2.

8. Please provide and label all required drainage easements on the Preliminary Plan for both open and closed conveyance systems, per Article 4 of the NCC Drainage Code. All easements shall be labeled in favor of a maintenance entity.

9. Add the following note to the plan, "The owner/developer shall pay, to New Castle County, funds for residential storm water management facility maintenance pursuant to section 40.27.310.C of the County code. The funds shall be issued for the costs associated with inspections, long-term sediment cleanout and structural repair and reconstruction of storm water management facilities. An amount shall be determined by the Department of Special Service and shall be payable upon issuance of seventy-five (75) percent of building permits for the lots in the subdivision, or phase thereof. The Department of Land Use shall withhold the issuance of any additional building permits until the Department of Land Use is furnished with satisfactory written proof that the funds have been paid to New Castle County in accordance with the requirements."

10. Add the following note to the plan, "Pursuant to Chapter 40, Article 27 of the New Castle County Code, the developer shall place funds in an interest bearing escrow account equivalent to the cost of maintaining the private open space and common facilities for a two (2) year period. The amount shall be _____

7

($_____) dollars per lot shown on this plan or subsequent plans ($_____ x
505 Lots = $ _____)."

**Historic comments:**

The following comments in italics are reiterated verbatim from the Department's November 10, 2005 review report. The comments remain applicable to this revised plan. However, it is acknowledged that the applicant is currently scheduled to present the application to the Historic Review Board at their June 20, 2006 hearing. Depending upon the Board's recommendation as a result of that hearing, the buffer requirements may or may not be modified. If the 500 foot buffers around the historic houses remain mandated, substantial design revisions will be necessary.

*"The historic preservation section has reviewed the submitted Exploratory Sketch Major Subdivision Plan for Port Penn Assemblage (application 2005-0459). Three historic farm complexes are located within the area proposed for development, and the submitted plan shows open space buffers of two hundred feet around these resources.*

*The Cleaver House, also known as the Lester property, is located on Tax Parcel 13-009.00-016. The Cleaver House is listed in the National Register of Historic Places, and Appendix 4 of the Unified Development Code notes that this farm complex is located within an open context setting. Therefore, a 500' open space buffer is required between the contributing structures, sites, and objects in this National Register site and any proposed new construction, per Article 15.111.B of the Unified Development Code.*

*The Diksa property, located on Tax Parcel 13-009.00-010, does not have any official historic designation at this time. However, the house is known to be over fifty years old. The structures that comprise the farm complex are located in an open context setting. Therefore, the 200' open space buffer shown on the submitted plan is insufficient to properly protect the historic setting of these resources.*

*The Cole property, located at 740 Dutch Neck Road and on Tax Parcel 13-004.00-008, does not have any official historic designation at this time. This house is also known to be over fifty years old and appears to be located in an open context setting. As with the Diksa property, the 200' open space buffer shown on the submitted plan is insufficient to properly protect the historic setting of these resources.*

*Because the Diksa and Cole properties are not currently listed in Appendix 4 of the Unified Development Code, the Department may consider challenges to the determinations that these resources are located within open context settings. If the applicant can reasonably argue that they are located in partially open or enclosed contexts, the 500' open space buffer requirement may be reduced.*

*Finally, the historic preservation section wishes to remind the applicant of the Old Zion Cemetery located to the south of the proposed development, on Tax Parcel 13-009.00-014. There may be unmarked graves associated with this cemetery, and there may be graves outside of the official tax parcel boundaries. Therefore, great care should be*

JUN-26-2006 14:35 FROM:                                 TO:ESE-ENGINEERING     P:9/10

8

*taken when disturbing the ground in the vicinity of the cemetery. If any human remains are found, work must cease immediately, and the proper authorities must be contacted."*

**Transportation comments:**

The Transportation Section is currently awaiting the submission of the required Traffic Impact Study and DelDot's review comments relative to it. The parameters of the TIS were scoped with the applicant in a meeting on August 7, 2005.

