# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GARY C. and GALE B. WARREN
    and
TOLL BROS., INC.

               **Plaintiffs,**

     v.

NEW CASTLE COUNTY
               **Defendant.**

:
:
:
:
:
:
:
:
:
:

Civil Action No. 07-CV-725-SLR

**JURY TRIAL DEMANDED**

## PLAINTIFFS' ANSWERING BRIEF
## IN OPPOSITION TO
## <u>DEFENDANT'S MOTION TO DISMISS</u>

Jeffery M. Weiner, Esquire (DE # 403)
1332 King Street
Wilmington, Delaware 19801
(302) 652-0505

### KAPLIN STEWART MELOFF REITER & STEIN, P.C.

Marc B. Kaplin, Esquire
Barbara Anisko, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA 19422-0765
(610) 260-6000

*Attorneys for Plaintiffs Gary C. and Gale B. Warren
and Toll Bros., Inc.*

DATED: March 10, 2008

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. I

TABLE OF AUTHORITIES ........................................................................................ III

NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 2

SUMMARY OF ARGUMENT ...................................................................................... 3

STATEMENT OF FACTS ............................................................................................. 4

    A.   Properties are Zoned Suburban with Access to Sewer ................................ 4

    B.   The County Commits to Provide Public Sewer to the Properties ................ 5

    C.   The County Confirms the Proposed Developments to Get Sewer ............... 6

    D.   Special Services Confirms Sewer Capacity for the Proposed Developments ......... 9

    E.   Plaintiffs Rely on Defendant's Assurances ............................................... 10

    F.   The County Devises a Plan to Stop the Proposed Developments ............... 11

    G.   The County Deliberately Treats Plaintiffs' Developments Differently ...... 14

    H.   The County Wants to Keep the Properties Undeveloped ........................... 14

    I.    The County Issues its Final Decisions ........................................................ 15

    J.    The County Does Not Provide the Right to an Administrative Appeal ....... 18

ARGUMENT ............................................................................................................... 19

I.   PLAINTIFFS' CLAIMS ARE JUSTICIABLE ...................................................... 19

    A.   Standard of Review ..................................................................................... 19

    B.   The Ripeness Doctrine/Finality Rule ........................................................ 19

    C.   Plaintiffs' Claims are Ripe .......................................................................... 20

        1.   Plaintiffs Sustained an "Actual Concrete Injury" ............................. 20

        2.   County's Final Decision Caused Injury to Plaintiffs ........................ 21

        3.   The County's UDC Did Not Provide an Administrative Appeal ....... 21

        4.   Planning Board Not Authorized to Hear Constitutional Challenges ........ 23

    D.   Three Exceptions to the Ripeness Doctrine .............................................. 24

        1.   Exception for Allegations of Wrongful Conduct .............................. 25

        2.   Exception for Facial Challenges ...................................................... 26

        3.   The Futility Exception ..................................................................... 27

    E.   Ripeness Doctrine Does Not Apply to Antitrust and Estoppel Claims ...... 28

II.  PLAINTIFFS' CLAIMS SHOULD NOT BE DISMISSED UNDER RULE 12(B)(6) ...... 28

   A.  The Rule 12(b)(6) Standards ........................................................................... 28

   B.  The County is Not Immune from Antitrust Liability ................................................. 29

   C.  Plaintiffs State a Substantive Due Process Claim ...................................................... 34

      1.  Plaintiffs' Right to Own, Use and Enjoy Property is Fundamental ................... 34

      2.  Plaintiffs State a Facial Substantive Due Process Challenge ............................. 37

      3.  Substantive Due Process Claim Based on Wrongful Conduct ......................... 38

   D.  Plaintiffs State an Equal Protection Claim .............................................................. 41

   E.  Plaintiffs State a Claim for Procedural Due Process ................................................. 45

   F.  Plaintiffs State a Declaratory Judgment Action ....................................................... 45

   G.  Plaintiffs State an Estoppel Claim ........................................................................ 47

III.  CONCLUSION ................................................................................................ 50

## TABLE OF AUTHORITIES

**CASES**

*ABD Monroe, Inv. v. Monroe Tp.*, 2008 WL 58876, *6, n. 3 (D.N.J. Jan. 3, 2008)............... 34, 45

*Acierno v. Mitchell*, 6 F.3d 970, 977 (3d Cir. 1993)..................................................................... 22

*Acierno v. New Castle County*, 2000 WL 718346 (D. Del. May 23, 2000) ................................. 49

*Aeroglobal Capital Mgt., LLC v. Cirrus Inds., Inc.*, 871 A.2d 428, 444 (Del. Super. Ct. 2005) . 50

*Albanian Assoc. Fund v. Township of Wayne*, 2007 WL 2904194, *11 (D.N.J. Oct. 1, 2007).... 38

*Alston v. Parker*, 363 F.3d 229, 233 (3d Cir. 2004) ..................................................................... 29

*American Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp.2d 569, 584 (D.N.J. 2003)..... 40

*Arnold v. Minner*, 2005 WL 1501514, *6 (D. Del. Jun. 24, 2005).............................................. 38

*Baldini West, Inc. v. New Castle County*, 852 F. Supp. 251, 253-54 (D. Del. 1994) ................... 27

*Barbaccia v. County of Santa Clara*, 451 F. Supp. 260, 264 n. 2 (N.D. Cal. 1978).................... 36

*Blanche Road Corp. v. Bensalem Tp.*, 57 F.3d 253, 267-68 (3d Cir. 1995) *overruled by United Artists Theatre Circuit, Inc. v. Township of Warrington, PA,* 316 F.3d 392 (3d Cir. 2003)).. 25, 35

*Brady v. Town of Colchester*, 863 F.2d 205, 215 (2d Cir. 1988)................................................. 19

*Brubaker v. East Hempfield Tp.*, 234 Fed.Appx. 32, 34-35 (3d Cir. 2007)............................ 21, 22

*Buckson v. Town of Camden*, 2001 WL 1671443, (Del. Ch. Dec. 4, 2001) ................................ 24

*Christiana Town Center, LLC v. New Castle County*, 2003 WL 21314499, *4 (Del. Ch. June 6, 2003) ......................................................................................................................................... 22

*City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 417 (1978) .............. 29, 30

*City of Winter Park v. Southern States Utilities, Inc.*, 540 So.2d 178, 180 (Fla. App. 1989) ...... 36

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)............................................................................... 29

*Corcoran v. Village of Bennington*, 128 Vt. 29, 66 A.2d 457, 491-93 (Vt. 1970) ...................... 36

*Cornell Cos., Inc. v. Borough of New Morgan*, 512 F. Supp.2d 238, 257-58 (E.D. Pa. 2007) .................................................................................................................................... passim

*Council of Middletown Tp. v. Benham*, 514 Pa. 176, 523 A.2d 311 (Pa. 1987)............... 32, 33, 47

*County Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006)........... passim

*Crosby v. Hospital Auth.*, 93 F.3d 1515 (11th Cir. 1996)............................................................. 34

*Delmarva Enterprises, Inc. v. Mayor and Council of City of Dover*, 282 A.2d 601, 602-03 (Del. Super. Ct. 1971)......................................................................................................................... 36

*Deninno v. Municipality of Penn Hills*, 2007 WL 316392., *9 (W.D. Pa. Jan. 31, 2007)........... 22

*Development Group, LLC v. Franklin Tp. Bd. of Supervisors*, 2003 WL 22358440 (E.D. Pa. Sept. 24, 2003)........................................................................................................................... 45

*Dobbins v. City of Los Angeles*, 195 U.S. 223 (1904) .................................................... 34

*Eastern Shore Environmental, Inc. v. Kent County Dept. of Planning*, 2002 WL 244690 (Del. Ch. Feb. 1, 2002) ...................................................................... 24, 28, 47

*Elsmere Park Club Ltd. P'ship. v. Town of Elsmere*, 771 F. Supp. 646, 649-50 (D. Del. 1991) . 35

*First American Title Co. v. DeVaugh*, 480 F.3d 438 (6th Cir. 2007) ............................... 29, 30, 31

*FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992) ................................................. 30

*Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1115 (E.D. Pa. 1993) 22, 27, 28

*Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 594 (1962) ................................ 41

*Gwynedd Properties, Inc. v. Lower Gwynedd Tp.*, 970 F.2d 1195, 1203 (3d Cir. 1992) ............. 19

*Hall v. Village of Swanton*, 113 Vt. 424, 35 A.2d 381, 384 (Vt. 1944) .......................... 37

*Hoffman v. Lehman*, 926 F. Supp. 510, 515-16 (M.D. Pa. 1996) ................................. 38

*In re 244.5 Acres of Land*, 808 A.2d 753, 758 (Del. Super. Ct. 2002) ........................... 48

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994) ................ 29

*Kaehley v. City of Pittsburgh*, 988 F. Supp. 888 (W.D. Pa. 1997) ............................... 34

*Liberty Curtin Concerned Parents v. Keystone Central Sch. Dist.*, 81 F.R.D. 590 (M.D. Pa. 1978) 38

*Lynch v. Household Finance Corp.*, 405 U.S. 538, 552 (1972) .................................... 35

*Motiva Enterprises, LLC v. Secretary of Dept. of Nat'l. Res. & Environm. Control*, 745 A.2d 234 (Del. Super. Ct. 1999) ...................................................................... 49

*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 141 (3d Cir. 2000) .......................... 34, 37

*Pace Resources, Inc. v. Shrewsbury Tp.*, 808 F.2d 1023, 1035 (3d Cir. 1987), *cert. den.*, 482 U.S. 906 (1987).................................................................................. 37

*Parker v. Brown*, 317 U.S. 341 (1943) ....................................................... 2, 29, 30, 33

*Pell v. E.I. DuPont de Nemours & Co., Inc.*, 231 F.R.D. 186, 189, n. 2 (D. Del. 2005) ............. 48

*Purze v. Village of Winthrop Harbor*, 286 F.3d 452 (7th Cir. 2002) ............................... 44, 45

*Ransom v. Marrazzo*, 848 F.2d 398 (3d Cir. 1988) ............................................. 35, 36

*Reid Dev. Corp. v. Parsippany-Troy Hills Tp.*, 10 N.J. 229, 89 A.2d 667, 669 (N.J. 1952) ........ 37

*Salem Church (Delaware) Assocs. v. New Castle County*, 2006 WL 2873745 (Del. Ch. Oct. 6, 2006) ................................................................................ 24, 48

*Sameric Corp. of Delaware v. City of Philadelphia*, 142 F.3d 582, 597 (3d Cir. 1998) ............. 22

*Southern Motor Carriers Rate Conf., Inc.  v. U.S.*, 471 U.S. 48, 105 S.Ct. 1721, 1730 (1985) .......................................................................... passim

*Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285, 1290 (3d Cir. 1993) ........................ passim

*Thomas v. Independence Tp.*, 463 F.3d 285, 295 (3d Cir. 2006) ................................. 29

*Toll Bros., Inc. v. Wicks*, 2006 WL 1829875 (Del. Ch. Jun. 21, 2006) ........................... 23

*Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38-39 (1985) ............................... 29, 33

*Town of South Bethany v. Nagy*, 2006 WL 1451528, at *7 (Del. Ch. May 12, 2006), *aff'd*, 918 A.2d 1170 (Del. Super. Ct. 2007) ............................................................................ 24

United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003).. 34, 38

*Unity Ventures v. County of Lake*, 841 F.2d 770 (7th Cir. 1988) ................................................ 28

*Village of Euclid, Ohio  v. Ambler Realty Co.*, 272 U.S. 365 (1926) ........................................ 35

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (U.S. 2000) ...................................... 41, 44

*Water and Wastewater Bd. of City of Madison v. Anderson*, 850 So.2d 1230, 1238 (Ala. 2002) 36

*Williamson County Regional Planning Com. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194-95 (1985) ................................................................................................... 20, 26

## STATUTES

26 Del. Code §203D ................................................................................................. 31, 47

9 Del. Code §1341 ............................................................................................................ 23

9 Del. Code §1521 ............................................................................................................ 31

## CASES

*ABD Monroe, Inv. v. Monroe Tp.*, 2008 WL 58876, *6, n. 3 (D.N.J. Jan. 3, 2008) ............... 34, 45

*Acierno v. Mitchell*, 6 F.3d 970, 977 (3d Cir. 1993) ............................................................... 22

*Acierno v. New Castle County*, 2000 WL 718346 (D. Del. May 23, 2000) ............................... 49

*Aeroglobal Capital Mgt., LLC v. Cirrus Inds., Inc.*, 871 A.2d 428, 444 (Del. Super. Ct. 2005) . 50

*Albanian Assoc. Fund v. Township of Wayne*, 2007 WL 2904194, *11 (D.N.J. Oct. 1, 2007).... 38

*Alston v. Parker*, 363 F.3d 229, 233 (3d Cir. 2004) ............................................................. 29

*American Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp.2d 569, 584 (D.N.J. 2003) ..... 40

*Arnold v. Minner*, 2005 WL 1501514, *6 (D. Del. Jun. 24, 2005) ............................................ 38

*Baldini West, Inc. v. New Castle County*, 852 F. Supp. 251, 253-54 (D. Del. 1994) ................... 27

*Barbaccia v. County of Santa Clara*, 451 F. Supp. 260, 264 n. 2 (N.D. Cal. 1978) .................... 36

*Blanche Road Corp. v. Bensalem Tp.*, 57 F.3d 253, 267-68 (3d Cir. 1995) *overruled by United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003)).. 25, 35

*Brady v. Town of Colchester*, 863 F.2d 205, 215 (2d Cir. 1988) .............................................. 19

*Brubaker v. East Hempfield Tp.*, 234 Fed.Appx. 32, 34-35 (3d Cir. 2007) ........................... 21, 22

*Buckson v. Town of Camden*, 2001 WL 1671443, (Del. Ch. Dec. 4, 2001) ................................ 24

*Christiana Town Center, LLC v. New Castle County*, 2003 WL 21314499, *4 (Del. Ch. June 6, 2003) ............................................................................................................................ 22

*City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 417 (1978) ............ 29, 30

*City of Winter Park v. Southern States Utilities, Inc.,* 540 So.2d 178, 180 (Fla. App. 1989) ...... 36

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) ........................................................................... 29

*Corcoran v. Village of Bennington,* 128 Vt. 29, 66 A.2d 457, 491-93 (Vt. 1970) ...................... 36

*Cornell Cos., Inc. v. Borough of New Morgan,* 512 F. Supp.2d 238, 257-58 (E.D. Pa. 2007) ................................................................................................................................... passim

*Council of Middletown Tp. v. Benham,* 514 Pa. 176, 523 A.2d 311 (Pa. 1987) .............. 32, 33, 47

*County Concrete Corp. v. Township of Roxbury,* 442 F.3d 159, 164 (3d Cir. 2006) ........... passim

*Crosby v. Hospital Auth.,* 93 F.3d 1515 (11th Cir. 1996) ............................................................. 34

*Delmarva Enterprises, Inc. v. Mayor and Council of City of Dover,* 282 A.2d 601, 602-03 (Del. Super. Ct. 1971) ...................................................................................................................... 36

*Deninno v. Municipality of Penn Hills,* 2007 WL 316392., *9 (W.D. Pa. Jan. 31, 2007)........... 22

*Development Group, LLC v. Franklin Tp. Bd. of Supervisors,* 2003 WL 22358440 (E.D. Pa. Sept. 24, 2003) .......................................................................................................................... 45

*Dobbins v. City of Los Angeles,* 195 U.S. 223 (1904) .................................................................. 34

*Eastern Shore Environmental, Inc. v. Kent County Dept. of Planning,* 2002 WL 244690 (Del. Ch. Feb. 1, 2002) ........................................................................................................ 24, 28, 47

*Elsmere Park Club Ltd. P'ship. v. Town of Elsmere,* 771 F. Supp. 646, 649-50 (D. Del. 1991) . 35

*First American Title Co. v. DeVaugh,* 480 F.3d 438 (6th Cir. 2007) ............................... 29, 30, 31

*FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636 (1992) ................................................................. 30

*Glendon Energy Co. v. Borough of Glendon,* 836 F. Supp. 1109, 1115 (E.D. Pa. 1993) 22, 27, 28

*Goldblatt v. Town of Hempstead, N.Y.,* 369 U.S. 590, 594 (1962)................................................ 41

*Gwynedd Properties, Inc. v. Lower Gwynedd Tp.,* 970 F.2d 1195, 1203 (3d Cir. 1992) ............. 19

*Hall v. Village of Swanton,* 113 Vt. 424, 35 A.2d 381, 384 (Vt. 1944)........................................ 37

*Hoffman v. Lehman,* 926 F. Supp. 510, 515-16 (M.D. Pa. 1996) .................................................. 38

*In re 244.5 Acres of Land,* 808 A.2d 753, 758 (Del. Super. Ct. 2002)......................................... 48

*Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994) ................... 29

*Kaehley v. City of Pittsburgh,* 988 F. Supp. 888 (W.D. Pa. 1997) ............................................... 34

*Liberty Curtin Concerned Parents v. Keystone Central Sch. Dist.,* 81 F.R.D. 590 (M.D. Pa. 1978)38

