UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GARY C. and GALE B. WARREN,
and TOLL BROS., INC.,

Plaintiffs,

v.

NEW CASTLE COUNTY,

Defendant.

C.A. No. 07-725 SLR-LPS

## NEW CASTLE COUNTY'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

CONNOLLY BOVE LODGE & HUTZ LLP
Collins J. Seitz, Jr. (Bar No. 2237) (cseitz@cblh.com)
Max B. Walton (Bar No. 3876) (mwalton@cblh.com)
The Nemours Building
1007 North Orange Street, 8th Floor
P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 656-0116
*Attorneys for New Castle County*

Dated: March 28, 2008

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 2

I.    THE CASE SHOULD BE DISMISSED UNDER RULE 12(b)(7) ................................ 2

II.    RIPENESS REQUIRES DISMISSAL UNDER RULE 12(b)(1) ................................. 2

    A.    Toll Has Not Satisfied The Finality Requirement And Therefore Has Suffered No Concrete Injury ................................................................ 2

    B.    Toll Has An Available Administrative Appeal ....................................... 3

    C.    The Ripeness Requirement Precludes Toll's Anti Trust Claim ................ 7

III.    TOLL'S CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(6) ...................... 7

    A.    The County Has State Action Immunity For Antitrust Claims ............... 7

    B.    Toll Has Not Stated A Substantive Due Process Claim ........................ 11

    C.    The Equal Protection Claim Fails As A Matter Of Law ....................... 15

    D.    Toll Has Failed To State A Procedural Due Process Claim ................... 17

    E.    The Declaratory Judgment Claim Fails As A Matter Of Law ............... 18

    F.    Toll's Equitable Estoppel Claim Fails As A Matter Of Law ................ 19

CONCLUSION ................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Acierno v. Mitchell*,
   6 F .3d 970 (3d Cir. 1993) .................................................................................2, 5

*Acierno v. New Castle County*,
   2000 WL 718346 (D. Del. May 23, 2000) ...........................................................13, 15

*ADB Monroe Inc. v. Monroe Twp.*,
   2008 WL 58876 (D.N.J. Jan. 3, 2008)..................................................................15, 16

*Alvin v. Suzuki*,
   227 F.3d 107 (3d Cir. 2000) ......................................................................................3

*Angstadt v. Mid-West School Dist.*,
   377 F.3d 338 (3d Cir. 2004) ....................................................................................13

*AvalonBay Communities, Inc. v. Sewer Commission of the City of Medford*,
   853 A.2d 497 (Conn. 2004) ....................................................................................11

*Baldini West, Inc. v. New Castle County*,
   852 F. Supp. 251 (D. Del. 1994) ...............................................................................3

*Brubaker v. East Hempfield Twp.*,
   234 Fed. Appx. 32 (3d Cir. 2007)..............................................................................2

*Bryant v. Town of Essex*,
   564 A.2d 1052 (Vt. 1989)........................................................................................12

*Christiana Town Center, LLC v. New Castle County*,
   2003 WL 21314499 (Del. Ch. June 6, 2003),
   *aff'd,* 841 A.2d 307 (Del. Jan. 16, 2004) ...................................................4, 6, 7, 18

*City of Tyler v. Likes*,
   962 S.W.2d 489 (Tex. 1997) ...................................................................................11

*City of Winter Park v. Southern States Utilities, Inc.*,
   540 So.2d 178 (Fla. App. 1989) ..............................................................................12

*Cooper v. Amster*,
   645 F. Supp. 46 (E.D. Pa. 1986)................................................................................7

*Corcoran v. Village of Bennington*,
   266 A.2d 457 (Vt. 1970)..........................................................................................12

*Council of Middletown Twp. v. Benham*,
   523 A.2d 311 (Pa. 1987)..........................................................................................10

*County Concrete Corp. v. Twp. Of Roxbury*,
   442 F.3d 159 (3d Cir. 2006) ....................................................................................13

*Deninno v. Municipality of Penn Hills*,
   2008 WL 683968 (3d Cir. Mar. 14, 2008)...............................................................2, 3

*Doe v. Pennsylvania Bd. Of Probation and Parole,*
   513 F.3d 95 (3d Cir. 2008) ............................................................................5

*Doug Grant, Inc. v. Great Bay Casino Corp.,*
   232 F.3d 173 (3d Cir. 2000) ........................................................................15

*Eastern Shore Envt. Inc. v. Kent County Dept. of Planning,*
   2002 WL 244690 (Del. Ch. Feb. 1, 2002) ..............................................6, 19

*Eichenlaub v. Twp. of Indiana,*
   214 Fed. Appx. 218 (3d Cir. 2007) ..............................................................17

*FCC v. Beach Communications, Inc.,*
   508 U.S. 307 (1993) .....................................................................................15

*Federal Trade Comm. v. Equitable Resources, Inc.,*
   512 F.Supp.2d 361 (W.D. Pa. 2007) ............................................................10

*Gagliardi v. Clark,*
   2006 WL 2847409 (W.D. Pa. Sept. 28, 2006) .......................................12, 17

*Hellman v. State,*
   784 A.2d 1058 (Del. 2001) ...........................................................................14

*Herr v. Pequea Twp.,*
   274 F.3d 109 (3d Cir. 2001) .........................................................................13

*Huberty v. U.S. Ambassador to Costa Rica,*
   2007 WL 3119284 (M.D. Pa. Oct. 22, 2007) .................................................3

*Kaehly v. City of Pittsburgh,*
   988 F. Supp. 888 (W.D. Pa. 1997) .................................................................8

*In re Kent County Public Facilities Ordinances Litigation,*
   C.A. No. 2921-VCN (Del. Ch. Mar. 19, 2008) ...........................................10

*Neilson v. D'Angelis,*
   409 F.3d 100 (2d Cir. 2005) .........................................................................16

*Pace Resources, Inc. v. Shrewsbury Twp.,*
   808 F.2d 1023 (3d Cir. 1987) .......................................................................14

*Prices Corner Liquors v. Delaware Alcoholic Beverage Control Commission,*
   1995 WL 716802 (Del. Super. Ct. Nov. 13, 1995), *aff'd,* 705 A.2d 851 (Del. 1998)..............16

*Ransom v. Marrazo,*
   848 F.2d 389 (3d Cir. 1988) ...................................................................12, 17

*Rogin v. Bensalem Twp.,*
   616 F.2d 680 (3d Cir. 1980) .........................................................................18

*Salem Church (Delaware) Associates v. New Castle County,*
   2006 WL 2873745 (Del. Ch. Oct. 6, 2006) ............................................passim

*Sameric Corp. of Delaware, Inc. v. City of Philadelphia,*
   142 F.3d 582 (3d Cir. 1998) ...........................................................................6

*Snyder v. State Dept. of Health and Mental Hygiene,*
   391 A.2d 863 (Md. App. 1978) .................................................................11

*State v. Schorr,*
   131 A.2d 158 (Del. 1957).......................................................................14

*Suburban Trails, Inc. v. New Jersey Transit Corp.,*
   800 F.2d 361 (3d Cir. 1986) ....................................................................7

*Taylor Inv., Ltd. v. Upper Darby Twp.,*
   983 F.2d 1285 (3d Cir. 1993) ...................................................................5

*Tenney v. Brandhove,*
   341 U.S. 367 (1951) ..............................................................................10

*Thornbury Noble, Ltd. v. Thornbury Twp.,*
   112 Fed. Appx. 185 (3d Cir. 2004).........................................................15

*Toll Bros. Inc. v. Wicks,*
   2006 WL 1829875 (Del. Ch. June 21, 2006)...................................passim

*Town of Hallie v. City of Eau Clarie,*
   471 U.S. 34 (1985) ...........................................................................8, 10

*Trustees of Mortgage Trust of America v. Holland,*
   554 F.2d 237 (5th Cir. 1977) ..................................................................16

*U.S. v. Pollard,*
   326 F.3d 397 (3d Cir. 2003) ..............................................................13, 17

*U.S. v. Roberts*
   229 Fed. Appx. 172 (3d Cir. 2007)...........................................................5

*Unity Ventures v. Lake County,*
   841 F.2d 770 (7th Cir. 1988) ...............................................................7, 8

*Water and Wastewater Bd. Of Madison v. Anderson,*
   850 So.2d 1230 (Ala. 2002)....................................................................12

**Rules**

Rule 12(b)(1) ..............................................................................................2

Rule 12(b)(6) ........................................................................................13, 15

Rule 12(b)(7) ..............................................................................................2

Rule 19(c) ...................................................................................................2

**Regulations**

NCC Code § 38.02.002..............................................................................18

NCC Code § 38.02.007..............................................................................18

NCC Code § 40.05.320..............................................................................18

NCC Code § 40.05.520.......................................................................5, 6, 18

NCC Code § 40.22.320.................................................................................................................10

NCC Code § 40.22.330...................................................................................................1, 10, 11, 12

NCC Code § 40.22.360.......................................................................................................1, 10, 11

NCC Code § 40.31.500...................................................................................................................4

NCC Code § 40.31.512.........................................................................................................3, 4, 5, 7

NCC Code § 40.33.300...................................................................................................................4

## INTRODUCTION

Gary Warren, Gail Warren, and Toll Bros., Inc.'s (collectively "Toll") 50 page answering brief shows that this action essentially boils down to Toll's disagreement with the line drawn by County Council where sewer service will be provided at this time. AB 14.[1] Even though documents attached to Toll's Amended Complaint prove that the County repeatedly advised Toll that no sewer is available for the proposed developments (AC Exs. "K," p. 2, § 17; "M," p. 2 § 20; "P," p. 1 § 1), and even though Toll can build houses with septic systems under the Code (NCC Code §§ 40.22.330 and 40.22.360), Toll nonetheless argues that the County is precluding it from developing property by not providing sewer service.

