**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

GARY C. and GALE B. WARREN.        :
and TOLL BROS., INC.,              :
                                   :
             Plaintiffs,           :
                                   :
     v.                            :        Civ. No. 07-725-SLR-LPS
                                   :
NEW CASTLE COUNTY,                 :
                                   :
             Defendant.            :

**REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

This is a land use case. Plaintiffs, Gale B. and Gary C. Warren (the "Warrens") and Toll

Bros., Inc. ("Toll"), seek declaratory and injunctive relief directing Defendant New Castle

County (the "County") to permit their proposed real estate developments to connect to public

sewer, or alternatively, to permit them to service the developments with sewer through use of a

community-based, privately-constructed sanitary sewage system. Presently pending before me is

the County's motion to dismiss the Amended Complaint. I recommend that Plaintiffs' federal

claims be dismissed with prejudice and that their state law claims be dismissed without

prejudice.


**PROCEDURAL AND FACTUAL BACKGROUND**

The Parties

The Warrens are Delaware citizens. They are the legal owners of 134 acres of

undeveloped land on the north side of Port Penn Road in the St. Georges Hundred in Southern

New Castle County ("the Warren Property").

Toll is a Pennsylvania corporation and real estate developer specializing in building homes in planned communities. Toll is the equitable owner of 118 acres of the Warren Property. Separately, Toll is the equitable owner of approximately 500 acres adjacent to the Warren Property, also in New Castle County, known as the Port Penn Property.[1] Toll proposes to develop the Warren and Port Penn Properties as residential subdivisions consisting of 631 new residences on a combined 618 acres of land.

Defendant County is a political subdivision of the State of Delaware created by Title 9 of the Delaware Code. The Delaware Code grants the County "all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration." Del. Code Ann. tit. 9 § 1101. These include zoning authority and, with it, the power to regulate land use within the adopted zones. *Id.* § 2602. Regulations adopted by the County pursuant to its zoning authority are for the purpose of "promoting such distribution of population and such classification of land uses and distribution of land development and utilization as will tend to facilitate and provide adequate provisions for . . . water flowage, water supply, drainage, sanitation . . . and the protection of both urban and nonurban development." *Id.* § 2603.

The Delaware Code further outlines the functions of various County departments and entities. These include: the Department of Special Services ("Special Services"), which "in cooperation with the Department of Land Use" develops plans and prepares designs and specifications for public facilities "including sanitary sewers and treatment facilities," *id.*

---

[1]The Amended Complaint makes no reference to the legal owners of the Port Penn Property.

2

§ 1341(1)-(2); the Department of Land Use ("Land Use"), which "enforce[s] compliance with the County subdivision and zoning code and regulations thereunder," including by determining "whether an applicant is properly entitled to [a] license which he or she seeks" and, if an application is rejected, "notif[ying] the applicant in writing of the refusal and the reasons therefor," *id.* § 1301(1) & (2)b-d; and the Planning Board, which reviews "proposed zoning plan changes, proposed subdivision regulations, and all amendments thereto," *id.* § 1304(2).

## County Authority Over Sewer

The County's authority over matters specifically pertaining to sewer is outlined in the Delaware Code. Title 9, § 1521 of the Delaware Code states that "the New Castle County Council shall have general jurisdiction over all matters pertaining to the County . . . including the power to act upon all matters pertaining to sewers, sewerage disposal plants, trunk line sewers and sewerage systems generally." Title 9, Chapter 22, "Sewers," cites among the County's powers the power to "[p]lan, construct . . . reconstruct, improve, better or extend any sewage system," as well as the power to "[o]perate and maintain any sewerage system and furnish the services and facilities rendered or afforded thereby." Del. Code Ann. tit. 9 § 2202(1)-(2).

The Delaware Code further provides that a non-governmental applicant wishing to operate a private wastewater utility must first obtain a certificate from the Delaware Public Service Commission ("PSC"). Del. Code Ann. tit. 26 § 203D(a)(1). An applicant for such private sewer must, however, apply to the County before turning to the PSC: "Any wastewater utility shall not extend its territory into a service territory of a municipality, government agency or wastewater authority or district without the approval of such entity and [without] approval of a

3

certificate of public convenience and necessity from the Commission under this section." *Id.* §
203D(b).

## Types Of Wastewater Treatment

Broadly speaking, the County Code contemplates three types of wastewater treatment.
The first of these is *County sewer service* (or "public sewer" or "sanitary sewer") which requires
the use of public facilities, and is reserved "on a first come, first serve[d] basis if and/or when
sanitary sewer service becomes available, as determined by the Department of Special Services."
County Code § 40.05.000B. The second is a *community system* (or "private sewer"), which is
constructed by a private entity and serviced by a private wastewater utility provider, subject to
County approval and other terms set out in the County Code and Delaware Code (including
required approval by the State PSC). County Code § 40.05.520(C); Del. Code Ann. tit. 26 §
203D(b). The third and final option is *on-site septic systems,* which may be utilized "within a
County-recognized sewer service area for which sewer capacity or sewer trunk lines do not yet
exist," subject to the approval of the County and the Delaware Department of Natural Resources
and Environmental Control ("DNREC"). County Code §§ 40.22.330-40. Subdivisions served by
septic systems instead of sewer are generally required to be divided into lots no smaller than
three quarters of an acre or one acre in size, *id.* § 40.22.360A, whereas substantially smaller lots
can be developed where there is access to public sewer or a community system.

While County sewer service is constructed by the County at public expense, a community
system and on-site septic systems are paid for by private sources. A developer may also propose
to pay for improvements to the County sewer system in order to obtain access to public sewer.

4

The Land Development Approval Process

Obtaining major subdivision approval from Land Use is a multi-step process governed by the New Castle County Unified Development Code (the "UDC"). Under the UDC, a developer must submit three successive plans to the County for approval: an exploratory plan, a preliminary plan, and a record plan. County Code §§ 40.31.112-14; *see also Toll Brothers, Inc. v. Wicks*, 2006 WL 1829875, at *1 (Del. Ch. June 21, 2006).[2] The UDC provides that if a plan submitted at the record stage complies with Chapter 40 of the County Code and all other applicable regulations, Land Use must approve the record plan. County Code § 40.31.114B.

Before a developer can receive approval at the final, record plan stage, it must obtain verification from Special Services that sewer capacity is available or will be available at the time of the proposed development. *Id.* § 40.05.320. If this condition is to be satisfied through access to public sewer, the County and the developer execute a sewer agreement committing the County to provide the developer with the reserved capacity. *Id.* § 38.02.002. Such a sewer agreement is recorded as part of a Land Development Improvement Agreement ("LDIA") between the County and the developer. *Id.* § 40.31.820. Where the County deems that discharge to a public sanitary sewer system "is not required," the developer may, with the County's and DNREC's approval, instead utilize private on-site wastewater disposal systems, or "septic systems." *Id.* § 40.22.330.

---

[2]The UDC is Chapter 40 of the County Code. Hence, any reference to a provision in County Code § 40 is a reference to the UDC.

The Administrative Appeal Process

The County Code establishes several administrative boards to hear appeals relating to land use decisions. *Id.* § 40.31.510. An applicant who is aggrieved by a finding, decision, or interpretation of a "decision-maker" must file her appeal with the appropriate review board within twenty days of the date the decision was issued. *Id.* Administrative "[a]ppeals may only be taken based upon a final decision, not the recommendation of an agency." *Id.* Further, "[u]nless otherwise provided by law, no appeal to a court of law or equity may be taken until all remedies made available by this Chapter have been exhausted." *Id.* The body hearing an administrative appeal may reverse a decision if the decision-maker made an error in interpreting the County Code or if the decision-maker's findings "were not the result of an orderly and logical review of the evidence." *Id.* § 40.31.512A.