The proposed entrances onto Port Penn Road and Dutch Neck Road, as well as the proposed interconnections with the adjoining property to the east, appear to be logical but are subject to approval by DelDot. Comments on this plan have not been received from DelDot to date. It is suggested that DelDot be consulted before preparing the Preliminary Plan.

A sidewalk should be provided along the entire frontage of Dutch Neck Road. The plan is not clear as to where the internal sidewalks end at or along Dutch Neck Road. The preliminary plan should clearly indicate the locations of all sidewalks as well as their width and construction material (Portland Cement Concrete). The sidewalk provided along Port Penn Road should have more gradual transitions instead of making a series of right angle turns around the adjacent properties.

**Special Services comments:**

The building lots proposed by the aforementioned application are being designed to discharge their untreated sewage to a community sanitary sewer collection system. There is no sanitary sewer service available nor has New Castle County warranted when or if sanitary sewer service will be available for this proposed subdivision. Therefore, no building permit shall be issued for any lot created by this application until sanitary sewer service becomes available and the Department of Special Services has approved all necessary sanitary sewer construction plans pertaining to this application. Add the following note to both the sanitary sewer feasibility and record plans:

*"The lots shown on this plan are designed to be served by sanitary sewer service. At the time of approval of the record plan, sanitary sewer service is not available nor has New Castle County warranted when or if sanitary sewer service will be available. No building permit shall be issued for any lot shown on this plan, or any lot created by any revision or resubdivision of the record plan, until or unless the Department of Land Use receives written verification from the Department of Special Services that sanitary sewer service is or will be available for the Development and that the Department of Special Services has approved all necessary sanitary sewer construction plans."*

Add the following note to the sanitary sewer feasibility plan:

*"Only the feasibility of the community sanitary sewer collection system will be reviewed and approved by the Department of Special Services, prior to recordation. All necessary sanitary sewer construction plans and supporting documentation, pertaining to this application, must be received by the*

JUN-26-2006 14:35 FROM:

TO:ESE-ENGINEERING     P:10/10

9

*Department of Special Services for review at the time sanitary sewer service becomes available for the Development."*

CC:     Mitch Kotler, Toll Brothers, Inc.
        Choong Y. Yim, P.E., Eastern States Engineering
        David M. Culver, Planning Manager
        Planning Board Members

**EXHIBIT "Q"**

Christopher A. Coons
County Executive





RECEIVED SEP 1 9 2006

Charles L. Baker
General Manager

Department of Land Use

## Department of Land Use Revised Exploratory Sketch Plan Approval

| | |
|---|---|
| Date – | September 14, 2006 |
| Application Number – | 2005-0459 (S) |
| Project Title – | **Port Penn Assemblage** |
| Consulting Engineer – | Choong Y. Yim, P.E., Eastern States Engineering |
| Legal Property Owner – | Mitch Kotler, V.P., Toll Brothers, Inc. |
| Description – | Proposal to subdivide 481.21 acres into an Open Space Planned development of 505 dwelling units northeast of Port Penn and Dutch Neck Roads. |
| Type and Stage of Plan – | Exploratory Sketch Major Subdivision Plan Approval |
| Prior Reviews – | November 10, 2005 Exploratory Sketch Plan Review |
| | June 14, 2006 Revised Exploratory Sketch Plan Review |

Project Review Team –

Planner, Steven Faux at 395-5437
Engineer, Stephanie DeAscanis at 395-5475
Historic Preservation, Christine Quinn at 395-5521
Transportation, John Janowski at 395-5426
Special Services, David Thurman at 395-5452

Status of Review –

Approved with Conditions – The Department of Land Use finds the above referenced application acceptable to advance to the Preliminary Plan stage subject to all of the conditions explained in the Department's June 14, 2006 Revised Exploratory Sketch Plan Review Report. Several local residents spoke at the August 1, 2006 Planning Board Public Hearing and raised concerns relative to traffic congestion, roadway conditions, potential flooding, and incompatibility with the surrounding areas. These concerns and the issues raised by the Department should be addressed with the Preliminary Plan submission.