*Lynch v. Household Finance Corp.,* 405 U.S. 538, 552 (1972).................................................... 35

*Motiva Enterprises, LLC v. Secretary of Dept. of Nat'l. Res. & Environm. Control,* 745 A.2d 234 (Del. Super. Ct. 1999) .............................................................................................................. 49

*Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 141 (3d Cir. 2000) .............................. 34, 37

*Pace Resources, Inc. v. Shrewsbury Tp.,* 808 F.2d 1023, 1035 (3d Cir. 1987), *cert. den.,* 482 U.S. 906 (1987)................................................................................................................................. 37

*Parker v. Brown,* 317 U.S. 341 (1943) ........................................................... 2, 29, 30, 33

*Pell v. E.I. DuPont de Nemours & Co., Inc.,* 231 F.R.D. 186, 189, n. 2 (D. Del. 2005) .............. 48

*Purze v. Village of Winthrop Harbor,* 286 F.3d 452 (7th Cir. 2002) ....................................... 44, 45

*Ransom v. Marrazzo,* 848 F.2d 398 (3d Cir. 1988) ............................................................. 35, 36

*Reid Dev. Corp. v. Parsippany-Troy Hills Tp.,* 10 N.J. 229, 89 A.2d 667, 669 (N.J. 1952) ........ 37

*Salem Church (Delaware) Assocs. v. New Castle County,* 2006 WL 2873745 (Del. Ch. Oct. 6, 2006) ........................................................................................................................ 24, 48

*Sameric Corp. of Delaware v. City of Philadelphia,* 142 F.3d 582, 597 (3d Cir. 1998) .............. 22

*Southern Motor Carriers Rate Conf., Inc.  v. U.S.,* 471 U.S. 48, 105 S.Ct. 1721, 1730 (1985) ....................................................................................................................... passim

*Taylor Inv., Ltd. v. Upper Darby Tp.,* 983 F.2d 1285, 1290 (3d Cir. 1993) ........................ passim

*Thomas v. Independence Tp.,* 463 F.3d 285, 295 (3d Cir. 2006) ............................................. 29

*Toll Bros., Inc. v. Wicks,* 2006 WL 1829875 (Del. Ch. Jun. 21, 2006) ...................................... 23

*Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38-39 (1985) ........................................ 29, 33

*Town of South Bethany v. Nagy,* 2006 WL 1451528, at *7 (Del. Ch. May 12, 2006), *aff'd,* 918 A.2d 1170 (Del. Super. Ct. 2007) ................................................................................ 24

United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003).. 34, 38

*Unity Ventures v. County of Lake,* 841 F.2d 770 (7th Cir. 1988) ............................................. 28

*Village of Euclid, Ohio  v. Ambler Realty Co.,* 272 U.S. 365 (1926) ........................................ 35

*Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (U.S. 2000) ....................................... 41, 44

*Water and Wastewater Bd. of City of Madison v. Anderson,* 850 So.2d 1230, 1238 (Ala. 2002) 36

*Williamson County Regional Planning Com. v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 194-95 (1985) ................................................................................................. 20, 26

## STATUTES

26 Del. Code §203D ................................................................................................. 31, 47

9 Del. Code §1341 ......................................................................................................... 23

9 Del. Code §1521 ......................................................................................................... 31

## TREATISES

Ely, James W., *The Guardian of Every Other Right,* p. 6 (Oxford University Press 1998) ......... 34

## REGULATIONS

NCC Code § 38.02.002 .................................................................................................. 10

NCC Code §2.05.300 ..................................................................................................... 6, 9

NCC Code §40.02.232 .................................................................................................... 4

NCC Code §40.05.300 .................................................................................................... 5

NCC Code §40.05.320 ............................................................................................ 11, 23

NCC Code §40.05.520 ............................................................................................ 46, 47

NCC Code §40.05.520C ...................................................................................... 7, 9, 17, 46

NCC Code §40.12.000 ............................................................................................... 9

NCC Code §40.14.241 ............................................................................................... 7

NCC Code §40.30.420 .............................................................................................. 18

NCC Code §40.31.112G ........................................................................................... 10

NCC Code §40.31.114 .............................................................................................. 10

NCC Code §40.31.390 .............................................................................................. 16

NCC Code §40.31.510 .............................................................................................. 18

NCC Code §40.31.512 ........................................................................................... 22, 24

## PRELIMINARY STATEMENT

Plaintiffs, Gary and Gale Warren and Toll Bros., Inc. (collectively, **"Plaintiffs"**) ask this Court to redress the injuries they sustained as a result of the wrongful conduct the defendant, New Castle County (the **"County"**) engaged in to stop the development of Plaintiffs' Properties. Before Plaintiffs submitted their Exploratory Plans, seeking approval to build a major residential subdivision as permitted under the County's Uniform Development Code (**"UDC"**), Plaintiffs met with County officials who assured them that the County had allocated public sewer capacity to Plaintiffs' Proposed Developments pursuant to the County's longstanding plan to provide public sewer to their area. Plaintiffs relied on those assurances, along with the County's Resolution, plans and maps confirming the County's intention to provide public sewer to Plaintiffs' properties, and expended substantial time, resources and monies in developing the Properties in direct reliance on those assurances.

While Plaintiffs' Preliminary Plans were still pending, however, the County did a complete about face, deciding it did not want Plaintiffs' Properties developed after all. The County determined to preclude Plaintiffs' development plans from proceeding further in the approval process by exerting its monopoly power over sewer so as to deny public sewer service to Plaintiffs' Properties. At the same time, the County declined to consent to Plaintiffs' request to obtain sewer through a private utility. The County knew that the UDC required all residential subdivisions, like Plaintiffs' proposed development, to have access to sewer and that without sewer, Plaintiffs' proposed development would be rejected. The County enacted a new Resolution which provided sewer to nearly all the residential developments with pending plans in southeast New Castle County, with the exception of one small pocket of land where Plaintiffs' Properties are located. The County thus successfully exerted its monopoly control over sewer to

1.

exclude Plaintiffs' Properties from being developed as lawfully permitted under the County's UDC.

The County's wrongful conduct to preclude Plaintiffs' constitutional right to develop their Properties free of unlawful governmental interference violated Plaintiffs' rights under the due process and equal protection clauses of the U.S. Constitution.  The County's unlawful exertion of its sewer monopoly power so as to preclude lawful development constitutes an unlawful restraint of trade in violation of the Clayton Act.  Moreover, this restraint of trade does not logically follow from the State's general grant of authority to the County over sewer so as to allow the County immunity for its antitrust violation under the *Parker* doctrine.

Contrary to the County's assertions in the motion to dismiss, this matter is fully ripe and justiciable as a result of the County having inflicted an actual concrete injury on Plaintiffs by denying their Properties access to sewer and halting the progress of their Preliminary Plans in the land use approval process.  One of the ironies presented by the instant motion is that on the one hand, the County claims this controversy is not ripe because it has not fully decided whether to grant sewer to Plaintiffs' properties and on the other, that Plaintiffs' properties will not gain access to sewer for at least five to seven years, in which time Plaintiffs' development plans will have long since expired.  The County continues to play fast and loose with Plaintiffs' rights and should be held accountable as any government would when it abuses its authority as flagrantly as was done here.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs commenced this action on November 13, 2007.  On January 4, 2007, Defendant filed a motion to dismiss.  On January 18, 2007, Plaintiffs filed an amended complaint, and on January 31, 2008, Defendant filed its motion to dismiss the amended complaint.  Pursuant to the scheduling order, Plaintiffs hereby file their answer to the motion to dismiss.

2.

## SUMMARY OF ARGUMENT

I.      Plaintiffs' antitrust and constitutional claims are ripe because the County has reached a final decision, Plaintiffs have sustained actual concrete injury and the County has no procedure in place for Plaintiffs to administratively appeal the County's decision. Plaintiffs' claims fall within each of the exceptions to the ripeness doctrine recognized by the Third Circuit Court of Appeals, *i.e.*, Plaintiffs are asserting that the County engaged in a course of wrongful conduct, facially challenging the County's Resolution changing its original sewer plan and asserting that pursuing an administrative appeal would be a futile exercise.

II.     The County is not immune from liability for its anti-competitive conduct.

III.    Plaintiffs have sufficiently pled a substantive due process claim.  Plaintiffs have a fundamental right to own, use and enjoy their property.  A facial challenge to a legislative enactment and a protracted wrongful course of conduct which deprives a person of a protected property right as alleged here is sufficient to state a substantive due process claim.

IV.     Plaintiffs have stated a claim for equal protection based on the County's different treatment of similarly situated developers.

V.      Plaintiffs have stated a procedural due process claim based on the County's failure to provide an administrative appeal of its decisions in this matter.

VI.     Plaintiffs are entitled to declaratory relief of the County's rights and obligations under the Delaware Code and the County's Uniform Development Code.

VII.    Plaintiffs have stated an equitable estoppel claim against the County based on the County's substantial change of position after causing Plaintiffs to, in good faith, rely on the County's original position to their detriment.

3.

## STATEMENT OF FACTS[1]

**A.    Properties are Zoned Suburban with Access to Sewer**

Plaintiffs, Gary and Gale Warren own approximately 134 acres of undeveloped land located on the north side of Port Penn Road in southern New Castle County (the **"Warren Property"**). AC ¶9.[2]  Plaintiff Toll is the equitable owner of 118 acres of the Warren Property and approximately 500 acres of undeveloped land adjacent to the Warren Property known as the Port Penn Property (the **"Port Penn Property"**). AC ¶¶9, 10.  Plaintiffs' Properties are located in the County's Suburban (S) District. AC ¶11.

The County's Uniform Development Code (**"UDC"**) provides that the Suburban District "includes all the newly developing areas designated as growth areas in the Comprehensive Development Plan" and "permits moderate to high density development and a full range of residential uses in a manner consistent with providing a high quality suburban character." NCC Code §40.02.232.[3]  Plaintiffs are seeking approval to build 631 new residences on a total of approximately 618 acres of land (**"Proposed Developments"**).  AC ¶13.  Plaintiffs' Proposed Developments are permitted uses for the Suburban District under the County's UDC.  AC ¶14. The UDC envisions that all Suburban Districts will be furnished access to public sewer.  *See* NCC Code Table 40.04.110A.[4]  The UDC requires all developments to obtain adequate sewer

---

[1]  While the County purports to accept as true the amended complaint's allegations, instead it in fact completely disregards key allegations, such as the County's representations to Plaintiffs, and casts those allegations which it cannot avoid, in the worst possible light, all in the determined effort to persuade this Court to dismiss Plaintiffs' action without the benefit of a developed record. *See Cornell Cos., Inc. v. Borough of New Morgan,* 512 F. Supp.2d 238, 254 (E.D. Pa. 2007) (when considering a dismissal motion, court must accept the complaint's allegations as true and draw all reasonable inferences in the plaintiff's favor).

[2]  The Amended Complaint is cited as "AC."

[3]  The Properties have been zoned Suburban since the County adopted the UDC in 1997 and remained Suburban, notwithstanding the County's periodic revisions to the Code since 1997.  The NCC Code can be found online at www.co.new-castle.de.us/landuse/home/webpage22.asp.

[4]  Table 40.04.110A provides under Suburban (S), an Open Spaced Subdivision, such as the Proposed Developments, is to have public, rather than on-site, utilities.  A copy of Table 40.04.110A is included in Plaintiffs' Appendix (**"PA"**) as PA01.

service. either public or private.  NCC Code §40.05.300.

### B.    The County Commits to Provide Public Sewer to the Properties

In 2003, the County adopted Resolution No. 03-093 in order to implement a sewer system for southern New Castle County.  *See* County's Resolution No. 03-093 (AC Exhibit B). The County's Resolution provides that "in 1997, the County made a commitment to construct sewers in southern New Castle County to accommodate the growth expected within this area which was designated as a growth area by the County and the State of Delaware…"  The Resolution provides further:

> **WHEREAS,** the implementation of a sewer system in southern New Castle County is a necessary component of good land use planning and is consistent with the tenets of the State's Livable Delaware program; and

> **WHEREAS**, the installation of sewers in southern New Castle County will provide better protection for the environment by substantially reducing the pollution of groundwater resulting from leaking septic systems; …

AC Exhibit B.  Thus, in 2003, the County confirmed its commitment to construct a sanitary sewer system in southern New Castle County in order to accommodate the growth expected within this area and to avoid the environmental hazards resulting from aging septic systems.[5]

The County's plan to install public sewer included constructing a sewer conveyance system and two new sewage treatment facilities, Water Farms I and II.  AC ¶ 18.  Water Farms I and II were designed as lagoon sewage treatment systems, the treated effluent from which is disposed of by spray irrigation on the property adjacent to the lagoons.  *Id.*  The State Department of Natural Resource and Environmental Control approved Water Farms I and II to treat 1,800,000 and 3,000,000 gallons per day, respectively.  AC ¶20, 23.  Water Farm I currently only

---

[5]  In its motion to dismiss (**"MTD"**), the County endeavors to distance itself from its original plan to provide sanitary sewer service in southern New Castle County by characterizing its original resolution, maps and wastewater management plan "concepts plans only."  MTD at p. 5.  Plaintiffs deny that the County's original maps and plans were mere concepts.  Furthermore, it is well settled that Plaintiffs, not Defendant, are entitled to every reasonable inference from the facts on resolving a motion to dismiss.

treats approximately 400,000 gallons of sewage per day, leaving Water farm I with 1,400,000 in underutilized capacity. AC ¶20.

Plaintiffs' Properties are located approximately five miles from Water Farm I and approximately two miles from the Boyd's Corner Interceptor, the force main that connects to Water Farm I. AC ¶19, Exhibit C.[6] Furthermore, Plaintiffs' Properties are located less than one mile from the pump station at the Augustine Creek Subdivision which pumps sewage to Water Farm I. AC Exhibit C. The County approved funding for the design and construction of Water Farm II on land that the County owns. AC ¶22. Plaintiffs' Properties are located approximately five miles from the proposed site for Water Farm II and approximately two miles from the existing Hyett's Corner Interceptor which leads to Water Farm II. *Id.*

The County's Department of Special Services (**"Special Services"**) maintains and operates the sanitary sewers, sewage treatment and disposal facilities in the County. *See* NCC Code §2.05.300. As late as January 2006, Special Services prepared maps depicting a sewer conveyance line to be installed adjacent to the Properties. See AC Exhibit C. Specifically, Special Services' map showed a sewer conveyance line starting from the Hyett's Corner Interceptor in the North and traveling East along the two roads, Dutch Neck and Port Penn Roads, both of which border the Properties. Thus, as late as January 2006, the County planned to install sewage conveyance lines to the Properties pursuant to its longstanding plan to provide public sewer to Suburban new growth areas.

### C.    The County Confirms the Proposed Developments to Get Sewer

Before Plaintiffs submitted Exploratory Plans for the Properties in 2005, Plaintiffs met

---

[6] A color copy of the map attached to the amended complaint, as Exhibit C, is included in Plaintiffs' Appendix at PA02. The map also includes the location of Plaintiffs' Properties, the Hyett's Corner and Boyd's Corner Interceptors and a radius showing the distances involved.

with the County on numerous occasions in order to work out the best possible solution for implementing the County's plan to provide public sewer to the Properties. AC ¶¶25 – 30. In those meetings, the County confirmed its commitment to providing public sewer to the Proposed Developments and pointed out ways that the Proposed Developments could gain access to the County's system. AC ¶¶26, 28. Because a large gravity line, the Boyd's Corner Interceptor, already extended from Water Farm I towards the Properties, the County discussed the plan of having Toll build a regional pump station and force main that would connect to the Boyd's Corner Interceptor, allowing the Proposed Developments to dispose of sewage at Water Farm I.

Plaintiffs followed up on the County's proposal by letter dated December 8, 2004, offering for Toll to design and construct the regional pump station, force main and gravity line that would connect the Proposed Developments to Water Farm I through the Boyd's Corner Interceptor. AC Exhibit D. The County's UDC expressly permits a developer to make such improvements where there is inadequate sewer service. AC Exhibit D (citing NCC Code §40.05.520C). Plaintiffs asked the County to consider giving Toll a credit against future impact fees because the proposed sewer system improvements would create substantial additional capacity that the County could use to service other planned developments.[7] AC Exhibit D. The UDC contemplates reduction of impact fees and credits to a developer where, as in this case, the developer constructs facilities that will provide more capacity than is required for the development. AC Exhibit D (citing NCC Code §40.14.241).

In 2005, when the County's new administration took office, Plaintiffs continued to meet with the County in order to work out the most cost effective solution for implementing the

---

[7] In its Motion to Dismiss, the County seeks to cast Toll's request for a credit against impact fees in a pejorative light in order to argue that Toll was not willing to build the system unless it recouped its costs. Again, Plaintiffs deny the County's assertion. Certainly, the County's slant on the facts does not give Plaintiffs the benefit of every reasonable inference as is required on resolving a motion to dismiss.