Toll ultimately cannot overcome five primary hurtles that bar its case: (1) the Court lacks jurisdiction to hear Toll's constitutional and antitrust claims because Toll had an available (but unexercised) administrative appeal right; (2) there is no constitutional right to public or private sewer service and nothing requires the County to build a sewer treatment system to allow Toll to build a massive 631 lot housing development; (3) the County has "general jurisdiction over all matters . . . pertaining to sewers, sewerage disposal plants, trunk line sewers and sewer systems generally" which bars any antitrust claim under the State action doctrine; (4) on the face of the Amended Complaint, the County's legislative decisions concerning sewer service are supported by a rational basis and Toll has no legal basis to compel the County to provide sewer service; and (5) Toll always knew the status of sewer availability and proceeded forward with development plans that contemplate connection to sewer knowing that it might not receive sewer service.

---

[1]     Toll's answering brief (D.I. 26) is cited herein as AB ___.

**ARGUMENT**

## I.    THE CASE SHOULD BE DISMISSED UNDER RULE 12(b)(7)

As argued in the earlier briefs, Toll's case should be dismissed because Toll has failed to join all property owners of the properties of the proposed developments. Toll's answering brief again fails to address this argument, and also fails to explain, as required by Rule 19(c), why these property owners have not been joined. Because Toll has not addressed this argument, and because the property owners are necessary parties, the case should be dismissed under Rule 12(b)(7). *Toll Bros. Inc. v. Wicks*, C.A. No. 1314, 2006 WL 1829875, at *7 n.44 (Del. Ch. June 21, 2006) ("because it appears to be only the equitable owner of the parcel of land . . . Toll Brothers should . . . bring suit together with the legal owner of the property.").

## II.    RIPENESS REQUIRES DISMISSAL UNDER RULE 12(b)(1)

### A.    Toll Has Not Satisfied The Finality Requirement And Therefore Has Suffered No Concrete Injury

Toll cannot re-write long established Third Circuit precedent requiring the exercise of an administrative remedy prior to asserting a constitutional claim. AB 20-21. Toll's claim that the County has "inflicted an actual concrete injury upon them," (AB 20) is simply insufficient to satisfy Toll's "high burden" of establishing a final decision – a prerequisite for a constitutional claim. *Acierno v. Mitchell*, 6 F.3d 970, 976-77 (3d Cir. 1993).

The law is settled that a party asserting an as-applied challenge to a land use decision must exercise an available administrative appeal before the decision is final. *Deninno v. Municipality of Penn Hills*, --F.3d--, 2008 WL 683968, at *2-3 (3d Cir. Mar. 14, 2008); *Brubaker v. East Hempfield Twp.*, 234 Fed. Appx. 32, 37 (3d Cir. 2007) (holding that "as-applied substantive due process and equal protection 'claims by property owners or tenants who have challenged the denial of a permit by an initial decision-maker but failed to take advantage of

available, subsequent procedures'" must be dismissed). As the Third Circuit held on March 14, 2008, "[i]f there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Deninno*, 2008 WL 683968, at *2-3 (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)) (holding that Fourteenth Amendment due process claims should be dismiss where, as here, "the Planning Commission has not yet issued a final decision").

Because Toll has not exercised its available administrative appeal remedy to the Planning Board, this Court lacks jurisdiction to hear Toll's claims.[2] *See Huberty v. U.S. Ambassador to Costa Rica,* No. 3:07-CV-1420, 2007 WL 3119284, at *1 (M.D. Pa. Oct. 22, 2007).[3]

### B.    Toll Has An Available Administrative Appeal

1.    The County Code Provides An Appeal Right.    Recognizing that it has failed to appeal to the Planning Board, Toll argues that it has no administrative appeal available under the County Code. AB 18. Toll's argument contradicts the plain language of the Code, which states:

---

[2]    As discussed in the County's opening brief, Toll has never made any formal application to build a private, community wastewater treatment facility. OB 15. Toll's answering brief does not dispute this fact, nor does Toll allege that: (1) it has sought approvals from the Delaware Department of Natural Resources and Environmental Control ("DNREC") to build a private system; or (2) it has set aside sufficient land to construct such a system on its land development submissions to the County. *See* OB 15. Because Toll has not made any meaningful application, its claims are not ripe because it has not yet been denied any application. *See* NCC Code § 40.31.512; *see also Toll Bros.*, 2006 WL 1829875, at *8 ("Until Toll Brothers obtains a final and determinative decision, its claims will not be ripe for adjudication because the underlying facts will not be 'concrete and final.'").

[3]    Toll also argues that the ripeness inquiry should be excused because it might suffer injury if its plans expire. AB 20. However, because the ripeness inquiry is jurisdictional, the Court "must dismiss the suit" regardless of the dictates of a State or County statute of limitations. *See Baldini West, Inc. v. New Castle County*, 852 F. Supp. 251, 255 (D. Del. 1994).

An applicant pursuing approval of a land use application[4] who is aggrieved by a finding, decision, or interpretation of a decision-maker made in response to review of such application may appeal such action to the jurisdictionally approved agency pursuant to Table 40.30.110. Appeals may only be taken based upon a final decision,[5] not the recommendation of an agency. . . . Unless otherwise provided by law, no appeal to a court of law or equity may be taken until all remedies made available by this Chapter have been exhausted. NCC Code § 40.31.510.[6]

Under the statute, a party who is "aggrieved by a finding, decision, or interpretation of a decision-maker made in response to review of such application may appeal" may take an administrative appeal. *Id.*; *see also* NCC Code § 40.31.500 ("This Division contains rules and standards for an appeal of a decision made by a County administrative board or body"); *Toll Bros.*, 2006 WL 1829875, at *7. There is no merit to Toll's contention that it does not have an appeal right for decisions of County decision-makers – the statute is to the contrary. *Id.*

2.    Toll May Seek Relief Under The UDC. Toll also argues that it does not have a viable appeal right because the Department of Land Use is the "decision-maker" and § 40.31.512 of the County Code states that the decision-maker's findings may be reversed if the decision-maker made an error in interpreting "this Chapter" (i.e., Chapter 40 of the UDC). AB 24. Yet

---

[4]    A "land use application" is defined as "[a]ny building permit application, zoning permit application, subdivision or land development plan application, rezoning application, limited use application, special use application, variance application, appeals, or any other application made to New Castle County which, if granted, would have the effect of permitting the development or use of land . . .". NCC Code § 40.33.300 (emphasis supplied).

[5]    A "final decision" is a prerequisite for taking an appeal to the Planning Board under the County Code. NCC Code § 40.31.510. Consequently, Toll's argument that it received a "final decision" (AB 21) does not excuse the exhaustion requirement because Toll was required to obtain a final decision from the decision-maker before it could take its available administrative appeal. *Christiana Town Center, LLC v. New Castle County*, C.A. No. 20215, 2003 WL 21314499, at *4 (Del. Ch. June 6, 2003), *aff'd*, 841 A.2d 307 (Del. Jan. 16, 2004).

[6]    Toll argues that certain letters sent by the County "never advised Plaintiffs that they had the right to take an appeal." AB 19. Although there is no requirement for the County to advise Toll of its available appeal, Toll was well aware of the available administrative appeals in the County Code prior to filing this suit because it previously had a suit dismissed based upon its own failure to appeal within the County process. *See Toll Bros.*, 2006 WL 1829875, at *6-8 (dismissing Toll's case against the Delaware Department of Transportation for failure to exercise available administrative remedies in the County Code).

Toll argues <u>in this case</u> that the County (and the Department of Land Use) is misinterpreting § 40.05.520 of the County's Unified Development Code ("UDC"). AB 7, 46. When Toll argues that it has a right to sewer under § 40.05.520 of the UDC, and the Planning Board clearly has jurisdiction to hear this claim even under Toll's interpretation of the County Code, Toll cannot fairly allege that it lacks an available appeal right.[7]

3.    <u>The Presence Of Constitutional Claims Does Not Divest The Planning Board Of Jurisdiction.</u>  Toll alleges that because the Planning Board does not have jurisdiction to hear constitutional claims, that it is excused from pursuing its available administrative appeal. AB 23. Toll has a fundamental misunderstanding of the ripeness doctrine. The Court is constrained to avoid constitutional questions if the case can be disposed of on statutory grounds or some other basis. *Doe v. Pennsylvania Bd. Of Probation and Parole*, 513 F.3d 95, 102 (3d Cir. 2008); *U.S. v. Roberts,* 229 Fed. Appx. 172, 179 (3d Cir. 2007) (Jordan, Concurring) (holding that "constitutional issues" should "be avoided whenever possible."). Because the courts avoid constitutional issues "whenever possible," a constitutional challenge to a land-use decision is not ripe unless "state authorities [are] given an opportunity to 'arrive[ ] at a final, definitive position regarding how [they] will apply the regulations at issue to the particular land in question.'" *Aciernio*, 6 F.3d at 974 (quoting *Taylor Inv., Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1291 (3d Cir. 1993)). As federal courts are not "super land-use boards of appeals," courts allow local authorities like the Planning Board to decide the issues prior to judicial intervention because "local authorities are in a better position than the courts to assess the burdens and benefits of . . . varying interests." *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 598

---

[7]    Toll also alleges that "Land Use could hardly be expected to reverse itself after it had prepared the Sewer Capacity Policy." AB 23. The Planning Board, however, has the authority to review decisions of Land Use on appeal. NCC Code § 40.31.512. Toll's challenge to the Department of Land Use's decisions again demonstrates the available administrative appeal.

(3d Cir. 1998). The finality requirement allows the municipality the opportunity to correct any alleged error without the need for a decision on the constitutional issues or judicial intervention.

Thus, even where constitutional issues are present, the Court does not allow the applicant to bypass the administrative process because the board may decide the case in a manner which may render the constitutional issues moot. *Eastern Shore Envt. Inc. v. Kent County Dept. of Planning*, No. Civ.A. 1464-K, 2002 WL 244690, at *7 (Del. Ch. Feb. 1, 2002) (citing Third Circuit cases and stating: "[h]aving elected to truncate the administrative appeal process that, when concluded, would establish this precondition for constitutional ripeness, Eastern Shore cannot presently contend that it has a ripe claim that the County has acted in an unconstitutional manner."); *see Christiana Town Center*, 2003 WL 21314499, at *4 (holding that the exhaustion requirement is to prevent the Court from interfering in the administrative process and allows an agency to apply its expertise to possibly resolve conflicts without judicial intervention).