With respect to decisions pertaining to subdivision applications and subdivision regulations, Land Use is the decision-maker and the Planning Board is the internal appellate body. *Id.* § 40.31.110.

The County's Former Sewer Policy

The County is divided into two sanitary sewer districts: the Northern New Castle County Sanitary Sewer Area and the Southern New Castle County Sanitary Sewer Area ("SSSA"). (D.I. 11 [Amended Complaint] ¶ 15) Both of Toll's[3] properties – the Warren Property and the Port Penn Property – are located in the SSSA. *Id.* In the mid-1990s, the County began making plans

---

[3]Hereinafter, "Toll" shall refer to both Toll and the Warrens, except where from the context it is clear I am referring to Toll alone.

6

for sewer service in the SSSA, which was then a largely rural area with limited sewer infrastructure. (D.I. 11 ¶ 17)  In 1999, the County created the "Wastewater Management Facilities Plan," which allowed for the construction of a sewer conveyance system and two facilities to treat and dispose of sewage generated in the SSSA.  (D.I. 11 ¶ 17)  These facilities, known as Water Farm 1 and Water Farm 2, were designed "as a lagoon treatment and spray irrigation effluent system."  (D.I. 11 ¶ 18)  Today, Water Farm 1 is operational; the County has purchased land for Water Farm 2 but has yet to build it.  (D.I. 11 ¶¶ 20, 24; *see also* D.I. 11 Ex. S)  Toll's Properties are located approximately 5-6 miles from both Water Farm 1 and the planned site for Water Farm 2.  (D.I. 11 ¶¶ 19, 22)

On June 24, 2003, the County adopted Resolution 03-093, "Supporting the Implementation of the Southern New Castle County Sewer System."  (D.I. 11 Ex. B)  The Resolution noted that in 1997 the County had "made a commitment to construct sewers in southern New Castle County to accommodate the growth expected within this area."  It further affirmed that the installation of public sewers in the area "is a necessary component of good land use planning and . . . will provide better protection for the environment by substantially reducing the pollution of groundwater resulting from leaking septic systems."  *Id.*  A note at the end of the Resolution stated that it had "no fiscal impact" as it merely "support[ed] the approval of the Southern New Castle County sewer system."  *Id.*[4]

---

[4]The parties disagree as to the legal effect of County Council resolutions such as 03-093. While the County describes Resolution 03-093 as a "concept plan" subject to revision, Toll disagrees – and insists I am bound to accept Toll's position because I must draw all reasonable inferences in Toll's favor. (*Compare* D.I. 14 at 5-6 *with* D.I. 17 at 5 n.5.)  Under the Delaware Code, the County is bound only by its comprehensive plans, which include various detailed elements.  *See* Del. Code. Ann. tit. 9 § 2656.  Resolution 03-093 contains none of these elements. Therefore I do not, and need not, accept Toll's legal conclusions as to the effect of County

Toll Is Allegedly Assured Sewer Capacity Will Be
Available And Informally Offers To Construct Improvements

Toll alleges that, beginning in or around October 2004, it met on multiple occasions with

County officials to discuss Toll's proposed development of the Warren and Port Penn Properties

and to establish the County's commitment to providing those properties with access to public

sewer. (D.I. 11 ¶¶ 25-26) According to the Amended Complaint, Toll was assured that Water

Farm 1 "and ultimately Water Farm 2" would contain adequate capacity to serve Toll's

properties. (D.I. 11 ¶ 25) Toll claims that at one of these meetings the County advised that it

was considering requiring Toll to make improvements to the public sewer lines (by having Toll

extend an existing gravity line from Water Farm 1 to Toll's properties and build a regional pump

station and force main). (D.I. 11 ¶ 26)

On December 8, 2004, Toll wrote to Special Services to express Toll's belief that the

County's facilities contained adequate treatment capacity to provide the Warren Property with

access to public sewer. (D.I. 11 Ex. D) Toll acknowledged that improvements to the public

sewer system would need to take place before Toll could connect the Warren Property to the

public system. *Id.* Noting that the UDC provides that developers may make improvements to

the public sewer system "as determined by the Department of Special Services," Toll's letter

sought the County's permission to design and construct the necessary improvements. *Id.*

Because the necessary construction would "cost substantially more than can be borne by the

development" of Toll's project alone, and because Toll's envisioned improvements would create

excess capacity the County could use for other developments in the future, Toll proposed that, in

_____

resolutions.

8

exchange for building these improvements, Toll should be granted a credit against the impact fees it would otherwise be required to pay. *Id.*

There is no allegation in the Amended Complaint, nor anything in the documents incorporated in it, to indicate that the County accepted Toll's offer to make improvements to the public sewer system.

New Administration Allegedly Continues Assurances to Toll

On January 1, 2005, a new County Executive took office. (D.I. 11 ¶ 28) Toll met with the new administration "on numerous occasions" to discuss plans for connecting its proposed developments to public sewer. *Id.* Toll maintains that the County represented its continuing intention to provide Toll's developments with public sewer service, including through completion of Water Farm 2. *Id.* The County allegedly told Toll it "could 'borrow" capacity from Water Farm 1" until Water Farm 2 was built. *Id.*

County Initiates Review Of Its Sewer Policy

In June 2005, the County hired a national engineering firm, Red Oak Consulting, to evaluate the feasibility of its program for the SSSA as laid out in documents including Resolution 03-093. (D.I. 11 ¶ 38) The County's retention of Red Oak was known to the public, including Toll. (D.I. 11 Ex. E at 3)

Toll Informally Proposes Three Sewer Plans

On June 9, 2005, Toll wrote another letter to the County proposing a "public/private

9

partnership" with respect to sewer. (D.I. 11 Ex. E) Toll's letter acknowledged that by this time "substantially all" of the remaining capacity of Water Farm 1 had been reserved to others, but noted that the "prior administration's plans for the development of Water Farm 2 contemplated" that a second sewage treatment system would eventually be constructed. *Id.*

Given these realities, Toll proposed two alternatives by which its properties could be provided access to public sewer. Under the first proposal, Toll would temporarily borrow unused capacity from Water Farm 1 and would also build a regional pump station and force main (to reach a public pump station in the Augustine Creek subdivision). Under the second proposal, Toll would again begin by using Water Farm 1 and would construct a regional pump station and force main to convey sewage via an existing gravity line to Water Farm 1. *Id.* The new force main could later be redirected to convey sewage from Toll's properties to Water Farm 2, if – in Toll's words – the County should "at some point decide to construct Water Farm 2." *Id.*

Toll alleges that it also proposed a third alternative: that Toll would design and construct its own on-site sewer collection, conveyance, treatment, and disposal system ("Community System"). Upon completion of the Community System, Toll would turn it over to the County (for Special Services to operate) or to a private wastewater utility (which would leave the Warren and Port Penn properties serviced by private sewer). (D.I. 11 ¶ 30) Notably, the Community System proposal is not expressly referenced in Toll's June 9, 2005 letter to the County nor anywhere else in the record prior to November 6, 2007. (D.I. 11 Ex. O)[5]

---

[5]In its Amended Complaint, Toll implies it proposed the Community Sewer option in its June 9, 2005 letter (D.I. 11 ¶ 30), but it did not (D.I. 11 Ex. E). The first reference to the Community System proposal in the record is in Toll's November 6, 2007 letter to Special Services, stating "[a]lternatively, Toll has offered to design and construct an on-site . . . Community System." (D.I. 11 Ex. O)

The Amended Complaint states that the County "refused to accept any of Toll's proposals for providing sewer service to the Proposed Developments." (D.I. 11 ¶ 31)