Timeframe –

Pursuant to Section 40.31.390 of the New Castle County Code (NCCC), the Preliminary Plan submission must be made within one year from the date of this first review report (by November 10, 2006) or the application will be expired. The Traffic Impact Study must be completed and be approved by DelDot by that date in order for the Preliminary Plan submission to be complete. A three month extension for this deadline may be requested if necessary.

87 Read's Way, New Castle, DE 19720        www.nccdelu.org        Phone: 302-395-5400        Fax: 302-395-5587

CC:   Mitch Kotler, Toll Brothers, Inc.
      Choong Y. Yim, P.E., Eastern States Engineering
      David M. Culver, Planning Manager
      Planning Board Members

EXHIBIT "R"

CHRISTOPHER A. COONS
COUNTY EXECUTIVE



TRACY Z. SURLES
ACTING GENERAL MANAGER

## DEPARTMENT OF SPECIAL SERVICES

November 20, 2007

NOV 26 2007

**Via Regular U.S. Mail**
Eastern States Engineering
250 Gibraltar Road, Suite 2E
Horsham, Pennsylvania 19044

Re:    Application No. 2005-0459
       Proposed Development known as "Port Penn Assemblage".

Dear Sir or Madam:

This letter is sent in response to your most recent submission to the New Castle County ("County") Department of Land Use. Your proposed development, currently known as "Port Penn Assemblage," Application No. 2005-0459, is designated for connection to the County sanitary sewer system but is located within an area in which the County does not currently have sanitary sewer capacity available. Furthermore, the County currently does not have any approved and fully funded projects to provide sanitary sewer capacity to that area.

Section 40.05.320 of the *Unified Development Code* ("*UDC*") states that the Department of Land Use cannot provide final plan approval for a plan unless verification from the Department of Special Services is received indicating that sewer capacity is or will be available for a proposed development. Because there is no sewer capacity for this proposed development and because sewer capacity will not be available for this development pursuant to the Department of Special Services and Department of Land Use Sewer Capacity Policy, the above application may not continue through the record plan process. Thus, the County will not grant preliminary plan approval and will not execute a Land Development Improvement Agreement ("LDIA") or a sewer agreement for sewer connection, as required before final plan approval by *New Castle County Code*. However, please be advised that the County would consider a revised submission for this Development that designated the use of on-site septic systems in accordance the *UDC*.

Please note that this land use application shall be subject to all applicable expiration provisions in the *New Castle County Code*.

Thank you for your attention to this matter.

Sincerely,

Jonathan W. Husband
Acting Senior Manager

187-A OLD CHURCHMANS ROAD, NEW CASTLE, DE 19720    PHONE: 302-395-5700    FAX: 302-395-5870

November 20, 2007
Eastern States Engineering
Page 2


cc:  Tracy Surles, Acting General Manager, Special Services
     Charles Baker, General Manager, Land Use
     Gregg Wilson, County Attorney
     George Haggerty, Senior Manager, Land Use
     David Culver, Land Use
     Jason Zern, Special Services
     Marc Kaplin, Esq., Kaplin Stewart

---

The information contained in this letter represents the final position of the Department of Special Services regarding sanitary sewer capacity at this stage in the development process and supersedes all prior representations, whether transmitted orally or in writing.

EXHIBIT "S"

THOMAS P. GORDON
COUNTY EXECUTIVE


RECEIVED
OCT 31 AM 11: 49
DELAWARE P.S.C.