County's plan to provide the Proposed Developments with public sewer. AC ¶28. As before, during those conversations, the County confirmed it was committed to providing public sewer to the Proposed Developments and offered to allow them to borrow capacity from the underutilized Water Farm I. AC ¶28.[8]

Plaintiffs followed up on the County's offer for the Proposed Developments to borrow capacity from Water Farm I by letter dated June 9, 2005. AC Exhibit E. The Proposed Developments were located less than one mile from the pump station at the Augustine Creek Subdivision which conveyed sewage to Water Farm I. Toll offered to construct a regional pump station on the Warren Property and accompanying force main to the pump station at the Augustine Creek Subdivision in order to connect with Water Farm I. Toll did not seek to recoup its costs as a credit against impact fees since Toll would have to build a much shorter sewer line to Augustine Creek than it would to the Boyd's Corner Interceptor. *Id.*

In the June 9, 2005 letter, Plaintiffs also offered to construct (1) a regional pump station to be located near the Warren Property and (2) a force main adjacent to Port Penn Road, which would convey sewage either to the Boyd's Corner Interceptor (leading to Water Farm I) or the Hyett's Corner Interceptor (leading to Water Farm II). AC Exhibit E at p. 3. Cost notwithstanding, Toll offered to design and construct the pump station and force main, with the County's input and approval, and turn over the entire system to the County once it was fully operational and financially stable.

Thirdly, Toll offered to design and construct – at its own cost -- a state-of-the-art community system consisting of (1) a treatment plant to treat the sewage from the proposed

---

[8] In its Motion to Dismiss, the County barely acknowledges Plaintiffs' allegations that the County made written and verbal assurances that the Properties would receive access to public sewer, arguing instead that the Court should disregard them as not true. MTD at p. 10, n. 10. Clearly, the truth or untruth of Plaintiffs' allegations are more appropriately decided by a jury, certainly not Defendant on a motion to dismiss.

developments, (2) conveyance lines to transport the sewage from the proposed developments and (3) a disposal system capable of processing over 100,000 gallons per day (the **"Community System"**). AC ¶30. Plaintiffs' third proposal comports with the County's UDC which allows the developer to make such improvements to sewer in order to increase site density. NCC Code §40.05.520C. Plaintiffs offered to turn this facility over to the County to operate or if it preferred, to a private wastewater utility regulated by the Public Service Commission. AC ¶30. Clearly, Plaintiffs strove to come up with a workable solution – in which Plaintiffs would take the laboring oar and make the initial financial investment -- to implement the County's plan to provide public sewer to the Proposed Developments. Throughout its discussions with Plaintiffs, the County confirmed its intention to provide public sewer to the Proposed Developments. AC ¶31.

### D.    Special Services Confirms Sewer Capacity for the Proposed Developments

Special Services is responsible for calculating and allocating available sewer capacity for proposed development in the County. NCC Code §2.05.300. The County's UDC provided:

> New development may continue to use sewer capacity on a first come, first served basis north of the C&D Canal within a sewer service area. South of the C&D Canal sewer capacity shall be distributed within the Southern Sewer Service Area proportionately based upon acreage.

NCC Code §40.12.000.[9] On August 11, 2005, Special Services sent a letter to Plaintiffs confirming that sewer capacity for the Warren Property "in the requested amount of 42,900 gallons per day will be available upon completion of the construction of Water Farm II" and related sewer interceptor lines to which the development can connect. AC Exhibit F. Similarly,

---

[9] While the Proposed Development Plans were pending, the County changed Section 40.12.000 to read instead: "New development may use sewer capacity on a first come, first served basis in all sewer districts in the County if and/or when sanitary sewer service becomes available, as determined by the Department of Special Services." *See* Defendant's Appendix at A15.

by letter dated October 13, 2005, Special Services notified Plaintiffs that capacity for the Port Penn Properties "in the requested amount of 138.600 gallons per day will be available upon completion of the construction of all necessary sanitary sewer infrastructure to which the [development] will connect." AC Exhibit G. Special Services had thereby confirmed that the County intended the Proposed Developments for public sewer and had allocated the requisite sewer capacity to them.[10]

### E.    Plaintiffs Rely on Defendant's Assurances

In reliance upon Defendant's assurances that the Properties would be provided public sewer, Plaintiffs expended substantial time, resources and monies in evaluating the Properties, preparing the complex subdivision and land development plans required for approval under the County's UDC, studying the feasibility of alternative sewer system facilities and paying nonrefundable deposits to the landowners.[11] AC ¶32. On August 22, 2005, in reliance upon the County's assertions that the County would provide public sewer to the Proposed Developments, Plaintiffs submitted an Exploratory Plan for the Warren Property to the County's Department of Land Use (**"Land Use"**). AC ¶35. Similarly, on October 7, 2005, Plaintiffs submitted to Land Use an Exploratory Plan for the Port Penn Properties. *Id.* Plaintiffs would not have taken these rigorous steps and incurred such substantial costs had they known that the County would later change course and ultimately decide not to allow public sewer to the Proposed Developments.[12]

---

[10] Even the County acknowledges, albeit in a footnote, that it advised Plaintiffs at the preliminary plan stage of available sewer capacity for their Proposed Developments, as it was required to do under the UDC. MTD at p. 4, n.5 (citing NCC Code § 38.02.002).

[11] The UDC requires land development applicants to obtain approval of three different plans, Exploratory, Preliminary and Record. The applicant has twelve months in which to progress to each stage. *See* NCC Code §40.31.112G, §40.31.114. If the plan expires before Land Use approves it for the next stage, the applicant must start all over again. Land Use is required to approve the plan if it comports with the UDC requirements.

[12] Contrary to the County's unsupported assertions in its Motion to Dismiss at p. 9, Toll is not in the business of "gambling" and would never have spent the time, resources and monies it had but for the County's assurances that public sewer would be provided pursuant to its original resolution, maps and sewer plan.

**F.     The County Devises a Plan to Stop the Proposed Developments**

The County's new administration secretly determined to halt Plaintiffs' Proposed Developments from proceeding through the Land Use review process because the County decided it did not want Plaintiffs' Properties developed.  AC ¶36.  The County was aware it faced a major obstacle in halting the Proposed Developments because their plans were already pending in Land Use, Land Use was obligated to approve them in accordance with the UDC and the Properties were designated for public sewer under the County's current sewer plan.  *Id.* Moreover, Special Services had already allocated the sewer capacity required for each Proposed Development.  AC Exhibits F and G.

To overcome these hurdles, the County seized on the fact that Land Use could not approve the plans if the Proposed Developments did not have access to sewer because the UDC required that subdivision and land developments have access to sewer, either public or private. *See* NCC Code §40.05.320.  In addition, the County knew that if Plaintiffs' plans did not proceed to the next stage of review, they would expire and Plaintiffs would be forced to re-file under the County's new sewer plan and thereby lose the benefit of the previous sewer plan. The County decided to exert its monopoly power over public sewer in order to create a new sewer plan which this time explicitly carved out Plaintiffs' Proposed Developments from receiving public sewer.

In June 2005, the County retained Red Oak Consulting to reevaluate the sewer system plan already in effect for southern New Castle County.  AC ¶38.  In January 2006, Red Oak concluded that the County's existing plan was inadequate because it did not address the sewer needs of all pending development plans.[13]  *Id.*  Red Oak recommended changing the sewer

---

[13]   Although the County puts a gloss on the Red Oak Report, claiming it concluded the original plan was unworkable, such matters are better left for full factual discovery and are not appropriate for a motion to dismiss.  In

system plan to address the development needs more fully but cautioned the County to implement a short-term strategy so as to allow pending development to proceed.  AC ¶39.

The County used Red Oak's recommendation as an opportunity to effectuate its hidden agenda of preventing development of the Properties. AC ¶40.  Under the guise of making new changes to its sewer plan for southern New Castle County, on March 28, 2006, the County enacted Resolution No. 06-069 which effectively divided the previously intact Southern Sewer Service Area (the **"SSSA"**) into three new sewer zones: (1) the Central Core located between Route 301 to the West and Route 13 to the East, (2) the area West of the Central Core and (3) the area East of the Central Core.  AC Exhibits I, H.  Resolution No. 06-069 provided that developments located in the Central Core and developments planned to be permanently sewered by Water Farm I, *i.e.*, developments located to the East of the Central Core, "will receive exclusive priority with respect to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006." Exhibit I at ¶5.

Under Resolution No. 06-069, the County committed to constructing sewer infrastructure in the Central Core and East of the Central Core, including the Hyett's Corner Interceptor which is located but two miles from the Properties.  Exhibit I at ¶1.  The County delayed construction of Water Farm II and terminated its contract to construct Water Farm II, thereby incurring a $350,000 penalty. AC ¶47.  Under Resolution No. 06-069, the County also determined that the developers, not the taxpayers as the County suggests in its Motion to Dismiss, would bear the brunt of the costs for constructing the sewer infrastructure. Exhibit I at ¶5.  That model comports with Plaintiffs' own offers to finance the construction of extending public sewer to the Proposed Developments.

---

any event such a conclusion does not begin to address why excluding Plaintiffs' Properties somehow cured the original plan's purported inadequacy.

Tellingly, while the County included most of the area East of the Central Core in its new sewer plan, the County carved out a small pocket in the northeast, approximately four square miles, – precisely where the Proposed Developments are located – which it excluded from its sewer plan and for which it decided not to provide any funding for sewer service in the foreseeable future. AC Exhibit H. Resolution No. 06-069 provides the following open-ended moratorium on sewer service for this small pocket of land:

> Within eighteen (18) months of commencing construction of the components of the Central Core transmission system, the County will provide a detailed report and analysis of available sewer capacities in the Southern Sewer Service Area ("SSSA") to County Council. If it is determined at that time that the County will be unable to provide sewer service capacity for any active or recorded plan as of March 9, 2006 outside the Central Core transmission system, alternative sewer disposal options will be considered by the County.

Exhibit I ¶10.

The County claims in its Motion to Dismiss that it began construction of the Central Core transmission system on February 5, 2007. *See* MTD Appendix at A19. Pursuant to Resolution No. 06-069, therefore, the County has until August 5, 2008 (i.e., eighteen months from February 5, 2007) merely to submit a report on available sewer service in the SSSA. Only at that time, according to the Resolution, will the County "consider" alternative sewer disposal options if it is not able to provide sewer service to development plans active as of March 9, 2006.[14] Should Plaintiffs' plans for the Proposed Developments expire in the interim, under the Resolution, the County will not be required to provide public sewer to Plaintiffs' Properties. Indeed, the County is bold to state in its Motion to Dismiss that "under the Resolution, the County will likely not be providing sewer to the northeast area of the Central Core in the next five to seven years..."

---

[14] As the County maintains in its Motion to Dismiss, "nothing obligates the County to approve 'alternate sewer disposal options' if sewer service will not be available, until the County completes its study, and until the County considers and decides on whether it will allow 'alternate sewer disposal options'...." MTD at p. 18.

13.

MTD at p. 28. Thus, the County has effectively maneuvered to exclude Plaintiffs' Proposed Developments from public sewer in direct contravention of its original sewer plan, maps, written and verbal assurances to Plaintiffs, made over a two year time period, that the Proposed Developments were scheduled to receive public sewer.

### G.    The County Deliberately Treats Plaintiffs' Developments Differently

The County arbitrarily drew a line to exclude Plaintiffs' Proposed Developments from public sewer precisely because it wanted to stop development of the Properties. AC ¶¶36. 41, 45, 49. As will be discussed further *infra* at pp. 42-45, the County's line drawing made no sense considering that the Proposed Developments are located but five miles from Water Farm I which, as discussed, has an abundance of unutilized capacity. In fact, the County had previously advised Plaintiffs their Developments could borrow capacity from Water Farm I since the Boyd's Corner Interceptor, a gravity force main leading to Water Farm I, already extended towards the Properties. AC ¶28. The Proposed Developments are also located less than one mile from the Augustine Creek Subdivision which conveys its sewage to Water Farm I and through which, as discussed, the Proposed Developments could be connected at no cost to the County. AC ¶113. Based on their geographic proximity, the Proposed Developments logically could gain access to public sewer through Water Farm I, if only the County did not have another agenda.[15]

### H.    The County Wants to Keep the Properties Undeveloped

In summer 2007, the County enacted its 2007 Comprehensive Land Use Plan. The

---

[15] The County contends in its Motion to Dismiss that Plaintiffs conceded that the County had already allocated capacity at Water Farm I. See MTD at pp. 9, 27. Plaintiffs strongly deny this assertion. Plaintiffs have at all times maintained that there is unused non-allocated capacity in Water Farm I that should be made available on a first come, first serve basis as required by the UDC. Plaintiffs' willingness to accommodate the County and connect the Proposed Developments to Water Farm II when completed, and in the meantime borrow capacity from Water Farm I, was not a concession that all the capacity in Water Farm I has been allocated. As the Complaint alleges and as evidenced by the County's recent approval of other developments for connection to Water Farm I, there is no justification for excluding the Proposed Developments from Water Farm I when all the other proposed developments located East of the Central Core to Water Farm I have been permitted to connect to Water Farm I.

County caused the northeast pocket where it had precluded public sewer to no longer be classified as "New Community Growth Area." *See* AC ¶¶51-53. Instead, this area is a designated sending area for transfer of development rights.[16] The County made these changes even though development plans had been pending for the area, including Plaintiffs', for more than three years. The County thereby demonstrated its intention to restrict the growth in the northeast pocket where Plaintiffs' Proposed Developments predominate.

Before issuing its final decision denying public sewer to the Warren Property, the County set up a meeting with Gary Warren alone. AC ¶68. At the October 31, 2007 meeting, the County declared it did not intend to provide the Warren Property access to the County's sanitary sewer system or allow any alternatives for sewage disposal. AC ¶69. The County advised it was interested in having Warren sell the TDRs to his Property in order to keep his Property undeveloped. AC ¶70. When Warren reminded the County he was under contract with Toll, the County responded that if a "window of opportunity" should arise when he was no longer bound he should continue their conversation about TDRs. *Id.* The County's interference with Toll demonstrates that the County would do everything in its power to stop the Properties from being developed.

## I.     The County Issues its Final Decisions

After enacting Resolution No. 06-069 excluding the Proposed Developments from sewer, all that remained was to apply the new Resolution to the Proposed Developments in order to stop their progress through the Land Use approval process. On January 22, 2007, Land Use had accepted the Preliminary Plan for the Warren Property, and on March 21, 2007, the Preliminary

---

[16]     Transfer of development rights ("**TDRs**") is a method used to keep lands from being developed. The rights to develop are severed from the area to be "protected" and transferred to an area where higher than normal density is permitted. The development rights are purchased from within the sending areas and transferred to an area to be developed, known as the "receiving" area.

Plan for the Port Penn Property. AC ¶¶59, 73. Under the UDC, Plaintiffs have twelve months from these acceptance dates, i.e., by January 22, 2008 (Warren)[17] and March 21, 2008 (Port Penn) to submit their final Record Plan or the Preliminary Plans will be deemed expired. AC Exhibit M.

On October 22, 2007, the County, through Special Services, issued a letter to Plaintiffs declining to give the necessary verification of sewer capacity required for the Warren Development. AC Exhibit N. The letter stated: "[T]he County currently does not have any approved and fully funded projects to provide sanitary sewer capacity to that area." *Id.* (emphasis added). The letter also enclosed a Sewer Capacity Policy jointly prepared by Special Services and Land Use with an effective date of October 22, 2007, the same date as the letter.

The new Sewer Capacity Policy enforced the provision in the County's Resolution No. 06-069 that development plans could only continue through the Land Use process if sewer capacity is or will be available. AC Exhibit I ¶7. The Policy acknowledged that if Special Services determines that capacity will be available at the exploratory or preliminary plan stage, as it had with the Proposed Developments (*see* Exhibits F, G), the developer can continue through the development plan application and review process. AC Exhibit N at p. 2. The Policy continued, however, that once Special Services notifies the developer "that sewer capacity is not and will not be available for the proposed development, the application shall not be permitted to continue through the land use application process." AC Exhibit N at p. 3.

Plaintiffs objected to Special Services' October 22, 2007 decision by letter dated November 6, 2007, outlining once again all the relatively straight forward and logical steps they

---

[17]  While this suit was pending, the County granted Warren the one three-month extension permitted under the County Code so that the Preliminary Plan for the Warren Property is now due to expire on April 22, 2008. *See* NCC Code §40.31.390.

could take to implement the County's original sewer plan for the Properties.  AC Exhibit O.
Plaintiffs offered again to design and construct a Community System that could be conveyed to
the County and operated by Special Services or conveyed to a wastewater utility approved and
licensed by the Public Service Commission.  *Id.*  Toll also announced it was prepared to execute
a wastewater service agreement with an experienced regulated utility company for the design,
construction and operation of the Community System.  *Id.*  If the County was not going to
provide public sewer as promised, then it should at a minimum consent to Plaintiffs obtaining
sewer through a private wastewater utility.  *Id.*  Plaintiffs requested Special Services to confirm
that sewer capacity was available for the Proposed Developments because the UDC expressly
permits developers to obtain sewer through a private wastewater utility, if necessary.  *Id.* (citing
NCC Code §40.05.520C).