4.    The Futility Exception Is Inapplicable. In a last effort to establish jurisdiction in this Court,[8] Toll argues that its administrative appeal would be "futile" "given that the County had decided not to provide sewer service to Plaintiffs' Proposed Developments." AB 27-28. Yet, Toll seeks declaratory relief in this Court, claiming that the UDC (specifically § 40.05.520) allows it to connect to public sewer and/or allows it to build a private wastewater treatment facility. AB 46-47. Where Toll has argued that it is entitled to a declaratory judgment that the County must provide it private or public sewer under NCC Code § 40.05.520, and the Planning

---

[8]    Toll argues that facial challenges, as opposed to as applied challenges, are not subject to the ripeness requirement. AB at 25-26. As discussed in the County's opening brief, the County's ripeness defense is not based upon Toll's vaguely stated facial challenge to Resolution 06-069. *See* OB 14 n.12-13. These facial challenges, while not subject to the ripeness inquiry, fail to state a claim as a matter of law. *See infra* p. 12-14.

6

Board has the authority to interpret Chapter 40 of the Code (*see* NCC Code § 40.31.512; AB 22), Toll should be precluded from claiming that the administrative appeal is "futile."[9]

### C.     The Ripeness Requirement Precludes Toll's Anti Trust Claim

Toll states that "the Third Circuit Court of Appeals has not applied the ripeness doctrine to antitrust . . . claims."[10] AB 28. On the contrary, the case of *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 362 (3d Cir. 1986) (cited in the County's opening brief) holds that "antitrust issues are not ripe for review" without a final decision by the agency. *Suburban Trails* was expressly relied upon in the Seventh Circuit's decision in *Unity Ventures v. Lake County*, 841 F.2d 770, 776 (7th Cir. 1988), which holds that the ripeness requirement applies to antitrust claims. Moreover, the Eastern District of Pennsylvania has also held that the ripeness requirement applies to antitrust claims. *See Cooper v. Amster*, 645 F. Supp. 46, 47 (E.D. Pa. 1986) (holding that "the ripeness doctrine precludes this court from exercising subject matter jurisdiction" over Sherman Act claims). Toll cites no case where <u>any</u> court has held that the ripeness requirement should not be applied to antitrust claims.

## III.     TOLL'S CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(6)

### A.     The County Has State Action Immunity For Antitrust Claims

Contrary to Toll's arguments, the County is entitled to State action immunity, commonly known as *Parker* immunity, for Toll's antitrust claims. As stated by the United States Supreme

---

[9]     Toll also alleges that the County has "blocked their plans from proceeding through the land use approval process." AB at 20. Again, if Toll believes that the County has improperly "blocked" its plans, its appeal is to the Planning Board. NCC Code § 40.31.510; *Toll Bros.*, 2006 WL 1829875, at *7; *Christiana Town Center, LLC*, 2003 WL 21314499, at *4.

[10]     Toll also argues that the ripeness doctrine does not apply to the State law equitable estoppel claims. AB 28. As the County's opening brief demonstrates, the County did not argue ripeness but instead argued that the equitable estoppel claims are barred by the exhaustion of administrative remedies doctrine because Toll is challenging the substantive correctness of the County's actions. OB 36.

Court in *Town of Hallie v. City of Eau Clarie*, 471 U.S. 34, 42 (1985), in sustaining the dismissal

of sewer service antitrust claims against a municipality under the State action doctrine:

> To establish immunity, "[i]t is not necessary . . . for the state legislature to have stated explicitly that it expected . . . [the County] to engage in conduct that would have anticompetitive effects . . . it is sufficient that the statutes authorized the . . . [County] to provide sewerage services and also to be served. We think it is clear that anticompetitive effects logically would result from this broad authority to regulate."

*Id.*; *see also Kaehly v. City of Pittsburgh*, 988 F. Supp. 888, 895 (W.D. Pa. 1997) ("An agency is

acting pursuant to a clearly articulated state policy" and is entitled to State action immunity "so

long as the anticompetitive conduct is a foreseeable result of the authority granted by the state.").

Here, the Delaware General Assembly has provided the County broad authority to act

upon all matters pertaining to sewers. In addition to the County's home rule authority (OB 3),

Title 9, § 1521, entitled "Enumeration Of Certain Specific Powers," states:

> In addition to the powers elsewhere conferred upon the New Castle County Council and without limiting their generality, the New Castle County Council shall have general jurisdiction over all matters pertaining to the County . . . **including the power to act upon all matters pertaining to sewers, sewerage disposal plants, trunk line sewers and sewerage systems generally. . . .**

Similarly, Title 9, Chapter 22 of the Delaware Code, entitled "Sewers" further grants the

County the right to plan, construct and improve "any sewerage system and furnish the services

and facilities rendered or afforded thereby." Del. Code Ann. tit. 9, § 2202(2).[11]  Under these

statutes, it is clear that the General Assembly "affirmatively expressed" a State policy which

allows the County to displace "competition with regulation in the area of municipal provision of

sewerage services." *Town of Hallie*, 471 U.S. at 44; *Unity Ventures*, 841 F.2d at 777.

Toll, however, argues that the Court should review "whether the alleged anticompetitive

activities logically result from the powers that the State did expressly give" (AB 31) and argues

---

[11]     This authority is "in addition to and not in substitution for the powers conferred by any other general, special or local law." Del. Code Ann. tit. 9, § 2220.

that the General Assembly's adoption of Del. Code Ann. tit. 26, § 203D divests the County of its jurisdiction concerning "all matters pertaining to sewers." AB 31. Not only does Toll's argument contradict the General Assembly's specific grant of jurisdiction to the County in Del. Code Ann. tit. 9, § 1521, it is also unsupported by the text of Del. Code Ann. tit. 26, § 203D(b) which expressly states that a "wastewater utility shall not extend its territory into a service territory of a municipality, government agency or wastewater authority or district without the approval of such entity." *Id.* In addition, under § 203D, a private wastewater provider is required to submit "[a] certified copy of a resolution or ordinance from the governing body of a county or municipality that requests, directs or authorizes the applicant to provide wastewater utility services to the proposed territory to be served, which must be located within the boundary of such county or municipality" before it can provide wastewater service. *Id.* at (d)(4). When the General Assembly has expressly exempted municipalities from § 203D, and requires a private wastewater provider to obtain the County's consent prior to providing wastewater service, § 203D does not trump the County's jurisdiction over "all matters pertaining to sewer." Del. Code Ann. tit. 9, § 1521.

Toll also argues that the County Code requires "all residential subdivisions . . . [to] have access to sewer" (AB 1), and that the County is seeking to prevent Toll from "developing an area of the County." AB 33. There is nothing that prevents Toll from developing with individual septic systems.[12] Table 40.04.110A of the County Code (cited by Toll – AB 4, n.4) provides that public facilities, pursuant to Division 40.22.300 of the County Code, are used for single family

---

[12]    Toll alleges that the "record" does not establish that septic systems can be used on this particular property based upon soil conditions. AB 49. This argument misses the point, as the Code allows septic systems. Moreover, beyond improperly shifting the burden to the County, Toll makes no allegation that septic systems could not be used based upon unique soil conditions at the properties sought to be developed. If that were true, Toll could not build the on-site community treatment system that it seeks the right to build in this case. *See* AB 42-43.

houses in the Suburban (S) zoning district.  Under 40.22.320B of the County Code, a sanitary sewer connection is required only where capacity is available and where "a suitable sanitary sewer line is located within two hundred (200) feet of the lot property line."  NCC Code § 40.22.320B.  "Where discharge to a sanitary sewer system is not required in accordance with section [NCC Code §] 40.22.320 . . . septic systems may be utilized."  NCC Code §§40.22.330.  The idea that Toll is required to connect to sewer (or that the County is required to provide sewer) for the proposed developments is simply unsupported by the County Code.[13]

Finally, Toll argues that "whether *Parker* immunity applies and to what extent requires a more in-depth factual analysis than this court has at its disposal on a motion to dismiss."  AB 33.  Contrary to Toll's arguments, however, State action immunity questions are regularly resolved on a motion to dismiss.  *Town of Hallie*, 471 U.S. at 44 (upholding the District Court's finding of State action immunity at the motion to dismiss stage); *Federal Trade Comm. v. Equitable Resources, Inc.*, 512 F.Supp.2d 361, 372 (W.D. Pa. 2007) (finding antitrust claims barred by State action immunity on a motion to dismiss).  Where, as here, the statutory grant of authority to the County is clear, and also when Toll is not permitted to depose State or County legislators concerning their legislative intent,[14] no discovery assists with the State action immunity defense.

---

[13]    Because Toll can build with septic systems, this case is readily distinguishable from the Pennsylvania case of *Council of Middletown Twp. v. Benham*, 523 A.2d 311 (Pa. 1987).  *Benham* "rejected the plans based on an ordinance requiring sewer service for such properties to be public."  AB at 32 (emphasis supplied); *see also Benham*, 523 A.2d at 313.  Here, by contrast, there is no requirement that the developer connect to public wastewater treatment facilities.  NCC Code §§ 40.22.320B and 40.22.330.

[14]    *See In re Kent County Public Facilities Ordinances Litigation*, C.A. No. 2921-VCN, at *14 (Del. Ch. Mar. 19, 2008) (citing *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951)) (holding that the legislative privilege precludes the Court from inquiring into the motives of legislators).  A copy of this unreported decision is attached hereto as Exhibit "A."

**B.    Toll Has Not Stated A Substantive Due Process Claim**

The County's opening brief establishes that Toll's substantive due process claim fails because it has no constitutionally protected right to sewer service, established case law demonstrates that the County is the sole authority to determine the location of sewers, and Toll's allegations do not rise to the level of a substantive due process claim. OB 22-28. Toll does not directly refute these points, but instead argues that the County has somehow infringed its right to "own, use, and enjoy" property because the County is not providing it sewer service when it demands. AB 34. Toll Bros. Inc., however, does not "own" any of the properties. OB 11, n.11. And, the County's decision not to provide sewer at this time does not infringe any right to ownership of any property because: (1) Toll can develop the properties; (2) Toll has no federally protected right to sewer service; and (3) the County's sewer decisions are rationally based.