Toll Submits Exploratory Plans

Toll alleges that despite the County's failure to accept its proposals, the County continued to assure Toll that the County was committed to constructing facilities that would eventually service Toll's properties with public sewer. *Id.* In reliance on these assurances, Toll expended substantial time and money readying subdivision and land development plans for the properties, including by paying nonrefundable deposits to landowners. (D.I. 11 ¶ 32)

In preparation for submitting a formal exploratory plan, Toll submitted to the County a Sewer Capacity Request for the Warren Property. (D.I. 11 Ex. F) On behalf of the County, Special Services replied to Toll on August 11, 2005. *Id.*[6] By letter, Special Services stated that sewage capacity in Toll's requested amount of 42,900 gallons per day "will be available upon completion of the construction of Water Farm II Treatment Facility and all related New Castle County sewer interceptor lines to which the development can connect." *Id.* The letter added, however, that Toll should "be advised that the available capacity is reserved on a first-come-first-served basis and that capacity can only be reserved by execution of a sewer agreement at the record plan stage of the development." *Id.* (emphasis added). Notwithstanding this warning, on August 22, 2005, "in reliance upon the County's assurances that the County would provide sanitary sewer service," Toll submitted an exploratory plan to Land Use for the Warren Property. (D.I. 11 ¶ 35)

_____

[6]The request that gave rise to Special Services' reply does not appear in the record.

11

Matters moved in much the same fashion with respect to Toll's desire to develop the Port

Penn Property.  On October 7, 2005, "again in reliance" on the County's purported promise of

public sewer, Toll submitted to Land Use its exploratory plan for Port Penn.  (D.I. 11 ¶ 35)  On

October 13, 2005, Special Services advised Toll that its "requested amount [of sewage capacity]

of 138,600 gallons will be available upon completion of the construction of all necessary sanitary

sewer infrastructure to which the [Port Penn] DEVELOPMENT will connect.  However, please

be advised that <u>capacity can only be reserved by execution of a sewer agreement at the record</u>

<u>plan stage of the development</u>."  (D.I. 11 Ex. G) (emphasis added)


## Red Oak Finds County's Sewer Plan Inadequate

On January 25, 2006, Red Oak Consulting "issued a report concluding that the County's

existing sewage treatment and disposal plan for the SSSA was inadequate."[7]  (D.I. 11 ¶ 38)


## The County Creates A New Sewer Map

Toll alleges that in or about March 2006, the County divided the SSSA into three sewer

service areas: (1) the Central Core area, (2) the area East of the Central Core, and (3) the area

West of the Central Core.  (D.I. 11 ¶ 40)  The County eventually also created a new sewer map,

describing the status of public sewer availability at each point within the SSSA as "Capacity

---

[7]The Red Oak Report does not appear in the record and the parties do not entirely agree as
to its findings.  For instance, while the County alleges that Red Oak "found that the County's
prior concept proposal was practically and financially unfeasible" (D.I. 14 at 6), Toll responds
that "such matters are better left for full factual discovery and are not appropriate for a motion to
dismiss" (D.I. 17 at 11 n.13).  In reaching my decision, I have considered the Red Oak Report
only to the extent it is described in the Amended Complaint and in Resolution 06-069, which is
incorporated in the Amended Complaint.

Available," "Capacity Not Available but Improvements are Funded," and "Capacity Not Available and No Improvements are Funded." (D.I. 11 Ex. H)

Toll's properties are located northeast of the Central Core in an area with public sewer status of "Capacity Not Available and No Improvements are Funded." Toll alleges that the County subdivided the area East of the Central Core with the intention of denying sewer to the Warren and Port Penn Properties, "carv[ing] out" from public sewer access the section where Toll's properties are located. (D.I. 11 ¶ 40)

### The County Passes Resolution 06-069

On March 28, 2006, the County passed Resolution 06-069, "Endorsing a Plan to Provide Sanitary Sewer Service to the Southern Sewer Service Area." (D.I. 11 Ex. I) Resolution 06-069 noted that the County had "retained a nationally-renowned engineering firm [Red Oak] to evaluate alternatives" for sewering the SSSA and cited multiple reasons for adopting a new sewer plan, including:

- the results of Red Oak's evaluation, coordination of efforts with State and local governments, and consideration of stakeholders' concerns;

- the necessity of providing wastewater treatment and disposal to a portion of the SSSA for the short-term, while evaluating regulatory, technical, and financial issues for the long-term;

- the further need to promote environmental stewardship and the establishment of more livable communities through effective planning and partnership;

- distributing risks, costs, and benefits in a fair and equitable manner; and

- ensuring that the SSSA would be financially self-sustaining.

13

*Id.*

In particular, the Resolution provided that the County would commence construction of the Central Core transmission system; utilize "temporarily surplus capacity" at Water Farm 1 to provide sewer for "some areas of the SSSA" for five to seven years; give Central Core developments and other "developments that are planned to be permanently sewered by Water Farm 1 . . . exclusive priority with respect to available sewer capacity over the next five to seven years if they have active plans in the Land Use process as of March 9, 2006;" amend the County Code to ensure that development plans "can only continue through the Land Use process if sewer capacity is or will be available for the development;" "revise [the County's] capital plan to reflect the new SSSA plan;" and prepare a report and analysis – within 18 months of commencing construction on the Central Core sewer system – of available sewer capacities in the SSSA. *Id.*

The County Code Is Amended

On July 25, 2006, County Council adopted amendments to the County Code implementing provisions of Resolution 06-069. Accordingly, effective July 31, 2006, County Code § 40.05.000 provided that development would be permitted only where sewer capacity was available.[8]  (D.I. 14 at A02-14)  One import of the County Code amendments was that, henceforth, subdivision plans that did not provide for adequate sewer capacity in one form or another (i.e., public or private) would not be permitted to proceed through the exploratory-

---

[8]The County again amended the Code to further implement Resolution 06-069 in October 2006 (Ordinance 06-125), providing that new developments may utilize public sewer capacity "if and/or when sanitary sewer service becomes available, as determined by the Department of Special Services."  (D.I. 14 at A15)

14

preliminary-record plan review process. *See* NCC Code § 40.05.320.

### Toll's Exploratory Plans Continue Through The Land Use Process

Meanwhile, the County continued to process Toll's exploratory plans for the Warren and

Port Penn Properties. On March 23, 2006, Special Services wrote to Toll in reference to the

Warren application. (D.I. 11 Ex. J) The letter observed that Toll's applied-for amount of public

sewer service (now reduced to 37,800 gallons daily) was not available and that the County had

not warranted when or if sewer service would be available. *Id.* It continued:

> [N]o building permit shall be issued for any lot on this plan . . . until or
> unless the Department of Land Use receives written verification from the
> Department of Special Services that sanitary sewer service is or will be
> available. . . . Please be advised that the available capacity is reserved on
> a first-come first-served basis and that capacity can only be reserved by
> execution of a sewer agreement at the record plan stage.

*Id.* (emphasis added)

On March 31, 2006, Land Use issued a Revised Exploratory Report for the Warren

Property, stating that the Warren plan "may proceed as proposed." (D.I. 11 Ex. K) However,

the Report included among a list of further instructions and comments this direction:

> Contact the New Castle County Department of Special Services . . . as there is no
> sanitary sewer service in this area (per letter from Special Services - dated March
> 23, 2006).

*Id.* at ¶ 17 (emphasis added). At some point before December 28, 2006, the County approved

the Warren Property exploratory plan, permitting Toll to proceed to the preliminary plan stage

of the process. (D.I. 11 ¶ 59; D.I. 11 Ex. L) Even so, the County continued to warn Toll about

the unavailability of public sewer for the project.