JOSEPH J. FREEBERY
GENERAL MANAGER

DEPARTMENT OF SPECIAL SERVICES

September 30, 2004

**Via Regular Mail**
Mr. Kevin Neilson
Regulatory Policy Administrator
State of Delaware
Public Service Commission
861 Silver Lake Boulevard
Cannon Building, Suite 100
Dover, Delaware 19904

Re:    Senate Bill 99

Dear Mr. Neilson:

Pursuant to Senate Bill 99 and your September 15, 2004 letter to County Executive Thomas P. Gordon, enclosed please find maps depicting New Castle County's ("County's") sewer service area. Please note that although the City of Newark owns and maintains sanitary sewer infrastructure within its city limits, a sewer agreement between Newark and the County mandates that wastewater from Newark is transported through the County sewer system to the Wilmington Wastewater Treatment Plant. Further, a sewer agreement between the County and the City of Middletown provides for the County to transport and treat up to 500,000 gallons per day of wastewater from Middletown.

Please be advised that Section 38.02.007.D of the County Code restricts the construction and operation of sanitary sewer infrastructure in the unincorporated areas of the County as follows:

> No entity, other than New Castle County or its assigns, may own, lease, operate, manage, utilize or otherwise maintain in any way any sewer system including, but not limited to, sewer lines, pumps stations and waste water disposal systems of any kind, in the unincorporated areas of New Castle County. This paragraph shall not apply to any approved Department of Special Services related sewer projects or to septic systems approved pursuant to Chapter 40, Article 22 of this Code.

38 N.C.C.C. §38.02.007.D

87 READS WAY, NEW CASTLE, DE  19720                    PHONE: 302-395-5700    FAX: 302-395-5797

September 30, 2004
Mr. Kevin Neilson
Page 2

Please do not hesitate to contact me at (302) 395-5777 if you have any questions.

Very truly yours,

Tracy Z. Sarles
Senior Manager

TZS/lll
Enclosures

cc:  The Honorable Thomas P. Gordon, County Executive
     Messrs. Joseph J. Freebery, General Manager, NCC Special Services
         J. Wayne Merritt, NCC Special Services
         Jonathan W. Husband, NCC Special Services

# Northern New Castle County Sanitary Sewer Service Areas



**Legend**

 New Castle County Service Area

116,466 Customers (2003 yr)



0  1  2        4        6        8
Miles

# Southern New Castle County Sanitary Sewer Service Areas

WF #1 EXISTING - 1213 (2003 yr)
WF #1 ULTIMATE - 11,000 DU
WF #2 PHASE I - 10,700 DU
WF #2 ULTIMATE - 30,700 DU

**Legend**

NCC Water Farm #1 Service Area
NCC Water Farm #2 Service Area
NCC Port Penn Service Area

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **GARY C. and GALE B. WARREN**<br>809 Port Penn Road<br>Middletown, DE 19709<br>and<br>**TOLL BROS., INC.**<br>250 Gibraltar Road<br>Horsham, PA 19044 | :<br>:<br>:<br>:<br>:<br>: | |
| **Plaintiffs,** | : | **Civil Action No.** 07-725-LPS |
| | : | |
| **v.** | : | |
| | : | |
| **NEW CASTLE COUNTY**<br>87 Reed's Way<br>New Castle, DE 19720 | :<br>:<br>: | |
| **Defendant.** | : | |

## VERIFICATION

STATE OF DELAWARE  )
                          ) SS.
NEW CASTLE COUNTY  )

**BE IT REMEMERED** that on this 18th day of January, 2008, personally appeared before me, a Notary Public for the State and County aforesaid, **GARY WARREN,** who being duly sworn according to law did state that he is the Plaintiff in the above-captioned action and that the allegations in the First Amended Complaint are true and correct to the best of his knowledge, information and belief.

GARY WARREN

**SWORN TO AND SUBSCRIBED** before me the day and year aforesaid.

/**NOTARY PUBLIC**

2

## CERTIFICATE OF SERVICE

I, Jeffrey M. Weiner, hereby certify that on January 18, 2008, a copy of Plaintiffs' First

Amended Complaint was served via e-mail and via first class mail by the Law Offices of Jeffrey

M. Weiner to counsel of record as follows:

Max B. Walton, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street, 8th Floor
PO Box 2207
Wilmington, DE  19899

_____
Jeffrey M. Weiner (DE #403)