The County did not respond to Plaintiffs' November 6, 2007 letter requesting
reconsideration, and Plaintiffs filed this lawsuit on November 13, 2007.  Thereafter, on
November 20, 2007, the County, through Special Services, issued a letter declining to verify the
sewer capacity required for the Port Penn Development.  AC Exhibit R.  Again, the decision was
framed in terms of "the County" implementing its new sewer policy.  *Id.*

Now, after suit had been filed, Special Services mentioned for the first time the
possibility of the Properties using on-site septic systems.  AC Exhibit R.  Special Services had
not made this suggestion in its October 22, 2007 letter declining sewer capacity for the Warren
Development.  *Compare* Exhibit N.  In making this suggestion, Special Services knew that on-
site septic systems are environmentally undesirable (*see* County's Resolution No. 03-093 [AC
Exhibit B]) and, as even the County admits in its Motion to Dismiss, would require Plaintiffs to
reduce drastically the number of units they are permitted to develop under the UDC.  *See* MTD

17.

at pp. 4 – 5.  Special Services highlighted the following legend at the bottom of the letter:

> The information contained in this letter represents <u>the final position</u> of the Department of Special Services regarding sanitary sewer service capacity at this stage in the development process <u>and supersedes all prior representations, whether transmitted orally or in writing</u>.

*Id.* (emphasis added).  Special Services considered its position on sewer capacity to be "final" and admitted that prior representations had been made to Plaintiff which it sought to "supersede" by this decision.

**J.      The County Does Not Provide the Right to an Administrative Appeal**

The County issued its final decisions cutting off the Proposed Developments from the Land Use approval process through Special Services' October 22, 2007 letter (Warran) and November 20, 2007 letter (Port Penn) (collectively the **"Final Decisions"**).  The County's UDC restricts aggrieved parties in the administrative appeals they can take:

> An applicant pursuing approval of a land use application who is aggrieved by a finding, decision, or interpretation of a decision maker made in response to review of such application <u>may appeal such action to the jurisdictionally approved agency pursuant to Table 40.30.110</u>.  Appeals may only be taken based upon a final decision, not the recommendation of an agency. …

NCC Code §40.31.510 (emphasis added).

The referenced Table 40.30.110 provides: (1) Land Use is the decision maker regarding major subdivision plans and (2) the Technical Advisory Committee "[m]akes recommendations to the decision-makers."[18]  Special Services issued the Final Decisions in this matter as a member of the Technical Advisory Committee.[19]  The UDC Table does not provide a party aggrieved from a decision of the Technical Advisory Committee, i.e., Special Services in this case, the right

---

[18]  A copy of Table 40.30.110 is included in Plaintiffs' Appendix at PA03.

[19]  Special Services is identified as a member of the Technical Advisory Committee in Appendix 6-1 of the County's UDC.  (See a copy of Appendix 6-1 included in Plaintiffs' Appendix at PA06-09.)  The Technical Advisory Committee has the responsibility to "[r]eview and make recommendations for major subdivision and land development plans." NCC Code §40.30.420.  Special Services issued its October 22 and November 20, 2007 letters in follow up to its prior letters as a member of the Technical Advisory Committee. *See* AC Exhibit L.

to take an administrative appeal.  Special Services' Final Decisions bear this out considering they never advised Plaintiffs they had the right to take an appeal.  *See* AC Exhibits N and R.  Moreover, Special Services did not respond to Plaintiffs' November 6, 2007 letter requesting reconsideration.  *See* AC Exhibit O.  The County's UDC does not provide Plaintiffs an administrative remedy for appealing the County's Final Decisions issued through Special Services.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE JUSTICIABLE

#### A.    Standard of Review

The Third Circuit Court of Appeals has admonished district courts "not to dismiss claims hastily because they may involve land use issues":

> It is incumbent upon district courts, faced with a claim arising our of land use questions, to examine the facts carefully to determine what the essence of the claim is.  If it is an unlawful conspiracy like the one alleged here, the mere presence of land use issues should not trigger a mechanical decision to abstain.

*Gwynedd Properties, Inc. v. Lower Gwynedd Tp.*, 970 F.2d 1195, 1203 (3d Cir. 1992).  While courts are careful not to be turned into zoning boards of appeal; nevertheless, if a property owner's constitutional rights are infringed by a municipality's actions, the Court's "duty to protect the constitutional interest is clear."  *Brady v. Town of Colchester,* 863 F.2d 205, 215 (2d Cir. 1988).

#### B.    The Ripeness Doctrine/Finality Rule

The County argues in its Motion to Dismiss that Plaintiffs' claims should be dismissed because (1) the County has purportedly not made a final decision as to whether to allow Plaintiffs' Proposed Developments access to sewer and (2) Plaintiffs were required to file an administrative appeal to the Planning Board before bringing this action.  Both contentions lack

19.

merit.

The Supreme Court set forth the ripeness doctrine in *Williamson County Regional Planning Com. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194-95 (1985), a Fifth Amendment Just Compensation Takings case. The Supreme Court ruled that a claim against a municipality's enforcement of a zoning ordinance is ripe when (1) the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue (the finality rule) and (2) the plaintiff has unsuccessfully exhausted the state's procedures for seeking just compensation, so long as the procedures provided by the state were adequate. *Id.* at 186, 195-95. *See also County Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006).

### C.     Plaintiffs' Claims are Ripe

#### 1.     Plaintiffs Sustained an "Actual Concrete Injury"

This matter is ripe because Plaintiffs have been inflicted with an "actual concrete injury." As the Third Circuit discerned in *County Concrete*, the ripeness doctrine fundamentally addresses whether the plaintiff has been inflicted with "an actual, concrete injury." *County Concrete*, 442 F.3d at 164. *See also Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285, 1290 (3d Cir. 1993) (the basic rationale of the ripeness doctrine is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.")

Plaintiffs have alleged that the County inflicted an actual concrete injury upon them. The County has blocked their plans from proceeding through the Land Use approval process by denying the Properties access to public sewer. Should their Preliminary Plans expire, Plaintiffs will be required to re-file their plans *ab initio*, forcing them not only to incur substantial duplicative costs but in addition lose their vested rights under the County's original plan to provide sewer to their Properties. *See* AC ¶¶74-77. Indeed, as long as the County continues to

20.

avoid its commitment to provide sewer, Plaintiffs will continue to encounter the same obstacle again if forced to re-file. Thus, the Plans' threatened extinction is a very real, all too imminent harm for which Plaintiffs do not have an adequate administrative remedy, and which is capable of being repeated again. *Brubaker v. East Hempfield Tp.*, 234 Fed.Appx. 32, 34-35 (3d Cir. 2007) (the ripeness inquiry requires court to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration).

### 2.     County's Final Decision Caused Injury to Plaintiffs

The County is hard pressed to deny that its decision to deny public sewer to Plaintiffs is a final decision that caused injury to Plaintiffs. First, as discussed, the County's decision to deny public sewer to the Proposed Developments was a final decision as to them because the County's decision caused their plan review to be stopped and the time for their plan expiration to be imminent. Second, as the County unabashedly admitted in its Motion to Dismiss, "the County will likely not be providing sewer service to the northeast area of the Central Core in the next five to seven years..." MTD at p. 28. The County's claim it could change its mind does not make its decision any less final, particularly as to the Proposed Development Plans which are scheduled to expire.

### 3.     The County's UDC Did Not Provide an Administrative Appeal

The County contends Plaintiffs were required to take an administrative appeal to the Planning Board before pursuing their federal action. As discussed *supra* at p. 18, the County's UDC did not provide Plaintiffs the right to take an administrative appeal of a Special Services decision.[20] Even assuming *arguendo* that the County's UDC did provide Plaintiffs the right to

---

[20] Because the County issued the Special Service decisions and did not provide the right to appeal them, this case is distinguishable from the numerous permit denial cases the County relies upon in its brief. An analysis of *Taylor Inv. Ltd .v Upper Darby*, 983 F.2d 1285 (3d Cir. 1993), which the County cites, highlights these distinctions. There, a

take an appeal, the UDC did not provide the Planning Board with authority to grant the relief

sought.  The UDC provides, in pertinent part, the following standards for appealing an action of

Land Use:

> The Body hearing an appeal may reverse a decision only upon a finding that:
>
> 1.    The decision-maker made an error in its interpretation of the applicable sections of this Chapter; or
>
> 2.    The decision-maker's findings and conclusions were not the result of an orderly and logical review of the evidence and the applicable provisions of this Chapter.

NCC Code §40.31.512.  As the County states in its brief at p. 16, Land Use is the "decision-

maker" for major subdivision plans pursuant to the UDC.  *See* Table 40.30.110 (PA03-05).

Under these UDC standards, to take an appeal before the Planning Board, Plaintiffs

would have had to argue that Land Use committed reversible error or illogically reviewed the

evidence when it refused to allow Plaintiffs' plans to proceed once Special Services declined to

---

landowner brought an as-applied constitutional claim against a township after one of its zoning officers exercised his discretion to revoke a tenant's use permit.  983 F.2d at 1292.  The Court held that the landowner's claims were not ripe because the plaintiff failed to appeal the zoning officer's decision to the zoning hearing board, a right specifically allowed under the municipal code.  *Id.* at 1290.  The Court viewed the zoning officer's decision as not final until the hearing board had the opportunity to ratify or reverse the officer's decision.  *Id.  Accord Glendon Energy Co. v. Borough of Glendon,* 836 F. Supp. 1109, 1115 (E.D. Pa. 1993) (zoning officer's denial of building permit appealable to hearing board and only hearing board's decision final for purposes of ripeness in an as-applied constitutional challenge).  By contrast, the court's concern over relying upon one officer's discretion is not implicated here since the County through Special Services issued the Final Decisions in this matter.  In addition, the court's concern that available administrative remedies be exhausted is not implicated because the County's Code did not provide Plaintiffs the right to take an administrative appeal of the Final Decisions.

The majority of the County's cites are similar to *Taylor* in that they involved denials of permits that were directly appealable to an administrative agency with jurisdiction to hear the appeal.  *See, e.g., Sameric Corp. of Delaware v. City of Philadelphia,* 142 F.3d 582, 597 (3d Cir. 1998) (administrative board had jurisdiction to hear permit denial); *Acierno v. Mitchell,* 6 F.3d 970, 977 (3d Cir. 1993) (Board of Adjustment had jurisdiction to hear denial of building permit); *Deninno v. Municipality of Penn Hills,* 2007 WL 316392., *9 (W.D. Pa. Jan. 31, 2007) (Planning Commission had jurisdiction to hear revocation of grading permits); *Christiana Town Center, LLC v. New Castle County,* 2003 WL 21314499, *4 (Del. Ch. June 6, 2003) (Planning Board had jurisdiction to hear denial of building permit).

Similarly, the takings cases, upon which the County also relies, are inapposite.  In those cases, the ripeness doctrine addresses whether landowners have exhausted procedures which authorize compensation for the taking and go to the question of just compensation.  *See, e.g., Brubaker v. East Hempfield Tp.,* 234 Fed.Appx. 32, 36 (3d Cir. 2007) (plaintiff failed to utilize inverse condemnation procedures available to him to rectify wrong); *Bateman v. City of West Bountiful,* 89 F.3d 704, 708 (10th Cir. 1996) (takings claim not ripe until plaintiff has sought compensation from the city under state inverse condemnation law).

verify sewer capacity. The problems with this approach are manifold. First, Land Use was required to enforce the UDC requirement that Special Services had to verify available sewer capacity before a development plan could receive record approval. *See* NCC Code §40.05.320. Second, even if it wanted to reverse Special Services, Land Use lacked the jurisdiction and expertise to overturn Special Services, considering Special Services (1) is a department of the County separate and independent from the Department of Land Use; (2) has express jurisdiction over the maintenance and operation of the County's sewer system and (3) has express responsibility for calculating sewer capacity availability. *See* 9 Del. Code §1341; NCC Code §40.05.320. Third, Land Use could hardly be expected to reverse itself after it had prepared the Sewer Capacity Policy preventing the Proposed Development plans from proceeding through Land Use which accompanied Special Services' October 22, 2007 Decision. Fourth, Land Use was bound to enforce the County's decision to preclude the Proposed Developments from public sewer, pursuant to Resolution No. 06-069 and Special Services' October 22 and November 20, 2007 Final Decisions. Fifth, Land Use did not have the authority to overturn resolutions enacted by County Council. Thus, even if Plaintiffs could have taken an appeal to the Planning Board, such an appeal would have been nonsensical and clearly an exercise in futility.[21]

### 4.    Planning Board Not Authorized to Hear Constitutional Challenges

To the extent the County is contending that Plaintiffs should have brought their constitutional challenge of the County's wrongful conduct before the Planning Board, the UDC

---

[21] Because the County dictated the final decision at issue here, this case is distinguishable from *Toll Bros., Inc. v. Wicks*, 2006 WL 1829875 (Del. Ch. Jun. 21, 2006), upon which the County relies. In *Wicks*, plaintiffs challenged a Traffic Impact Study issued by DelDOT in connection with plaintiffs' land use application. The Chancery Court held that DelDOT's decision was not a final decision because it was merely advisory and "not binding" on the County. *Id.* at *4, 5. By contrast, Special Services' decision was the County's decision and clearly binding on Land Use. In addition, Special Services' decision also cut short Plaintiffs' Preliminary Plans' progress in the Land Use approval process, thereby triggering the clock on their Plans' expiration. In *Wicks*, on the other hand, the plaintiffs were not foreclosed from the Land Use approval process and therefore the Court held they had not been injured. *See id.* at *7.

23.

appeal standards clearly do not reach such a challenge.  The UDC standards pertain solely to the decision-maker's "interpretation of the applicable sections of this Chapter" or "review of the evidence and the applicable provisions of this Chapter."  NCC Code §40.31.512 (emphasis added).  The Delaware Chancery Court concluded the New Castle County Planning Board "lacks the expertise, the experience, and the jurisdiction to address questions of constitutional violations."  *Salem Church (Delaware) Assocs. v. New Castle County*, 2006 WL 2873745 (Del. Ch. Oct. 6, 2006).  *See Buckson v. Town of Camden*, 2001 WL 1671443, at *6 (Del. Ch. Dec. 4, 2001) (court excused plaintiff's failure to exhaust administrative remedies because the administrative agency was not qualified to adjudicate the merits of a constitutional challenge on the zoning ordinance); *Town of South Bethany v. Nagy*, 2006 WL 1451528, at *7 (Del. Ch. May 12, 2006), *aff'd*, 918 A.2d 1170 (Del. Super. Ct. 2007) (landowners' failure to exhaust administrative remedies did not preclude them from filing suit to challenge ordinance on constitutional grounds).  *See also Eastern Shore Environmental, Inc. v. Kent County Dept. of Planning*, 2002 WL 244690 (Del. Ch. Feb. 1, 2002) (landowner not required to exhaust administrative remedies because Department of Planning does not have jurisdiction to hear equitable estoppel claims).  In sum, Plaintiffs were caught in a Catch-22 bind with how to take an administrative appeal of Special Services' Final Decisions when the County's UDC did not permit such a remedy and even if it had, the Planning Board lacked the jurisdiction, expertise and experience to resolve Plaintiffs' claims of estoppel, constitutional and antitrust violations.

### D.    Three Exceptions to the Ripeness Doctrine

Even were this action somehow deemed unripe, this action falls into the three major exceptions the Third Circuit Court of Appeals recognizes to the ripeness doctrine.  The three exceptions are where: (1) the plaintiff is asserting that the municipality engaged in wrongful conduct which interfered with the legal process by which the municipality was supposed to make

24.

decisions; (2) the plaintiff is making a facial challenge of a zoning ordinance, *i.e.*, a claim that the enactment of the ordinance constitutes a substantive violation of due process or equal protection and (3) pursuing an administrative appeal would have been an exercise in futility. *County Concrete*, 442 F.3d at 164-66 (citing, *inter alia*, *Blanche Road Corp. v. Bensalem Tp.*, 57 F.3d 253, 267-68 (3d Cir. 1995) *overruled on different grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003)).    Plaintiffs' allegations fall squarely within all three of these exceptions to the Ripeness Doctrine.

## 1.    Exception for Allegations of Wrongful Conduct

In *County Concrete*, the Third Circuit explained that allegations of wrongful conduct separate and apart from the offending ordinance are not subject to the ripeness doctrine or finality rule:

> In *Blanche Road*, we held that a plaintiff landowner need not comply with the finality rule where, instead of "appealing from an adverse decision on a permit application," the plaintiff claimed that the defendant Township officers "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or to delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits to the application for the permits."   It was asserted by the plaintiff that the Township "engaged in a campaign of harassment designed to force [it] to abandon its development of [an] industrial park."   We explained that this type of SDP claim is "substantively different" from "that presented in the ripeness cases" and that "[s]uch actions, if proven, are sufficient to establish a [SDP] violation, actionable under § 1983, even if the ultimate outcome of plaintiff's permit applications was favorable."