1.    The County Has No Duty To Provide Sewer Service To Toll.  Ultimately, Toll's claim that the County has infringed its purported "right" to "own, use, enjoy and develop" property (AB 34) is based upon the County not extending sewer service to where Toll wants to build at this time.  But Toll can build with septic systems.  NCC Code §§ 40.22.330 and § 40.22.360.  Established law also states that the County cannot be compelled to provide sewer service.  OB 23 (citing *AvalonBay Communities, Inc. v. Sewer Commission of the City of Medford*, 853 A.2d 497, 505 (Conn. 2004); *City of Tyler v. Likes*, 962 S.W.2d 489, 501 (Tex. 1997); *Snyder v. State Dept. of Health and Mental Hygiene*, 391 A.2d 863, 866 (Md. App. 1978)); *see also* 18A McQuillin Mun. Corp. § 53.119 (3d ed. 2007) ("the fact that a municipality has adopted a plan of sewerage does not make it liable in damages arising from its failure to execute part of the plan because the municipality is at liberty to carry out the plan in whole or in part at such times as it sees fit."). Even if Toll had the ability to sue to extend municipal services

(which it does not), in this Circuit, the provision of sewer service is not a right worthy of substantive due process protection. *Ransom v. Marrazo*, 848 F.2d 389, 412 (3d Cir. 1988); *Gagliardi v. Clark*, C.A. No. 06-20, 2006 WL 2847409, at *10 (W.D. Pa. Sept. 28, 2006).

Toll attempts to distinguish this well established precedent by arguing that *"Ransom was not a land use case and . . . did not implicate the fundamental right to use and develop one's property."* AB 35. This argument is without merit because the County has not prevented Toll from developing property. Toll can develop the property using septic systems (NCC Code § 40.22.330), but Toll wants sewer so it is able to put a few more units on the development plan. Ultimately, Toll disregards the *Ransom* decision (which holds there is no right to continuation of existing sewer service) in favor of a substantive due process right (not heretofore recognized) to the extension of sewer services. No surprisingly, Toll does not cite a single case that stands for this proposition – and the Third Circuit has soundly rejected this purported substantive due process "right." *Ransom*, 848 F.2d at 412; *Gagliardi*, 2006 WL 2847409, at *10.[15]

    a.    <u>Toll's Facial Challenge Fails As A Matter Of Law</u>. Toll states that "a legislative act will withstand substantive due process challenge if the government identifies the legitimate state interest that the <u>legislature could rationally conclude</u> was served by the statute." AB 37 (emphasis supplied). Yet Toll argues that its mere use of the words such as "arbitrary,"

---

[15]    None of the cases cited by Toll hold that a private party has a substantive due process right to the extension of sewer service. *See Water and Wastewater Bd. Of Madison v. Anderson*, 850 So.2d 1230, 1238 (Ala. 2002) (holding that the Water Board's policy of refusing service was based upon a "reasonable rationale" and Plaintiff had no right to service); *City of Winter Park v. Southern States Utilities, Inc.*, 540 So.2d 178, 180 (Fla. App. 1989) (holding that the City could not require residents to disconnect from an <u>existing</u> private service when the City did not have the capacity to serve). The case of *Corcoran v. Village of Bennington*, 266 A.2d 457, 462 (Vt. 1970), cited by Toll, was later distinguished by *Bryant v. Town of Essex*, 564 A.2d 1052 (Vt. 1989) which held "Neither *Corcoran v. Village of Bennington*, . . . nor *Kedroff v. Town of Springfield*, . . . established an absolute obligation on the part of a municipality to provide sewage disposal services on demand." *Id.* at 1057.

"irrational," or "intentional" in the Amended Complaint allow it to survive a Rule 12(b)(6) motion. AB 37-38. Toll's substantive due process claim, however, fails as a matter of law because Resolution 06-069 on its face provides a rational basis for the County's actions.

Rational basis review, which governs Toll's facial challenge to Resolution 06-069, is not a license for Courts to judge the wisdom, fairness, or logic of governmental choices, *Acierno v. New Castle County*, 2000 WL 718346, at *7 (D. Del. May 23, 2000), but rather is a "highly deferential" standard that requires that the challenged action be upheld "if there is any reasonably conceivable set of facts that could provide a rational basis for the classification." *Angstadt v. Mid-West School Dist.*, 377 F.3d 338, 345 (3d Cir. 2004). A legislative decision may be invalidated for irrationality or arbitrariness only if "the governmental body could have had no legitimate reason for its decision." *County Concrete Corp.* v. *Twp. Of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006); *Herr v. Pequea Twp.*, 274 F.3d 109, 110-11 (3d Cir. 2001) (decisions concerning amendment of municipal service plans must survive due process review unless the government body could have had no legitimate reason for the decision). The Court may even "hypothesize the motivations of the ... legislature to find a legitimate objective promoted by the provision under attack." *U.S. v. Pollard*, 326 F.3d 397, 408 (3d Cir. 2003). Toll bears the burden "to negative every conceivable basis which might support" the actions of the County. *Id.*

Resolution 06-069 has a rational basis. The County determined that the path forward for the SSSA "ensures that the SSSA will be financially self-sustaining." AC Ex. "I." (Whereas Clause). It directs that the County will construct certain portions of the sewage treatment conveyance system immediately (*id.* at § 1), and authorized additional capacity to be purchased from the Town of Middletown to provide capacity (*id.* at § 2), – at a cost of $3.2 million for 100,000 gallons per day of sewer capacity. *Id.* (fiscal note). In addition, the Resolution states

that areas "planned to be permanently served by Water Farm #1," and areas in the Central Core (where the transmission systems are to be built – at a cost of $34-39 million) (*id.* at § 5 and fiscal note), will receive sewer service priority for available capacity. The fiscal note also provides that the County will "likely spend $5-10 million evaluating long term disposal methods over the next five to seven years." *Id.*[16] These legislative pronouncements about the best way to allocate the County's sewer resources are rationally based legislative judgments made by the County Council. Even though Toll may not like the sewer allocation method chosen by the County, or may wish that the line was drawn differently, the actions have a rational basis as a matter of law. Where a rational basis supports the County's legislative choices, "the court will not substitute its judgment about land use policy and thereby undermine the legitimacy of democratic decision making." *Pace Resources, Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1035 (3d Cir. 1987).[17]

> b.    Toll Cannot Meet The Rigorous "Shocks The Conscience Standard" In Challenging The County's Sewer Decisions. Separate and apart from the County's enactment of Resolution 06-069, (AB 26), Toll alleges that the decision not to provide sewer service for Toll's massive development at this time violates the rigorous "shocks the conscience" test for executive actions. Toll complains that the County acted with the intent of "preventing such development" and claims that the County sought to "halt the development plan process." AB 39. Toll makes

---

[16]    Financial appropriation for construction and operation of a sewer system is quintessentially a matter of legislative discretion.

[17]    *See also Hellman v. State*, 784 A.2d 1058, 1068 (Del. 2001) ("Courts are not super-legislatures and it is not a proper judicial function to decide what is or is not wise legislative policy."); *State v. Schorr*, 131 A.2d 158, 161 (Del. 1957) ("the power of the legislature as the repository of the legislative power with its broad and ample sweep, has full and unrestrained authority to exercise its discretion in any manner it sees fit in its wisdom or even its folly to adopt.'"); *Salem Church (Delaware) Associates v. New Castle County*, C.A No. 20306, 2006 WL 2873745, at *14 (Del. Ch. Oct. 6, 2006) (same).

these unsubstantiated allegations, even though Toll was repeatedly advised that no sewer service is available for Toll's development. AC Exs. "K," p. 2, § 17; "P," p.1 § 1.[18]

Even though Toll's allegations are directly rebutted by documents attached to the Amended Complaint, even if they were accepted as true, such claims do not "shock the conscience" as a matter of law. Similar claims were reviewed by the Delaware Court of Chancery in the case of *Salem Church*, 2006 WL 2873745, at *13. There, in dismissing the claim pursuant to Rule 12(b)(6), the Court stated "Courts have generally held that even if a municipality is guided by political motivations, unrelated to an application, that is not enough to 'shock the conscience' under a substantive due process analysis, particularly where the municipality, as the County here, can justify its actions as related to some legitimate goal." *Salem Church*, 2006 WL 2873745, at *13 (citing *Thornbury Noble, Ltd. v. Thornbury Twp.*, 112 Fed. Appx. 185, 188 (3d Cir. 2004)); *see also ADB Monroe Inc. v. Monroe Twp.*, 04-1412, 2008 WL 58876, at *7 (D.N.J. Jan. 3, 2008) ("unless a defendant's actions were 'completely unrelated in any way to a rational land use goal,' there is no substantive due process violation.").[19] There is simply nothing "conscious shocking" when the County decides where to allocate limited sewer services, even if it is not exactly the plan that best suits Toll's development desires.

## C.    The Equal Protection Claim Fails As A Matter Of Law

Toll alleges that it has stated an equal protection claim by merely identifying other properties that were provided sewer under the actions implementing Resolution 06-069. AB 41-44. Tellingly, Toll does not identify a single property or parcel within the east yellow area on the

---

[18]    The Court "need not accept as true unsupported conclusions and unwarranted inferences" and should address plaintiffs' allegations in a "realistic" manner. *Doug Grant, Inc. v. Great Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000).
[19]    As stated by Judge Robinson, "[t]he actual motivations of the Council are entirely irrelevant." *Acierno*, 2000 WL 718346, at *4 (citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)).