15

On December 20, 2006, Special Services sent Toll a "Plan Comment" relating to the

Warren Property, noting that "[a]pproval of the exploratory design review by the Department of

Special Services shall not be interpreted as a guarantee that sanitary sewer service will be

provided to this region." (D.I. 11 ¶ 57; D.I. 11 Ex. L)  Then, on January 22, 2007, Land Use

sent Toll a detailed Preliminary Technical Advisory Committee Report regarding the Warren

Property. (D.I. 11 Ex. M)  While stating that the plan "may proceed as proposed," it outlined

several changes that would need to occur before record plan approval.  *Id.*  It further contained

the following note:

> Contact the New Castle County Department of Special Services . . . as there is no
> sanitary sewer service in this area (per letter from Special Services - dated March
> 23, 2006).

*Id.* at 2 ¶ 20.

Likewise, as the Port Penn exploratory plan was processed, the County again reminded

Toll that the sewer issue remained unresolved.  On June 14, 2006, Land Use issued a Revised

Exploratory Report for the Port Penn Property. (D.I. 11 Ex. P)  It commenced with this

comment:

> This plan relies on connection to a public sanitary sewer system, but no such
> system exists. The applicant has been advised on numerous occasions, since the
> initial plan submission, that the County has made no commitment to provide
> sewer infrastructure availability to this site. The developer is again reminded that
> advancing a subdivision plan in reliance of the provision of sewer infrastructure
> secures no guarantee that the County will provide such infrastructure. Without
> an approved sewerage strategy, the plan will not be approved and construction
> will not be permitted.

*Id.* at 1 (emphasis added).  Land Use's report included comments from Special Services stating

that no building permit would be issued for any lot on the development until sewer became

16

available. *Id.* at 8. Special Services further directed that a note be added to Toll's sanitary

sewer feasibility and record plans stating that "[n]o building permit shall be issued for any lot

shown on this plan . . . until or unless the Department of Land Use receives written verification

from the Department of Special Services that sanitary sewer service is or will be available for

the Development . . . ." *Id.*

On September 14, 2006, the Port Penn development received exploratory-stage approval,

though "subject to all of the conditions explained" in Land Use's Revised Exploratory Report of

June 14, 2006. (D.I. 11 Ex. Q)

The Warren Preliminary Plan Fails To Win Approval

On October 22, 2007, the County sent Toll a letter stating that it would not approve

Toll's preliminary plan for the Warren Property, due to the absence of sewer capacity. (D.I. 11

Ex. N) The County wrote:

> As noted in previous County responses to your submissions, your proposed
> development . . . is located within an area in which the County does not currently
> have sanitary sewer capacity available. Furthermore, the County currently does
> not have any approved and fully funded projects to provide sanitary sewer service
> capacity to that area . . . .
>
> Because there is no sewer capacity for this proposed development pursuant to the
> Department of Special Services and Department of Land Use Sewer Capacity
> Policy, the above application may not continue through the record plan process.

*Id.*

The letter appeared on Special Services' letterhead. *Id.* The County enclosed with the

letter an October 22, 2007 version of its Sewer Capacity Policy, on which the names of both

Special Services and Land Use appeared. *Id.*; *see also* D.I. 11 ¶ 60. The revised Sewer

17

Capacity Policy, relying on the recently-amended § 40.05.320 of the County Code, provided that "once a developer of proposed sewered development is notified by Special Services that sanitary sewer is not and will not be available for the proposed development, the application shall not be permitted to continue through the land use application process." (D.I. 11 Ex. N) The policy concluded with the statement: "The Developer shall be notified via letter from Special Services with a copy provided to Land Use when sewer capacity is not or will not be available." *Id.*

## Toll Protests Rejection Of Warren Preliminary Plan

Toll responded by letter to Special Services on November 6, 2007, taking issue with the County's finding that no sewer capacity was available for the Warren Property. (D.I. 11 Ex. O) Toll repeated the two methods for securing public sewer for the development (via improvements funded by Toll) it had proposed in its June 2005 letter.[9] Toll further declared that it had "offered to design and construct" an on-site Community System for private sewer, and that it "has negotiated and is prepared to execute a wastewater service agreement with an experienced regulated utility company" for the Community System's construction and operation. *Id.*

## Toll Files Suit

On November 13, 2007, one week after sending its letter protesting the County's decision – and before hearing any response from the County – Toll filed this action. (D.I. 1)

---

[9]Toll refers to its proposals as having been made by letter "dated June 26, 2005." (D.I. 11 Ex. O) There is no June 26, 2005 letter in the record. By its description of the letter, it appears Toll is referring to its June 9, 2005 letter.

18

The Port Penn Preliminary Plan Fails To Win Approval

On November 20, 2007, the County sent Toll a denial of its public sewer application for

the proposed Port Penn development, again on Special Services letterhead. (D.I. 11 Ex. R) The

County's letter stated that the Port Penn application proposed "connection to the County

sanitary sewer system but [the property] is located within an area in which the County does not

currently have sanitary sewer capacity available." *Id.* Hence, as with the Warren Property

preliminary plan, "pursuant to the Department of Special Services and Department of Land Use

Sewer Capacity Policy," the Port Penn Property plan could not continue through the land use

process. *Id.*

Finally, the County letter added: "the County would consider a revised submission for

this Development that designated the use of on-site septic systems in accordance with the

UDC." *Id.*


Procedural Background In This Court

As noted above, Toll filed this suit on November 13, 2007. (D.I. 1) Initially, the case

was assigned to the "judicial vacancy" left by the elevation of the Honorable Kent A. Jordan to

the United States Court of Appeals for the Third Circuit and referred to me for all pretrial

proceedings. (D.I. 5)

Toll filed its Amended Complaint on January 18, 2008. (D.I. 11) In its Amended

Complaint, Toll asserts six claims arising from alleged violations of the Constitution, federal

antitrust law, and several provisions of Delaware law. Specifically, Toll alleges pursuant to 42

U.S.C. § 1983 that the County violated Toll's constitutional rights by depriving Toll of

19

substantive due process, procedural due process, and equal protection. Toll further alleges that the County violated the Clayton Act, 15 U.S.C. § 2 et seq., by taking anti-competitive action with respect to sewer service in the County. Next, Toll seeks a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that certain provisions of the Delaware Code require the County to consent to a private utility's provision of sewer service in an area where the County is not providing public sewer service. Finally, Toll asks this Court to hold that, under Delaware law, the County is estopped from denying Toll access to public or private sewer for the Warren and Port Penn properties.

The County filed the instant motion to dismiss on January 31, 2008. (D.I. 14)  On February 4, 2008, the case was reassigned from the vacant judgeship to Judge Sue L. Robinson, who continued the referral to me. (D.I. 20)

## LEGAL STANDARDS

The County moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of ripeness, 12(b)(6) for failure to state a claim, and 12(b)(7) for failure to join indispensable parties.[10]  It is unclear whether the County's challenge to ripeness should be analyzed under Rule 12(b)(1) or under Rule 12(b)(6).[11]  The 12(b)(1) standard, which the County believes

---

[10]The County's argument with respect to joinder is that the legal owners of the Port Penn Property – who, unlike the legal owners of the Warren Property (i.e., the Warrens), are not parties to this suit – are indispensable parties. (D.I. 14 at 11 n.11; D.I. 34 at 2) The County does not argue that Toll, as the equitable owner of the Port Penn Property, lacks standing. Therefore, given my recommendation to dismiss Toll's claims on other grounds, I need not reach the County's 12(b)(7) joinder argument.

[11]*Compare, e.g., County Concrete Corporation v. Township of Roxbury,* 442 F.3d 159, 163-64 (3d Cir. 2006) (evaluating, in land use context, ripeness challenge pursuant to Rule

applies, would be more favorable to the County because, pursuant to it, I would not have to accord presumptive truthfulness to the complaint's factual allegations, nor would I be limited to consideration of the pleadings and the attachments to them. *See, e.g., Anjelino*, 200 F.3d at 87-88. Toll has not addressed whether 12(b)(1) or 12(b)(6) is applicable. In the interest of fairness to Toll as the non-moving party, and given that I do not believe my decision as to the appropriate standard affects the outcome of the analysis, I will apply the Rule 12(b)(6) standards to the County's motion to dismiss for lack of ripeness. Also, of course, I will apply the same Rule 12(b)(6) standards to the County's motion to dismiss for failure to state a claim.