442 F.3d at 166 (*Blanche Road*, 57 F.3d at 267-68).   In *County Concrete*, the township argued that the landowners were required to exhaust their administrative remedies by seeking a variance from the offending ordinance before bringing suit.  *Id.* at 165-66.  The court disagreed, holding that the landowners' claims that the municipality's course of conduct, separate and apart from its enactment of the offending ordinance, violated their substantive due process rights was ripe for federal adjudication.  *Id.* at 167.  *Accord Cornell Cos., Inc. v. Borough of New Morgan*, 512 F.

Supp.2d 238, 257-58 (E.D. Pa. 2007).

Similarly, in this matter Plaintiffs have clearly asserted in the Amended Complaint that the County deliberately engaged in a course of wrongful conduct, separate and apart from its enactment of Resolution No. 06-069 by, *inter alia*: (1) denying Plaintiffs the right to connect their Properties and the Proposed Developments to existing public sewer collection, conveyance and disposal systems; (2) refusing to allow Plaintiffs to provide a privately owned and operated Community System; (3) treating the Proposed Developments differently than numerous other developments in the SSSA which, despite their similarity and proximity to Plaintiffs' Properties, have been granted access to public sewer and (4) intentionally causing Plaintiffs' Proposed Development Plans to be derailed in the Land Use approval process so they are scheduled to expire and Plaintiffs to lose their rights under the County's original sewer plan. AC ¶¶100-103. In accordance with *County Concrete*, Plaintiffs' claims of Defendant's wrongful conduct are ripe for federal adjudication and must not be dismissed.

### 2.    Exception for Facial Challenges

Secondly, the court explained in *County Concrete* that *Williamson's* finality rule only pertains to as-applied challenges and not to facial due process claims because facial challenges are generally ripe the moment the challenged regulation is enacted. *County Concrete*, 442 F.3d at 166-67 (citing *Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285 (3d Cir. 1993)). In *County Concrete*, landowners asserted a facial challenge to a zoning ordinance on grounds that the Township had intentionally enacted the ordinance to prevent them from extending their sand and gravel removal operations. *Id.* at 163. The court held that the landowners were not required to seek a variance of the ordinance before bringing their substantive due process and equal protection claims since their challenge to the ordinance was facial. *Id. Accord Cornell Inds.*, 512 F. Supp.2d at 256-57.

26.

Similarly in this case, Plaintiffs assert a facial challenge to the County's Resolution No. 06-069 as part of their substantive due process and equal protection claims. Plaintiffs allege the County intentionally enacted Resolution No. 06-069 in order to prevent Plaintiffs' Properties from gaining access to public sewer and cutting them off from Land Use review so as to cause their plans' ultimate demise in violation of their substantive due process rights. AC ¶¶104-107. Plaintiffs further allege that enactment of the Resolution violated their equal protection rights because the Resolution arbitrarily treats Plaintiffs differently than other similarly situated property owners. Resolution No. 06-069 purported to introduce a new sewer plan for the SSSA but in actuality it provides public sewer to all the major planned developments East of the Central Core, with the exception of the small northeast pocket where Plaintiffs' Proposed Developments predominate. AC ¶¶111-20. Under both *County Concrete* and *Taylor,* Plaintiffs' facial challenge of the County's resolution is therefore ripe for adjudication.[22]

### 3.    The Futility Exception

Thirdly, the Third Circuit recognized the "futility" exception to the ripeness doctrine. *County Concrete*, 442 F.3d at 164. In *County Concrete*, the Court held that the landowners were not required to exhaust their administrative remedies because to seek a variance of the offending ordinance would have been an exercise in futility. *Id.* As discussed *supra* at pp. 22-24, taking an appeal to the Planning Board, assuming the County provided that right, would have been completely futile in this case because the Planning Board lacked the authority under the County's appeal standards to grant relief to Plaintiffs. Thus, at a minimum, Plaintiffs were excused from

---

[22] By contrast, cases that the County cites to support its argument that Plaintiffs' claims are not ripe involve as-applied, rather than facial, challenges to zoning regulations. *See, e.g., Glendon Energy Co. v. Borough of Glendon,* 836 F. Supp. 1109, 1117 n. 6 (E.D. Pa. 1993) (plaintiff did not challenge the facial validity of the ordinance); *Baldini West, Inc. v. New Castle County*, 852 F. Supp. 251, 253-54 (D. Del. 1994) (dismissing an as-applied constitutional claim for failure to exhaust administrative remedies).

filing what would have been a purely formalistic appeal because such an appeal would have been utterly futile given that the County had decided not to provide sewer service to Plaintiffs' Proposed Developments.[23]

### E.    Ripeness Doctrine Does Not Apply to Antitrust and Estoppel Claims

Notably, the Third Circuit Court of Appeals has not applied the Ripeness Doctrine to antitrust and estoppel claims. In antitrust and estoppel claims, an injury has been inflicted at the time of the wrongful conduct and therefore the claim is sufficiently concrete to be adjudicated. Moreover, as discussed, the Planning Board does not have jurisdiction to hear such claims. *See, e.g., Eastern Shore Environmental, Inc. v. Kent County Dept. of Planning,* 2002 WL 244690 (Del. Ch. Feb. 1, 2002) (Board of Adjustment lacks jurisdiction to hear equitable estoppel claim).[24] In sum, Plaintiffs have alleged claims that are ripe and the motion to dismiss must be denied.

## II.    PLAINTIFFS' CLAIMS SHOULD NOT BE DISMISSED UNDER RULE 12(B)(6)

### A.    The Rule 12(b)(6) Standards

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn there from

---

[23]  The County argues that even under the futility exception, the property owner must still make at least one application for administrative relief, citing *Glendon Energy Co. v. Borough of Glendon,* 836 F. Supp. 1109 (E.D. Pa. 1993) in support. MTD at p. 14, n. 13. But *Glendon* predates *County Concrete* and therefore did not have the benefit of that decision. In fact, in applying the futility test from another circuit, the *Glendon* court pointed out: "In land-use cases, the Third Circuit Court of Appeals has not, as of yet, adopted the 'futility exception.'" *Id.* at 1119, n. 12. In *County Concrete,* the Third Circuit did adopt the futility exception in a land-use context and notably, did not endorse adding the requirement that the landowner make at least one application for administrative relief. Indeed, this add-on eviscerates the very purpose of the futility exception, because if administrative review is truly futile, as it was here, no purpose is served by requiring owners to take an administrative appeal.

[24]  The County argues that Plaintiffs' antitrust claim should be dismissed for lack of ripeness in accordance with *Unity Ventures v. County of Lake,* 841 F.2d 770 (7th Cir. 1988), but that case is highly distinguishable. The landowner there did not submit even a development plan in his effort to obtain public sewer for his development. *Id.* at 775. The municipalities therefore had not issued any final decision on his request before he brought suit. *Id.* Also, the Seventh Circuit declined to excuse his failure to file on grounds of futility, requiring, unlike this circuit, that the plaintiff make at least one meaningful application. *Id.* The court concluded that because defendants had not yet reached a final decision on plaintiff's application for a sewer connection, they had not yet exercised their powers and as a result plaintiff's claim was premature.

and view them in the light most favorable to the non-moving party. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994). The question for the court is not whether a plaintiff will ultimately prevail on his theories, but whether the allegations are sufficient to allow plaintiff to conduct discovery in the attempt to prove the allegations. *Id.* Accordingly, a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).[25]

### B.    The County is Not Immune from Antitrust Liability

The County argues that it is immune from liability for "<u>any</u> antitrust claim" under the state action exemption established by the Supreme Court in *Parker v. Brown,* 317 U.S. 341 (1943). MTD at p. 20 (emphasis added). The problem with the County's argument is that *Parker* immunity does not afford it blanket protection for every anticompetitive activity in which it engages. There are limits to its reach. *See First American Title Co. v. DeVaugh,* 480 F.3d 438 (6th Cir. 2007). "[E]ven a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 417 (1978).

As an initial matter, municipalities are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38-39 (1985) (citing *Lafayette,* 435 U.S. at 412). To obtain exemption, municipalities must demonstrate that their anticompetitive activities were authorized by the State

---

[25] Furthermore, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a). This liberal standard of notice pleading applies in all civil actions. *Thomas v. Independence Tp.,* 463 F.3d 285, 295 (3d Cir. 2006). The Third Circuit has recognized the Supreme Court's abrogation of a heightened pleading requirement for Section 1983 actions. *Alston v. Parker,* 363 F.3d 229, 233 (3d Cir. 2004). A plaintiff does not need to plead specific facts; rather, the complaint "must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Independence Tp.,* 463 F.3d at 295 (quotation and citation omitted).

"pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* (citing *Lafayette*, 435 U.S. at 413). Like other judicially-imposed exemptions from the antitrust laws, the state-action immunity doctrine must be narrowly construed. *First American Title,* 480 F.3d at 445 (citing *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636 (1992)).

The determination whether a municipality's actions are comprehended within the powers granted to it by the legislature can only be made under the specific facts of each case. *Lafayette,* 435 U.S. at 394. "A district judge's inquiry on this point should be broad enough to include all evidence which might show the scope of legislative intent." *Id.* In *Lafayette,* the Supreme Court observed:

> [T]he fact that the governmental bodies sued are cities, with substantially less than statewide jurisdiction, has significance. When cities, each of the same status under state law, are equally free to approach a policy decision in their own way, the anticompetitive restraints adopted as policy by any one of them, may express its own preference, rather than that of the State. Therefore, in the absence of evidence that the State authorized or directed a given municipality to act as it did, the actions of a particular city hardly can be found to be … restraints that "the state…as sovereign" imposed.

*Id.* at 414. The Supreme Court in *Lafayette* remanded so that the district judge could look at all the evidence to determine whether the city's actions were comprehended within the powers granted to it by the legislature. *Id.* at 394. The defendant bears the burden of showing that the State clearly intends to displace competition in a particular area. *First American Title,* 480 F.3d at 447 (citing *Southern Motor Carriers Rate Conf., Inc. v. U.S.,* 471 U.S. 48, 105 S.Ct. 1721, 1730 (1985)).

In *First American Title,* the Sixth Circuit Court of Appeals demonstrated the proper approach for determining the extent to which the *Parker* doctrine affords immunity under the circumstances. There, title insurance companies brought an antitrust action against several counties' registers of deeds, alleging the registers' refusal to provide duplicate records unless the

title company agreed not to re-sell them injured competition in violation of the Sherman Antitrust Act. The registers moved to dismiss on grounds that the challenged practices qualified for state-action immunity. The Sixth Circuit reversed the district court's grant of the motion. *Id.* at 440. The Sixth Circuit concluded that while the State legislature intended the registers to have a monopoly on the acquisition of real estate transaction information and possession of original title documents, the legislature did not intend them to displace competition in the provision of duplicate title documents. *Id.* at 447.

The next step in the Court's inquiry was to ask whether a monopoly on the provision of duplicate title documents "logically result from" the powers that the State did expressly give the registers. *Id.* The Court held that it was not foreseeable that the powers expressly granted to the registers would result in the refusal to sell documents if they were going to be re-sold. *Id.* at 448. *First American* demonstrates that merely because the State has granted a monopoly in a certain area does not end the inquiry. The next step is to ask whether the alleged anticompetitive activities logically result from the powers that the State did expressly give.

While the Delaware General Assembly authorized the County to act upon matters pertaining to sewerage systems, *see* 9 Del. Code §1521, the issue here is whether the County's anticompetitive activities logically result from that grant of power. 26 Del. Code §203D allows a private entity or wastewater utility to provide wastewater services to a territory upon receipt of approval of a certificate of public convenience and necessity from the Delaware Public Service Commission. Where, as here, a municipality designated a wastewater service territory to the Commission, a private wastewater utility is required to first obtain consent from the municipality before it may apply to the Public Service Commission to operate in the municipality's territory. The intent of the Delaware General Assembly in enacting Section 203D was to ensure that sewer

service was available throughout the state if not by public, then by private means. A municipality's withholding of consent for private wastewater utility service in its territory is unreasonable and contrary to the intent of the General Assembly when the municipality cannot or deliberately will not provide public sanitary sewer service to the territory.

Here, the County leveraged its monopoly power to prevent lawful development. The County purposely took affirmative action to redraw existing sewer district lines in order to exclude Plaintiffs' Proposed Developments from public sewer. While refusing the Proposed Development public sewer, the County declined to permit the Proposed Developments to obtain private sewer. The actions of the County were taken with the improper purpose of effectuating the County's plan to keep Plaintiffs' Property undeveloped. Surely, the legislature did not intend that by granting authority over sewer, the County could exert its monopoly power so as to exclude proposed developments it did not want. *See Council of Middletown Tp. v. Benham*, 514 Pa. 176, 523 A.2d 311 (Pa. 1987).

In *Benham,* the Pennsylvania Supreme Court admonished a municipality for exerting its monopoly power over sewer in an effort to prevent development. 523 A.2d at 317. There, the landowner submitted residential development plans which included an on-site sewage plant because the property was not served by public sewer. *Id.* at 312. The township rejected the plans based on an ordinance requiring sewer service for such properties to be public. *Id.* at 313. The landowner proposed several modifications to his plan, including dedicating the sewage plant to the township, but the township refused his offers. *Id.* The Pennsylvania Supreme Court affirmed the lower courts' ruling that the ordinance in question should be broadly construed to allow a privately owned sewer system. *Id.*

The Pennsylvania Supreme Court recognized that local governments prefer to have all persons use their facilities in the interest of uniformity and assuring availability to everyone. Nonetheless, the Court admonished, "[I]f a municipality is to have a monopoly on the service, it must provide it in a reasonable manner."

> [A municipality] may not refuse to provide an essential service and then prevent individuals from providing it for themselves. The township cannot have it both ways. Here, the Township had no plans to extend public sewage service to the development in the near future, but rejected Benham's plan out of hand because the sewage facility was not municipally owned. It also ignored Benham's numerous offers to jointly operate the facility or dedicate it to public authority.
>
> The township cannot preclude development by a zoning requirement that developers use non-existent municipal services. We have invalidated local legislative attempts to impede development through imposition of sewage requirements in zoning ordinances. A municipality must take steps to provide the services or, alternatively, allow individual systems to adequately provide for the service in a manner consistent with the public health, welfare and safety, and the Sewage Act. To that end, it may set reasonable non-discriminatory specifications for facilities and conditions for private provision of essential services it is not in a position to provide currently or in the reasonably foreseeable future.

*Id.* at 317 (emphasis added; citations omitted). The lessons in *Benham* are directly applicable to this case because the County is trying to do just what the Township did there, i.e., exert its monopoly power over sewer to prevent Plaintiffs from lawfully developing an area of the County the County does not want developed. That is an antitrust violation that the General Assembly did not intend when it provided the County authority to furnish public sewer. Therefore, *Parker* immunity does not lie.[26] Furthermore, as discussed above, the question of whether *Parker* immunity applies and to what extent requires a more in-depth factual analysis than this court has at its disposal on a motion to dismiss. Notably, the decisions upon which the County relies in its

---

[26] By contrast, the anticompetitive conduct at issue in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), upon which the County relies, was directly foreseeable to the legislature because it logically followed from the legislature's specific grant of authority in that case. There, the legislature expressly permitted the City to condition the provision of sewer treatment service on the landowners' agreement to annexation. The Supreme Court ruled that it followed from that grant of power that the legislature contemplated that the City would displace competition from surrounding unincorporated counties. *Id.* at 42.

brief were decided on motions for summary judgment. *See, e.g., Kaehley v. City of Pittsburgh,* 988 F. Supp. 888 (W.D. Pa. 1997) (summary judgment); *Crosby v. Hospital Auth.,* 93 F.3d 1515 (11th Cir. 1996) (summary judgment).

## C.    Plaintiffs State a Substantive Due Process Claim

The County contends in its Motion to Dismiss that Plaintiffs' substantive due process claims should be dismissed because (1) Toll has not asserted a property interest protectible under the substantive due process clause and (2) the County's alleged conduct did not satisfy the requisite standards for sustaining such a claim. Both assertions lack merit.

### 1.    Plaintiffs' Right to Own, Use and Enjoy Property is Fundamental

Plaintiffs alleged they have a protected property interest under the United States Constitution to own, use, enjoy and develop their Properties. AC ¶99. In its Motion, the County seeks to overturn a long standing established precedent in the Third Circuit that land ownership is a fundamental property interest worthy of substantive due process protection. *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 601 (3d Cir. 1995) ("Indeed, one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership.");[27] *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 141 (3d Cir. 2000) (land ownership "is unquestionably a fundamental property interest dating back to the foundation of the American colonies [citation omitted].")[28] Thus, Plaintiffs' right to use and develop their property is a

---

[27] Although *DeBlasio* was decided before the Third Circuit changed the standard for executive action under substantive due process to "shocks the conscience," *DeBlasio's* discussion of protected property interests in the land use context remains good law. *ABD Monroe, Inv. v. Monroe Tp.,* 2008 WL 58876, *6, n. 3 (D.N.J. Jan. 3, 2008).