SSSA map that is being provided sewer service under the SSSA path forward. A1. Toll is essentially arguing that because the County drew a line and decided that it would not provide sewer north of the Augustine Creek at this time, it has stated an equal protection claim. Legislative line drawing for municipal services, however, simply does not rise to the level of an equal protection violation. *See Trustees of Mortgage Trust of America v. Holland*, 554 F.2d 237, 239-40 (5th Cir. 1977) (reversing the lower court's equal protection finding and holding that for zoning lines "[i]t is not even the function of the courts to pass judgment on the wisdom of those lines"); *Prices Corner Liquors v. Delaware Alcoholic Beverage Control Commission,* C.A. No. 95A-04-017, 1995 WL 716802, at *3 (Del. Super. Ct. Nov. 13, 1995), *aff'd,* 705 A.2d 851 (Del. 1998) ("the Court has almost no authority to second-guess legislative decisions, even ones involving line-drawing.").

Toll has not established that the County is treating it differently than any owner similarly situated because the County is treating everyone in the east yellow area the same, and Toll has certainly not alleged that the County has treated it differently than property owners that are *prima facie* identical.[20]  *ADB Monroe,* 2008 WL 58876, at *7 ("In order to succeed [on a class of one equal protection claim], the [plaintiff] must demonstrate that [it was] treated differently than someone who is *prima facie* identical in all relevant respects."); *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) ("level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high.").

Even if Toll had sufficiently pled that similarly situated persons were treated differently (which it has not), Toll bears a "heavy burden of demonstrating that [the County] had no rational

---

[20]    Toll alleges that the County has treated it differently than the Pennfield development. AB 43. The County, however, is not providing any sewer to Pennfield at this time and Toll does not allege otherwise.

justifications for any allegedly different treatment among similarly situated property owners." *Eichenlaub v. Twp. of Indiana,* 214 Fed. Appx. 218, 224 (3d Cir. 2007). Toll also bears the burden "to negative *every conceivable basis* which might support" the actions of the County, and the County's actions must be sustained even if rational County motivations can be hypothesized. *U.S. v. Pollard,* 326 F.3d at 408.

Toll has made no effort to negate the legitimate policy based justifications for the SSSA path forward (which are set forth in the County's opening brief) and include, but are not limited to: (1) making judgments about how limited sewer treatment capacity should be allocated; (2) moving forward with design plans for the conveyance system for the Central Core which were substantially complete at the time of Resolution 06-069; (3) County needing time to study the environmental impact of additional treatment facilities; (4) County assuring that a sewer system that extends miles from the treatment facilities is financially sustainable; and (5) the "path forward" allowing the County additional time planning and coordinating infrastructure improvements with other governmental agencies and allowing the County time to evaluate growth. OB at 30 (citing AC Ex. "I."). Because the County's actions are justified by numerous legitimate governmental objectives, and Toll is unable to negate every conceivable basis for the action as a matter of law, there can be no equal protection claim.

**D.    Toll Has Failed To State A Procedural Due Process Claim**

Toll correctly states that it must demonstrate that it has a protected property interest to establish a procedural due process claim. AB 45. However, as discussed above, Toll has no legally protected property right to sewer. *Ransom,* 848 F.2d at 412; *Gagliardi,* 2006 WL 2847409, at *10. Toll also has an available administrative appeal to the Planning Board that it has not exercised. *See infra* p. 2-7; *Toll Bros.,* 2006 WL 1829875, at *7; *Christiana Town*

17

*Center, LLC,* 2003 WL 21314499, at *4. Because Toll has not availed itself of the available administrative procedure, it cannot bring a procedural due process claim. *Alvin,* 227 F.3d at 116. Finally, Toll has no procedural due process right to challenge legislative decisions made pursuant to Resolution 06-069, and Toll cites no law to the contrary. *See* AB 45; *see contra, Salem Church,* 2006 WL 2873745, at *14; *Rogin v. Bensalem Twp.,* 616 F.2d 680, 693 (3d Cir. 1980).

### E.     The Declaratory Judgment Claim Fails As A Matter Of Law

Even though Toll fails to allege that: (1) it made any application to the County or DNREC for a community wastewater treatment facility; or (2) it took any appeal to the Planning Board,[21] it seeks a declaratory judgment that it is entitled to relief under provisions of the County Code. AB 46. Toll's brief, however, does not point to any provision in the County Code that mandates that the Department of Special Services approves a sewer connection in an area where the County is not currently providing service or that mandates approval of an on-site community wastewater treatment system. *See contra* OB 34-35 (citing NCC Code § 38.02.002, § 40.05.320, § 38.02.007D, and § 40.05.520C). While Special Services <u>may</u> approve certain system or connection, there is nothing that mandates a connection – and Toll cites no authority to the contrary. *Compare* AB 45-47; OB 34-35. Consequently, even if the Court entertains Toll's declaratory judgment claim without an administrative appeal, the claim fails as a matter of law.

Toll also argues that it is entitled to build a community treatment system under Titles 9 and 26 of the State Code. AB 47. However, as discussed *supra*, Title 9 provides the County jurisdiction over all matters pertaining to sewers and sewer systems generally. Del. Code Ann. tit. 9, § 1521. And, Del. Code Ann. tit. 26, § 203D expressly states that a "wastewater utility shall not extend its territory into a service territory of a municipality, government agency or

---

[21]     Again, as Toll did not take any appeal to the Planning Board, it has failed to exhaust its available administrative remedies pursuant to NCC Code § 40.31.510.

wastewater authority or district without the approval of such entity," and expressly requires the approval of the governing body of the municipality prior to the private wastewater provider providing the service. Del. Code Ann. tit. 26, § 203D(d)(4). There is nothing within Title 9 or Title 26 that states that the County must approve a private wastewater treatment facility.

**F.    Toll's Equitable Estoppel Claim Fails As A Matter Of Law**

1.    <u>Exhaustion Bars Toll's Equitable Estoppel Claim</u>.    In its opening brief, the County demonstrated that when a litigant challenges the substantive correctness of a County decision, the litigant must exhaust its available administrative remedies before asserting an equitable estoppel claim. OB 36; *Salem Church*, 2006 WL 2873745, at *5 n.44; *Eastern Shore*, 2002 WL 244690, at *6. Toll argues that it should be excused from the exhaustion requirement because "it is also challenging the County's [purported] change in position." AB 48 n.39. Delaware law requires that exhaustion occur even if Toll is also challenging an alleged change in position. *Salem Church*, 2006 WL 2873745, at *5 n.44. Toll's failure to appeal to the Planning Board (when challenging the substantive correctness of the County's actions) precludes its equitable estoppel claim. *Id.*

2.    <u>Toll's Equitable Estoppel Claim Is Barred Because Toll Has Other Uses For The Land Absent Estoppel</u>.    Judge Robinson's decision in *Acierno*, 2000 WL 718346, at *11, holds that "Delaware courts have estopped enforcement of zoning regulations where landowners have incurred considerable expenses on permanent improvements <u>and</u> where the landowners had no other use for the land." (emphasis supplied).  Here, assuming that Toll has incurred expenses, Toll does not (because it is unable to) allege that it lacks other uses for the land absent estoppel.

3.    <u>Toll Cannot Establish Exceptional Circumstances Or That Its Rights Were Impaired</u>.    Toll's equitable estoppel claim should be dismissed because documents attached to

19

the Amended Complaint unequivocally refute Toll's claims.    Exhibit E to the Amended

Complaint clearly shows that Toll knew that the County would need to allow it to "borrow"

capacity from other developments in order to provide it sewer service because no facilities were

constructed. *Id.* at pp. 2, 5; AC 8.  Toll, however, decided to press forward with its development

plans for connection to sewer even though it knew that sewer service was not available.  AC Exs.

"K," p. 2, § 17; "M," p. 2 § 20, "P," p.1 § 1.[22]  As Toll always knew of the truth of the facts in

question, it has failed to state an equitable estoppel claim as a matter of law.  *See Salem Church,*

2006 WL 2873745, at *12 (dismissing an equitable estoppel claim on a Rule 12 motion).[23]

## CONCLUSION

The County respectfully requests that Toll's Amended Complaint be dismissed.

CONNOLLY BOVE LODGE & HUTZ LLP

*[signature]*

Collins J. Seitz, Jr. (Bar No. 2736) (cseitz@cblh.com)
Max B. Walton (Bar No. 3876) (mwalton@cblh.com)
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 656-0116
*Attorneys for Defendant New Castle County*

Dated: March 28, 2008

---

[22]    Certain letters attached to the Amended Complaint state that sewer capacity will be available when Water Farm #2 is built. AC Exs. F, G. There is no dispute that Water Farm #2 has not been built and the County is studying when and/or if it will build Water Farm #2.  AC Ex. "I," Resolution 06-069 ¶ 6. Importantly, Exhibits F and G of the Amended Complaint do not reserve any capacity for Toll's projects, as both letters state that capacity may only be reserved at the record plan stage of the development process. These letters demonstrate that Toll was proceeding with its development plans for connection to sewer at its own risk.

[23]    For the first time in its answering brief, Toll asserts a vested rights claim.  AB 48, n.40. Even if this newly raised claim was pled in the Amended Complaint, the claim fails because Toll must plead and prove good faith reliance on existing standards.  *Salem Church,* 2006 WL 2873745, at *9. As Amended Complaint's exhibits demonstrate, at no time did the County ever guarantee or promise Toll sewer capacity, and the County has not built Water Farm #2.

# EXHIBIT A

EFiled: Mar 19 2008 3:06PM EDT
Transaction ID 19060563
Case No. 2921-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

March 19, 2008

John W. Paradee, Esquire
Prickett, Jones & Elliott, P.A.
11 North State Street
Dover, DE 19901

Joseph Scott Shannon, Esquire
Marshall, Dennehey, Warner,
Coleman & Goggin, P.C.
1220 N. Market Street, 5th Floor
Wilmington, DE 19899-8888

Re:   In re Kent County Adequate Public Facilities Ordinances Litigation
      Consolidated – C.A. No. 2921-VCN
      Date Submitted: February 4, 2008

Dear Counsel:

Petitioners, land owners and developers, are challenging Respondent Kent County's adoption and implementation of its Adequate Public Facilities Ordinances (the "APFOs"). The parties dispute the right of Petitioners to obtain discovery regarding the adoption of the APFOs directly from Respondents Kent County Levy Court Commissioners and Respondents Kent County Regional Planning Commission members. The Respondents have invoked both legislative immunity and legislative privilege in their effort to resist Petitioners' discovery.