Evaluating a motion to dismiss under Rule 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citation omitted). Thus, a court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

---

12(b)(6)) *and Cornell Companies, Inc., v. Borough of New Morgan,* 512 F.Supp.2d 238, 254-55 (E.D. Pa. 2007) (same) *with Huberty v. U.S. Ambassador to Costa Rica*, 2007 WL 3119284, at *1 (M.D. Pa. Oct 22, 2007) ("Because lack of ripeness impedes justiciability and thus the subject matter jurisdiction of the district court, ripeness claims should be raised in a 12(b)(1) motion to dismiss . . . .") *and Salem Church v. New Castle County,* 2006 WL 2873745, at *4 (Del. Ch. Ct. Oct. 6, 2006) (considering motion to dismiss based on ripeness doctrine under Court of Chancery Rule 12(b)(1)); *see also Anjelino v. New York Times Co.,* 200 F.3d 73, 87-88 (3d Cir. 1999) (finding that District Court should have considered "failure to exhaust" defense under Rule 12(b)(6)).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Twombly*, 127 S. Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element" of a plaintiff's claim. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). Nor is the Court obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

In reviewing a motion to dismiss, "[c]ourts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Certain additional materials may also be considered without converting a motion to dismiss into a motion for summary judgment (which generally cannot be ruled upon without providing the plaintiff a reasonable opportunity for discovery). For instance, the Third Circuit has held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* at 1196 (internal

22

citations omitted); *see also* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (2007) ("The court is not limited to the four corners of the complaint, however. Numerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.").

The general principle is that a plaintiff is entitled to notice and a fair opportunity to respond to any evidence the court might consider in reviewing a motion to dismiss. Where a plaintiff had such notice – where, for example, the plaintiff is asserting claims that rely on and are based on particular documents – it is proper for a court to consider such documents in the context of a motion to dismiss. *See Pension Benefit*, 998 F.2d at 1196-97 ("When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.") (internal citations omitted).

## DISCUSSION

I.      The Ripeness Doctrine And Finality Rule

"Ripeness, the simple question of whether a suit has been brought at the correct time, goes to the very heart of whether a court has subject matter jurisdiction." *Bebchuck v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. Ct. 2006). The related doctrine of exhaustion of administrative remedies "often serves as a precondition for a finding of ripeness." *Salem Church*, 2006 WL

23

2873745, at *4; *see also Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 434 (3d Cir.

2003) ("Where a dispute arises under circumstances that permit administrative review . . . [in

many cases] a claim will be deemed unfit for adjudication until administrative appeals have

been completed, because the administrative tribunal might work out the intricacies of an area of

law in which it enjoys special expertise.") (internal citation omitted).

Another precondition to ripeness in cases that allow for administrative review is the

finality rule, which (subject to certain exceptions) bars claims by "property owners who . . .

failed to take advantage of available, subsequent [administrative] procedures." *County

Concrete*, 442 F.3d at 164. The Third Circuit has explained the relationship between ripeness

and finality:

> Ripeness and finality in this context [administrative procedures] are closely
> related. Finality is an element in the test for ripeness. And as we have noted, the
> Court's treatment of the finality issue has involved an inquiry into the broader
> question of whether a given action is ripe for judicial review.

*University of Medicine and Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 68 (3d Cir. 2003)

(internal citations and quotation marks omitted).

Here, the County asserts that Toll's constitutional and antitrust claims should be

dismissed because they are not yet ripe. (D.I. 14 at 12) More particularly, the County argues

that Toll's federal claims are subject to dismissal because: (1) Toll failed to exhaust its rights to

take an administrative appeal from the County's decision denying the Warren and Port Penn

applications for public sewer; (2) Toll never submitted a formal application for a private sewer

system; and (3) County Council has yet to arrive at a final decision as to whether the County

will ultimately permit alternate sewer disposal options for active or recorded sewer plans outside

the Central Core for which capacity is unavailable (having allowed itself, under Resolution 06-069, 18 months from commencing construction of the Central Core transmission system to make this determination). (D.I. 14 at 12)

For the reasons explained below, I agree with the County on its first two points. I need not reach the County's third point.

A.     Toll's Claims As To Public Sewer Are Unripe

The Third Circuit has explained that "in cases involving land-use decisions, a property owner does not have a ripe, constitutional claim until the zoning authorities have had an opportunity to arrive at a final, definitive position regarding how they will apply the regulations at issue to the particular land in question." *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 597 (3d Cir. 1998) (internal citations and quotations marks omitted). This finality rule prevents courts from becoming "super land-use boards of appeals." *Id.* at 598. "Land-use decisions concern a variety of interests and persons, and local authorities are in a better position than the courts to assess the burdens and benefits of those varying interests." *Id.*

In the land use context, finality requires the exhaustion of administrative appeals. Where a property-owner applicant has "challenged the denial of a permit by an initial decision-maker but failed to take advantage of available, subsequent procedures," the governmental entity has not, as a legal matter, made a final, definitive decision. *County Concrete*, 442 F.3d at 164 (internal citation omitted); *see also Toll Bros.,* 2006 WL 1829875, at *7 ("Toll Brothers has not yet obtained a final decision [from New Castle County] on its development plans and it

25

currently may be pursuing any of the several administrative remedies available to it. Depending on which of these remedies Toll Brothers ultimately chooses, the facts underlying Toll Brothers' claim will assume a 'concrete and final form' at some time in the future."). Therefore, subject to certain exceptions noted below, in order for Toll's constitutional claims to be ripe for review by this Court, I must find that Toll exhausted the administrative remedies available to it.

The County argues that Toll failed to exhaust its administrative remedies by failing to appeal the rejection of its Warren and Port Penn preliminary plans to the Planning Board. In support of its position, the County cites to County Code § 40.31.510, which provides: "An applicant pursuing approval of a land use application who is aggrieved by a finding, decision, or interpretation of a decision maker . . . may appeal such action to the jurisdictionally approved agency pursuant to Table 40.30.110. Appeals may only be taken based upon a final decision, not the recommendation of an agency. . . ." Table 40.30.110 identifies Land Use as the decision maker with respect to major subdivision applications and the Planning Board as the entity to which appeals from Land Use's decisions are to be taken.

It is undisputed that Toll did not take an appeal to the Planning Board before filing the instant suit. Toll claims, however, that the letters it received from Special Services on October 22, 2007 (rejecting the Warren application) and November 20, 2007 (rejecting the Port Penn application) did not constitute "final decisions" by the decision maker – that is, Land Use – and, therefore, were not appealable to the Planning Board. In Toll's view, the letters it received from Special Services were, in the language of County Code § 40.31.510, merely "recommendations of an agency," and, therefore, not appealable.

I find that the letters Toll received in October and November 2007 were "final decisions"

of the decision maker, Land Use, within the meaning of § 40.31.510. It is true that these letters were printed on the letterhead of Special Services, not Land Use. However, included with one or both of the letters was a copy of the County's Sewer Capacity Policy, on which the names of both Special Services and Land Use appear, and which clearly states that "[t]he County" will not continue processing sewer plans if sewer service will be unavailable. (D.I. 11 Ex. N, R) The Policy also expressly advises that an applicant will be notified of the County's decision "via letter from Special Services." *Id.*

Toll further complains that the County's letters did not apprise Toll of its right to appeal to the Planning Board. (D.I. 17 at 19) But Toll cites no authority for a requirement of such notice. Moreover, there can be no doubt that Toll – a sophisticated developer that was represented throughout the land use process by counsel – is aware of the availability of intra-County appellate options. *See, e.g., Toll Bros.*, 2006 WL 1829875, at \*4 (dismissing similar claims by Toll for reasons including lack of ripeness and failure to exhaust administrative remedies).