[28] At the time of the American Revolution, the founding fathers declared the commonly held belief that "[t]he right of property is the guardian of every other right, and to deprive the people of this, is in fact to deprive them of their liberty." Ely, James W., *The Guardian of Every Other Right,* p. 6 (Oxford University Press 1998). As a delegate to the constitutional convention, Andrew Hamilton stated: "One great obit. of Govt. is personal protection and security of Property." *Id.* at 43. James Madison, a long-time champion of property rights, successfully argued for including the protection of property in the Bill of Rights." *Id.* at 53-54.

Early on, the Supreme Court recognized that ownership of land is constitutionally protected in land use cases. *See, e.g., Dobbins v. City of Los Angeles,* 195 U.S. 223 (1904); *Village of Euclid, Ohio v. Ambler Realty Co.,* 272

fundamental right protectible under the substantive due process clause.

Furthermore, in the land use context, the Third Circuit recognizes that a landowner's right to develop his property free from a municipality's unlawful interference constitutes a cognizable property interest protectible under the substantive due process clause. *See County Concrete,* 442 F.3d at 170 (landowner's right to be free from harassment in its land development efforts is protectible interest under substantive due process); *Blanche Road,* 57 F.3d at 268, n. 15 (same); *Cornell Cos., Inc. v. Borough of New Morgan,* 512 F. Supp.2d 238, 261 (E.D. Pa. 2007) ("when a landowner's substantive due process claim alleges that arbitrary governmental actions impinged upon its intended use of property, the plaintiff has, as a matter of law, impliedly established possession of a property interest worthy of substantive due process protection.") *See also Elsmere Park Club Ltd. P'ship. v. Town of Elsmere,* 771 F. Supp. 646, 649-50 (D. Del. 1991) (municipality's interference with issuing building permit constitutes substantive due process violation).

To support its Motion to Dismiss, the County seeks to narrow the property interest at stake here to whether Plaintiffs have a property interest in the provision of public sewer.[29]  The County then relies on *Ransom v. Marrazzo,* 848 F.2d 398 (3d Cir. 1988), to argue there is no federally protected right to sewer.  The County's reliance is misplaced, however, because *Ransom* was not a land use case and therefore did not implicate the fundamental right to use and develop one's property.  Instead, *Ransom* involved a civil rights claim brought by city residents who were denied water and sewer service until they paid delinquent service charges incurred by

---

U.S. 365 (1926). *See also Lynch v. Household Finance Corp.,* 405 U.S. 538, 552 (1972) ("[t]hat rights in property are basic civil rights has long been recognized.")

[29] In order to make this argument, the County is also narrowing Plaintiffs' allegations since Plaintiffs are alleging not only that the County arbitrarily precluded them from public sewer but refused to allow them to build and operate a private Community System as well.  AC ¶ 101.

the prior occupants of the residences.  The Court observed in *Ransom* that the State had authorized the city to impose the liens in question and that the state Supreme Court had approved the city ordinance allowing for the shut off remedy.  *Id.* at 404, 407-8.  Under these circumstances, the Court held that a state-law entitlement to water and sewer services was not a federal right protected under substantive due process.  *Id.* at 412.

This action is a far cry from the *Ransom* case.  Unlike *Ransom*, this case directly implicates Plaintiffs' right to develop property free of the County's unlawful interference, a venerable federal right protectible under substantive due process.  In this case, the County chose to exert its power through its monopolization over sewer in order to prevent Plaintiffs from developing their Properties, but the County's choice of tactics should not dictate the type of property interest at stake here.  The County's decision to prevent Plaintiffs' Properties from gaining access either to private or public sewer through its monopolization power does not alter the fact that Plaintiffs' right to develop their Properties is the fundamental constitutional interest in jeopardy here and as such fully protectible under substantive due process. [30]

---

[30]  The County argues strenuously that it cannot be compelled to provide sewer if it chooses not to do so and cites cases in support of that general proposition.  MTD at p. 23.  That proposition, however, does not abrogate Plaintiffs' federally protected interest in developing their Properties free of governmental interference.  In addition, the County fails to recognize the other line of cases that holds once a municipality decides to provide sewer service in a given area, as the County originally did here and continues to do in the SSSA except for the small carve out where Plaintiffs' Properties are located, the municipality is required to provide that service, like any private utility would, without discriminating between users.  *See, e.g., Water and Wastewater Bd. of City of Madison v. Anderson,* 850 So.2d 1230, 1238 (Ala. 2002) (public utility is obligated to serve all members of the public that it holds itself out to serve, fairly and without discrimination.");  *City of Winter Park v. Southern States Utilities, Inc.,* 540 So.2d 178, 180 (Fla. App. 1989) ("All corporations which voluntarily undertake to engage in performing a service of a public nature whether a governmental agency, such as a municipality, or a private corporation, assume an obligation implied by law to render, for reasonable compensation and without discrimination and to all of the public in the area sought to be served, a service reasonably adequate to meet the just requirements of those sought to be served.");  *Barbaccia v. County of Santa Clara,* 451 F. Supp. 260, 264 n. 2 (N.D. Cal. 1978) (recognizing "that a city holding itself out as the sole provider of sewer services in a given locale will be considered a public utility and allowed to deny sewer hook-ups to property within its 'service area' only for such utility-related reasons as lack of capacity.");*Corcoran v. Village of Bennington,* 128 Vt. 29, 66 A.2d 457, 491-93 (Vt. 1970) (municipality's exertion of power over sewer to discriminate between users is unlawful);  *Delmarva Enterprises, Inc. v. Mayor and Council of City of Dover,* 282 A.2d 601, 602-03 (Del. Super. Ct. 1971) (in providing sewer service, city is a public utility and therefore subject to the same requirement that it provide service without discriminating between users);  *Reid Dev. Corp. v. Parsippany-*

## 2.    Plaintiffs State a Facial Substantive Due Process Challenge

Plaintiffs have asserted substantive due process claims based on the County's (1) enactment of Resolution No. 06-069 and (2) wrongful interference with Plaintiffs' Proposed Development Plans. Legislative and non-legislative action are judged by different standards for purposes of determining liability for a violation of substantive due process. In *County Concrete,* the court summarized the standards as follows:

> [T]ypically, a legislative act will withstand substantive due process challenge if the government identifies the legitimate state interest that the legislature could rationally conclude was served by the statute. On the other hand, non-legislative state action violates substantive due process if "arbitrary, irrational, or tainted by improper motive" or if "so egregious that it 'shocks the conscience.'"

442 F.3d at 169 (quoting *Nicholas,* 227 F.3d at 139). To support a facial substantive due process challenge to an ordinance, plaintiffs need allege facts that would support a finding of arbitrary or irrational legislative action by the municipality. *Id.* (quoting *Pace Resources, Inc. v. Shrewsbury Tp.*, 808 F.2d 1023, 1035 (3d Cir. 1987), *cert. den., 482 U.S. 906 (1987)). "A plaintiff can satisfy this burden by alleging that the defendants' actions in passing the amendment were aimed at it for reasons unrelated to land use planning," i.e., unrelated to the merits of the land use application. *Cornell,* 512 F. Supp.2d at 260 (citing *Pace*, 808 F.2d at 1035).

Plaintiffs have alleged facts that indicate irrationality and arbitrariness, and present a case involving actions aimed at Plaintiffs for reasons unrelated to the merits of their land use application. *See County Concrete*, 442 F.3d at 170. Specifically, Plaintiffs have asserted that the County enacted Resolution No. 06-069 in order to carve out Plaintiffs' Properties from gaining public sewer, while at the same time including all the other similarly situated residential

---

*Troy Hills Tp.,* 10 N.J. 229, 89 A.2d 667, 669 (N.J. 1952) ("There can be no invidious discrimination in the extension of the service thus undertaken by the municipality as a public responsibility."); *Hall v. Village of Swanton,* 113 Vt. 424, 35 A.2d 381, 384 (Vt. 1944) ("The fact that a public service system is owned by a municipal corporation does not affect the rule that there must be no unjust discrimination and that the commodity must be furnished to each and every citizen or resident who needs the commodity sold or the service given.")

subdivisions, with pending plans, located close to Plaintiffs' Properties. AC ¶102. The County knew that by prohibiting sewer from serving the Properties, Plaintiffs would not be able to proceed through the Land Use process to record plan approval. *Id.* The County's enactment of Resolution No. 06-069 was intentionally directed at the Proposed Developments in order to cause the expiration of their plans and thereby keep Plaintiffs' Properties undeveloped. AC ¶104. As the *Cornell* Court noted, "[a] legislative action is not taken for a legitimate reason if it is done to harm the interest of a corporation and it is unrelated to land use planning." *Cornell,* 512 F. Supp.2d at 260. Plaintiffs' allegations set forth a claim that the County's enactment of the Resolution violated their substantive due process rights and therefore should be permitted to proceed to discovery. *See, e. g., Arnold v. Minner,* 2005 WL 1501514, *6 (D. Del. Jun. 24, 2005) (plaintiff should be given "opportunity to engage in discovery and obtain testimony and documents that may establish a violation of constitutional law.")[31]

### 3.    Substantive Due Process Claim Based on Wrongful Conduct

A municipality's non-legislative course of conduct is actionable where it is "arbitrary, irrational, or tainted by improper motive or so egregious that it shocks the conscience." *County Concrete,* 442 F.3d at 169 (citation omitted).[32]    At the time Plaintiffs filed their land

---

[31] Whether the County had a rational basis for enacting the Resolution necessarily revolves around issues of material fact (e.g., Water Farm I's sewer capacity and the criterion for excluding Plaintiffs from Water Farm I) to be determined by the finder of fact. *See, e.g., Hoffman v. Lehman,* 926 F. Supp. 510, 515-16 (M.D. Pa. 1996) (summary judgment denied on substantive due process and equal protection claims because whether providers had a reasonable basis for their actions presented factual issue); *Liberty Curtin Concerned Parents v. Keystone Central Sch. Dist.,* 81 F.R.D. 590 (M.D. Pa. 1978) (summary judgment denied on equal protection claim because whether school had reasonable basis for its actions presented material issue of fact); *Albanian Assoc. Fund v. Township of Wayne,* 2007 WL 2904194, *11 (D.N.J. Oct. 1, 2007) (summary judgment on equal protection claim denied because triable issue of fact as to whether plaintiff similarly situated to persons treated differently).

[32] The Third Circuit in *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir. 2003), noted that "Executive action violates substantive due process only when it shocks the conscience but … the meaning of this standard varies depending on the factual context." *Id.* at 399-400 (emphasis added). Notably, the *United Artists* Court was deciding a motion for summary judgment and therefore had the benefit of a full record when it made its ruling on liability. In considering a motion to dismiss in *Cornell,* the District Court postponed the decision

development plans, the County's sewer map and plans provided for the Properties to be serviced by public sewer. After filing their exploratory plans, Plaintiffs met with the County on numerous occasions at which time the County represented that Plaintiffs' Proposed Development would receive public sewer service. The County approved Plaintiffs' exploratory plans representing orally and in writing that sewer capacity had been allocated in the County's sewer system to service the Proposed Developments. Plaintiffs reasonably relied on the County's existing sewer map and plans and the representations of its public officials. Plaintiffs spent substantial resources to prepare plans and to revise the plans to address the County's comments. In 2005, a change in administration occurred. Thereafter, the new administration began to implement a new policy in total disregard of prior representations and commitments made by the County. The new administration did not want the area northeast of the Central Core to be developed. Beginning in January 2006, the County deliberately engaged in a course of conduct with the specific intent of preventing such development. AC ¶100. The County proceeded to create a new sewer map specifically to carve out the Properties. The County exerted its monopoly control over the sanitary sewer to implement its plan to prevent Plaintiffs from being able to develop their Properties. By refusing to allow Plaintiffs to connect their Properties and Proposed Developments to existing public sewage collection, conveyance, treatment and disposal systems and by refusing to allow Plaintiffs to build sewer improvements or the Community System, the County was able to halt the development plan process. *Id.* at ¶101.

The County's carve-out of Plaintiffs' Properties from its new public sewer plan was for the illegal purpose of precluding the Proposed Development plans from receiving final record approval. *Id.* at ¶102. The County's conduct disregarded its own sewer consultant, Red Oak's

---

on whether the complaint's assertions satisfied the "shocks the conscience" standard until it had a full record before it. *Cornell,* 512 F. Supp.2d at 262, n.14.

recommendations that the County implement a short-term strategy for allowing development to proceed while the County investigates and implements the best long-term strategy. *Id.* at ¶43. The County's motive of preventing development was revealed by its attempted interference with Toll's contracts for the Properties. *Id.* at ¶¶68-70. The County met with Warren for the purpose of suggesting that Warren allow the contract with Toll to expire and then sell the development rights to the Warren Property to the County. The County's conduct arbitrarily and irrationally interfered with Plaintiffs' right to develop their Properties free from governmental harassment and consequently was wrongful and shocking to the conscience. Plaintiffs' allegations support a claim that the County's wrongful interference violated their substantive due process rights and therefore plaintiffs should be permitted to proceed to discovery in order to make a full record in this case. *See, e.g., American Marine Rail NJ, LLC v. City of Bayonne,* 289 F. Supp.2d 569, 584 (D.N.J. 2003) (fact finder could determine that constitutional violation satisfied the conscience shocking standard for substantive due process violations).

In its brief, the County's analysis of its own conduct is highly self-serving and illustrates the disputed facts underlying the County's rationale for creating the new sewer plan. For instance, the County's assertion that it decided "to build infrastructure for the Central Core of the SSSA and allow development that is intended to be permanently served by Water Farm #1 to obtain sewer" is fact driven, highly one-sided and begs the factual question of what criteria the County used to determine who was to be served, whether permanently or temporarily, by Water Farm I. MTD at p. 27. The only way to make its proposition fly is for the County to argue, as it does, that Plaintiffs "admitted" they were not to receive service through Water Farm I. *Id.* A purported concession, one that is hotly contested, is clearly not an appropriate basis for resolving

a motion to dismiss.[33]  The County's further claim that it cannot afford to provide sewer to the entire SSSA (MTD at p. 27) does not begin to explain how excluding Plaintiffs' Properties, which are located but five miles from Water Farm I, or refusing to allow Plaintiffs to build the force main and infrastructure to connect to Water Farm I or a Community System at its own expense, remedies the County's concerns over affordability.  In short, the County's efforts to exclude Plaintiffs' Properties from public and private sewer were irrational, arbitrary and intended to deprive Plaintiffs of their federal right to use and develop their Properties as the County's law permits.

**D.    Plaintiffs State an Equal Protection Claim**

The County contends that Plaintiffs do not have an equal protection claim because (1) the County is treating "every developer <u>within the northeast carve out</u> the same" and (2) Plaintiffs have not alleged they are being treated differently than any other "*prima facie* identical" developer (emphasis added).    To make this argument, the County overly restricts the requirements for alleging traditional equal protection in this Circuit.  To assert a successful equal protection claim, plaintiffs need only allege (1) they have been intentionally treated differently from others "similarly situated" and (2) there is no rational basis for the difference in treatment.[34] *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (U.S. 2000).  "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms

---

[33]    The County bears a heavy burden to prove that Plaintiffs "waived" their rights in this matter for waiver requires a demonstration of a voluntary and intentional relinquishment of a known right.  *See Aeroglobal Capital Mgt., LCC v. Cirrus Inds., Inc.,* 871 A.2d 428, 444 (Del. Super. Ct. 2005).  This the County cannot show, particularly on a motion to dismiss where the pleadings are to be liberally construed in Plaintiff favor.

[34]    Under the rational basis test, the municipality must not exercise its authority in an arbitrary, capricious or unreasonable manner.  To be sustained, their exercise of authority must be shown to bear a rational relationship to a legitimate governmental objective.  *See, e.g., Goldblatt v. Town of Hempstead, N.Y.,* 369 U.S. 590, 594 (1962).  As discussed *supra* at pp. 38-40, the County did not have a rational basis for arbitrarily excluding Plaintiffs' Proposed Developments from public sewer while granting it to other similarly situated residential subdivisions.

of a statute or by its improper execution through duly constituted agents." *Id.* (citations omitted). In *Willowbrook*, the landowners alleged that the Village arbitrarily requested a larger easement than it did from others in violation of their equal protection rights. The Supreme Court held these allegations were sufficient to state a claim for relief under traditional equal protection analysis. *Id.* at 565.

The County's effort to restrict the area for comparison on an equal protection claim to the small pocket of land it intentionally carved out for the purpose of excluding it from public sewer is hardly controlling. The County cannot create the carve-out and then attempt to argue that any equal protection analysis is limited to that carve out. Notably, the County does not cite any authority for that overreaching proposition. Under traditional equal protection analysis, the comparison is of persons "similarly situated," *i.e.*, placed in like circumstances.[35] Persons similarly situated to Plaintiffs include those landowners with development projects similar to Plaintiffs' Proposed Developments, i.e., having common characteristics, which are situated in the County's SSSA and unlike Plaintiffs' Proposed Developments permitted to gain public sewer or at a minimum obtain private sewer.