March 19, 2008
Page 2

Petitioners have noticed the depositions of the seven Respondent members of

the Kent County Levy Court (the "Levy Court") and the seven Respondent members

of the Kent County Regional Planning Commission (the "Planning Commission")

(collectively the "Kent County Officials" or, more generally, "Kent County" or the

"County").   The County has refused to produce the Kent County Officials for

depositions and has moved for a protective order pursuant to Court of Chancery

Rule 26(c); Respondents assert that the Kent County Officials are entitled to

absolute legislative immunity[1] from suit and, thus, they also are absolutely

---

[1] The members of the Levy Court constitute the elected governing body of Kent County and perform both legislative and administrative functions; the members of the Planning Commission are appointed. Accordingly, there may be some question as to whether the members of the Planning Commission are entitled to assert legislative immunity or legislative privilege to preclude Petitioners from taking their depositions. The parties have not joined debate over whether their appointed status matters in this instance or is one that the Court should even consider. Therefore, for purposes of the pending motion, the Court will assume that the members of the Planning Commission would be considered an integral part of the legislative process, and, thus, they are entitled, to the same extent as members of the Levy Court, to assert legislative immunity or legislative privilege.

The Court must also be mindful that it is considering the assertion of legislative immunity and legislative privilege by members of municipal or local governmental entities. Unlike members of the General Assembly, members of the Levy Court not only enact legislation but they also implement that legislation. Accordingly, care must be taken to recognize the context from which any particular discovery request has arisen, and that the Kent County Officials, as representatives of the interests of a subordinate governmental body, may enjoy protection less than that which would be afforded members of, for example, the General Assembly. In short, the Court is not necessarily addressing the scope of legislative immunity or legislative privilege that would be available to members of the General Assembly. *See, e.g.*, 10 *Del. C.* § 4001 (State Tort Claims Act) (expressly providing that, notwithstanding certain means by which a plaintiff can survive assertion of a statutory tort immunity defense and obtain an award of money damages against the state and certain of its agents, "the immunity of [certain state officials] and members of the

March 19, 2008
Page 3

privileged from being deposed by Petitioners.[2]    The parties have staked out

diametrically opposed "all or nothing" positions on the narrow issue presented for

the Court's resolution: whether Respondents are entitled to a protective order

prohibiting Petitioners from deposing the Kent County Officials on the grounds of

legislative immunity or legislative privilege.

Kent County contends that the doctrine of legislative immunity would be

rendered meaningless and that the public policies underlying the doctrine would be

eviscerated if the Kent County Officials could be haled into court (or Petitioners'

attorneys' conference room) to answer questions about the APFOs.    Petitioners

counter that the County's view of legislative immunity is unprecedented and that

legislative immunity is not so "absolute" as to preclude the taking of the Kent

County Officials' depositions under all circumstances.    Petitioners further contend

that even if legislative immunity is "absolute," immunity has no application in this

case because the Kent County Officials are being sued in their official (as opposed

to individual) capacities.    Petitioners concede, however, that their request to depose

---

General Assembly shall, as to all civil claims or causes and actions founded upon an act or
omission arising out of the performance of an official duty, be absolute.").
[2] Respondents did not assert legislative immunity as an affirmative defense in their Answer to
Petitioners' Fourth Amended Petition for Injunctive Relief, Declaratory Judgment, and Other
Relief. After filing the pending motion, Respondents moved to amend their Answer to assert an
immunity defense for the Kent County Officials; the Court has not yet addressed that motion.

March 19, 2008
Page 4

the Kent County Officials may be subject to heightened judicial scrutiny;[3]

nevertheless, they maintain that depositions are necessary because, *inter alia*, the

Kent County Officials are the only source of information regarding Petitioners'

claims under Delaware's Freedom of Information Act ("FOIA")[4] and because the

proposed depositions will amount to only a *de minimis* interference with the Kent

County Officials' duties.

Legislative immunity and legislative privilege, both grounded in the same

public policies, are closely related and, at times, overlapping concepts.[5]  The Court

---

[3] *See, e.g., New Castle County v. Christiana Town Center, LLC*, 2004 WL 740029 (Del. Ch. Apr. 7, 2004); *see also* Ct. Ch. R. 26(b)(1) (The Court has discretion to limit the means of discovery in appropriate circumstances.).

[4] 29 *Del. C.* § 10001, *et seq.*

[5] Although both legislative immunity and legislative privilege can support the relief sought by Respondents, namely to preclude Petitioners from taking certain discovery about the APFOs directly from the Kent County Officials, they are conceptually distinct.  In cases where immunity applies, a legislator is entitled to a relatively prompt dismissal of all claims against him. Moreover, legislative immunity also acts as something of an absolute testimonial and evidentiary privilege because it can preclude a litigant from ever having the opportunity to summon the immune legislator to provide discovery.

Yet, there may be some instances where, for various reasons, legislative immunity does not apply.  For example, depending on the nature of a plaintiff's claims, it may not be evident on the face of the complaint that a legislator is entitled to the protection of immunity, and so limited discovery might be necessary to establish a legislator's entitlement to immunity, *see, e.g., State Employees Bargaining Agent Coalition v. Rowland*, 2006 WL 141645, at *3 (D. Conn. Jan. 18, 2006), *aff'd*, 494 F.3d 71 (2d Cir. 2007).  There may also be other instances where a legislator is not a named party to a lawsuit (or has been dismissed) but is nonetheless called upon to testify or to give other evidence.  In those instances, the legislative privilege may still apply.  The legislative privilege, however, is not as "absolute" as the testimonial and evidentiary protection accompanying immunity; accordingly, it does not deny a litigant the right to require the legislator to appear at a noticed deposition—instead, it operates to limit, possibly severely, the permissible

March 19, 2008
Page 5

ultimately is guided in its resolution of this discovery dispute by two reasonably

indisputable propositions. First, although the doctrine of legislative immunity will

frequently serve as an absolute bar to discovery in matters involving legislative

conduct, Respondents' suggestion that a litigant may *never* seek (and that a court

may never order) a legislator's deposition is untenable. Second, in cases where

discovery from a legislator is permitted, the scope of the inquiry may be sharply

limited by the legislative privilege (regardless of whether the legislator is entitled to

the defense of immunity) and, more generally, by public policy disfavoring judicial

intrusion into the independence of the legislature.

Thus, for the reasons set forth more fully below, the Court concludes that

Respondents may not absolutely preclude Petitioners from seeking discovery from

the Kent County Officials on the basis of legislative immunity; Respondents may,

however, assert legislative privilege to limit the scope of permissible discovery.

---

scope of the litigant's inquiry of the legislator. Of course, if it appears that assertion of legislative privilege would deprive the deposition of any productive purpose, a court, in its discretion, might truncate the deposition even before it begins.

In sum, an immune legislator may be able to resist any discovery of matters falling within the "sphere of legitimate legislative activity" because, in the instances where immunity applies, the testimonial and evidentiary protections accompanying it are relatively "absolute." On the other hand, where a legislator is not entitled to (or has not asserted) immunity, he may rely upon the legislative privilege to circumscribe the scope of discovery a litigant may seek, but the legislator may not be able to avoid appearing at the deposition in the first instance.

March 19, 2008
Page 6

Given those limitations and the deference a court ought to accord members of a duly

constituted legislative body for their legislative acts, the Court seeks additional input

from counsel regarding whether a protective order should limit Petitioners' means of

seeking discovery from the Kent County Officials, at least initially, to those that

might be considered less intrusive and burdensome, such as written interrogatories,

depositions upon written interrogatories, or a limitation on the number of Kent

County Officials to be deposed.[6]

\*      \*      \*

A.    *Legislative Immunity Cannot Preclude the Depositions of the Kent County*
      *Officials at this Stage of the Proceedings*

Legislative immunity absolutely protects legislators from personal liability for

"damages on account of their votes, cast in the exercise of discretion vested in them

by virtue of their office."[7]  The doctrine may also extend to cases where a plaintiff

seeks prospective relief, particularly if the relief sought would encroach upon a

legislator's official duties (*e.g.*, requiring a legislator to vote in favor of a particular

piece of legislation).[8]  "The purpose of [legislative] immunity is to insure that the

---

[6] *See* Ct. Ch. R. 26(b)(1).
[7] *Shellburne, Inc. v. Roberts*, 238 A.2d 331, 337 (Del. 1967).
[8] *See, e.g., State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 82-88 (2d Cir. 2007) (holding that state legislators are immune from suits for injunctive relief). *But see id.* at 85-

March 19, 2008
Page 7

legislative function may be performed independently without fear of outside interference,"[9] and, as a matter of public policy, it is well-settled that "legislators engaged in the 'sphere of legitimate legislative activity' should be protected not only from the consequences of litigation's results, but also from the burden of defending themselves"[10] with regard to their official legislative conduct. Thus, where legislative immunity applies, the protection afforded a legislator is twofold: (1) the legislator may not be held personally liable in damages (or required to take a particular legislative act); and (2) the legislator may not be required to appear and defend against a lawsuit (including responding to discovery requests) challenging legitimate legislative activity, except to the extent necessary to assert the immunity.[11]

---

86 (citing cases holding that local and municipal legislators are not entitled to legislative immunity from suits seeking injunctive relief).

[9] *Sup. Ct. of Va. v. Consumer's Union of U.S., Inc.*, 446 U.S. 719, 731 (1980) (citations omitted).

[10] *Id.* at 731-32; *cf. Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998) ("Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability. . . .[T]he time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace . . . [a]nd the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability." (citations omitted)).

[11] *See, e.g., Powell v. Ridge*, 247 F.3d 520, 524 (3d Cir. 2001) ("Absolute [legislative] immunity . . . creates not only protection from liability but also a right not to stand trial." (citation omitted)).