In any event, even if Toll were correct and the Special Services letters should be read as mere recommendations, Toll's suit would remain premature. The finality requirement is not satisfied when a developer, unhappy with a mere recommendation of a first-level land use agency, runs immediately to court. Indeed, on this view, Toll recognized the lack of finality of the Warren decision by writing to Special Services seeking reconsideration on November 6, 2007; the lack of finality of the Port Penn decision is evident from the fact that Toll filed suit on November 13, 2007, a week before even Special Services rejected the Port Penn application. Thus, even if I were to accept Toll's view that Toll was in receipt merely of a recommendation

27

of denial of access to public sewer, I would still find, nonetheless, that Toll's suit was premature and should be dismissed.[12]

### B.   Toll's Claims As To Private Sewer Are Unripe

Toll has not alleged facts sufficient to demonstrate the ripeness of its claims as they pertain to its request to use a private sewer system to service its properties. At no point in the Amended Complaint does Toll allege that it ever submitted a formal plan – exploratory, preliminary, or record – to the County proposing that the Warren or Port Penn Properties be serviced by a private sewer option. At most, Toll alleges that it suggested in letters a private sewer alternative if public sewer access were not granted. In my view, the lack of any formal application – and, therefore, any "final decision" of denial by the County – renders Toll's claims with respect to private sewer unripe.

In the Amended Complaint, Toll alleges the following with respect to private sewer:

> Moreover, Toll presented a third alternative, offering to design and construct a state of the art Community System (the **"Community System"**). The Community System would consist of: (a.) a treatment plant to treat the sewage from the Proposed Developments; (b.) conveyance lines to transport the sewage from the Proposed Development to the treatment plant; and (c.) a disposal system having a processing capacity in excess of 100,000 gallons per day. Upon completion of construction, Toll would turn over the Community System either to the County or if it preferred, a private wastewater utility, as permitted by the Delaware Code.

(D.I. 11 ¶ 30) The Amended Complaint does contain any allegations as to when or how Toll

---

[12]Toll's argument that, even assuming it possessed an appellate right to the Planning Board, "the UDC did not provide the Planning Board with authority to grant the relief sought" (D.I. 17 at 21-22), is essentially an argument that the "futility" exception to the finality rule applies, which I address in a later section.

presented its "third alternative" Community System proposal.[13] Notably, Toll does not allege

that this alternative was ever presented to the County in a formal subdivision plan.

Nor do any of the many documents in the record before me demonstrate, or even

suggest, Toll ever submitted a formal Community System proposal. For example, Toll's

November 6, 2007 letter protesting the County's rejection of its public sewer application for the

Warren development notes only that Toll "offered to design" a Community System and had

"negotiated and is prepared to execute a wastewater service agreement" with a private utility.

(D.I. 11 ¶ 61; D.I. 11 Ex. O) Again, Toll does not allege that it ever submitted an exploratory

plan seeking private sewer via a Community System, that Special Services or Land Use or any

other County entity formally rejected a Community Sewer proposal, or that Toll appealed any

such rejection to the County's Planning Board.

While it is remains remotely possible that Toll did, in fact, submit exploratory plans

proposing private sewer – and the parties, in their pleadings, attachments, briefs, and oral

argument, simply failed to mention it – such a suggestion is not "plausible on its face" nor does

it "raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1974, 1965. The

Amended Complaint does not "state enough facts to raise a reasonable expectation that

discovery will reveal evidence of the necessary element" – in this case, evidence that Toll

exhausted administrative remedies by, at minimum, formally proposing a Community System –

and, therefore, Toll's claims as to private sewer should be dismissed as unripe. *Wilkerson*, 522

---

[13]The other two proposals involved improvements to the public sewer system and were
set out in Toll's June 9, 2005 letter to the County. (D.I. 11 Ex. E) That letter does not mention a
Community System (or any other private sewer proposal).

F.3d 315 at 321.[14]

### C.    Applicable Exceptions To The Finality Rule

While I have found that Toll's claims are unripe with respect to its theories predicated on denial of access to both public and private sewer, my finding does not end the analysis. This is because the finality rule has three types of exceptions in zoning cases, two of which are potentially helpful to Toll here.

First, a party pressing a facial challenge to a zoning ordinance, on either substantive due process or equal protection grounds, need not wait for a final decision applying the zoning ordinance to the party's particular project. *See County Concrete*, 442 F.3d at 164. "A 'final decision' is not necessary in [this] context because when a landowner makes a facial challenge, he or she argues that *any* application of the regulation is unconstitutional." *Id.* (internal quotation marks and citations omitted).[15] Because Toll appears to assert facial substantive due process and equal protection challenges to Resolution 06-069 and the Code amendments made pursuant to this Resolution, these claims are ripe and I must address them.

Second, the finality rule does not apply to an as-applied substantive due process claim

_____

[14]If I were to accept the County's invitation to apply Rule 12(b)(1) instead of Rule 12(b)(6) I would still recommend dismissal of Toll's claims with respect to private sewer. Under 12(b)(1), I would not need to presume the truthfulness of the allegations in Toll's Amended Complaint but, instead, would be free to weigh the merits of the dispute. Under this approach, based even on the limited record before me, I find that Toll never presented a formal exploratory or preliminary plan for the Warren or Port Penn Properties proposing a Community System. Thus, again, Toll's suit is premature.

[15]By contrast, as-applied substantive due process challenges – "claims that the local land-use decision was based on an erroneous application or interpretation of the local ordinance" – are ordinarily subject to the finality rule. *Sameric*, 142 F.3d at 598.

30

when the landowner alleges extreme "wrongful conduct" by the governmental entity directed at the landowner. *See id.* at 166. The Third Circuit has excused a landowner from the finality rule where the landowner claimed that relevant Township officials "deliberately and improperly interfered with the process by which the Township issued permits, in order to block or delay the issuance of plaintiff's permits, and that defendants did so for reasons unrelated to the merits of the application for the permits." *Id.* In one case, a landowner's as-applied substantive due process challenge was deemed ripe because the landowner alleged that Township officials "engaged in a campaign of harassment designed to force [it] to abandon its development;" made false accusations against the landowner, erroneously attributing reports of environmental contamination to the landowner's operations; and violated a prior agreement with the landowner. *Id.* at 167. This type of substantive due process claim does not really challenge the land use decision but, rather, is directed to the related wrongful conduct; because the claim would survive "even if the ultimate outcome of plaintiff's permit applications was favorable," it is ripe regardless of the stage of the land use process at which the wrongful conduct occurs. *Id.* at 166.

Here, while it is not entirely clear that Toll alleges the type of wrongful conduct the Third Circuit has required in order to excuse a lack of finality, I need not decide this issue. For reasons explained in the next section (relating to the asserted nature of the property right at stake), Toll's substantive due process claims (facial and as-applied) must be dismissed, even assuming the finality exceptions apply.

The final exception to the finality rule is where exhaustion of administrative remedies would plainly have been futile, generally because the administrative body the plaintiff avoided

31

had no power to provide the relief sought. *See id.* at 164. Toll claims that an administrative

appeal to the Planning Board would have been futile because "the Planning Board lacked the

authority under the appeal standards to grant relief" to Toll. (D.I. 17 at 27) In making this

assertion, Toll cites to County Code § 40.31.512, which allows the Planning Board to reverse a

Land Use decision where Land Use "made an error in its interpretation of the applicable sections

of this Chapter [i.e., Chapter 40, the UDC]; or where [Land Use's] findings and conclusions

were not the result of an orderly and logical review of the evidence and the applicable

provisions of this Chapter."