The Amended Complaint identifies at least six developments that are similarly situated to and yet being treating differently than Plaintiffs' Proposed Developments in the SSSA. AC ¶¶113-18. Like the Proposed Developments, five of the developments are located east of the Central Core (Augustine Creek, Pennfield, Silver Maple, Baymont Farms and Ponds at Odessa) and one (Carter Farm) west of the Central Core. There are compelling reasons for including each one in the comparison of "similarly situated" landowners. The Augustine Creek Subdivision is located within one mile of Plaintiffs' Properties and yet the County has permitted

---

[35] "Similar" means "having a likeness or resemblance, especially in a general way." *See* www.Dictionary.com. Merriam-Webster defines "similar" as having characteristics in common. *See* www.Merriam-Webster.com.

it to connect to public sewer and have its sewage disposed of at Water Farm I. AC ¶113. As discussed, Plaintiffs asked the County's permission to connect the Proposed Developments to public sewer through the Augustine Creek's pump station and although this proposal would have been the most cost effective, the County declined to grant consent. AC ¶29.

Plaintiffs' Properties are also located within one mile of the proposed Pennfield Development. Pennfield is the only other development, with pending plans, located within the small pocket of land the County carved out to exclude from public sewer. In its original complaint, Plaintiff pointed out that the County was treating Pennfield differently because it was allowing Pennfield's sewer capacity to be determined after it reached record stage approval. AC¶117. The County argues that the equal protection claim is moot because just after Plaintiffs' complaint was filed, it sent a letter to Pennfield's owner denying sewer capacity at the present time. Nonetheless, the County still allowed the Pennfield development, unlike Plaintiffs' Proposed Developments, to reach record stage approval. *Id.* Furthermore, due to the County's monopolization over sewer, it could always treat Pennfield differently again. Therefore, Plaintiffs' equal protection claim based on Pennfield is not moot.

In addition, Plaintiffs' Properties are located less than three miles from three other proposed developments which the County, through its line drawing, is allowing to gain access to public sewer: (1) Silver Maple located approximately two miles south from the Proposed Developments; (2) Baymont Farms and (3) The Ponds at Odessa, each located approximately three miles south from the Proposed Developments. AC ¶¶114-115. Like Plaintiffs' Proposed Developments, these developments are proposed residential subdivisions with plans filed within a year of Plaintiffs' plans. *Id.* Despite their similarity in plan and geographical proximity, the

County decided to grant all three of these neighboring residential subdivisions access to public sewer while denying access to Plaintiffs' Proposed Developments.

Lastly, the County has permitted the Carter Farm Development, a residential subdivision located west of the Central Core, to construct its own private Community System while denying Plaintiffs the same requested remedy. AC ¶116. Initially, the County objected to the Carter Farm Development's application to the Public Service Commission for permission to install a private sewer facility; recently, however, it withdrew its objection, allowing the Carter Farm to proceed with a private wastewater utility. *Id.* Plaintiffs also sought the County's permission to install a private Community System. In this case, the County failed to respond to the proposal. *See* AC ¶¶30, 31. Carter Farm is also similar to the Proposed Developments in that it is located on the margins of the Central Core and yet the County allowed it to obtain access to private sewer, while denying the same right to Plaintiffs.

Citing *Purze v. Village of Winthrop Harbor,* 286 F.3d 452 (7th Cir. 2002), the County further contends that Plaintiffs were required to identify only developers who are "prima facie identical" to them. In deciding a motion for summary judgment, the Seventh Circuit held that the plaintiffs had to demonstrate they were treated differently than "someone who is *prima facie* identical in all relevant respects." *Id.* at 455. The court reviewed the evidence presented in response to the summary judgment motion and decided none of the comparable developments was "identical in all relevant respects." *Id.* "Identical in all relevant respects" is not the same as "similarly situated," the standard the Supreme Court set forth for traditional equal protection analysis in a land use context. *Willowbrook*, 528 U.S. at 564. The Seventh Circuit's heightened requirement for making out an equal protection claim is reminiscent of the heightened pleading requirements the courts used to apply for Section 1983 claims until the Supreme Court

repudiated such heightened requirements. *See supra* n. 25. Notably, the Third Circuit has not adopted this heightened pleading requirement of "*prima facie* identical,"[36] and the County's attempt to create new law at Plaintiffs' expense should be rejected.

**E.    Plaintiffs State a Claim for Procedural Due Process**

The County contends that Plaintiffs do not state a claim for procedural due process because (1) they purportedly have no federally protected right to sewer and (2) they failed to take an administrative appeal of Special Services' Final Decisions to the Planning Board.  To prevail on a procedural due process claim, Plaintiffs must demonstrate the County deprived them of a protected property interest and state procedures for challenging that deprivation do not comport with due process of law.  *Cornell*, 512 F. Supp.2d at 258 (citing *Taylor Inv.*, 983 F.2d at 1293). As discussed *supra* at p. 34, Plaintiffs have a federally protected right to use and develop their Properties with which the County interfered by refusing to allow them to gain access either to public or private sewer and by curtailing their plans' progress through the Land Use approval process.  As discussed *supra* at pp. 18-24, the County's UDC does not provide Plaintiffs the right to take an administrative appeal of the Final Decisions the County issued through Special Services and therefore those decisions were unreviewable and Plaintiffs were deprived of an adequate post-deprivation remedy.  AC ¶¶94-96.

**F.    Plaintiffs State a Declaratory Judgment Action**

The County essentially argues that Plaintiffs' declaratory judgment action should be

---

[36]  The only case within the Third Circuit to rely upon *Purze* which the County cites, *ABD Monroe, Inc. v. Monroe Tp.*, 2008 WL 58876 (D.N.J. Jan. 3, 2008), was decided on a much fuller record presented by a motion for summary judgment.  Indeed, many of the County's cites in support of dismissing the equal protection claim in a land use context were decided on a motion for summary judgment, including *Purze*, *ABD Monroe* and *Development Group, LLC v. Franklin Tp. Bd. of Supervisors*, 2003 WL 22358440 (E.D. Pa. Sept. 24, 2003).

dismissed because Plaintiffs do not have a right to obtain public or private sewer.[37]   The
Plaintiffs are seeking a declaration that both the State and County Codes envision that where, as
here, the County refuses to provide access to public sewer the landowner can either (1) build his
own sanitary sewer system, pursuant to NCC Code §40.05.520, or (2) apply to have a private
utility provide sewer service under the regulation of the Public Service Commission, assuming
the County will cooperate.  AC ¶¶127-133.

Where there is inadequate sewer capacity or facilities, as the County claims here, Section
40.05.520 gives the County the option of transferring its obligation to construct the needed sewer
improvements and systems to the developer.[38]   In this case, pursuant to Section 40.05.520,
Plaintiffs offered with no monetary outlay by the County to construct sewer improvements
including sewer lines, force mains and a treatment plant.  The County refused Plaintiffs' offer.
The County exerted its monopolistic power over sewer to exclude Plaintiffs from existing public
sewer on the one hand yet prohibited Plaintiffs from constructing sewer improvements and/or a

---

[37]   The County also argues that the declaratory judgment action should be dismissed due to Plaintiffs' purported
failure to exhaust the County's administrative remedies.  Plaintiffs rely on their response to that argument set forth
*supra* at pp. 18-24.  In sum, the County did not provide the right to take an appeal of the decisions it issued through
Special Services; even if it had the Planning Board lacked authority to grant Plaintiffs relief; furthermore, the
County's decision was final because it caused injury to the Plaintiffs and taking an appeal would have been futile
under the circumstances.  The two decisions the County cites in its brief were not rendered in the land use context.
[38]   Section 40.05.520 provides:

> C. Make improvements.  The developer can make improvements for traffic as approved by the
> County and DelDOT.  Improvements may be made to the sewer as determined by the Department
> of Special Services.  In the Suburban zoning districts, sewer improvements may include the use of
> spray irrigation, provided that such a system has a minimum processing capacity of one hundred
> thousand (100,000) gallons per day and so long as the capacity of the system can be increased at a
> later time by an additional fifty thousand (50,000) gallons per day.  Other types of large scale
> treatment systems may be permitted if approved by DNREC and the County Department of
> Special Services.  Such facilities shall only be permitted in Suburban zoning districts and shall
> only be constructed in accordance with the rules and regulations governing such systems as
> promulgated by DNREC and the County Department of Special Services.  All such systems shall
> be turned over to the County upon their completion and formal acceptance by the Department of
> Special Services.  The developer may reach agreements with the school district or with a water
> supplier to make or fund improvements that would be available prior to occupancy.

NCC Code §40.05.520C.  As discussed, Plaintiffs offered to make these improvements as the UDC contemplates
and turn them over to the County but the County refused.  AC ¶¶27- 30, Exhibits D, E.

Community System on the other, even though this system would ultimately be turned over to the County. The County's refusal to permit Plaintiffs to implement the solutions provided in Section 40.05.520 does not make sense unless, as Plaintiffs allege, the County is trying to accomplish its goal of preventing Plaintiffs' Properties from being developed.

Plaintiffs also seek a declaration of the County's rights and obligations under Titles 9 and 26 of the Delaware Code. Plaintiffs seek a declaration that neither Title 9 nor Title 26 provides the County with authority to withhold public sanitary sewer service on the one hand and refuse to give its consent for Toll to construct a Community System on the other hand. Plaintiffs allege that it provided the County with the option of Toll dedicating to the County the Community System once it is completed or for a private utility to operate the Community System pursuant to the procedures set forth in 26 Del. Code §203D. The County refused. The County's refusal, when it cannot or will not provide public sanitary sewer service, is unreasonable and violates the letter and spirit of 26 Del. Code §203D and Title 9. As the Pennsylvania Supreme Court so forcibly stated in *Benham*, a municipality is prohibited from exerting its monopoly power over sewer so as to preclude development it does not want. *See Benham*, 523 A.2d at 317 and discussion *supra* at pp. 32-33.

G.      **Plaintiffs State an Estoppel Claim**

The County argues that Plaintiffs' equitable estoppel claim should be dismissed because (1) Plaintiffs will not be able to prove the elements of their claim and (2) Plaintiffs have another use for their Properties since they can always resort to using septic tanks.[39] The County presents

---

[39] The County also argues that the estoppel claim is barred for failure to exhaust administrative remedies. In *Eastern Shore Environm., Inc. v. Kent County Dept. Planning*, 2002 WL 244690 (Del. Ch. Feb. 1, 2002), the Delaware Chancery Court excused a landowner from filing an appeal of an adverse zoning decision before bringing suit based on equitable estoppel because that claim was not within the county board of adjustment's jurisdiction. *Id.* at *6. The County attempts to distinguish *Eastern* on the basis that the landowner was excused from filing an appeal because it was not challenging the substantive correctness of the county's decision so much as the change in the

an extremely restrictive view of the law on equitable estoppel and weighs the facts utterly in its favor.

In the context of land development, Delaware courts recognize equitable estoppel claims where (1) a party, acting in good faith, upon some act or omission of the government, (2) makes a substantial change of position or incurs extensive obligations and expenses and (3) it would be highly inequitable or unjust to impair or destroy rights that the landowner has acquired. *Salem Church*, 2006 WL 2873745, *12. Plaintiffs alleged that (1) in 2004 and throughout 2005, County representatives repeatedly informed Plaintiffs the Proposed Developments would be serviced by public sewer (AC ¶135); (2) the County sewer maps and plans provided for the area in which the Warren Property and the Port Penn Properties are located to be serviced by public sewer; (3) Plaintiffs acted in good faith in relying on the County's representations and incurred a substantial investment of time, expense and obligations as a result (*Id.* at ¶137), and; (4) it would be highly inequitable and unjust, particularly at this late stage in the approval process, to deny the Proposed Developments access to public sewer which the County represented would be provided (*Id.* at ¶139).[40] In short, each of these elements presents a material question of fact which is properly determined by a fact finder, not a court on a motion to dismiss. *See, e.g., Pell v. E.I. DuPont de Nemours & Co., Inc.,* 231 F.R.D. 186, 189, n. 2 (D. Del. 2005) (equitable estoppel claim involved issues of material fact that precluded summary judgment).[41]

---

county's position. In this matter, Plaintiffs are also challenging the County's change in position. Furthermore, unlike *Eastern,* the County's UDC did not provide Plaintiffs any right of appeal and the Planning Board's jurisdiction is even more circumscribed than that of the board of adjustment. The Planning Board is without authority to reverse a decision of the Department of Special Service or County policy regardless of its illegality.

[40] Plaintiffs also have a claim under Delaware's vested rights doctrine. *See In re 244.5 Acres of Land,* 808 A.2d 753, 758 (Del. Super. Ct. 2002) (where an owner has made a substantial expenditure, a vested right arises from good faith reliance upon standards existing as of the time of reliance).

[41] The County attempts to engraft on the equitable estoppel elements an additional requirement that the plaintiff prove some sort of "affirmative misconduct" on the government's part. MTD at p. 38. For this new add-on, the County relies upon *Motiva Enterprises, LLC v. Secretary of Dept. of Nat'l. Res. & Environm. Control,* 745 A.2d 234

48.

Secondly, the County argues that equitable estoppel will not lie because Plaintiffs can always resort to using septic tanks.[42] As the County acknowledges, the use of septic tanks would reduce the number of lots Plaintiffs could develop. MTD at pp. 4-5, 38. The County's recommendation of sewer also constitutes another changed position since the Weston Study it previously commissioned recommended that public sewer be installed in the area of Plaintiffs' Properties precisely in order to protect ground water quality and prevent contamination from septic tanks. AC ¶16. The County's new position also contradicts the County's original Resolution No. 03-093 providing for installation of public sewers to better protect the environment and reduce the pollution of groundwater resulting from leaking septic systems. AC Exhibit B. Moreover, even if septic tanks provided a legitimate alternative, which they emphatically do not, there is nothing in the record that establishes that septic tanks could even be installed on Plaintiffs' property, given the soil and environmental testing involved, let alone present a viable alternative. This Court simply cannot decide the issue of Plaintiffs' substantial reliance without the benefit of a full record, including information about the expenditures

---

(Del. Super. Ct. 1999). The *Motiva* court held, however, that equitable estoppel did not apply in the pollution regulatory matter before it, noting that Delaware courts limited the application of equitable estoppel to the land use context. *Id.* at 250. In dicta, the *Motiva* court mentioned that other circuits required some "affirmative misconduct" be alleged on the government's part. *Id.* at 250, n. 102. An off the point discussion of other circuits' estoppel requirements is hardly foundation for adding a new element to equitable estoppel in the land use context. In any event, Plaintiffs have alleged affirmative misconduct on the County's part, including: its exploitation of its monopoly power to do away with legally permissible development, its disparate treatment of similarly situated properties and its unlawful disregard of the County's UDC and the recommendation of its own experts in denying Plaintiffs' Properties public sewer.

[42] The County's purported reliance for this point on *Acierno v. New Castle County,* 2000 WL 718346 (D. Del. May 23, 2000), is misplaced. In ruling on a motion for summary judgment in *Acierno,* Judge Robinson observed that Delaware courts have estopped enforcement of zoning regulations where (1) landowners have incurred considerable expenses and where (2) the landowners had no other use for the land. *Id.* at *11. Because the landowner's expenses did not rise to the level of substantial reliance in *Acierno,* the Court looked to whether the land had other uses besides the original plan to build an apartment complex. *Id.* at *10-11. The Court concluded that because the landowner could still build a housing development, the equities involved did not favor estoppel. *Id.* at 11. Unlike this Court, the *Acierno* Court was resolving a motion for summary judgment and therefore had the benefit of a fuller record before deciding the equities involved.

Plaintiffs made in reliance upon the County's representations that their Properties would be given sewer.

Moreover, it is highly inappropriate for the County to be inviting the Court to weigh facts in its favor. The most egregious example of this is the County's final argument that the Court should hold that Toll "conceded" that Water Farm I's capacity was fully reserved and that the County did not intend to provide public sewer to Plaintiffs' Properties. To so hold, the Court would have to conclude that Plaintiffs had "waived" the claims they are asserting here. As the Court is aware, the standards for proving waiver under Delaware law are "quite exacting." *Aeroglobal Capital Mgt., LLC v. Cirrus Inds., Inc.,* 871 A.2d 428, 444 (Del. Super. Ct. 2005). "Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights. The facts relied upon to prove waiver must be unequivocal." *Id.* Defendant's purported "facts" of waiver are highly equivocal and contravene the Court's obligation to read the averments of the amended complaint liberally in Plaintiffs' favor, giving Plaintiffs the benefit of every reasonable inference from the allegations asserted.