March 19, 2008
Page 8

Delaware recognizes the doctrine of legislative immunity, but our courts have

not defined its precise contours.[12] Legislative immunity under federal law finds its

genesis in the Speech or Debate Clause of the United States Constitution.[13] The

Speech or Debate Clause of the Delaware Constitution of 1897 mirrors the federal

constitution.[14] Although the protections of the Speech or Debate Clause, either state

or federal, do not directly apply to the Kent County Officials, the policies animating

such protections support the extension of similar (even if not identical) protection to

local legislative officers.

---

[12] *See, e.g., Shellburne, Inc.*, 238 A.2d at 331; *see also* 10 *Del. C.* § 4001, *et seq.* (State Tort Claims Act) and § 4010, *et seq.* (County and Municipal Tort Claims Act) (The Tort Claims Acts codify common law immunity from civil liability for money damages traditionally afforded to state (and other governmental) actors for their official acts. They do not, however, abrogate, or even address, the common law with respect to any evidentiary or testimonial privileges that might attach to a successful assertion of immunity as a defense to Petitioners' suit. In addition, although the Tort Claims Acts shift the burden to the Plaintiff to rebut the presumption of immunity in order to seek an award of money damages, these acts do not otherwise redistribute the legislator's burden of establishing his entitlement to immunity in other instances. Instead, the burden of establishing an entitlement to an immunity or a privilege typically falls upon the party seeking to assert it. *See, e.g., Deutsch v. Cogan*, 580 A.2d 100, 107 (Del. Ch. 1990) (in light of the broad discovery permitted under Court of Chancery Rule 26, "the party objecting to the discovery bears the burden of establishing the existence of [a] privilege.")).

[13] U.S. Const. art. I, § 6 ("[F]or any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other place.").

[14] Del. Const. art. II, § 13 ("[F]or any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other place."). Although comparable provisions of the federal and state constitutions may not necessarily be coextensive in application, *see, e.g., Dorsey v. State*, 761 A.2d 807, 814-15 (Del. 2000), the parties have not suggested any material difference, and the Court will assume consistency.

March 19, 2008
Page 9

The Third Circuit has adopted a two-part test for determining whether a particular action is entitled to the protection of legislative immunity.[15] First, the action must be "substantively legislative" (*i.e.*, involves "policy-making" or a "line-drawing" decision).[16] Second, the action must be "procedurally legislative" (*i.e.*, be "undertaken through established legislative procedures").[17] The burden rests on the party asserting legislative immunity to establish the necessary conditions precedent to its application.[18] For local governmental bodies, such as the Levy Court, "[i]t is only with respect to the powers delegated to them by the state legislatures that [their] members . . . are entitled to absolute immunity."[19]

There is no doubt that the APFOs are "substantively legislative." Indeed, they reflect precisely the type of policy-making and line-drawing decisions typically reserved to a legislative body. Petitioners have raised some doubt, however, as to whether adoption of the APFOs was "procedurally legislative." The nub of

---

[15] *See, e.g., Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994).

[16] *Id.*

[17] *Id.*

[18] *See, e.g. Almonte v. City of Long Beach*, 2005 WL 1796118, at *3 (E.D.N.Y. July 27, 2005) (Party asserting legislative immunity "bears the burden of persuasion.").

[19] *Acierno*, 40 F.3d at 610; *see also County Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 173 (3d Cir. 2006) ("'An unconstitutional or illegal course of conduct by county government does not fall within the doctrine of absolute immunity merely because it is connected to or followed by a vote of a county board.'" (quoting *Carver v. Foerster*, 102 F.3d 96, 102 (3d Cir. 1996))).

March 19, 2008
Page 10

Petitioners' FOIA claim is that a quorum of Kent County Officials held meetings and discussions outside the public record to develop the APFOs initially as well as their amendments. As an inferior legislative body, the Levy Court exists by the grace of the General Assembly[20] and, accordingly, must abide by the legislative procedures prescribed by the General Assembly, including compliance with FOIA's open meeting requirement.

Petitioners speculate (although they have not put forth much credible evidence to support their theory) that, for example, the precision of the amendments to the APFOs introduced at the March 27, 2007 Levy Court meeting, without any prior "on the record" discussion, suggests that the amendments had been discussed by the Kent County Officials outside the public record. Respondents report that the County's attorney anticipated possible problems with the APFOs as initially drafted and, therefore, had prepared several alternative amendments for the Levy Court members to consider. That is one plausible explanation for the precisely drawn amendments; Respondents have not, however, foreclosed the possibility that Petitioners' theory also could be a plausible explanation. Indeed, if Petitioners' allegations are true, it would seem that Respondents violated the procedures by

---

[20] 9 *Del. C.* § 4101, *et seq.*

March 19, 2008
Page 11

which the General Assembly has authorized the Levy Court to enact legislation for

Kent County.    Accordingly, even if the Court assumes that the Kent County

Officials may properly assert an immunity defense in this case, they have not yet

satisfied the "procedural" prong of *Acierno* to establish the defense.[21]    Thus,

---

[21] The Court notes that it has not expressly been called upon to consider an assertion of immunity in a situation where minor, technical non-compliance with proper legislative procedures has been alleged. In *Acierno*, for example, the New Castle County (Delaware) Council was alleged to have violated proper legislative procedure because a proposed rezoning had not received all of the necessary public notices. Nevertheless, the Third Circuit held that, as a matter of federal law, the New Castle County Council had satisfied the procedural prong of the immunity defense and that, in considering whether a legislative body has established that prong of the defense, "[a federal] court need only be satisfied that the municipal body is acting pursuant to the basic legislative procedure." 40 F.3d at 614. The *Acierno* Court noted, however, that a different result might obtain under state law:

> We . . . believe there to be an important distinction between general adherence to legislative procedure for the purposes of taking legislative action as a matter of federal law, as opposed to full compliance with all technical requirements for such legislative action to be valid under state or county law. It may well be that if in fact state law required the substitute to the originally proposed ordinance to also go through all the statutorily required notice procedures and hearings, then Acierno would be able to successfully attack the validity of the [ordinance] in an administrative or state court proceeding. . . . In the present case, we find no indication in the record that members of the County Council bypassed state-mandated procedures *in bad faith* when enacting the [ordinance].

*Id.* at 614-15 (emphasis added).

The Court need not resolve whether a good faith, technical failure to comply with proper legislative procedures would vitiate legislative immunity under Delaware law. In this case, for example, Petitioners have alleged that the Kent County Officials surreptitiously and intentionally violated Delaware's FOIA, which mandates important procedures governing the Levy Court's enactment of valid legislation. Accordingly, even if an exception similar to the one recognized in *Acierno* exists under Delaware law, the actions alleged to have occurred here could fairly be

March 19, 2008
Page 12

Respondents are not entitled to a protective order absolutely precluding the taking of

discovery from the Kent County Officials on the basis of legislative immunity at this

stage of the proceedings.[22]

B.    *The Legislative Privilege Will Sharply Curtail the Permissible Scope of Petitioners' Inquiry Regarding the APFOs*

Legislative privilege is distinct from the doctrine of legislative immunity,

even though the former is an outgrowth of the latter.[23]  Unlike legislative immunity,

---

characterized as in "bad faith" and, thus, as failing the procedural prong of the legislative immunity defense.

[22] *Accord v. Rowland*, 2006 WL 141645, at *3 ("At this juncture, discovery is required before the court can determine whether the defendants are entitled to the defense [of legislative immunity].").

[23] It may be that legislative immunity is better viewed functionally as an affirmative defense to suit with accompanying testimonial and evidentiary restrictions once the defense is established.  If so, under these circumstances and at this stage of the litigation, legislative privilege is perhaps the more precise protection available to the Kent County Officials for two reasons.  First, it is not clear whether legislative immunity, as an affirmative defense, even will have proper application in this case.  (The Court must address that question in connection with Respondents' motion to amend their Answer.).  Second, assuming that immunity may be a defense in this case, the Kent County Officials have not yet established their entitlement to immunity because they have not shown that their actions were both procedurally and substantively legislative.

The distinction between legislative immunity and legislative privilege has been somewhat blurred in the case law, and, perhaps, may be largely irrelevant in this case because the protections afforded to the Kent County Officials under either rubric, to the extent either applies in this case, are the same.   Complete and successful invocation of legislative immunity under these circumstances would preclude inquiry into *both* the process by which the Kent County Officials drafted the APFOs *and* the substance of the APFOs.  As described above, however, in order to invoke legislative immunity (assuming that the doctrine is applicable), a legislator must demonstrate that his actions were *both* procedurally *and* substantively legislative.

There can be little doubt as to the substantively legislative nature of the APFOs.  Petitioners' FOIA claim, however, necessarily calls into question whether the drafting of the APFOs was procedurally legislative; thus, the Petitioners must be able to inquire into the process by which the Kent County Officials developed and adopted the APFOs, at least to the extent necessary to

March 19, 2008
Page 13

which will more frequently be asserted as an affirmative defense to a lawsuit in

which a legislator has been named as a party, legislative privilege is a testimonial

and evidentiary privilege that may be asserted even if the legislator is not a named

party or entitled to assert the immunity as a defense. It is intended primarily to

shield legislators from inquiry into their motivations, mental processes, or the

substance of discussions, deliberations, or communications underlying legislative

actions. Thus, as with legislative immunity, "the purpose in preventing inquiry into

[the] motivation of legislative acts is to shield legislators from civil proceedings

which disrupt and question their performance of legislative duties [and] to enable

them to devote their best efforts and full attention to the 'public good.'"[24]  Indeed,

the legislative privilege embodies the venerable principle that it is "not consonant

---

determine that the process was in fact procedurally legislative (*i.e.*, in compliance with FOIA), in order for the Kent County Officials to establish their entitlement to immunity in the first instance. Conversely, inquiry into the substance of the APFOs is plainly precluded by either legislative immunity or legislative privilege or both (depending on how one reconciles the cases). Thus, regardless of whether the Kent County Officials have immunity from this lawsuit, the scope of the protective order the Court eventually will enter under these circumstances is the same because inquiry by the Petitioners or the Court into the Kent County Officials' mental processes underlying the APFOs is precluded by the privilege; some limited inquiry into the process by which the APFOs were developed and adopted, however, cannot be avoided.