    I have considered the futility exception to the finality rule and find that it does not help

Toll. As an initial matter, I do not agree that Toll's contentions are necessarily outside the scope

of the claims on which the Planning Board may accord relief. More importantly, the Planning

Board may not agree – and it should have been given the opportunity to say so. Significantly,

Toll's futility argument is inconsistent with its interpretation of County Code § 40.05.520 (the

subject of Toll's declaratory judgment claim), which Toll interprets as giving landowners "a

right . . . to construct improvements [to the public sewer system] if public sanitary sewer service

facilities are inadequate." (D.I. 11 ¶ 127) It is possible that the Planning Board could have

agreed with Toll – and, therefore, found that Land Use's interpretation of § 40.05.520 (or some

other provision of the UDC), and application of that interpretation to Toll's properties, was

erroneous. Additionally, federal courts have a prudential obligation to avoid reaching

constitutional issues if they can be avoided. *See Jean v. Nelson*, 472 U.S. 846, 854 (1985); *see

also Spector Motor Co. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more

deeply rooted than any other in the process of constitutional adjudication, it is that we ought not

32

to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").

Planning Board review might have led to reconsideration of sewering issues relating to Toll's

properties and, so, might have mooted the constitutional issues now before me.

II.     Toll's Substantive Due Process Claims

Having found that Toll's facial substantive due process challenge to Resolution 06-069

and the subsequent County Code amendments is ripe, and further that Toll's as-applied

substantive due process challenge may be ripe given Toll's allegations of wrongful County

conduct, I must consider the merits of Toll's substantive due process claims. The Third Circuit

has found that "a legislative act will withstand substantive due process challenge if the

government identifies the legitimate state interest that the legislature could rationally conclude

was served by the statute." *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 139 (3d

Cir. 2000) (internal citation and quotation marks omitted). A valid facial challenge must assert

that the act "as a whole is arbitrary, capricious and unreasonable." *County Concrete*, 442 F.3d

at 166. A federal court "will not substitute its judgment about land use policy and thereby

undermine the legitimacy of democratic decisionmaking unless the local legislative judgment is

without a plausible rational basis." *Pace Resources, Inc. v. Shrewsbury Tp.*, 808 F.2d 1023,

1035 (3d Cir. 1987).

Yet before a court considers whether a rational basis exists to support challenged

legislative actions, a plaintiff must first "establish as a threshold matter that [it] has a protected

property interest to which the Fourteenth Amendment's due process protection applies." *Desi's

Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411 (3d Cir. 2003) (internal citation omitted).

33

Whether a particular property interest is constitutionally protected "depends on whether that interest is 'fundamental' under the United States Constitution." *Nicholas*, 227 F.3d at 140. The Third Circuit has been resistant to efforts to expand the scope of property interests that come within the protections of substantive due process. *See id.* at 141; *see also Reich v. Beharry*, 883 F.2d 239, 245 (3d Cir. 1989) (holding that service contract with the state did not qualify for due process protection). Most relevant here is the Third Circuit's holding in *Ransom v. Marazzo*, 848 F.2d 398, 411-12 (3d Cir. 1988), that "[t]he provision of water and sewer services, whether by a municipality or by a private utility company, is not . . . a federally protected right."

In light of *Ransom*, Toll argues that the property interest it is asserting is not a purported right to public sewer access but rather its right to own, use, enjoy, and develop the Warren and Port Penn properties free from unlawful interference by the County. (D.I. 17 at 34-6) I disagree. The only alleged interference with Toll's property rights is the County's denial of access to public sewer. Public sewer access is the only thing Toll formally asked for and it is the only thing the County ever formally denied. As already explained, because Toll never formally proposed a private Community System, I do not read the Amended Complaint as adequately stating a claim that the County prevented Toll from constructing, entirely at its own expense, a private sewer alternative.

Just as importantly, it is undisputed that Toll could have developed – and still could develop – its properties using individual septic systems. In fact, although it had no obligation to do so, the County explicitly advised Toll of the availability of the septic systems option in its November 20, 2007 letter rejecting the Port Penn preliminary plan. (D.I. 11 Ex. R) Likewise, in briefing and at oral argument on the instant motion, the County reiterated that septic systems

34

remain a viable option for Toll's proposed developments. *See* D.I. 34 at 12 ("Toll can develop the property using septic systems. . . ."); D.I. 38 at 17 ("[Toll] can absolutely build with septic systems right now. . . ."). Toll evidently does not want to develop its properties with individual septic systems – it has protested that such an approach is "environmentally undesirable" and "would reduce drastically the number of units [Toll is] permitted to develop under the UDC" (D.I. 17 at 17) – but it has not argued that being forced to employ septic systems is somehow unconstitutional. Nor do I see how this could be the case. While Toll has refused to state how many units it could develop if it had to use individual septic systems on the Warren and Port Penn Properties (D.I. 38 at 43), based on what Toll has stated it appears to be in excess of 300 units.[16] Although undoubtedly Toll would prefer to build the 631 units it has proposed, even Toll does not argue that it has a constitutionally-protected property interest in building more units than can be serviced by individual septic systems.

Thus, I conclude that the only interest Toll has asserted is its interest in having its proposed developments on the Warren and Port Penn Properties given access to the County's public sewer system. Because access to public sewers is not a fundamental property right within the protections of the Substantive Due Process Clause of the Fourteenth Amendment, *Ransom*,

---

[16]Toll's equitable interest in the Warren and Port Penn Properties totals 618 acres. (D.I. 11 ¶ 13) Its proposed residential subdivision, dependent on public sewer access, would result in construction of 631 new residences on the properties. *Id.* The County Code requires that lots serviced by individual septic systems be at least three-quarters of an acre to one acre in size, *see* NCC Code § 40.22.360A; *see also* D.I. 14 at 4-5, larger than the lot size Toll prefers. Toll has stated that approximately half of the acreage in its project is required to be left as open space. (D.I. 38 at 43) Although Toll's counsel told me at oral argument he had "no idea" how many units Toll could build if it had to use the larger lots required with individual septic systems, *id.*, a rough calculation under this scenario indicates that Toll could build approximately 300 such units. That is, assuming half of the 618 acres would be used as open space, there would remain over 300 acres available for homes with 1-acre lots.

35

848 F.2d at 411-12, Toll has failed to state a claim on which it could be granted relief.

Accordingly, I recommend that Toll's substantive due process claims be dismissed.

III.    Toll's Equal Protection Claim

A landowner makes a facial equal protection challenge to a land-use regulation "when it alleges that a municipality knew exactly how the plaintiff intended to use its land and the municipality passed the ordinance specifically tailored to prevent that use." *Cornell*, 512 F.Supp.2d at 258; *see also County Concrete*, 442 F.3d at 167. Toll alleges that at "[s]ome time in 2005, the County, under its new administration, secretly determined to halt the development of the [Warren and Port Penn] Properties . . . [and] embarked on a course of conduct to prevent" the properties' advancement in the Land Use process. (D.I. 11 ¶ 36) According to Toll, the County "seized the opportunity [Red Oak's] recommendation gave it of overhauling the Wastewater Management Plan" when it passed Resolution 06-069 in order to "carve[] out" a pocket of the SSSA – in which Toll's properties are located – to be excluded from access to public sewer service. (D.I. 11 ¶ 40) Thus, Toll has alleged a facial equal protection claim that is not subject to the finality rule.