## III.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the County's Motion to Dismiss be denied.

Respectfully submitted,

By:    /s/ Jeffrey M. Weiner
Jeffery M. Weiner, Esquire (DE # 403)
1332 King Street
Wilmington, Delaware 19801
(302) 652-0505
legalw@aol.com

By: _____
Kaplin Stewart Meloff Reiter & Stein, P.C.
Mark B. Kaplin, Esquire
Barbara Anisko, Esquire
910 Harvest Drive
Blue Bell, PA 19422-0765

*Attorneys for Plaintiffs Gary C. and Gale B. Warren and Toll Bros., Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GARY C. and GALE B. WARREN        :
    and                            :
TOLL BROS., INC.                  :
            **Plaintiffs,**     :     **Civil Action No. 07-CV-725-SLR**
                            :
    v.                        :
                            :     **JURY TRIAL DEMANDED**
NEW CASTLE COUNTY         :
            **Defendant.**     :

## PLAINTIFFS' APPENDIX
## IN SUPPORT OF THE ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Jeffery M. Weiner, Esquire (DE # 403)
1332 King Street
Wilmington, Delaware 19801
(302) 652-0505

### KAPLIN STEWART MELOFF REITER & STEIN, P.C.

Marc B. Kaplin, Esquire
Barbara Anisko, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA 19422-0765
(610) 260-6000

*Attorneys for Plaintiffs Gary C. and Gale B. Warren
and Toll Bros., Inc.*

DATED: March 10, 2008

**Table 40.04.110 A. DISTRICT AND BULK STANDARDS**

| Zoning District & Development Type | District Standards | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Density | | | Floor Area Ratio | | Utilities (on-site, public) | Minimum Site Area |
| | Min. OSR / LSR | Max. Gross | Max. Net | Max. Gross | Max. Net | | |
| **Suburban (S)** | | | | | | | |
| Farmstead | 0.00 | 0.02 | 0.02 | na. | na. | OS | 50 ac. |
| Single family | 0.15 | 0.67 | 0.80 | na. | na. | P* | 1 ac. to less than 50 acs.** |
| Single-family, conservation design | 0.50* | 0.67 | 1.34 | na. | na. | P** | 5 ac. |
| Age restricted single-family, see Division 40.07.700 | 0.15 | 0.80 | 0.95 | na. | na. | P* | 1 ac. to less than 50 acs.** |
| Open space subdivision - option 1 | 0.30 | 1.09 | 1.70 | na. | na. | P | 10 ac. to less than 50 acs.* |
| Open space subdivision - option 1, conservation design | 0.50* | 1.09 | 2.38 | na. | na. | P | 10 ac. |
| Open space subdivision - option 2 | 0.50* | 1.25 | 2.54 | na. | na. | P | 10 ac. |
| Age restricted open space subdivision, see Division 40.07.700 | 0.50* | 1.30 | 2.60 | na. | na. | P | 10 ac. |

**Table 40.04.110 B. DISTRICT AND BULK STANDARDS**

*Lot and Building Standards*

| | Minimum | | | | | | | Maximum |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Lot Area | Lot Width (feet) | Street Yard (feet) | Side Yard (feet) | Rear Yard (feet) | Paving street yard/ other yard (feet) | Unit Mix (%) | Building Height (feet) |
| **Suburban (S)** | | | | | | | | |
| Farmstead | 50 ac. | 600 | 50 | 50 | 50 | na. | na. | 50 |
| Single family | 1 ac. | 150 | 40 | 12 | 40 | na. | na. | 40 |
| Single-family, conservation design | 20,000 | 100 | 40 | 10 | 40 | na. | na. | 40 |
| Age restricted single-family | 1 ac. | 150 | 40 | 12 | 40 | na. | na. | 40 |
| Open space subdivision - option 1 | 20,000 sf. | 100 | 40 | 10 | 40 | na. | na. | 40 |
| Open space subdivision - option 1, conservation design | 15,000 sf. | 80 | 25 | 6 | 25 | na. | na. | 40 |
| Open space subdivision - option 2 | 6,500 to 15,000 sf. | 60 | 25 | 6 | 25 | na. | 30 | 40 |
| | over 15,000 sf. | | | | | | | |
| Age restricted open space subdivision | 10,000 sf. | 60 | 25 | 6 | 25 | na. | na. | 40 |

**Table 40.04.110 C. DISTRICT AND BULK STANDARDS**

*Storage and Comments*

| | Exterior Storage | Notes |
| --- | --- | --- |
| | Percent of Lot Area | |
| **Suburban (S)** | | |
| Farmstead | na. | |
| Single family | na. | • Division 40.22.300  •• Maximum site area allowed for sites utilizing this option. Project site shall have been a legally existing tax parcel prior to August 1, 2003. |
| Single-family, conservation design | na. | • Division 40.10.387  •• Division 40.22.300 |
| Age restricted single-family | na. | • Division 40.22.300  •• Maximum site area allowed for sites utilizing this option. Project site shall have been a legally existing tax parcel prior to August 1, 2003. |
| Open space subdivision - option 1 | na. | • Maximum site area allowed for sites utilizing this option. Project site shall have been a legally existing tax parcel prior to August 1, 2003. |
| Open space subdivision - option 1, conservation design | na. | • Division 40.10.387 |
| Open space subdivision - option 2 | na. | • Division 40.10.387 |
| Age restricted open space subdivision | na. | • Division 40.10.387 |



# CHAPTER 13
# ARTICLE 30
# COUNTY COUNCIL AND ADMINISTRATIVE BODIES

**DIVISION 30.000**    **PURPOSE**

This Article sets forth the responsibilities and duties of County Council and all County administrative departments and boards.

**DIVISION 30.100**    **ADMINISTRATION**

**SECTION 30.110**    **RESPONSIBILITY**

The following codes are used in Table 30.110 to indicate what types of responsibilities and duties County Council and County administrative departments and boards posses under this Code:

**R**  =  The body makes recommendations to the decision-makers.

**H**  =  The body must hold a public hearing.

**D**  =  The body makes the decision.

**A**  =  The body hears an appeal to the decision.

**C**  =  The body must give its consent to the decision, or may remand the matter for further findings.

| Type of Action | County Council | Administrative Boards | | | Administrative Agents | | |
|---|---|---|---|---|---|---|---|
| | | Planning Board | Board of Adjustment | Historic Review Board | Department of Land Use | Technical Advisory Committee | RPA - Technical Advisory Committee |
| **Table 30.110**<br>**PROCEDURAL RESPONSIBILITIES** | | | | | | | |
| **General Reviews (see Division 31.400 for standards)** | | | | | | | |
| Zoning Text Amendment | HD | HR | | | R | | |
| Zoning Map Amendment | HD | HR | | | R | R | |
| Historic Zoning District Map Amendment | HD | HR | | R | R | | |
| Special Use | | | HD | | R | | |
| Environmental Impact Assessment Report | | | | | D | | R** |
| Historic Permit | A | | | HD | R | | |
| Zoning Variance | | | HD | | R | | R** |
| Use Variance | C | | HD | | R | | R** |
| Subdivision Variance | A | HD | | | R | | R** |
| Deed Restriction Change | HD | HR | | | R | | |
| **Design Reviews (see Division 31.700 for standards)** | | | | | | | |
| Minor Subdivision Review | | A | | | D | | |
| Major Subdivision Review | C | H/A | | | D | R | |

| Type of Action | County Council | Administrative Boards | | | Administrative Agents | | |
|---|---|---|---|---|---|---|---|
| | | Planning Board | Board of Adjustment | Historic Review Board | Department of Land Use | Technical Advisory Committee | RPA - Technical Advisory Committee |
| **Administrative (see Division 31.200 for standards and Article 3 for limited uses)** | | | | | | | |
| Limited Use | | | A | | D | | |
| Zoning Permit | | | A | | D | | |
| **Other Reviews and Appeals (see Division 31.400 and 31.600 for standards and Article 11 for LOS waiver standards)** | | | | | | | |
| Interpretation | | | A | | D | | |
| Beneficial Use | A | | HD | | R | | R** |
| Vested Rights/Impact Fees Only*** | | | HD | | R | | |
| Level of Service Waiver | HD | | | | R | | |
| Zoning Map Correction*** | C | | | | R | | |
| Appeal: Zoning | | | HD | | R | | |
| Appeal: Subdivision | | HD | | | R | | |

**Table 30.110
PROCEDURAL RESPONSIBILITIES**

**   Only required if relief is sought from any regulation pertaining to a Water Resource Protection Area (WRPA) issue.
***  See Sections 1.140 (for vested rights) and Section 2.110 (for zoning map corrections) for standards and time limitation.

*(Amended September 22, 1998 by Ordinance 98-080; amended December 14, 1999 by Ordinance 99-075; amended December 12, 2000 by Ordinance 00-103)*

## APPENDIX 6. MISCELLANEOUS ITEMS

1.    **Technical Advisory Committee.**  One representative from each of the following:

New Castle County
>    Department of Land Use
>> Licensing Division, Engineering Section
>> Planning Division, Historic Preservation Section
>> Planning Division, Transportation Section
>    Department of Special Services
>    Department of Police

New Castle Conservation District

Delaware Geological Survey

State of Delaware
>    Division of Public Health
>    Division of State Police (Planning Section, Troop 1, Troop 6, Troop 9)
>    Office of the State Fire Marshal
>    DelDOT, State Highway Department, Subdivision Manager
>    DelDOT, Division of Highways
>    DNREC, Office of the Secretary
>    State Planning Coordinator
>    Department of Agriculture, Urban Forester
>    Bureau of Archeology and Historic Preservation
>    Department of Education

Delaware Transit Corporation

University of Delaware Water Resources Agency

Public Service Commission

Public Water Company (City of Newark, United Water Delaware, City of Wilmington, Artesian, Tidewater Utilities, Town of Middletown)

Delaware Farm Bureau

Superintendent of Local School District

Chief of Local Fire District

---

2. **Resource Protection Area Technical Advisory Committee.** One representative from each of the following:

Chemical Industry.
Consulting Engineers' Council
DNREC
Delaware Geological Survey
The County Chamber of Commerce
The County Department of Land Use
The County Department of Special Services
Water Company Representative
University of Delaware Water Resources Agency
Environmental Advocacy Group Representative
Private Sector Representative
New Castle Conservation District
Private Sector Environmental Professional

The members shall be appointed by the County Executive for a four (4) year term. The members may be reappointed, and each member shall serve until a successor is appointed. The chairman shall be designated by the County Executive.

3. **Extractive Use Technical Advisory Committee.** One representative from each of the following:

Delaware Geological Survey
Delaware Department of Natural Resources Environmental Control
Water Resources Agency
Delaware Department of Transportation
New Castle County
University of Delaware - College of Agricultural Sciences
New Castle County Conservation District

4. **Department of Land Use Distribution of Approved Plans.**

Upon recordation, the Department shall notify in writing and forward copies of the plan to the following:

The owner of the property in question, one (1) paper print.
The subdivider, one (1) paper print.
The person or firm responsible for preparing the plan, one (1) paper print.
County Division of Assessment, three (3) paper prints.
Recorder of Deeds, three (3) paper prints.
State Highway Division, one (1) reproducible copy.

Unofficial Reprint of the New Castle County Unified Development Code - Appendix 6
As Amended Through September 30, 2006                                                                    Appendix 6-2

PA 07

School district, one (1) paper print.
Fire company, one (1) paper print.
Post office, one (1) paper print.
Department of Elections, one (1) paper print.
Adjacent incorporated town or city, one (1) paper print.
Department of Special Services, one (1) paper print.
All other applicable persons and agencies as determined by the Department.

5. **Source of Data for Establishing Resource Protection Levels (supplement to Table 40.05.420.**

| Natural Resource | Contact |
| --- | --- |
| Floodplain/floodway | FEMA mapping - Dept. of Land Use |
| Wetlands | Wetlands delineator |
| Riparian Buffer | Applicant's engineer |
| Drainageways | Applicant's engineer |
| Water Resource Protection Areas | U. of Del. Water Resources Agency |
| Cockeysville Formation - WRPA | U. of Del. Water Resources Agency |
| Cockeysville Formation Drainage Area | U. of Del. Water Resources Agency |
| Sinkhole | U. of Del. Water Resources Agency |
| Wellhead Class A, B and C - WRPA | U. of Del. Water Resources Agency |
| Recharge Areas - WRPA | U. of Del. Water Resources Agency |
| Steep Slopes | Applicant's engineer |
| Critical Natural Areas (CNA) | DNREC |
| Rare and Endangered Species (CNA) | DNREC |
| Forests | Applicant's forester |
| Historic Structures or Areas | Department of Land Use, Historic Preservation Section |

Department of Land Use - (302) 395-5400
Department of Natural Resources and Environmental Control (DNREC) - (302) 739-4504
University of Delaware Water Resources Agency - (302) 831-4925

6. **Newspapers for Public Notice.** The Department of Land Use shall advertise the receipt of all major and minor land development plans and all other applications (e.g., deed restriction changes; rezonings; subdivision, area, use, and floodplain variance requests; beneficial use appeals; appeals of Department decisions; major land development plans Technical Advisory Committee, TAC; Historic Review Board applications; Resource, Protection Area Technical Advisory Committee, RPATAC applications; and other Planning Board and Board of Adjustment applications) in the following:

News Journal, Saturday issue

Refer to Sections 40.31.320 and 40.31.340 for a complete discussion of Public Notification Requirements.

7.    **Trip Reduction/ Transportation Demand Management (TDM) Measures Selection Form** (see attached)

Unofficial Reprint of the New Castle County Unified Development Code - Appendix 6      Appendix 6-4
As Amended Through September 30, 2007

PA 09

RSW

Introduced by: Councilperson _____ Mr. Weiner _____
Date: May 8, 2001

Mr. Coons
Mr. Hollins

ORDINANCE NO. 01- *051*

### TO REVISE CHAPTER 38 OF THE NEW CASTLE COUNTY CODE ("UTILITIES") REGARDING ARTICLE 2 ("SEWERS AND SEWAGE DISPOSAL")

**WHEREAS**, County Council has determined that there is a need to clarify that all sewer systems in the unincorporated areas of New Castle County are to be owned and operated by New Castle County or its assigns;

**WHEREAS**, County Council has determined that the Department of Special Services should be empowered to remove or disable any unlawful sewer systems at the expense of the violator; and

**WHEREAS**, County Council has determined that the provisions of this ordinance substantially advance, and are reasonably and rationally related to, legitimate government interests (i.e., promoting the health, safety, morals, convenience, order, prosperity and/or welfare of the present and future inhabitants of this State).

### NOW, THEREFORE, THE COUNTY OF NEW CASTLE HEREBY ORDAINS:

**Section 1.**     Section 38.02.007 ("Maintenance and control of sewers.") of Division 38.02.000 ("Generally") of Article 2 ("Sewers and Sewage Disposal") of Chapter 38 of the New Castle County Code ("Utilities") is hereby revised by the addition of the underlined text as set forth below:

**Section 38.02.007.     Maintenance and control of sewers.**

. . .

D.     No entity, other than New Castle County or its assigns, may own, lease, operate, manage, utilize or otherwise maintain in any way any sewer system including, but not limited to, sewer lines, pumps stations and waste water disposal systems of any kind, in the unincorporated areas of New Castle County.  This paragraph shall not apply to any approved Department of Special Services related sewer projects or to septic systems approved pursuant to Chapter 40, Article 22 of this Code.

E.     Violations:  In addition to any penalties or remedies provided in Sec. 38.02.003 of this Chapter, the Department of Special Services may remove or otherwise disable any sewer system including, but not limited to, sewer lines, pumps stations and waste water disposal systems of any kind, installed in violation of paragraph D of this section at the expense of the violator.

**Section 2.      Consistent with Comprehensive Development Plan.** New Castle County Council finds that the provisions of this Ordinance are consistent with the spirit and intent of the New Castle County Comprehensive Development Plan.

**Section 3.      Inconsistent Ordinances and Resolutions Repealed.**  All ordinances or parts of ordinances and all resolutions or parts of resolutions that may be in conflict herewith are hereby repealed.

**Section 4.      Severability.**  The provisions of this ordinance shall be severable.  If any provision of this ordinance is found by any court of competent jurisdiction to be unconstitutional or void, the remaining provisions of this ordinance shall remain valid, unless the court finds that the valid provisions of this ordinance are so essentially and inseparably connected with, and so dependent upon, the unconstitutional or void provision that it cannot be presumed that County Council would have enacted the remaining valid provisions without the unconstitutional or void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with County Council's intent.  If any provision of this ordinance or any zoning map or portion thereof is found to be unconstitutional or void all applicable former ordinances, resolutions, zoning maps or portions thereof shall become applicable and shall be considered as continuations thereof and not as new enactments regardless if severability is possible.

**Section 5.      Effective Date.** This ordinance shall become effective immediately upon its adoption by County Council and approval by the County Executive.

Approved on:                                          Adopted by County Council of

_5/30/01_                                            _5/22/01_

_T.P.C._                                             _Chris Coons_
_____                              _____
County Executive                                     President of County Council of
New Castle County


**SYNOPSIS:**  This ordinance clarifies that all sewer systems in the unincorporated areas of New Castle County are to be owned and operated by New Castle County or its assigns. This ordinance also grants the Department of Special Services the power to remove or disable any such unlawful system at the expense of the violator.

**FISCAL NOTE:**      This ordinance will have no discernable fiscal impact.

## CERTIFICATE OF SERVICE

I, Barbara Anisko, hereby certify that on March 10, 2008, a copy of Plaintiffs' Answering

Brief in Opposition to Defendant's Motion to Dismiss and accompanying Appendix was served

via e-mail and via first class mail to counsel of record as follows:

Max B. Walton, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street, 8th Floor
Wilmington, DE 19899

Barbara Anisko, Esquire