[24] *ACORN (The New York Ass'n of Community Orgs. for Reform Now) v. County of Nassau*, 2007 WL 2815810, at *2 (E.D.N.Y. Sep. 25, 2007) (quoting *Searingtown Corp. v. Inc. Village of North Hills*, 575 F.Supp. 1295, 1298 (E.D.N.Y. 1981)).

March 19, 2008
Page 14

with our scheme of government for a court to inquire into the motives of legislators . . . ."[25]

Although a court should avoid requiring legislators to submit to intrusive discovery concerning matters falling within the "sphere of legitimate legislative activity," the legislative privilege is qualified, not absolute, and so it may yield to the interests of a litigant in obtaining relevant discovery in some limited instances, particularly where the acts in question might fall outside the "sphere of legitimate legislative activity."  Even if discovery from a legislator is permitted, however, a party generally may not inquire into the legislator's motivations, mental processes, or the substance of discussions or deliberations relating to the enactment of any particular legislation.  Such avenues of inquiry command the greatest protection under the legislative privilege and will routinely be precluded in all but the most exceptional circumstances.[26]

---

[25] *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *see also Bogan* 523 U.S. at 52 ("Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference. . . .").

[26] *See, e.g., Village of Arlington Heights v. Metro. Housing  Dev. Corp.*, 429 U.S. 252, 268 (1977) (Court may be able to inquire into possible discriminatory motives even though such inquiry might otherwise be barred by legislative privilege.).

March 19, 2008
Page 15

With respect to certain other matters touching upon the legislative process, the legislative privilege is construed more narrowly,[27] and a court may order discovery of non-privileged information even though it relates to legislative activity. In determining whether to permit such discovery, a court must balance the interests of the party seeking the discovery against those of the legislator in being free from the burdens of complying with discovery requests in civil lawsuits. In balancing those interests, a court may consider several factors, including (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.[28] Courts must also be particularly mindful of the public's interest in being served by legislators who are not mired in protracted civil litigation relating to their official acts and various other public policy concerns underlying the legislative privilege (and legislative immunity).

---

[27] *See generally Rodriguez v. Pataki*, 280 F.Supp.2d 89, 94 (S.D.N.Y. 2003) (Testimonial privileges must be construed narrowly because they "contravene the fundamental principle that 'the public . . . has the right to every man's evidence.'" (citing *Trammel v. United States*, 445 U.S. 40, 50 (1980)).

[28] *Id.* at 101.

March 19, 2008
Page 16

In light of the foregoing, it is clear that the Kent County Officials are not entitled to "absolute" protection from being deposed by Petitioners. Moreover, Petitioners have demonstrated a sufficient need to seek discovery from the Kent County Officials, particularly with respect to their FOIA claim. Accordingly, the Court will allow Petitioners an opportunity to seek limited discovery from the Kent County Officials; that right, however, will be subject to the Kent County Officials' right to assert legislative privilege to circumscribe the scope of Petitioners' inquiries. Respondents, therefore, are entitled to a protective order limiting the scope of petitioners' discovery requests directed to the Kent County Officials.

Without knowing the exact questions Petitioners intend to ask, it is impossible for the Court to resolve fully the dispute at this point.[29] Nonetheless, some general

---

[29] Uncertainty about the range of discovery sought by Petitioners has complicated resolution of Respondents' motion for a protective order. It is not clear exactly what Petitioners intend to accomplish in the noticed depositions or whether they intend to seek information protected by legislative privilege. For example, in their Answering Brief, Petitioners wrote:

> The [Planning Commission] and Levy Court Commissioners are the only ones who know what, if anything went on behind closed doors, at least as amongst themselves or in consort with other public officials. The Commissioners also possess unique information about the *meaning of the statutes they adopted*—which the Petitioners contend are vague and ambiguous. The Commissioners were the architects of the APFOs and personally directed their drafting and adoption. This type of information is not available from any other source and is critical to proving—or disproving—the Petitioners' claims, which of course is the whole point and purpose of discovery.

March 19, 2008
Page 17

_____

Pet'rs' Ans. Br. at 13 (emphasis added).

    Questioning the Kent County Officials about the meaning of the APFOs, as suggested by the quoted passage from Petitioners' Answering Brief, would plainly be an improper avenue of inquiry and would fall squarely within the legislative privilege. Petitioners perhaps recognized that because they went on to state (on the same page of their brief):

> The depositions will also be consistent with protecting the "mental processes of executive and administrative officers," as the Petitioners are not interested in the *legislative motives* underlying the APFOs (*i.e.*, "why" and "how do you justify" questions). Instead, Petitioners *simply seek to take factual discovery* regarding their claims that the APFOs were not adopted in accordance with the procedural requirements of applicable law.

*Id.* (emphasis added).

    Petitioners at oral argument addressed the topics about which they anticipate questioning the Kent County Officials, but the scope of the proposed inquiry remained unclear:

> [COUNSEL FOR PETITIONERS]: [Petitioners] are asking [the Kent County Officials] to *defend their legislative actions on behalf of the County.* The Petitioners do not intend to ask . . . the sort of "why" and "how do you justify" questions which the doctrine of legislative immunity typically precludes. And the Petitioners are not interested in the commissioners' motives, purposes or legislative policy judgments regarding the supposed merits of the APFOs. Rather, the Petitioners are merely interested in discovering the objective facts which would evidence violations, if any, of the various rules, ordinances and statutes cited in support of the Petitioners' claims . . . The Petitioners are merely asking the commissioners to provide testimony upon the question whether the APFOs were adopted in accordance with the requirement of applicable rules, ordinances and statutes.

Tr. of Argument on Resp'ts' Mot. for a Protective Order, Feb. 4, 2008 ("Tr.") at 33-34 (emphasis added).

Further argument did not yield definitive results:

> [COUNSEL FOR PETITIONERS]: We also intend to ask *how the commissioners interpret the Adequate Public Facilities Ordinances.*

March 19, 2008
Page 18

guidance is appropriate. Although Petitioners are permitted to seek discovery from

the Kent County Officials, such discovery will necessarily be limited by the

legislative privilege. Petitioners, for example, may not inquire into the Kent County

Officials' motivations for enacting the APFOs, the substance of their public, or

lawful private, discussions and deliberations relating to the drafting and enactment

of the APFOs, or their understanding of the proper interpretation of the APFOs (*e.g.,*

---

THE COURT:        Why is that even relevant? . . . [D]oes it matter what [the
Kent County Officials] think [the APFOs] mean[]?  Isn't it that you read the
ordinance as it was drafted?  Maybe you look back at some legislative history so
you can see the evolution.  But the idea that legislators can come along after they
have enacted a law and inform the judicial process and say "Oh, I meant X even
though the language probably the better reading is Y."  I'm not sure I understand
how that's even the type of thing which I can look at.

[COUNSEL FOR PETITIONERS]:  Well, we have a claim in our fourth amended
petition, Your Honor, that the APFOs are so poorly written and so arbitrary and
capricious that they're incapable of being understood and enforced.

THE COURT:        If that's the case, they fail by their very words . . . . Let's
posit there's a Levy Court member who says, "I don't understand what this
ordinance means."  That doesn't necessarily mean that it's void for vagueness . . .
That is not something that influences or informs a judicial decision anyway, is it?

[COUNSEL FOR PETITIONERS]:  Well, Your Honor, it may not rise to a
Freedom of Information Act violation, but I would respectfully submit that if
commissioners, for example, either didn't read the ordinances at all, didn't read the
amendments before they voted on them, or didn't understand them at all, then that
informs or would inform the Court's evaluation of whether or not their actions were
arbitrary and capricious.

Tr. at 38-40 (emphasis added).

March 19, 2008
Page 19

the "why" or "what did you intend" questions). On the other hand, for example, inquiry about discussions among Levy Court members or among Planning Commission members, in the presence of a quorum of the respective body and not at a meeting in compliance with FOIA, would be proper. A more precise delineation of the proper boundaries of inquiry, however, cannot be achieved on the present record.

C.    *Management of Discovery*

The Court, "on it own initiative after reasonable notice," may limit the frequency or extent of discovery to avoid "unreasonably cumulative or duplicative" discovery or discovery that "is obtainable from some other source that is more convenient, [or] less burdensome, . . ."[30] The notion of deposing all seven members of the Levy Court and all seven members of the Planning Commission would appear, especially in light of the limited evidentiary basis for Petitioners' allegations of misconduct under FOIA (or other procedural shortcomings), to be not only cumulative but also burdensome.[31] The Court's concern is heightened because of the policies supporting legislative immunity and legislative privilege.

---

[30] Ct. Ch. R. 26(b)(1).

[31] Although the Court suggested to Petitioners during a teleconference on December 28, 2007, that they might not be permitted to depose all of the Kent County Officials without a showing of need

March 19, 2008
Page 20

Counsel, thus, are requested to confer and to agree upon a schedule pursuant to which they will submit the parties' views as to whether any limitation is warranted as to the means or extent of the discovery to be pursued from the Kent County Officials in light of this letter opinion.[32]

IT IS SO ORDERED.

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    William W. Pepper, Sr., Esquire
       Register in Chancery-K

---

that would counterbalance the burden, *see generally* Tr. of 12/28/2007 Status Teleconf., it is not clear those comments satisfied the "reasonable notice" provision of Court of Chancery Rule 26(b)(1).
[32] No award of attorneys' fees would be appropriate under Court of Chancery Rules 26(c) and 37(a)(4) because the parties' positions were "substantially justified."

## CERTIFICATE OF SERVICE

I, Max B. Walton, hereby certify that on the 28th day of March, 2008, a copy of

New Castle County's Reply Brief in Support of Its Motion to Dismiss was served by

CM/ECF to counsel of record as follows:

Jeffrey M. Weiner (#403)
Law Offices of Jeffrey M. Weiner
1332 King Street
Wilmington, DE 19801

Max B. Walton (Bar No. 3876)