Whether Toll has stated an equal protection claim on which relief may be granted (as analyzed under Rule 12(b)(6)) is another matter entirely. "[T]he first inquiry a court must make in an equal protection challenge to a zoning ordinance is to examine whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone. If, and only if, the entities are similarly situated, then the [municipality] must justify its different treatment of the two." *Congregation Kol Ami v. Abington Township*, 309

36

F.3d 120, 137 (3d Cir. 2002). If the analysis reaches the second (justification) step, the municipality can justify its different treatment of similarly-situated entities "by demonstrating that the ordinance is rationally related to a legitimate government purpose." *County Concrete*, 442 F.3d at 171.

Toll identifies six developments that it claims are similarly situated to Toll's properties. According to Toll, each of these six other developments is "situated in the County's SSSA" and have "common characteristics" with Toll's properties. (D.I. 17 at 42) However, even taking the Amended Complaint's allegations as true, one of the other developments to which Toll points – Carter Farm – is not similarly situated to Toll's properties. As alleged, Carter Farm was permitted "to proceed with a private wastewater utility." (D.I. 11 ¶ 116) As I have previously explained, the formal plans Toll submitted to the County only involved a request for access to public sewer.

Of the remaining five developments, the only one that is located in the same allegedly "carved out" portion of the SSSA as Toll's Properties – Pennfield – has also been denied access to public sewer.[17] (D.I. 17 at 43) Thus, while Pennfield may be similarly situated to Toll, there is no differential treatment between the two properties, so there is nothing that the County need

---

[17]Toll alleges that the County gave Pennfield preferential treatment by initially agreeing to defer resolving Pennfield's sewer capacity issue until the record plan stage, whereas Toll's applications were denied at the preliminary plan stage. (D.I. 11 ¶ 117) Subsequent to the filing of Toll's original complaint, but prior to the filing of its Amended Complaint, the County allegedly changed its position and rejected Pennfield's application. *Id.* According to Toll, "the County is capable of changing its mind again about the Pennfield application," *id.*, but this is mere speculation. Because what Toll wants is access to public sewer, and not simply to have its application for public sewer rejected at a later stage in the process, I find that Toll has failed to state a plausible claim that the County's treatment of Pennfield was irrationally different than its treatment of Toll.

37

justify. *See Kol Ami,* 309 F.3d at 137.

The other four developments are each located in portions of the SSSA that are either served by the existing Water Farm 1 or are planned to be served by public sewer under the County's current plans.[18] Toll alleges that each has been "permitted to gain public sewer or at a minimum obtain private sewer." (D.I. 17 at 42)

Assuming, *arguendo,* that these remaining four properties can be considered similarly situated to Toll's properties, I find that Toll cannot satisfy the second step of the equal protection test. "To state a [facial equal protection] claim, the complaint must allege *facts* supporting a finding of irrational or arbitrary legislative action by the [County]." *County Concrete,* 442 F.3d at 159. "Under rational basis review, legislation enjoys a presumption of validity, and the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. v. Pennsylvania Dep't of Educ.,* 230 F.3d 582, 586 (3d Cir. 2000). This – even giving every consideration to the Amended Complaint and materials attached therein – Toll cannot do.

Under the plausibility standard set forth by the Supreme Court in *Twombly,* I find that Toll has not "nudged [its] claim across the line from conceivable to plausible" by alleging facts supporting a finding of irrationality or arbitrariness. 127 S.Ct at 1974. Resolution 06-069 cites several reasons for its adoption, including: the findings in the Red Oak Report; the need to

---

[18]The other developments are: Silver Maple, whose developers were permitted "to connect to public sewer by constructing their own line and pump station" (D.I. 11 ¶ 114); Augustine Creek, located east of the Central Core and within one mile of Toll's properties (D.I. 11 ¶ 113); Baymont Farms, also east of the Central Core and approximately three miles south of Toll's properties (D.I. 17 at 42-3); and the Ponds at Odessa, east of the Central Core and approximately three miles south of Toll's properties, *id.*

provide a short-term wastewater treatment solution to a portion of the SSSA while the County

evaluates its long-term options; the need to further environmental stewardship; the County's

support of the establishment of more liveable communities through more effective planning; and

the need to ensure that the SSSA will be able to sustain itself financially. (D.I. 11 Ex. I) All of

these are rational, non-arbitrary reasons for dividing the SSSA into areas, designating certain

areas as priorities for public sewer access, and deeming other areas as not within present plans

to receive public sewer access. Understanding that its previous sewer plan was not feasible, it

was rational for the County to do something in the nature of reducing its obligations, which

would inevitably have the effect of making public sewer unavailable to some who, under

previous plans, would have received it. The County found itself in the unenviable position of

having to scale back its ambitions and, accordingly, it had to draw its new sewer lines

somewhere. Toll was not the only developer to lose out under the new plan; Pennfield was hurt

as well. With so many rational justifications for the County's action already supported in the

record, it is simply not plausible that, even with the benefit of discovery, Toll would be able to

negate every conceivable justification for the Resolution and the resultant re-drawing of the

SSSA sewer map. Thus, I find that Toll has failed to state an equal protection claim upon which

relief may be granted and recommend that this claim be dismissed.[19]

---

[19]Toll argues that undertaking this type of rational basis analysis in the context of a
motion to dismiss is improper. (D.I. 43 at 77-78) Toll is incorrect. For example, in *Rogin v.
Bensalem Tp.*, 616 F.2d 680, 688-89 (3d Cir. 1980), the Third Circuit affirmed a district court's
dismissal of an equal protection challenge to a zoning amendment reducing the previously-
allowed population density, even assuming the amendment disproportionately burdened the
plaintiff-developer as compared to other developers, because the decision to adopt the
amendment was not irrational. *See id.* at 689 ("That the zoning amendments burden developers
who had previously obtained construction approval more than they burden developers that may,
in the future, plan to build in an R-4 zone, does not, under an equal protection analysis, vitiate

IV.   Toll's Remaining Claims

Toll's two remaining federal claims – an alleged violation of its right to procedural due process and an antitrust claim – are subject to the finality rule and are therefore not properly before me on review.[20] Toll further seeks relief for two pendent state law claims: a claim for a declaratory judgment that Section 40.05.520 of the UDC and various provisions of the Delaware Code require the County either to provide Toll with public sewer access or permit Toll to construct a Community System, and a claim for equitable estoppel. The County argues that the Court should not retain jurisdiction over the state law claims if Toll's federal claims are dismissed, citing *State Auto Ins. Companies v. Summy*, 234 F.3d 131, 135 (3d Cir. 2000) (finding that "where the applicable state law is uncertain or undetermined, district courts should be particularly reluctant to entertain declaratory judgment actions"). (D.I. 14 at 40, n.30) I agree with the County and, therefore, recommend dismissal of Toll's declaratory judgment and estoppel claims without prejudice.

---

either the reasonableness or the legitimacy of the density restrictions. Inasmuch as we must defer to [the Township's] judgment unless we find it to be so unrelated to the achievement of the Township's objectives as to be irrational, and we do not, we hold that the district court did not err in concluding that Mark-Garner did not state an equal protection claim under § 1983.").

[20]*See Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir. 2000) ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."); *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 362 (3d Cir. 1986) (holding that antitrust claim was not ripe for review where a challenged state regulatory action was subject to modification and therefore not final); *Cooper v. Amster*, 645 F. Supp. 46, 47 (E.D. Pa. 1986) (dismissing, on ripeness grounds, plaintiff-physician's antitrust claims against employer hospital, where plaintiff had bypassed hospital's internal administrative grievance procedures).

**RECOMMENDED DISPOSITION**

For the reasons set forth above, I recommend that the County's motion to dismiss be

GRANTED and that Toll's federal constitutional and antitrust claims (Counts I- IV) be

dismissed with prejudice and that Toll's state-law claims (Counts V-VI) be dismissed without

prejudice.


Dated: June 26, 2008

_____
Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE

41